UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | C. A. No. 04-10685 GAO |
| AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | ) ) ) ) ) | |
| Defendants. | ) ) ) ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 3 PART 1 OF 4**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF KENTUCKY
LEXINGTON DIVISION

IN RE
COMPUTREX, INC.                                    CASE NO. 01-53755
    DEBTOR                                              CHAPTER 7

JAMES D. LYON, Trustee                                  PLAINTIFF
for the bankruptcy estate
of Computrex, Inc.,

V.                                          ADVERSARY NO. _____

Melinda Brown
147 Prince Street
West Newton, MA  02465

Milton Cleve Collins
9800 Flowering Grove Place
Louisville, KY  40241

Arthur Dana
24 Drayton Street, Suite 300
Savannah, GA 31401

Peter LaFleche
24 W. 60th Street, #48G
New York, NY  10023

Treffle LaFleche
147 Prince Street
West Newton, MA  02465

Edward Lindquist
5906 Marina View Court
Prospect, KY  40059

Gary Pershbacher
23829 N. 58th Drive
Glendale, AZ  85310

Ronald Schaupp
2419 Clark Station Road
Fisherville, KY  40023

Tatum CFO Partners, LLP
Serve:     Douglas Payne
           13050 E. Shangri La Rd.
           Scottsdale, AZ  85259

Jonathon Wilfong
536 Manor Ridge Dr., N.W.
Atlanta, GA  30305-3513                    DEFENDANTS

## ADVERSARY COMPLAINT

        *        *        *        *        *

Comes now Trustee James D. Lyon, through counsel, and for his Complaint against Melinda Brown, Milton Cleve Collins, Arthur Dana, Peter LaFleche, Treffle LaFleche, Edward Lindquist, Gary Pershbacher, Ronald Schaupp, Tatum CFO Partners, LLP, and Jonathon Wilfong respectfully alleges as follows:

## JURISDICTION AND VENUE

1.    This is an adversary proceeding brought pursuant to FRBP 7001 of Title 11 of the United States Code (hereinafter "U.S.C.").

2.    The jurisdiction of this case is based upon 28 U.S.C. § 1334 in that it arises under Title 11 U.S.C.

3.    This is a related proceeding under 28 U.S.C. § 157(c).

4.    Venue for this complaint is proper pursuant to 28 U.S.C. § 1409.

5.    This adversary complaint is brought under both federal law and Kentucky law.

6.    This non-core proceeding is related to the bankruptcy case,  In re Computrex, Inc., Case No. 01-53755, presently pending in the United States Bankruptcy Court for the Eastern District of Kentucky, Lexington Division.

7.    Plaintiff James D. Lyon does not object to the entry of final judgment by this Court.

### PARTIES

8.    Plaintiff James D. Lyon is the duly appointed Chapter 7 Trustee (hereinafter "Trustee") for Computrex, Inc. (hereinafter "Debtor"), whose involuntary petition in bankruptcy was filed on December 20, 2001 in the Eastern District of Kentucky, Lexington Division.    The Court entered an order for relief under Chapter 7 on January 22, 2002.

9.    Defendant Melinda Brown is a resident of Massachusetts and served on the Debtor's Board of Directors from at least 1996 through March 10, 2001.  She also served as a Board of Director of the Debtor for one day on June 28, 2001.

10.  Defendant Milton Cleve Collins is a resident of Kentucky and served on the Debtor's Board of Directors from 1999 through March 10, 2001.  He also served as a Board of

3

Director of the Debtor for one day on June 28, 2001.  In addition, Collins also served as Vice President of the Debtor from 1996 through 1997, Executive Vice President of the Debtor's logistics in division 1998, Chief Operating Officer from 1999 through 2000, and President from 2000 through March 10, 2001.

11.  Defendant Arthur Dana is a partner with the accounting firm of Lazard, Dana, Curlee, & Aikin, LLP located at 24 Drayton Street, Savannah, Georgia.

12.  Defendant Peter LaFleche is a resident of New York and served on the Debtor's Board of Directors from January 2000 through November 2000.  He is the son of Ronald LaFleche, former President of the Debtor.

13.  Defendant Treffle LaFleche is a resident of Massachusetts and served on the Debtor's Board of Directors from at least 1996 through 2001.  Part of his service included the position of Chairman of the Board.  He is the son of Ronald LaFleche, former President of the Debtor.

