UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE,<br><br>Plaintiffs,<br><br>v.<br><br>AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA,<br><br>Defendants. | C. A. No. 04-10685 GAO |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

**EXHIBIT 3 PART 2 OF 4**

70. Included in the financial disarray was the abandonment by Collins of the Debtor's company policy regarding payment of employee American Express accounts. According to company policy, each employee was responsible directly to American Express for all charges on his or her respective card. Collins directed his subordinates in accounting to have the Debtor pay American Express directly for the charges on his employee card.

71. As a result, the Debtor unknowingly paid American Express $155,916.81 for personal expenses charged by Collins and $77,258.99 for cash advances acquired by Collins. Collins also received from the Debtor $91,707.98 in expense reimbursements for improper charges to his American Express account. He also improperly received $3,650.00 in car allowances despite the fact the Debtor was paying the lease on his company Mercedes. Collins declined to reimburse the Debtor for these improper payments.

72. Collins also ignored the Debtor's policy on employee reimbursements which required supervisory approval before the Debtor paid an employee based on the submitted reimbursement form. Pursuant to policy, Collins should have obtained Edward Lindquist's signature on his reimbursement forms prior to receiving payment for same.

20

This was to ensure the reimbursements were for legitimate work expenses.

73. Instead, Collins directed his subordinates in the accounting department to reimburse him without the proper authorization to avoid review of his expenses. As a result, he received $32,141.45 in unauthorized expense reimbursements, and $47,676.77 for expense reimbursements lacking proper receipts or support.

74. In order to delay financial collapse, the defendants solicited money from the Debtor's clients to pay for the debts of other clients. The funds were solicited by mailing invoices to the clients after their respective freight bills had been audited. Clients would then mail or wire the solicited funds to the Debtor.

75. The defendants knew that the solicited funds would not be applied to these clients' freight bills. Instead, the funds solicited through the mail would be used to pay the freight bills of clients whose money the defendants had already spent. This practice constituted a Ponzi scheme.

76. On December 14, 2000, Lindquist sent a memorandum titled "Project Merlin" to Treffle LaFleche and Melinda Brown for the express purpose of outlining a spin-off of

21

the logistics division.[6] This memorandum highlighted the following:

> (A) The Board of Directors knew of the cash deficit as early as February 2000.
>
> (B) There was no way to sell the company out of the loss situation.
>
> (C) Clients could not be eliminated because the Debtor needed client funds to operate.
>
> (D) A logistics division spin-off would not have the baggage of a cash-deficit.
>
> (E) Logistics division clients would be protected from the Debtor's anticipated financial failure.
>
> (F) If bankruptcy occurred, creditors of the Debtor could challenge the spin-off.

**Exhibit 11.**

77. Pershbacher was a facilitator in preparing the Merlin budget fiscal year 2001.

78. In an effort to defend against a trustee in bankruptcy due to its insolvency, the Debtor sought legal advice as to how to protect itself and the new companies. Debtor's counsel advised the Debtor that there could be no overlaps between the two corporations with respect to Board membership, management, or employees.

---

[6] Computrex International, Inc. and CX-IT, Inc. were the entities formed as a result of the spin-offs under Project Merlin.

22

79. A January 5, 2001 Board memorandum reflected the following:

> (A) An investment in sales infrastructure will result in a projected loss of $2 million for 2001, and the working capital to fund the current business plan was not available.
>
> (B) Potential clients were demanding to review the Debtor's financial statements before agreeing to move their business to the Debtor.
>
> (C) Based on the current financial situation, Chapter 11 bankruptcy was an unlikely possibility and that the company would be put in Chapter 7 liquidation.
>
> (D) A bankruptcy initiative would immediately harm clients and creditors to the extent of the net overdraft at that particular time.
>
> (E) Not only would the company be open to claims from the "overdraft creditors", but also to potentially larger claims from logistics clients where bankruptcy by Computrex would have serious operational effects upon the clients' supply chain.
>
> (F) Bankruptcy would make the shareholders' stake in the company worthless.
>
> (G) "By each company maintaining its own client/creditor base, should one company fail, the other company's clients and creditors are protected...Shareholder risk is reduced. If one company were to fail, they would still have stock in the other."

