UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C. A. No. 04-10685 WGY |
| AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**EXHIBIT A**

**DIRECTORS' AND OFFICERS' LIABILITY INSURANCE**

# CHAPTER 12A

# DIRECTORS' AND OFFICERS' LIABILITY INSURANCE

by
Dan L. Goldwasser and Alan A. Harley*

---

## SYNOPSIS

§ 12A.01   Introduction
            [1]   Purpose and Extent of Coverage
            [2]   Nature of Directors' and Officers' Liability Insurance
§ 12A.02   History of Directors' and Officers' Insurance
§ 12A.03   Liability of Corporate Directors and Officers
            [1]   Introduction
            [2]   Duty Of Care
                  [a]   Reliance On Corporate Officers and Employees
                  [b]   Reliance On Legal Or Expert Advice
                  [c]   Reliance On Committee Reports
            [3]   Duty Of Loyalty
            [4]   Enforcement of Liability
            [5]   Contribution
§ 12A.04   State Regulation of Director and Officer Liability and D&O
            Insurance
            [1]   State Corporation Laws
                  [a]   Limitations on Liability
                  [b]   Limitations on Indemnity
            [2]   Insurance Regulation
                  [a]   Regulation of Pricing
                  [b]   Regulation of Cancellations and Non-Renewals

---

* Solinger, Grosz & Goldwasser, New York, New York. The authors wish to thank Stacy M. Leopold and Laura S. Kim for their assistance in the preparation of this chapter.

    [3]  Insured's Duty To Cooperate
    [4]  Defense Agreements
    [5]  Settlement
§ 12A.08  Other Significant Clauses
    [1]  Notice
    [2]  Subrogation
    [3]  Cancellation
    [4]  Other Insurance
§ 12A.09  Applications for D&O Insurance
    [1]  Required Information
    [2]  Effect of Material Misrepresentations
    [3]  The "Innocent" Director or Officer
    [4]  Specific Questions
        [a]  Declined Insurance
        [b]  Mergers, Acquisitions and Public Offerings
        [c]  Accuracy of Filings and Financials
        [d]  Potential Claims
§ 12A.10  Negotiating D&O Coverage
    [1]  In General
    [2]  Understanding the Underwriter's Perspective
    [3]  Completing the Application
    [4]  Meetings with the Underwriter
    [5]  Areas Open for Negotiation
        [a]  Retroactive Coverage
        [b]  Self Retention and Co-Insurance
        [c]  Covered Persons
        [d]  Exclusions
        [e]  Extended Discovery

## § 12A.01   Introduction

### [1]—Purpose and Extent of Coverage

Directors' and officers' liability insurance ("D & O" insurance) protects corporate directors and officers from third-party claims made against them in their capacities as directors and officers for certain breaches of their duties to their corporations and its shareholders. Demand for this type of insurance, and concomitantly its cost, has increased in recent years as new statutes and case interpretations of officers' and directors' duties to their corporations have increased their exposure to potential liability and brought about high litigation costs.

A corporations's ability to indemnify its officers and directors, whether from the corporation's coffers or through insurance, is

governed for the most part by state corporation laws. In response to the explosion of litigation against corporate officers and directors, many state legislatures have amended their state's corporation laws to limit officer and director liability and/or to expand the corporation's ability to indemnify its officers and directors. State regulation of officer and director insurance plays an important role in assuring officers and directors of adequate coverage.

The policy format of D & O insurance differs from other types of liability insurance, as it is a two-part format—with one part directly insuring the officers and directors if there is no corporate indemnification and the other part reimbursing the corporation for any amounts that it pays to indemnify its officers or directors for covered losses.

The D & O policy provides coverage for "loss," which includes the cost of defense incurred by the insured. The insured handles his own defense and the costs are reimbursed by the insurer.

D & O insurance coverage and exclusion provisions continue to be revised as insurers adapt to court interpretations of existing provisions and to new risks created by the increasing litigation against officers and directors.

D & O insurance applications pose special problems that must be considered in answering the questions, since material misrepresentations can result in avoidance of the policy. The extent of

(Text continued on page 12A–5)

coverage and policy exclusions can be the subject of negotiation between the insured and the insurance underwriter.

### [2]—Nature of Directors' and Officers' Liability Insurance

Directors' and officers' liability insurance (hereinafter referred to as "D & O insurance") is designed to protect corporate officers and directors in the event of claims against them by third-parties arising out of their services in those capacities. It generally covers injuries caused by corporate officers acting within the scope of their duties to the corporation. D & O insurance is not designed to protect the corporation itself. Accordingly, a lawsuit alleging claims against only the insured corporation does not state claims against the officers or directors and, therefore, is outside the coverage of the policy.[1]

Officers' and directors' liability policies are designed to protect officers acting to advance the business interests of the corporation. Therefore, in a case in which former officers who were also minority shareholders acted in a manner antagonistic to the corporation's business interests, the insurer had no duty to defend them in an action by majority shareholders alleging that the former officers had acted to cripple the corporation and misrepresent its worth to a potential buyer.[2]

D & O insurance is a relatively new form of liability insurance which is still evolving. In large measure, this evolution is due to the fact that claims against corporate officers and directors have increased rapidly in both frequency and severity over the past 20 years and because the variety of those claims is rapidly expanding. These developments have also led to a significant increase in coverage litigation testing the language of existing policies which has caused insurers to revise their policy language in order to plug any loopholes created by court interpretations. This process is likely to go on for at least another decade before the language of D & O insurance policies will become standardized.