14. Upon information and belief, Defendant Edward Lindquist is a resident of Kentucky and served on the Debtor's Board of Directors from 2000 through 2001.  He also served as Executive Vice President from December 1999 through July 2000, Chief Executive Officer from August 2000 through bankruptcy, and Secretary during 2001.

15. Defendant Gary Pershbacher is a resident of Arizona and served as Chief Financial Officer of the Debtor from October 2000 through March 2001. He acquired this position through the Debtor's contract with Tatum CFO Partners, LLP with whom he remains employed.

16. Defendant Ronald Schaupp is a resident of Kentucky and served on the Debtor's Board of Directors from at least 1996 through 2000. He also served as Vice President of Sales and Marketing from 1996 through 1997, President from 1998 through 1999, and Chief Executive Officer, President, and Secretary from August 1999 through July 2000.

17. Defendant Tatum CFO Partners, LLP ("Tatum CFO") is a national professional services firm providing CFOs, CIOs, or CTOs, on a contractual basis to organizations undertaking significant management change. Tatum CFO's central corporate office is in Atlanta, Georgia and it has partnerships based throughout the country.

18. Defendant Jonathon Wilfong is a resident of Georgia and served on the Debtor's Board of Directors from at least 1996 through November 2000.

## **FACTS**

19.  In 1973, Ronald LaFleche and Charles Buxton[1] formed the Debtor for the purpose of auditing freight bills received from clients through a contractual relationship. Pursuant to the terms of the agreement with its clients, the Debtor received freight bills from carriers who performed services on the clients' behalf.  Those freight bills were processed and audited for correct charges, and then invoiced to the client by the Debtor.  The invoice was mailed to the client.  Upon receipt of the Debtor's invoice, the clients would remit funds by wire to the Debtor who would cut checks to pay the freight bills. Included in the funds remitted was a contractual service fee assessed by the Debtor.  This fee ranged from $.15 to $.60 per freight bill.  After cutting the checks, the Debtor would mail the checks to the carriers. Contractually, the debtor had three days from the receipt of funds to mail the carrier checks.

20.  The Debtor also earned income by investing client funds and earning interest from those funds.  This interest income was referred to by the Debtor as the "float income".

---

[1] Charles Buxton was bought out and Ronald LaFleche became the majority owner in the late 1970s.

The invested client funds were referred to by the Debtor as "float investments".

21.  In 1978, the Debtor hired Steven Thurn to prepare its tax returns.  Thurn became President and Chief Financial Officer of the Debtor in 1982, and replaced Ronald LaFleche as Chief Executive Officer in 1989.

22.  The Debtor formed Computrex Associates, Ltd. ("CA") in 1986 to provide the Debtor's shareholders with another stream of income.[2]  CA borrowed funds from the Debtor to purchase land and build an office building in Nicholasville, Kentucky.  The funds came from the Debtor's float income.  The Debtor moved into the building in 1988 and began to pay rent to CA.  Rental payments ranged from $17,000.00 to $24,000.00 per month.  The limited partners of CA received monthly distributions from income received by the Debtor.

23.  In 1988, the Debtor incorporated DI/COM, Ltd. to market a computerized early warning system and funded same in the amount of several million dollars over a five to six year period.  The money used to fund DI/COM, Ltd. was derived from the Debtor's float income.

---

[2] The Debtor was a 1% general partner and the Board of Directors and certain shareholders were limited partners.  The shareholders included Ronald and Julia LaFleche (47%), Steven and Ann Thurn (20%), Treffle LaFleche and his wife, Melinda Brown (9%), and others.

24.  The Debtor released an annual report to its shareholders in 1995 reflecting the segregation of client funds into escrow accounts.  This report was signed by Thurn as CEO and Treffle LaFleche as Chairman of the Board. In reality, only a few clients had segregated accounts as policy directed the commingling of client funds with the Debtor's own funds and the use of those funds as the Debtor's own.  This policy continued through the Debtor's bankruptcy filing.

25.  From the late 1980s through 1995, the Debtor's float investment included loans of over $1.8 million to insiders, loans to CA of over $1.7 million, and investments of over $1.2 million in DI/COM, Ltd. which had failed.  The source of these loans and investments were client funds deposited in the Debtor's general account where all funds were commingled.  The Debtor dissolved DI/COM, Ltd. in November 1996 and wrote off $1,578,806.43.