23

>   (H) "It is clear given the loss of sales momentum coming into the fiscal year...and the lack of investment capital, we do not have the ability to sell our way out of the loss situation (which was the foundation of the approved plan)."
>
>   (I) "The current contracts have pricing that would make them unprofitable even with improved efficiencies," but the clients cannot be eliminated "because we need the float income."

**Exhibit 12**.

80. On January 16, 2001, the Debtor's counsel prepared a memorandum admitting that the Debtor was in a "financially precarious position" and that the interests of the Debtor may become adverse or at least incompatible with the interests of the new corporation to be named Computrex International, Inc. ("International") and be comprised of the Debtor's logistics division. The memorandum further stated that the adverse interests of the stockholders/lenders of the Debtor presented a "real conflict" with those of International. Counsel acknowledged that a future trustee in bankruptcy may find an "ethical conflict" in the firm's representation of both entities. The memorandum concluded with a commentary by counsel that the advice "might be different if the financial position of these two companies were considerably

24

sounder...[b]ut, here that is not the case, and we must be wary of the consequences." **Exhibit 13.**

81. The Board of Directors did not seek separate counsel or request that its counsel cease representation of what would become the new corporation. Instead, the Board willing permitted its counsel to continue to represent both the Debtor and International despite the existing conflict.

82. In January 2001, Bank One again began contacting the Debtor regarding a continuous stream of overdrafts on the Debtor's accounts. These overdrafts resulted from the fact that the Debtor already spent the money solicited for freight carrier bills, and the anticipated funds from other clients coming in to cover those checks had not yet arrived. On February 1, 2001, the Debtor slowed down the release of carrier checks due to Bank One complaining of overdrafts of as much as $1 million. In response to Bank One's concerns over the sizeable overdraft, Pershbacher instructed Christa Corbin to release only checks equal to funds in the bank at the end of each day, and that she would need to communicate with Lindquist as to which checks to release.

83. By February of 2001, an average of thirteen days would elapse between the time the Debtor cut a carrier's check and it cleared the bank. The increase in clearance

time was a result of the officers directing the employees to place checks in a cue until there was sufficient funds in the Bank One account to cover the cut checks. Simultaneously, the Debtor posted on its website the date each freight carrier's check was cut to give the false impression that it had already been sent to the carrier.

84. Mercer Capital Management, Inc. ("Mercer"), an entity employed by the Debtor for valuation services, valued the logistics division of the Debtor on February 10, 2001 at $421,000.00. Pershbacher prepared the pro-forma financials attached to this valuation.

85. Through February 14, 2001, the cash deficits continued to grow and Pershbacher raised with Lindquist and Collins a "breach of contract" issue created by the holding of carrier checks.

86. On March 9, 2001, Mercer prepared a valuation of the logistics division at $84,000.00.[7]

87. On March 10, 2001, International and CX-IT, Inc. ("CX-IT"), a second spin-off company, were officially formed through the issuance of one share of International and CX-IT stock for every share of the Debtor's stock held

---

[7] On February 26, 2002, Mercer explained that it gave two different valuations of the logistics division because the first report assumed that certain assets and liabilities would be transferred to the new company, and the second report assumed that no assets or liabilities would be transferred to the new company.

26

by each shareholder. The Board of Directors for International consisted of Melinda Brown, Treffle LaFleche, Milton Cleve Collins, and Edward Lindquist who became CEO. The Board instructed the Debtor's counsel to prepare all documents relating to the new arrangement between the sister companies and the Debtor.

88. CX-IT's purpose was to provide technological assistance to the Debtor through the service of all of the Debtor's computers including but not limited to, software updates, hardware maintenance, and technology difficulties. CX-IT was the former IT department of the Debtor. Lindquist was the CEO and sole director of CX-IT. The Debtor provided $158,000.00 to CX-IT for start up costs and payroll. Between June 2001 and December 2001, the Debtor paid CX-IT over $500,000.00 for services performed by its former IT department.