---

[1] National Bank of Ariz. v. St. Paul Fire & Marine Ins. Co., 193 Ariz. 581, 975 P.2d 711, 714 (Ct. App. 1999) (case of first impression).

*See also* Bank of Carbondale v. Kansas Bankers Sur. Co., 324 Ill. App. 3d 537, 540–542, 755 N.E.2d 543, 545–547, 258 Ill. Dec. 160 (2001) (case of first impression). The language of a D & O policy providing that the insurer would indemnify the officers and directors for any loss which they were obligated to pay, or for which the bank was required to indemnify its officers and directors, was unambiguous and did not cover the bank itself in an action by a borrower for breach of a promissory note, nor did the policy obligate the insurer to provide a defense for the bank in that action.

[2] Farr v. Farm Bureau Ins. Co. of Nebraska, 61 F.3d 677 (8th Cir.1995), applying Nebraska law.

(Matthew Bender & Co., Inc.)                                    (Rel.70–3/02  Pub.354)

Because the purchasers of D & O insurance are generally both sophisticated and financially strong, D & O insurance policies, probably more than most other forms of liability insurance, tend to be highly negotiable. This is true even in tight insurance markets such as that experienced during 1985 through 1987.[3] Indeed, many D & O insurance policies are still being issued in a manuscripted (typed rather than printed) form, although most policies today are written on standardized forms.

The market for D & O insurance has been anything but stable, with premium rates and availability gyrating wildly within a period of only a few months.[4] These great swings in the market for D & O insurance are largely the product of the following factors:

(1)  Claims against directors and officers are frequently the result of economic downturns and stock market declines;

(2)  The market for D & O insurance is relatively small, making it difficult for insurance underwriters to price their policies on the basis of prior loss data;

(3)  The laws affecting the liability of corporate officers and directors are in a state of rapid change, making it difficult for underwriters to assess the potential liability exposure of their insureds; and

(4)  There are no convenient objective criteria (such as the size of the insured corporation or the number of its officers and directors) which can realistically measure the potential risk posed by an applicant corporation.

For the foregoing reasons, the market for D & O insurance is likely to remain unstable for many years to come and there are likely to be a relatively large number of changes in the identity of insurers participating in this market each year.

## § 12A.02   History of Directors' and Officers' Insurance

D & O insurance is intended to provide corporate officers and directors with protection against suits by third-parties based upon their malfeasance in their respective capacities as corporate officers and directors. Although corporate officers and directors have long

---

[3] From 1985 to 1987 the availability of D & O insurance coverage shrank from approximately $350 million to $117.5 million and premiums increased from 300 percent to 500 percent.

See § 12A.02, below.

[4] See § 12A.02, below.

been deemed fiduciaries, owing a duty of due care to their corporation's shareholders, there was traditionally little need for this type of insurance as corporate officers and directors have long been protected by the "business judgment" rule. Under this doctrine, the courts have refused to second-guess the decisions made by corporate directors and officers.[1]

Standard "directors and officers liability insurance policies" consist of two distinct coverages: The first coverage indemnifies individual directors and officers for losses for which they are not indemnified by their corporation, and the second coverage reimburses the corporation for amounts which it is lawfully permitted or required to expend in indemnifying its officers and directors for their losses.[1.1]

Although D & O insurance has been offered since the late 1930s, there was little demand for such insurance until the mid 1960s. In many respects, the impetus behind the increasing market for D & O insurance can be traced back to the decision in *Perlman v. Feldmann*[2] (sometimes referred to as the "Newport

*(Text continued on page 12A–7)*

---

[1] For a discussion of the evolution of the business judgment rule, *see* D. Block, N. Barton and S. Radin, The Business Judgment Rule: Fiduciary Duties of Corporate Directors and Officer (Law Journal Press, 1988).

[1.1] Clark v. General Acc. Ins. Co., PR. Ltd., 951 F. Supp. 559, 560 (D.V.I. 1997), applying Virgin Islands law.

[2] Perlman v. Feldmann, 219 F.2d 173 (2d Cir. 1955), applying New York law. Perlman, a director and dominant stockholder of Newport Steel, was accountable to minority stockholders for any money he received from the sale of his shares of stock and the burden of proof was on the defendants concerning the value of the stock as well as other issues concerning the breach of fiduciary duty.

(Rel.70–3/02  Pub.354)

Steel Case"). The business community perceived that case, which received wide notoriety, as signalling an erosion of the protection afforded by the business judgment rule. The Newport Steel Case and its progeny[3] gave rise to a movement during the late 1950s and early 1960s to amend corporation laws of the various states to provide for shareholder derivative suits, by which individual shareholders could bring claims in the name of their corporation against the corporation's officers and directors for a variety of improper actions.[4] This form of derivative suit was popularized in the 1960s by Abraham Pomerantz, a New York City attorney who specialized in shareholder derivative suits against the officers and directors of large publicly held corporations.

Despite the growing threat of shareholders derivative litigation in the 1960s, sales of D&O insurance policies remained moderate throughout the decade. Joseph P. DeAlessandro, a pioneer in D&O insurance, stated at a symposium held in 1986 that even as late as the early 1970s, insurers were virtually "giving away" D&O insurance policies.[5]

Against this backdrop of legislative enhancement of derivative actions and an erosion of the business judgment rule, the increased use of the federal securities laws acted as a further catalyst for the D&O insurance market. In the early 1940s, the Securities and Exchange Commission adopted Rule 10b-5 in furtherance of the antifraud provision of the Securities Exchange Act of 1934 (the "Exchange Act"). This rule declares it unlawful for an issuer of securities to make any false or misleading statement or omission of material fact or to engage in other deceptive practices.[6] By the late 1960s, there were a growing number of

---

[3] *See, e.g.,* Miller v. American Tel. and Tel. Co., 507 F.2d 759 (3d Cir. 1974); Mckay v. Wahlenmaier, 226 F.2d 35 (D.C. Cir. 1955); Johnson v. American General Ins. Co., 296 F. Supp. 802 (D.D.C. 1969).