26.  The Debtor purchased Louisville Logistics, Inc. ("LLI") in 1996 and began operating under the assumed name of "Computrex Logistics".  Upon the purchase of LLI, the Debtor created two divisions:  the freight pay division in Nicholasville ("freight pay division") and the logistics division in Louisville ("logistics division").

27. In April 1999, the Board of Directors consisting of Thurn, Treffle LaFleche and then President, Ronald Schaupp, hired Crowe, Chizak and Company to perform an audit due to concerns regarding the Debtor's books and records.

28. In July 1999, Thurn directed the award of $425,000.00 in bonuses to various executives. In the summer of 1999, CA owed the Debtor $2,259,566.00 even though a 1998 appraisal of the building and grounds reflected a value of $1,956,550.00. Additionally, outstanding loans to Thurn, Ronald LaFleche, Treffle LaFleche, and others totaled approximately $1 million. Despite the fact evidence existed that the Debtor could not pay its debts as they became due, executive bonuses were paid, dividends were declared, and insider loans were not collected.

29. Steven Thurn left the Debtor in August 1999 under a separation agreement whereby he received $72,100.00 in severance pay and a stock redemption of $282,003.00. The redemption was offset by Thurn's outstanding debt of $261,973.00 with the excess given to Thurn.

30. Ronald Schaupp replaced Thurn in August 1999 as CEO and Milton Cleve Collins, a former LLI employee, was elected COO. Schaupp managed the freight pay division

while Collins managed the logistics division and accounting department. Both officers worked from the logistics office in Louisville.

31. Each division of the Debtor had separate operating accounts, account payable accounts, and investment accounts. The logistics division, however, was allowed to automatically withdraw cash from the freight pay division investment account.

32. The freight pay division was the net provider of working capital for the logistics division. Beginning in August 1999 through January 2000, one of the Nicholasville investment accounts was depleted of all of its cash under the management of Collins. This amount was approximately $10 million.

33. In September 1999, the Debtor hired Edward Lindquist as a consultant. Lindquist was hired in November 1999 as Executive Vice President for Strategic Planning. Arthur Dana negotiated his contract. Lindquist and Collins were colleagues at Integrity Music prior to their employment with the Debtor. Dana had also worked with Lindquist and Collins during their Integrity Music employ.

34. In December 1999, amendments were made to the Debtor's Articles of Incorporation and By-Laws which resulted in an increase in the number of Directors on the

Board from three to eight.  The Board of Directors then consisted of the following individuals:  Treffle LaFleche, Melinda Brown, Peter LaFleche, Ronald LaFleche, Milton Cleve Collins, Edward Lindquist, Ronald Schaupp, and Jonathon Wilfong.

35.  In January 2000, the Debtor began bouncing checks drawn on one of its Bank One accounts.  Additionally, Bank One informed Collins that the $10 million investment account had been depleted.  Simultaneously, the Debtor hired Arthur Dana as an outside accountant to perform a balance sheet audit.[3]

36.  The minutes of the February 18, 2000 meeting of the Board of Directors reflected the following:

> (A)  The Debtor had failed to build a strong accounting department.
>
> (B)  The purchase of LLI placed a further strain on management time allocation and the Debtor suffered from inefficiencies inherent in a two-location business operation.
>
> (C)  From the outside, the Debtor looked superb with record top line sales and good profits.  Below the surface, however, a major meltdown was underway.
>
> (D)  Proper financial and management information tools were not in place.

---

[3] Dana replaced Crowe, Chizak and Company.

37. In May 2000, a Restricted Stock Plan was implemented increasing the number of shares given to certain shareholders. This plan effectively diluted Ronald LaFleche's majority stock ownership from fifty-five percent to thirty-one percent.