89. The spin-off left the Debtor holding only the freight pay division and the multi-million dollar cash deficit. The Board of Directors consisted only of Treffle LaFleche and Lindquist who remained the Debtor's CEO.

90. At or near this time, clients of the Debtor began requesting copies of the Debtor's financial statements. When asked by Lindquist as to how to respond to these requests, Arthur Dana replied as follows:

27

> The Company's position is so bad that anyone receiving the statement would not continue to extend any credit or advance funds. I think that you are best served standing on the principal that you are a private company and do not give out the financial statements. A good bluff beats a losing hand every time!

See **Exhibit 14**.

91. By March 16, 2001, the Debtor's balance sheet showed a negative equity of $14,935,888.00.

92. Despite the fact that the logistics division was valued at $421,000.00, the Debtor sold to International during the spin-off, the logistics division for $84,000.00 and certain computer software for $34,883.00. The Debtor also agreed to provide International with a $250,000.00 revolving credit line. The funding for this line of credit was actually the perpetual solicitation of funds by mail through the Ponzi scheme from the Debtor's clients. The Debtor never received cash from International regarding the customer contracts or the computer equipment. Instead, promissory notes were exchanged.

93. Computrex International Services, Inc., which held the permits and licenses for the logistics division, was transferred to International for no value in early March 2001. Without these permits and licenses, International could not legally operate.

94. The Debtor then entered into a series of agreements with International and CX-IT to provide services such as accounting and human resources, and leases for office equipment and furniture.

95. Notwithstanding the Debtor's historical problems, current losses, and the fact that it was insolvent and could not pay its own debts as they became due, the Debtor willfully became a creditor of International and transferred cash and assets to it.

96. The Debtor's Board of Directors gave International the Debtor's "d/b/a Computrex Logistics" name as well as the Debtor's vendors and goodwill. Since almost all vendor accounts were set up as "Computrex Logistics", International was not required to provide financial information to vendors to set up accounts. The Debtor received nothing in exchange.

97. On March 16, 2001, Pershbacher sent a memo to Collins, Lindquist, and Dana stating that the Debtor was losing $200,000.00 per month, and faced a growing shortfall in working capital. Soon after he sent another letter to Collins and Lindquist indicating that the continued operations of the Debtor could result in increased losses to the clients.

29

98. On March 29, 2001, the Debtor and Dana met with the Debtor's counsel to discuss whether the Debtor should prepare for bankruptcy.

99. Pershbacher intended to leave the Debtor at this time. Due to the Debtor's inability to find a replacement, Pershbacher stayed on until May 4, 2001. He then assisted the Debtor in transitioning his position to someone in Arthur Dana's accounting department who then served as a consultant to the Debtor.

100. When questioned by Ivex Packaging, a client of the Debtor, regarding the delay of freight payment checks to the carriers, Pershbacher deflected the concern by stating the Debtor had "an internal control problem."

101. The Debtor, International, and CX-IT were not prepared for the spin-off. Most client funds for International were deposited in the Debtor's commingled bank accounts. Members of the Board of Directors have admitted that International used the Debtor's funds to operate. International expenses were paid by the Debtor and International could draw funds from the Debtor's investment account.

102. Throughout the summer and fall of 2001, the Debtor spent thousands of dollars in accounting fees untangling the accounting mess created by the spin-off. In

May 2001, an employee of the Debtor's accounting department sent a spreadsheet to International detailing over $2.3 million in funds owed to the Debtor. In September 2001, this amount was reduced to $789,197.20 and a promissory note was executed between International and the Debtor. See **Exhibit 15**. The money loaned to International upon which this debt was based came from the Debtor's clients in the same manner that the Debtor acquired new funds to pay its clients' freight carriers.

103. The Board of Directors permitted the Debtor's counsel to represent both companies in this commingling debacle despite being fully aware this arrangement created a conflict of interest.