[4] These provisions are generally found in the rules of civil procedure and generally require that a demand be made of the corporation to bring such suits unless such a demand would be of no avail. *See, e.g.,* N.Y. Bus. Corp. Law § 7.20.

[5] Address by Joseph P. DeAlessandro, Directors' and Officers' Liability Insurance and Self Insurance, in New York City (March 12, 1986).

[6] Securities Exchange Act Release No. 3230, May 21, 1942. The rule was originally designated X-10B-5. Except for the numerical designation and its title, the Rule remains unamended since 1942. *See* A. Jacobs, Litigation and Practice Under Rule 10b-5 § 5.02 (Boardman, 2d ed. 1988 rev.).

civil cases against publicly-traded corporations based upon allegedly false and misleading statements contained in their reports filed with the Securities and Exchange Commission, their annual reports to their shareholders and their other public statements. The existence of implied civil causes of action based upon this provision were validated by the various circuit courts in the late 1960s and by the U.S. Supreme Court in 1971.[7]

In the early 1970s, the Securities and Exchange Commission also modified the requirements for corporate annual reports required to be filed with the Commission, greatly expanding their scope and requiring them to be signed by a majority of the board of directors of the reporting corporation.[8] These developments led to a rise in the number of suits under the antifraud provision of the federal securities laws, naming corporate officers and directors on the theory that they had "aided and abetted" violations of the federal securities laws by their corporation.[9] By the mid-1970s, such suits had become common.[10]

It was these developments in the corporate and the securities laws, along with a recession and a decline in the stock market triggered by the Arab oil embargo in 1974, which led to a new wave of litigation against corporate officers and directors. This increase in expensive litigation and potential liability of corporate officers and directors made D&O insurance a veritable necessity for public corporations.

In the late 1970s, litigation against corporate officers and directors remained relatively stable as economic conditions improved, and the courts temporarily placed a halt on the rapid expansion of liability under the federal securities laws.[11] As a re-

---

[7] See Superintendent of Ins. of N.Y. v. Bankers Life & Cas. Co., 404 U.S. 6, n.9, 92 S. Ct. 165, n.9 (1971).

[8] See Securities Exchange Act Release No. 9,000 (Oct. 21, 1970).

[9] The "aiding and abetting" theory was adapted from field of criminal law because the civil cause of action was implied from a criminal provision. See Brennan v. Midwestern United Life Ins. Co., 417 F.2d 147 (7th Cir. 1969); In re Union Carbide Corp. Consumer Products Business

Securities Litig., 666 F. Supp. 547 (S.D.N.Y. 1987).

[10] See, e.g., Stokes v. Lokken, 644 F.2d 779 (8th Cir. 1981); Hokama v. E.F. Hutton & Co., Inc., 566 F. Supp. 636 (C.D. Cal. 1983); Andreo v. Friedlander, Gaines, Cohen, Rosenthal & Rosenberg, 660 F. Supp. 1362 (D. Conn. 1987); Frankel v. Wyllie & Thornhill, Inc., 537 F. Supp. 730 (D. Va. 1982).

[11] During the mid-1970s the U.S. Supreme Court rendered the follow-

sult, by 1979, the market for liability insurance, including D&O insurance, began to soften. In addition, the lure of high interest rates in the early 1980s[12] caused many insurance companies to drop their rates for all lines of insurance in the hope of maximizing their premium income and portfolio earnings.

Due, in part, to the high rate of inflation and the high interest rates during 1980 and 1981, the U.S. economy went into a tailspin during the second half of 1981, from which it did not emerge until the end of 1982.[13] During this period, the U.S. stock market declined by approximately 25%,[14] causing untold investor losses and again giving rise to suits against corporate officers and directors for misleading public statements.

The new wave of litigation, however, offered a new twist. In the mid-1970s, Congress had adopted the Racketeer Influenced and Corrupt Organizations Act,[15] (commonly referred to as "RI-

---

ing securities law decisions restricting these statutes:

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375, *reh'g denied,* 425 U.S. 986, 96 S. Ct. 1395 (1976). The Court held that a private cause of action for damages will not lie under § 10(b) and Rule 10b-5 in the absence of any allegation of "scienter," that is, there is no liability for negligent conduct alone.

Rondeau v. Mosinee Paper Corp., 422 U.S. 49, 95 S. Ct. 2069 (1975). The Court held that, in accordance with traditional equity principles, a private litigant must show irreparable harm before he may obtain injunctive relief under § 13(d) of the Securities Exchange Act of 1934.

Bluechip Stamps v. Manor Drug Stores, 421 U.S. 723, 95 S. Ct. 1917, *reh'g denied,* 423 U.S. 884, 96 S. Ct. 157 (1975). The Court limited the class of plaintiffs who may maintain a private cause of action for money damages for violation of Rule 10b-5 to those who ac-

tually were "purchasers" or "sellers" of securities.

[12] The average prime rate charged by banks rose from 11.75% during early 1979 to a high of 20.35% in December 1980. It remained at levels above 15.75% until August 1982. Data from Factset Data Systems, Inc., *Average Prime Rate Charged by Banks,* EUOM 109.