38. On May 12, 2000, counsel for the Debtor issued a memorandum indicating that Arthur Dana believed the Debtor to be either slightly under water or just barely solvent, and that the shares of stock had very little value. *See* **Exhibit 1.**

39. On May 16, 2000, Arthur Dana informed the Debtor's counsel that the financial statement prepared for the period ending March 31, 2000 reflected a deficit net worth of $599,143.00. Dana stated that "[o]n a book basis, the company is insolvent." **Exhibit 2.**

40. On or near May 16, 2000, Treffle LaFleche, Chairman of the Board, received a letter from the Debtor's counsel acknowledging that the Debtor's certified public accountant had advised the Debtor that it was either insolvent or perilously close to insolvency to the extent that the Debtor's net worth was very small and its shares of stock had very little value. *See* **Exhibit 3.**

41. This letter also discussed concerns about the validity of the Debtor to continue to function.

35.  A special Board of Directors meeting occurred on May 16, 2000 to discuss Ronald LaFleche's allegations of mismanagement by the current Management Team.  In addition, the Board voted to implement the Restricted Stock Plan. All eight Board members were in attendance.

42.  At the meeting, Jonathon Wilfong noted that the Debtor could go into bankruptcy in the next twelve months. Board Member Peter LaFleche acknowledged that the Debtor was in a precarious position and that "the Management Team had not presented a pretty financial picture." **Exhibit 4.**

43.  On May 19, 2000 a special meeting of the Board of Directors was called at which all members were present. Collins presented a third quarter loss of $990,781.00 and a year to date loss of $1,077,438.00.  A projected loss of $2.1 million for 2001 was discussed.  It was also noted by Collins that the Debtor was paying $12,000.00 more than the normal rate to CA for the monthly rental of the Nicholasville property.

44.  On June 8, 2000, Lindquist met with an attorney to discuss potential criminal liability regarding the financial issues and practices of the Debtor.

45.  On June 20, 2000, Ronald LaFleche called a special meeting of shareholders wherein he requested the removal of all Directors, save himself.  His intention was

13

to replace current management. LaFleche's efforts failed and the number of Directors did not change.

46. On June 20, 2000, Ronald LaFleche filed suit against the Board of Directors and certain shareholders of the Debtor who received additional shares under the Restricted Stock Plan. His complaint alleged essentially that these individuals were attempting to decrease his ownership interest in the Debtor.

47. During the LaFleche suit, it was again acknowledged that the Debtor's stock had little value and the Debtor was insolvent. *See* **Exhibit 5**, June 22, 2000 memorandum.

48. On June 30, 2000, the Debtor had a net cash overdraft of $16,887,071.00 and a deficit net worth of $12,386,783.00. *See* **Exhibit 6**. The Debtor wrote off $5.6 million in logistics division receivables. Over the next year, this amount increased to $10 million.

49. On July 17, 2000, Lindquist stated in an e-mail to the Debtor's counsel that that the Debtor never had retained earnings, that all dividends paid were illegal, and that the Debtor's assets were really client monies as the Debtor may have never really made money. *See* **Exhibit 7**.

50. On July 20, 2000, Lindquist again informed the Debtor's counsel via e-mail that the Debtor's past financial records may have been manipulated to the extent that the financial records have no integrity, and that the Debtor was out of balance in one year by over $62 million. *See* **Exhibit 8.**

51. In late July 2000, several members of the Board acknowledged they may have liability in agreeing to a settlement with Ronald LaFleche.

52. Schaupp was fired at the end of July 2000 and given a compensation package of $140,000.00 plus medical coverage.

53. Lindquist was then appointed CEO of the Debtor in August 2000 and Collins was appointed President and COO. This action left the Board of Directors with seven of the required eight members.

54. In September 2000, Arthur Dana advised the Debtor it had a $17 million cash deficit as of June 30, 2000, and that he would be unable to audit the Debtor due to the condition of its books and records.

55. On or about September 6, 2000, the Debtor's management expressed its desire to continue operating even if the Debtor was insolvent. *See* **Exhibit 9.**

56.  A special meeting of the Board of Directors was called on September 6, 2000 whereby five members were in attendance.  The Board voted to approve a $400,000.00 settlement with Ronald LaFleche to repurchase his stock and forgive his outstanding debt to the Debtor in the amount of $581,202.00.  Arthur Dana advised members of the Board of Directors regarding its negotiations with Ronald LaFleche, and the manner in which to structure the settlement. Dana's overall view was to get Mr. LaFleche out of the Debtor and "worry about the tax consequences later." **Exhibit 10.**

57.  K.R.S.  271B.6-400 prevents the repurchase of stock if a corporation is insolvent. [4]

---

[4] K.R.S. 271B.6-400(3) provides:

No distribution shall be made if, after giving it effect:

(a)  The corporation would not be able to pay its debts as they become due in the usual course of business; or

(b)  The corporation's total assets would be less than the sum of its total liabilities plus (unless the articles of incorporation permit otherwise) the amount that would be needed, if the corporation were to be dissolved at the time of the distribution, to satisfy the preferential rights upon dissolution of shareholders whose preferential rights are superior to those receiving the distribution.