104. In May 2001, the Debtor began a series of Board meetings with additional bankruptcy counsel. In July and August 2001, Collins and Lindquist received a bonus of $195,000.00 each for the orchestrated spin-off of International. These bonuses dwarfed the previous awards of December 2000 despite the fact the Debtor was in an even more perilous financial condition.

105. By May of 2001, an average of nineteen days elapsed between the time the Debtor cut a freight carrier's check and it cleared the bank.

106. Pershbacher left the Debtor on May 4, 2001. Arthur Dana assisted the Debtor in interviewing his replacement. During this time, Dennis Zulu, and employee of Dana's accounting firm, handled the Debtor's daily transactions, and monitored the inventory of held checks. Simply put, Zulu monitored the float. Zulu
the duties of Christa Corbin after her departure.

107. In August 2001, Dana informed Lindquist that none of his accounting firm's recommendations were implemented to correct the Debtor's numerous accounting problems and that he was horrified by the lack of attention that the Debtor's accounting department paid to the spin-off of the logistics division. Dana pointed out that no books existed on International until more than fifty days after the spin-off.

108. By October 2001, the Debtor faced a cash deficit of $23 million. Checks cut by the Debtor did not clear the bank until nearly twenty-three days after issue. This clearance date had steadily increased throughout the year.

109. From 1999 through 2001, the Debtor was involved in a contract dispute involving General Warehouse and Transportation Co. ("General Warehouse") and Cosco, Inc.

("Cosco"), main clients of the logistics division.[8] After the spin-off in March 2001, Cosco became a client of International. In order to financially benefit International, General Warehouse remained with the Debtor because of the contract dispute even though it was a logistics division client.

110. Throughout the summer and fall of 2001, the dispute was negotiated and settled by International employees acting on behalf of the Debtor. As part of a global settlement involving the Debtor, International, General Warehouse, and Cosco, the Debtor agreed to pay General Warehouse $300,000.00 through a new warehouse lease. Upon information and belief, the Debtor never intended to use the storage space provided in the General Warehouse lease. International then entered into a lucrative contract with Cosco as a result of the global settlement. The Board of Directors permitted the Debtor's counsel to represent both the Debtor and International in the dispute and settlement. According to its invoices, the Debtor's counsel billed the Debtor for all legal fees associated with this matter except for several minor entries.

---

[8] In 2000 and 2001, the Debtor wrote off over $8.7 million in receivables from General Warehouse & Cosco. This write-off occurred despite the fact that the Debtor had a $17 million cash deficit.

33

111. At a November 27, 2001 meeting, the Debtor's Board of Directors voted to implement a wind down procedure to dissolve the company.

112. During its severe financial difficulties from August 1997 through December 1999, the Debtor presented shareholder dividends individually to Milton Cleve Collins in the amount of $29,700.00, to Treffle LaFleche in the amount of $12,727.20, and to Ronald Schaupp in the amount of $470.00. Melinda Brown and Treffle LaFleche also jointly received $33,722.50 in dividends. Other shareholders received a total of $440,501.51. The Debtor also presented to each shareholder at the time of the spin-off, one share of stock in International and CX-IT, respectively, for every share of the Debtor's stock held by the shareholder. Ironically, the shareholders were receiving stock in companies which were started with the Debtor's own money, and all assets held by the spin-off companies were former assets of the Debtor which received only promissory notes in exchange for same.

113. During the severe financial difficulties of the Debtor, certain defendants were compensated as members of the Board of Directors in the following total amounts: Melinda Brown - $7,500.00; Peter LaFleche - $5,870.00;

34

Treffle LaFleche - $60,532.86; Ronald Schaupp - $7,500.00; and Jonathon Wilfong - $5,000.00.

114. The Debtor continued to use the mail to solicit client money despite being aware that bankruptcy was inevitable due its atrocious financial condition. On December 20, 2001, five creditors of the Debtor filed an involuntary Chapter 7 petition for bankruptcy against the Debtor. At the time the involuntary petition was filed, the Debtor had a shortfall of $25,419,257.36. Over $23,000,000.00 of this shortfall consisted of funds owed to clients whose freight carriers had not been paid despite the fact that the clients had either mailed or wired to the Debtor the solicited funds.