[13] The Gross National Product (GNP), adjusted for inflation, declined in every quarter from the third quarter of 1981 ($3.264 trillion) through the third quarter of 1982 ($3.154 trillion). It was only in the fourth quarter of 1982 that GNP began increasing and did not reach the third quarter 1981 level again until the third quarter of 1983. Data from Factset Data Systems, Inc..

[14] The Dow Jones Industrial (Stock) Average fell from an April 1981 high of 1030.98 to an August 1982 low of 769.98. Data from Factset Data Systems, Inc..

[15] 18 U.S.C. § 1961 *et seq.*

(Rel.31–2/89  Pub.354)

CO") designed to prevent organized crime from infiltrating private businesses. This legislation not only provided for civil remedies in the event of violations of the federal securities laws, but also created private remedies permitting injured parties to recover both trebled damages and their attorneys' fees. Thus, the new wave of litigation posed an even greater threat to corporate officers and directors than that which grew out of the recession of the mid-1970s.

To make matters worse, the power of OPEC, which had sent inflation soaring in the late 1970s, began to wane while oil and gas production in this country began to boom. While this greatly contributed to the economic recovery of the United States as a whole, it weakened the economies of Texas, Louisiana, Oklahoma and other oil producing states, causing the insolvencies of literally hundreds of state and federal banks and savings and loan associations that had extended credit based upon oil and gas reserves and real estate, the values of which had been inflated by the boom in energy prices.

These developments gave rise to a new form of suit against officers and directors; namely, suits by their own corporations against them in an effort to recover the enormous losses suffered by these institutions. Typical of these suits was the action commenced in 1985 by the Bank of America against six of its former officers to recover $95 million dollars in mortgage-backed securities losses and the action by Chase Manhattan against certain of its officers to recover more than $175 million dollars arising out of the collapse of the Penn Square Bank.[16] Such suits, which sought to tap the funds represented by the plaintiff corporation's D&O insurance policy, were not well received by D&O insurers, who had been operating under the assumption that their policies were designed to protect corporate officers and directors from suits brought by third-parties and not by their own corporations.[17]

D&O insurers were also upset over a host of other new types of claims brought against corporate officers and directors, including the following:

---

[16] *See* N.Y. Times, May 5, 1985, at D2, col.1: *Negligence Suits Threaten Liability Coverage,* American Banker, March 5, 1985, at 3.

[17] These responses were vehemently expressed by London D&O underwriters at the ABA meeting held in London in August 1985.

(1)  Suits against corporate officers and directors based upon
violations of various environmental statutes, including The
Clean Air Act, The Federal Water Pollution Control Act,
The Toxic Substances Control Act, The Resource Conserva-
tion and Recovery Act and The Comprehensive Environ-
mental Response Compensation and Liability Act (frequent-
ly referred to as the "Superfund" legislation).

(2)  Litigation arising out of hostile takeover battles, which typ-
ically included shareholder derivative litigation based upon
the actions of the target corporation's management to per-
petuate itself by effectuating a wide variety of defensive
corporate changes intended to make the economics of
takeover less palatable and by paying greenmail to hostile
bidders.

(3)  Derivative actions brought by a corporation's shareholders
against its officers and directors for failing to obtain ade-
quate insurance to protect against a whole host of prob-
lems, such as products liability claims and employment dis-
crimination claims.

These new forms of suits against corporate directors and offi-
cers, together with plunging interest rates and a hostile U.S. ju-
diciary (which invariably interpreted broad policy language
against insurance companies), led insurers, both in the United
States and abroad, to re-evaluate the terms of their D&O insur-
ance policies and their premium structures. As a result, insurers
began modifying the language of their policies, adding addition-
al exclusions and tightening policy language to preclude claims
which they had long considered to be outside the scope of their
policies. The across-the-board premium hikes in D&O insurance
(as well as other lines of liability insurance) in turn caused a se-
vere capacity crisis in 1985 and 1986, prompting many D&O in-
surers to leave the D&O insurance market altogether. Those that
remained drastically reduced their available limits of liability.
Whereas at the beginning of 1984 there were approximately 30
insurance companies providing aggregate limits of liability of
$350 million, by December 31, 1984 the available limits of liabil-
ity had dropped to an aggregate of $253 million and by Decem-
ber 1985 they were down to 117.5 million.[18] Although there was
a modest gain in capacity during 1986, with the total limits of

_____

[18] Directors' and Officers' Liability
- Market Update, at 14 (Conning &
Company December 1987).

liability increasing to $240 million as of January 1, 1987, it was not until 1987 and early 1988 that the market for D&O insurance began to approach its prior level of capacity (approximately $320 million as of June 1988).[19]

Changes in the market for D&O insurance are not reflected only in the total capacity figures or in the premium levels that remained relatively constant throughout 1986 and 1987. For the most part, the changes in market capacity were the result of the advent of new and specialized insurers which entered into the D&O market. Prior to December of 1984, much of the D&O insurance written in the United States was either provided directly by London insurers or was reinsured in the London market. The collapse in the D&O market in late 1984 was, in large measure, the result of the withdrawal of these London insurers. The London insurers have now been replaced by captive insurers, principally incorporated in Bermuda, and formed by large industry groups such as American Capacity Excess, Ltd. (A.C.E.), which was formed to provide up to $50 million of excess D&O insurance, X.L. Insurance Company, Ltd, which was formed to provide up to $25 million of D&O insurance, Corporate Officers & Directors Assurance Ltd. (CODA) which was formed to provide up to $25 million of primary or excess insurance and Directors & Officers Liability Insurance Co. (DOLI) which was formed to provide up to $25 million of primary or excess D&O insurance. It has been reported that in 1987 there were at least 10 such companies with estimated premium revenues of $475 million.[20]

During this period, insurance premiums for D&O insurance rose over 300%.[21] The increase in premium rates prompted numerous other insurers to begin writing D&O insurance. By mid-1988 there were again approximately 30 insurance compa-

---

[19] Biller, *D&O Liability Pegged as Next Crisis In Insurance In Peat Marwick Survey*, Ins. Advoc., Feb. 7, 1987, at 5.