K.R.S. 271B.1-400(6) provides:

"Distribution" means a direct or indirect transfer of money or other property (except its own shares) or incurrence of indebtedness by a corporation to or for the benefit of its shareholders in respect of any of its shares.  A distribution may be in the form of a declaration or payment of a dividend; a purchase, redemption, or other acquisition of shares; a distribution of indebtedness; or otherwise.

16

58. In early September 2000, the Debtor prepared documents for a spin-off of the logistics division into a separate corporation.

59. The settlement with Ronald LaFleche was finalized on September 14, 2000 despite the fact that all of the defendants were aware that the Debtor was insolvent.

60. Ronald LaFleche formed REL Holdings, LLC and transferred his stock ownership in the Debtor to the LLC. The Debtor then purchased the LLC from Ronald LaFleche for $400,000.000 through CLI Development, LLC ("CLI"), a subsidiary of the Debtor set up for the payment of funds to purchase Ronald LaFleche's stock. These limited liability companies were a pretense created to avoid the appearance of a violation of K.R.S. 271B.6-400(3), though in actuality the transfer of stock did indeed violate same.

61. The settlement attempted to avoid a direct redemption of stock from LaFleche due to the insolvency of the Debtor.

62. In September 2000, the Debtor hired Gary Pershbacher of Tatum CFO to manage the Debtor's accounting department. Perschbacher replaced Collins who managed the accounting department from July 1999 through August 2000. Arthur Dana provided assistance during the November 2000 through December 2000 transition period.

17

63. One month after he was hired, Pershbacher was informed in October 2000 by Lindquist and Collins that the Debtor was losing roughly $2-3 million annually. This loss was confirmed by Arthur Dana.

64. On November 24, 2000, Debtor's counsel transmitted a letter to Lindquist outlining the reorganization of the Debtor and the spin-off of the logistics division.

65. A Board of Directors meeting was held on December 1, 2000 at which time the Board voted to give Lindquist and Collins a bonus of $46,500.00. These bonuses were awarded and accepted while each member of the Board of Directors, Lindquist, and Collins possessed knowledge of the Debtor's true financial condition.

66. The bonuses awarded were based in large part on false or inflated revenues directed or prepared by Defendants Milton Cleve Collins, Edward Lindquist, and Ronald Schaupp from 1999 through 2001 during their respective periods of employment as officers of the Debtor.

67. These false or inflated receivables also earned Collins a bonus of $85,246.00 and Schaupp a bonus of $144,149.00 in July 1999.

68. On December 14, 2000, Arthur Dana through his accounting firm issued a report ("ADC Report") to the Board

18

on the fiscal condition of the Debtor.[5]    The ADC Report
stated that the Debtor had a cash deficit of $16 million,
that the Debtor's accounting records were in "considerable
disarray", and that its bank accounts had not "been
reconciled to the books in many years."    The ADC Report
further stated that the Debtor had a stockholder deficiency
of $12,386,783.00, a net cash overdraft of $16,887,783.00,
and that the logistics division accounts receivable
reflected a write-off of $5,650,046.00 arising in part from
double billings and unsupported transactions.    The ADC
Report determined that the Debtor was "surviv[ing] on the
'float time' in the mail and banking system, i.e. the time
between a check being placed in the mail and the time it is
presented to the bank for payment," so that "cash received
today is used to cover checks issued days ago."    Specific
recommendations were given to management in the ADC Report
to rectify the accounting reporting and management issues,
but the report did not provide a recommendation as to
restructuring alternatives.    **Exhibit 6.**

    69.  By the end of 2000, checks cut by the Debtor took
nine days to clear the bank.

---

[5] The ADC Report was initially released on October 27, 2000.    Arthur
Dana has stated that the December 14, 2000 report contained no material
changes, only some minor adjustments proposed by management.