115. On January 6, 2002, Dana prepared a letter to Lindquist in which he stated that had the Debtor agreed to liquidation on June 30, 2000, the "liquid assets, net of carrier liabilities would have produced a shortfall of $17,536,636." By June 30, 2001, the shortfall had increased to $22,495,968.00.

116. Due to the Ponzi scheme in play, the amounts owed to clients by the Debtor in June 2000 were not the same amounts owed in June 2001. Some clients' carriers had been paid in full while other new clients had been solicited. Some clients' carriers were owed money in June 2000, and

35

were still owed money at the time the involuntary petition was filed. In other words, the Debtor had completely repaid the client money due under the June 2000 shortfall with new funds solicited under the Ponzi scheme.

117. The Debtor filed its Schedules and Statement of Financial Affairs on January 22, 2002 and did not contest the bankruptcy.

## ALLEGATIONS

### COUNT ONE – BREACH OF FIDUCIARY DUTY TO CORPORATION

118. Plaintiff incorporates all previous paragraphs.

119. As members of the Board of Directors, Melinda Brown, Milton Cleve Collins, Peter LaFleche, Treffle LaFleche, Edward Lindquist, Ronald Schaupp, and Jonathon Wilfong had a fiduciary duty to act in good faith, on an informed basis, and in a manner the Board honestly believed was in the best interest of the corporation pursuant to K.R.S. 271B.8-300.

120. The acts described are failures to exercise diligence, care, and skill which an ordinarily prudent person have exercised under similar circumstances in a like position, and are breaches of each director's statutory and fiduciary duty.

121. The continuation of the Debtor's business during insolvency based on the Ponzi scheme, the Ronald LaFleche

36

settlement, the award of improper bonuses, the improper distribution of shareholder dividends in the form of cash and shares of stock in International and CX-IT, the acquiescence given to Debtor's counsel to represent the Debtor and parties having adverse interests with the Debtor in matters involving those parties, and the spin-off of International and CX-IT eventually led to the demise of the Debtor, raided the Debtor's coffers, and was a predicate to the filing of the involuntary bankruptcy petition by five of the Debtor's creditors.

122. The Board's actions caused direct, proximate, and foreseeable damage to the Debtor.

123. The Board's actions were intentional, oppressive, malicious, wanton, fraudulent, and with reckless disregard, thereby entitling Plaintiff to punitive damages. The Board's actions were also grossly negligent and entitle Plaintiff to punitive damages.

124. Each member of the Board of Directors approving these acts is jointly and severally liable to the corporation for the loss caused by the breach as follows:

(a) the continuation of the Debtor's business during times of insolvency based on the Ponzi scheme - $25,419,257.36;

(b) the Ronald LaFleche settlement - $981,202.00;

37

(c) the award of improper bonuses - $711,895.00;

(d) the improper distribution of shareholder dividends in the form of cash - $561,651.21;

(e) the improper distribution of shareholder dividends in the form of shares of stock in International and CX-IT - $947,197.20;

(f) the spin-off of International - $789,197.20;

(g) the spin-off of CX-IT - $158,000.00.

125. Each member of the Board of Directors receiving fees for their services on the Board should be disgorged of same in the following amounts: Melinda Brown - $7,500.00; Peter LaFleche - $5,870.00; Treffle LaFleche - $60,532.86; Ronald Schaupp - $7,500.00; Jonathon Wilfong - $5,000.00.

**COUNT TWO - BREACH OF FIDUCIARY DUTY TO CREDITORS**

126. Plaintiff incorporates all previous paragraphs.

127. At the time a corporation appears insolvent, the fiduciary duty of a Board of Directors shifts from just the corporation and the shareholders to include the creditors of the corporation.

128. As members of the Board of Directors, Melinda Brown, Milton Cleve Collins, Peter LaFleche, Treffle LaFleche, Edward Lindquist, Ronald Schaupp, and Jonathon Wilfong had a fiduciary duty to act in good faith, on an

38