[20] Directors and Officers Liability - Market Update, at 30 (Conning & Company December 1987).

[21] The estimated volume of premiums for D&O insurance in the U.S.

rose from $.75 billion in 1985 to $1.7 billion in 1986 to $2.5 billion in 1987. Directors and Officers Liability - Market Update, at 7 (Conning & Company December 1987).

Other publications have indicated that premiums rose as much as 500-800%. *See Obtaining D&O Coverage*, + Plus, July 1988.

In addition, during 1986 and 1987, many states proposed, and a few states passed, legislation providing for caps on damages, particularly in the area of medical malpractice. For example, California enacted a $250,000 cap on awards for non-economic damages in medical malpractice cases.[88] As discussed above, Virginia was the first state to enact such legislation in the area of director and officer liability.[89]

In addition to the existing laws and regulations, there have been numerous legislative proposals designed to counter the "insurance crisis." Such proposed legislative solutions include:

(1)   limitations on punitive damages;

(2)   providing that judges, not juries, determine punitive damage awards;

(3)   providing for a separate trial for compensatory and punitive damages;

(4)   setting a cap on contingency fees for attorneys;

(5)   permitting a successful defendant to sue for costs; and

(6)   providing for sanctions against parties, attorneys and insurers for frivolous pleadings and motions.

## § 12A.05   Operative Policy Provisions

### [1]—In General

D&O insurance, while a form of liability insurance, differs from other types of liability insurance in a number of respects.

---

[88] Cal. Civ. Code § 3333.2(b).

[89] Va. Code Ann. § 13.1-692.1.

12A-57     D & O Liability Insurance     § 12A.05[1]

Perhaps, first and foremost is the unique two-part format.[1] This, of course, is an outgrowth of the limitations under corporate law regarding the indemnification of corporate officers and director. Secondly, D&O insurance generally provides for the insured to conduct his own defense. While other forms of liability insurance, on occasion, permit the insured to control the defense, in D&O policies this treatment is the norm. Lastly, it should be appreciated that D&O insurance has traditionally been, and still remains (but to a diminished degree) highly negotiable; insurers are open to negotiations regarding elimination of exclusions, extensions of coverage, modification of discovery clauses and other major changes.[2]

The structure of the insuring clauses for each part of the D&O policy are essentially the same: the insured (whether officer, director or corporation) is covered for

   (1)  any loss

   (2)  arising from any claim first made during the policy period (or discovery period or extended reporting period, where applicable)

   (3)  for any wrongful act

   (4)  committed in the insured's capacity as an officer or director.

For example, the insuring clauses of the National Union Fire Insurance Company (8/88) policy provides:

COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the company arising from any claim or claims first made against the Directors or Officers and reported to the Insurer during the Policy Period or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, except for and to the extent that the Company has indemnified the Directors or Officers. The insurer shall, in accordance with and subject to Clause 9, advance to each and every Director and Officer the Defense Costs of such claim or claims prior to their final disposition.

---

[1] See § 12A.05[2]. one of the principal D&O insurers had in excess of 130 endorsements for its D&O policies.

[2] Indeed one former D&O underwriter has confided that at one point,

Case 1:04-cv-10685-WGY    Document 29-2    Filed 07/19/2004    Page 17 of 25

§ 12A.05[2]    Law of Liability Insurance    12A-58

## COVERAGE B: COMPANY REIMBURSEMENT INSURANCE

This policy shall reimburse the Company for Loss arising from any claim or claims which are first made against the Directors or Officers and reported to the Insurer during the Policy Period or of or the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the Company, but only when and to the extent that the company has indemnified the Directors or Officers for such loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of Indemnity.

In some policies the requirement that the wrongful act be committed while acting in the capacity as an officer or director is made part of the definition of wrongful act.

### [2]—Two-Part Format

In general, D&O insurance policies are written in a two-part format. One part directly insures directors and officers for any loss not indemnified by their corporation, and is often referred to in the "directors and officers liability" part or the "direct in-demnity" part. The other part, often referred to as the "corporate reimbursement" part, insures the corporation when and if it indemnifies any of its officers for a loss. This second part of the policy does not insure the corporation for claims made directly against it, but only insures the corporation if a claim is made against an insured director or officer and the corporation indemnifies that director or officer.

The two-part format is largely historical and first appeared in the 1967 London Open Market Starge Syndicate forms ALS 4 and ALS 5. This format is intended to coincide with existing statutes which allow a corporation to indemnify its officers and directors within certain limitation and is intended to augment that indemnity, since generally greater limitations are imposed on the right of corporate officers and directors to obtain indem-nity from their corporations than from unrelated third-parties.[3]

The two-part format generally appears in one of two forms. In one form (generally encountered in older policies), the direct in-

---

[3] See supra § 12A.04[1].

(Rel.31-2/89 Pub.354)

demity part and the corporate reimbursement part are separate, each with their own definitions, exclusions and other applicable provisions. An example of a policy that uses the two distinct parts form is the 6/85 version of the National Union Fire Insurance Company of Pittsburgh policy (which has recently been replaced by a 8/88 version that uses the single policy with two insuring clauses approach discussed below). In the 6/85 National Union policy, the direct indemnity insuring clause (which is the second part of the policy) provides:

This policy shall, subject to its terms, conditions and limitations as hereinafter provided, pay on behalf of each and every person who now is or may hereafter be a Director or Officer (who are herein individually or collectively sometimes called the "Insureds") named in Item 1 of the Declarations (herein called the "Company") Loss (as herein defined) arising from any claim or claims which are first made during the policy period against the Insureds, jointly or severally, during the policy period by reason of any Wrongful Act (as herein defined) in their respective capacities as Directors or Officers.

The corporate reimbursement insuring clause provides:

This policy shall, subject to its terms, conditions and limitations as hereinafter provided, pay on behalf of the Company named in Item 1 of the Declarations (herein called the "Company") Loss (as herein defined) arising from any claim or claims which are first made during the policy period against each and every person, jointly or severally, who was or now is or may hereafter be a Director or Officer (as herein defined) of the Company, by reason of any Wrongful Act (as herein defined) in their respective capacities as Directors or Officers of the Company, but only when the Directors or Officers (herein individually or collectively sometimes called the "Insureds") shall have been indemnified by the Company for damages, judgments, settlements, costs, charges or expenses incurred in connection with the defense of any action, suit or proceeding or any appeal therefrom to which the Directors or Officers may be a party or with which they may be threatened, pursuant to law, common or statutory, or the Charter or By-Laws of the Company duly effective under such law which determines and defines such rights of indemnity.

The difference in these insuring clauses reflects the fact that the liability of a director or officer derives from the claim against him or her, whereas the only corporate liability covered is that arising out of an indemnification by the corporation of the officer or director.

§ 12A.05[2]    Law of Liability Insurance    12A-60

The newer D&O form is a policy with a two-part insuring paragraph (or two subparagraphs), with all other provisions being common.[4] Typical of the insuring clauses found in the single policy form, are those of the 8/88 version of the National Union Union policy, which provide:

## COVERAGE A: DIRECTORS AND OFFICERS INSURANCE

This policy shall pay the Loss of each and every Director or Officer of the Company arising from any claim or claims first made against the Directors or Officers and reported to the Insurer during the Policy Period or (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the company, except for and to the extent that the Company has indemnified the Directors or Officers. The Insurer shall, in accordance with and subject to Clause 9, advance to each and every Director and Officer the Defense Costs of such claim or claims prior to their final disposition.

## COVERAGE B: COMPANY REIMBURSEMENT INSURANCE

This policy shall reimburse the Company for loss arising from any claim or claims which are first made against the Directors or Officers and reported to the Insurer during the Policy Period or of the Discovery Period (if applicable) for any alleged Wrongful Act in their respective capacities as Directors or Officers of the company, but only when and to the extent that the Company has indemnified the Directors or Officers for such Loss pursuant to law, common or statutory, or contract, or the Charter or By-laws of the Company duly effective under such law which determines and defines such rights of Indemnity.

Since the retention is typically greater under the corporate reimbursement coverage than under the direct indemnity coverage some policies are structured to, in essence, compel the corporation to indemnify its officers and directors whenever possible, in order to activate the corporate coverage, with its larger deductible. In such policies, the direct indemnity insuring clause itself excludes coverage under that part where "the Company is required or permitted by law to indemnify the Directors

[4] In this latter type of form, the exclusions may be divided between those applicable only to the director and officer insuring paragraph and those applicable to both insuring paragraphs.

(Rel.11-2/89 Pub.354)

§ 12A.05[7]    Law of Liability Insurance    12A-78

A retroactive date is also often used in connection with coverage of a newly acquired subsidiary. In this context the retroactive date will be the date of acquisition. This limitation is most frequently applied to subsidiaries acquired after the initiation of the D&O policy, where coverage of the subsidiary is added by endorsement.

### [7]—What Expenditures Are Covered

#### [a]—Definition of Loss

##### [i]—In General

The principal obligation of the insurer is to indemnify the insureds against liabilities incurred as a result of their covered actions. These liabilities are generally defined by the term "Loss", which covers, among other things, judgments and settlements incurred by the insureds. Set forth below is the definition of "Loss" in the policy now being offered by Chubb, the elements of which are common to most D&O insurance policies:

Loss means the total amount which any Insured Person(s) becomes legally obligated to pay on account of each claim and for all claims in each Policy Year made against them for Wrongful Acts for which coverage applies, including, but not limited to, damages, judgments, settlements, costs and Defense Costs. Loss does not include fines or penalties imposed by law or matters uninsurable under the law pursuant to which this policy is construed.

This definition of "loss" encompasses settlements and judgments which the "insured shall be legally obligated to pay."[30.2] This limiting clause is found in most, but not all, of the available D&O insurance policies. The plain meaning of this limitation would seemingly

Paul Ins. Co., 100 N.J. 325, 495 A.2d 406 (1985).

See also Lynott v. National Fire Ins. Co., 123 Wash. 2d 678, 871 P.2d 146 (1994). A report and statements made prior to the effective date of a director's and officer's policy were irrelevant to show mental state, at the time the policy was issued, in a case involving coverage for a 'stock purchased' transaction.

[30.2] Cf. Safeway Stores, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa.,

64 F.3d 1282 (9th Cir. 1995), applying California law. Under a directors' and officers' liability policy, the plain meaning of "loss" requires that the corporation suffer some financial detriment. The company's early payout of a quarterly loss as part of a leveraged buyout was not a "loss" under the terms of the policy because neither the company owners nor its directors suffered a loss; the effect of the dividend was merely to transfer corporate profits from the owners to the shareholders.

(Matthew Bender & Co., Inc.)

preclude the insurer's liability where there has been some form of collusive settlement between the insured and the claimant. For example, should an insured make a sweetheart settlement of a covered claim with a claimant who was also a customer of the insured corporation (presumably in return for future business) this language would seemingly relieve the insurer from any duty to reimburse the insured for more than the fair value of the customer's legitimate claim. For this reason alone, insureds would be wise to secure the consent of the insurer to every covered settlement even in the absence of policy language requiring consent.

Interpretation of the "legally obligated to pay" language has arisen in cases in which the insured consents to a judgment, assigns to the claimant his rights under his liability policy in exchange for a general release or a promise that the claimant will only seek to satisfy the judgment from the insurance proceeds.[31] When the claimant seeks recovery against the insurer, he is faced with the insurer's assertion that there is no longer any legal obligation owed by the insured and, therefore, no loss to be paid by the insurer. While this might be a fair result had the insurer not previously received notice of the claim (in which event the insurer could also disclaim by reason of the insured's failure to have given notice), it is a harsh result in those cases in which the insurer has been given notice, has refused to fund the defense of the claim and has left the insured unequipped to defend. It is in such latter circumstances that some courts have held that the "legally obligated to pay" language will not absolve the insurer's indemnity obligation.[32] These cases, however, might have also been decided on the basis that the insurer had breached its duty to defend, therefore, barring it from disclaiming on this basis. It should be noted that, unlike most forms of liability insurance, D&O insurance does not normally require the insurer to defend the insured, but only to reimburse the costs of defense.

---

[31] *See:* Coblentz v. American Sur. Co., 416 F.2d 1059, 1063 (5th Cir. 1969), applying Florida law. The insurer was found liable to pay the underlying consent judgment even though the judgment stated that it "may only be satisfied from . . . insurance policies."

State Farm Mutual Auto. Ins. Co. v. Paynter, 593 P.2d 948, 953 (Ariz. Ct. App., 1979). The court found no inher-

ent fraud in a consent judgment on liability. The court held the insurer liable up to the policy limits even though neither the insurer nor the trial court had been notified of the agreement to seek recovery only from insurance proceeds. *See also* American Family Mut. Ins. Co. v. Kivela, 408 N.E.2d 805, 813 (Ind. Ct. App. 1980).

[32] *Id.*

"Loss" can be interpreted to include pre-and post-judgment inter-
est as well as court costs and the attorneys' fees of the claimant in
those situations in which those costs are customarily awarded as
a part of a judgment.[32.1] The issue of these costs, however, is most
likely to be raised when the insured(s), as a part of a settlement,
agree to pay the claimant's attorneys' fees and/or claimed prejudg-
ment interest in situations in which such additional costs would not
normally be awarded as a part of a judgment. In such cases, the
insured's largesse in negotiating the settlement might not be reim-
bursed by his insurer.

[ii]—Costs of Defense

Typical of the definitions of "defense costs" which are part of the
covered "loss" under D&O policies is the following provision found
on the National Union (8/88) policy:

"Defense Costs" means reasonable and necessary fees, costs and
expenses consented to by the insurer (including premiums for any
appeal bond, attachment bond or similar bond, but without any
obligation to apply for or furnish any such bond) resulting solely
from the investigation, adjustment, defense and appeal of any
claim against the insureds, but excluding salaries of Officers or
employees of the Company.

Several aspects of this definition should be noted. First, the
definition explicitly limits expenses to those that are "reasonable
and necessary." This recently added limitation was a reaction by
insurers to the upward spiral of defense costs. Older policies typi-
cally do not have such a limitation, although a reasonableness
standard could be implied even where explicit reference to reason-
ableness is absent.[33] Since D&O policies are typically "duty to pay"

---

**32.1** *See, e.g.,* Safeway Stores, Inc. v.
National Union Fire Ins. Co. of Pitts-
burgh, Pa, 64 F.3d 1282 (9th Cir. 1995),
applying California law. A corporation is
entitled in California to collect prejudg-
ment interest on damages collected
from its insurer under an officers' and
directors' liability policy when the in-
sured furnishes the insurer with undis-
puted data from which the loss can be
ascertained.

**33** *Cf.* Peter Fabrics, Inc. v. S.S. Her-
mes, 765 F.2d 306 (2d Cir. 1985). This
case was an admiralty case in which the
trial court applied an indemnity clause
in a stevedore agreement to award a
third-party defendant its attorneys fees
in successfully defending against plain-
tiff's claim. The third-party defendant
did not submit evidence of what fees
were actually paid, but instead presented
evidence of their attorneys' ordinary
fees. The trial court substantially re-
duced the claimed fees on the ground
that an arms' length defendant would

(as opposed to "duty to defend")[34] under which the insurer has relinquished much of its control over defense costs, the imposition of a "reasonable and necessary" limitation is an attempt to reimpose control over those costs. This provision will undoubtedly give rise to disputes between the insurer and insured over what is "reasonable and necessary" and to closer scrutiny of defense counsel's bills.

The insurer also maintains control over defense costs by requiring that all defense costs be consented to by the insurer in order to qualify for payment. As in the National Union (8/88) policy, defense costs are typically defined as those specified costs "resulting solely from . . . any claim against the insured." Thus, a claim must have been asserted against the officers or directors before the insurer will have an obligation to reimburse costs relating to the investigation, adjustment, defense or appeal thereof.[35]

One issue that may arise is whether the D&O policy covers costs associated with investigatory or administrative proceedings, such as an investigation by the Securities and Exchange Commission or other governmental body, or collateral proceedings such as a bankruptcy proceeding. For those policies that define the term "claims," an examination of that definition is crucial to the analysis. For instance, the London [86] policy defines "claim" as follows:

> "Claim" shall mean any judicial or administrative proceeding initiated against a Director or Officer in which such Director or Officer may be subjected to a binding adjudication of liability for damages or other relief, including any appeal therefrom.

---

pay no more in the defense of the claim against it. Substantially all of the disbursements were allowed. In approving the trial court's approach, the Second Circuit noted that "the issue is to determine what Massport actually would have paid as a reasonable fee under its [indemnity] contract with Italian Line." Since the trial court was not dealing with fees actually paid, the Second Circuit approved the trial court's use of a lodestar approach (developed mainly for class action type attorneys' fee awards) — that is, determining a base charge derived by multiplying the hours reasonably worked by a reasonable hourly fee and then adjusting, up or down, by factors such as the difficulty of the case, the risk of success and whether the attorney had foregone other work.

[34] For a discussion of the distinction, see § 12A.05[7][a], below.

[35] As discussed in § 12A.05[3] above, the initiation of coverage under a D&O policy may require the commencement of a judicial or administrative proceeding against an officer or director. The mere threat of legal action may not be sufficient.

(Matthew Bender & Co., Inc.)

(Rel 57–11/97  Pub 354)

This definition would seem to exclude costs associated with an SEC or governmental investigation, at least until it resulted in a judicial or administrative proceeding.[36]

For those policies in which "claim" is not a defined term, the insured might benefit from the doctrine that ambiguities are construed against the insurer, to obtain coverage for SEC or criminal investigations prior to the commencement of legal proceedings.[37]

Where a legal action is threatened but is settled prior to commencement of a lawsuit, the question arises whether the settlement and legal and investigation costs are recoverable. Under policies where "claim" is limited to an initiated judicial or administrative proceeding, a settlement of a threatened legal action (and expenses relating to such settlement) would not be covered. However, as a practical matter, if the legal action would be covered by the policy if commenced, the insured might be able to negotiate coverage from the insurer. Otherwise, it might be in the corporation's monetary interest to allow the claimant to commence the legal proceeding in order to obtain coverage, although there might be reasons for avoiding the publicity associated with the commencement of a legal proceeding. To the extent that an adjudicatory proceeding arising out of an SEC or governmental investigation would seek relief for any of the items excluded from coverage by the definition of "loss" (e.g., civil or criminal fines or penalties imposed by law), the insurer would disclaim defense coverage on the basis of that exclusion.

The typical D&O policy explicitly excludes the salaries of officers or employees of the company as reimbursable defense costs.

[36] See § 12A.05[3].

[37] See Polychron v. Crum & Forster Ins. Cos., 916 F.2d 461 (8th Cir. 1990), applying Arkansas law. The insured bank officer's legal expenses in responding to a grand jury investigation were covered. The investigation was a "claim." The court indicated in *dicta* that criminal defense costs would also be covered.

*See also* § 12A.05[3], n.9, *above,* for a discussion of cases defining "claim" to require some demand for monetary or other relief, thus possibly excluding coverage for investigations prior to commencement of legal proceedings.

*But see* MGIC Indem. Corp. v. Home State Savings Ass'n, 797 F.2d 285 (6th Cir. 1986), applying federal law. The Sixth Circuit held that a bank's settlement of a criminal claim against it, in which the bank agreed to repay fraudulently obtained funds, was not covered under its D&O insurance because no claim or demand had been asserted against the insured officers or directors. The court so held despite the fact that the settlement agreement explicitly provided that the government would not bring similar charges against the bank's directors and officers.

### [A]—Duty To Pay vs. Duty To Defend

The defense obligation under the typical D&O insurance policy differs in a number of respects from the obligation under a typical professional liability insurance policy.

Under the typical D&O policy, the insurer is only obligated to reimburse defense costs. It has no obligation, nor any opportunity, to appoint or control counsel, although the typical policy does require the insurer's consent to the insured's incurring defense costs, which consent is not to be unreasonably withheld. In the typical professional liability policy, however, the insurer has a duty to provide defense counsel and has the right to select defense counsel.

The difference between these two types of defense obligations (often referred to as the "duty to pay" and the "duty to defend", respectively) is in part, historical. When directors and officers insurance was first written, giving control of the defense to the insured was viewed as a favorable marketing strategy. At that time, defense costs for this type of insurance were modest (it was well before the explosion in litigation involving directors and officers) so the insurers were less concerned with the lack of ability to control defense costs. Due to the rise in defense costs, which can amount to a significant portion of the insurer's total exposure, at least one insurer (The Home Insurance Group) is attempting to market a policy with a "duty to defend" provision.

The existence of the reimbursement of defense costs provision is due to more than just marketing strategy, however. Most of the early D&O policies were offered to large corporations with established relationships with their outside counsel. These corporations not only wished to use their own counsel to defend them, but also had the bargaining power to insist upon this feature. In recent years, however, many of these underlying factors have changed. Policies are now being purchased by numerous small corporations (when they can get them) as well as large corporations. These smaller entities simply do not have the bargaining power to insist upon their own counsel.

The use of a corporation's regular outside counsel, however, poses problems since frequently such firms participated in the very transactions that gave rise to the claim, and in some cases gave legal advice on the very actions which gave rise to the claim. As a result, the regular outside counsel may be a likely co-defendant in the case,