UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | ) ) ) ) ) |
| Defendants. | ) ) ) |

C. A. No. 04-10685 WGY

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**<u>EXHIBIT A (PART 2 OF 2)</u>**

**DIRECTORS' AND OFFICERS' LIABILITY INSURANCE**

or at least, a witness. In either event, such counsel may be disqualified from serving as the defense counsel for the insured officers and directors. Even if this is not the case, the corporation's regular outside counsel may be required to render an opinion as to whether the insured officers and directors may or must be indemnified by their corporation. Service as counsel for such officers and directors may preclude them from advising the corporation on these issues. In view of these factors and the rising importance of controlling defense costs one might expect to see more insurers offering policies with defense obligations rather than a "duty to pay" provision.[38]

The scope of an insurer's duty to reimburse defense costs may be more limited than a duty to defend. Typically, under a "duty to defend" policy, the insurer has the obligation to provide defense counsel for all claims against the insureds as long as there is at least one claim against each insured potentially covered by the policy.[39] Thus, an insurer can refuse to defend in action only if there is no claim in the complaint that could conceivably be covered.[40] Since

---

[38] For a further discussion of the selection of defense counsel *see* § 12A.07.

[39] *See, e.g.,* Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley, 638 F.2d 670, 674 (4th Cir. 1980), applying Virginia law; Maneikis v. St. Paul Ins. Co. of Illinois, 655 F.2d 818, 822 (7th Cir. 1981), applying Illinois law; U.S. Fidelity & Guar. Co. v. Louis A. Roser Co., Inc., 585 F.2d 932, 937 (8th Cir. 1978); Previews, Inc. v. California Union Ins. Co., 640 F.2d 1026, 1027 (9th Cir. 1981), applying California law; St. Paul Fire & Marine Ins. Co. v. Parzen, 569 F. Supp. 753, 755 (E.D. Mich. 1983), applying Michigan law; Maryland Casualty Co. v. Peppers, 64 Ill. 2d 187, 355 N.E.2d 24, 28 (1976).*But see* Insurance Co. of North Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212, 1224–25 (6th Cir. 1980), *aff'd on reh'g,* 657 F.2d 814, *cert. denied,* 454 U.S. 1009 (1982), applying federal law. In this case involving asbestos litigation, the court held that defense costs could be allocated, *pro rata,* between the insured corporation and the insurer(s) based on

the relative period of time during the development of a plaintiff's asbestos-related disease that the corporation was self insured.

[40] *See:*

Maryland Casualty Co. v. Pearson, 194 F.2d 284 (2d Cir. 1952); Pepsico, Inc. v. Continental Casualty Co., 640 F. Supp. 656, 660 (S.D.N.Y. 1986).

Imperial Casualty & Indem. Co. v. High Concrete Structures, Inc., 858 F.2d 128 (3d Cir. 1988), applying Pennsylvania law. The court noted that, if the language of an insurance policy is clear and unambiguous, its ordinary meaning will be given effect and that, if ambiguities exist in the wording chosen by the insurer, then a court would interpret the ambiguous terms in a light most favorable to the insured. It stated that an insurance company was obligated to defend an insured whenever the complaint filed by the injured party was within the scope of the policy's coverage and that the burden was on the insurer to prove that the complaint was not within the scope of the policy.

the duty to defend and the duty to pay any liability of the insured are two separate duties, even if the ultimate judgment is based on an excluded claim the insurer cannot recover its defense costs from the insured.[41]

Under a "duty to pay" policy, however, most insurers have taken the position that they are obligated to reimburse only that portion of the costs of defense attributable to potentially covered claims.[42] The basis for negotiating an allocation of defense costs is discussed later in this chapter.[43]

Under a "duty to defend" type policy, the insurer may relinquish its ability to select counsel by asserting a reservation of rights or by disclaiming liability as to some of the claims asserted in the complaint.[44] In such case, the insurer may be required to reimburse

---

Wayne County Neighborhood Legal Servs. v. Nat'l Union Fire Ins. Co., 971 F.2d 1 (6th Cir. 1992), applying Michigan law. It was not necessary that there be a judgment finding the insured guilty of a wrongful act in order for the defense and settlement obligations of a directors and officers policy to be implicated. It was sufficient that there be potential liability, based on the allegations in the underlying suit.

Bowie v. Home Ins. Co., 923 F.2d 705 (9th Cir. 1991), applying California law. The insurer had no duty to defend or indemnify because the errors and omissions policies in question did not cover the actions of the insured's directors or officers in their capacity as directors or officers of another corporation.

[41] See Goldberg v. Lumber Mut. Casualty Ins. Co., 297 N.Y. 148, 153, 77 N.E.2d 131 (1948). The court noted that "whether or not the insurance company would have been under a duty to pay had the tenant prevailed in the negligence suit need not concern us [citation omitted], for it is crystal clear that — irrespective of this duty — the company had obligated itself to defend if a suit were brought against its insured alleging such injury [coming within coverage] and

seeking damages on account thereof."

[42] See below § 12A.05[7] for a discussion of allocation of defense costs.

See F.D.I.C. v. Booth, 824 F. Supp. 76 (M.D. La. 1993), applying Louisiana law. A loss-payable provision was ambiguous and had to be construed against the insurer to require the insurer to pay defense costs when they were incurred by the insured. Accordingly, legal fees incurred by the directors and officers of the insured bank in a suit filed by the FDIC were included within the meaning of "loss" as defined by the bank's D&O policy. The policy provision indicated that loss included any amount that the insured was obligated to pay with regard to legal liability, whether actual or asserted, and included costs, charges, and expenses incurred in defense of actions, suits, or proceedings and appeals.

[43] See below § 12A.05[7][a][ii][D].

[44] See U.S. Fidelity & Guar. Co. v. Louis A. Roser Co., Inc., 585 F.2d 932, 937–39 (8th Cir. 1978), applying Minnesota and Utah law; Previews, Inc. v. California Union Ins. Co., 640 F.2d 1026, 1028 (9th Cir. 1981), applying California law; Transamerica Ins. Co. v. Keown, 451 F. Supp. 397 (D.N.J. 1978), applying New Jersey law; Public Serv.

the insured for the reasonable fee of counsel selected by the insurer.[45] However, some courts have concluded that the insured is not entitled to select its own counsel despite the insurer's reservation of rights.[46]

Mut. Ins. Co. v. Goldfarb, 53 N.Y.2d 392, 442 N.Y.S.2d 422, 425 N.E.2d 810 (1981). *See also* San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y Inc., 162 Cal. App.3d 358, 208 Cal. Rptr. 494 (1984). In this case, the California Court of Appeals, in keeping with the above-cited cases, held that when the insurer reserved its right to disclaim coverage, the insured could refuse the appointed counsel, select its own independent counsel and have the insurer reimburse the cost of this independent counsel. Insurers were startled by the breadth of the court's ruling. One consequence of this decision was the addition, in 1987 of § 2860 to the California Civil Code. This section spelled out, in some detail, the circumstances that would allow an insured to reject the insurer's appointed counsel and have the insurer reimburse the costs of independent counsel.

*But see* Federal Ins. Co. v. X-Rite, Inc., 748 F. Supp. 1223 (W.D. Mich. 1990), applying Michigan law. The mere fact that a conflict of interest existed due to covered and uncovered claims in the same suit did not preclude the insurer from selecting independent counsel to defend the insured. The court rejected the rule of San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y, Inc., 162 Cal. App. 3d 358, 208 Cal. Rptr. 494 (1984), that such a conflict of interest entitles the insured to select defense counsel, whom the insurer must pay. The insured, who defended, had to bear its own fees.

**45** *Id.*

*See* Chicago Bd. of Options Exch., Inc. v. Harbor Ins. Co., 738 F. Supp. 1184 (N.D. Ill. 1990). Officers insured under a directors and officers liability policy were sued for wrongful discharge of the insured's chief enforcement counsel. The insurer refused to reimburse the insured for the amount of a settlement and associated legal expenses, on the ground that only the insured corporation itself could have been held liable to the former employee. The court held that the insurer had a duty to defend and indemnify for any claim against the officers and directors, not just those claims which had legal merit.

*Compare* Macmillan, Inc. v. Federal Ins. Co., 741 F. Supp. 1079 (S.D.N.Y. 1990). The insured corporation advanced funds for legal fees and other expenses on behalf of its former officers and directors who had been sued in connection with an attempted takeover of the corporation. Its claim for reimbursement under a directors and officers liability policy was denied by the insurer on the ground, inter alia, that the corporation had not properly granted indemnification to the officers and directors. The court dismissed the insured's complaint, holding that the corporation had failed even to allege compliance with the procedures for proper indemnification of officers and directors, and that furthermore it did not allege that the corporation was under any legal compulsion to make the payments in question.

**46** *See* Maneikis v. St. Paul Ins. Co. of Illinois, 655 F.2d 818, 825 (7th Cir. 1981), applying Illinois law. In an action against an attorney, charging the insured with fraud, false representation, breach of fiduciary duty and malpractice, the court did not believe that the insurer's

**[B]—Retention, Policy Limits and Exhaustion**

D&O policies typically provide on the declaration page for a retention, which is the initial portion of any loss that the insured must bear without reimbursement under the policy. A typical policy provision describing the retention reads:

> The Insurer shall only be liable for the amount of Loss arising from a claim which is in excess of the retention amount stated in item 5 of the Declarations, such retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regards to all Loss under Coverage A or B for which the Company has indemnified or is permitted or required to Indemnify the Insured(s). A single retention amount shall apply to Loss arising from all claims alleging the same Wrongful Act or related Wrongful Acts.

Since defense costs are, by policy definition, part of the "loss" against which the retention applies, the initial defense costs will typically be borne by the insured as the retention. The policy retention for individual officers and directors often consists of a limit for each individual officer and director and an aggregate limit for all defendant officers and directors. This may create allocation problems if, because of conflicts of interests, the officers and directors are represented by separate counsel.

Similarly, since defense costs are included in the definition of "loss" to which the policy limits apply, defense costs are included within, not in addition to, the insurer's limit of liability under the policy.[47] Thus, expended defense costs reduce the amount available

---

reservation under an exclusion for "any dishonest, fraudulent, criminal or malicious act of omisssion" raised a "conflict in the case at bar . . . serious enought to merit" the insured retaining separate counsel. *See also* American Home Assurance Co. v. Weissman, 79 A.D.2d 923, 434 N.Y.S.2d 410 (1st Dep't 1981).

[47] *See* Board of Education v. CNA Ins. Co., 647 F. Supp. 1495, 1500, 1507 (S.D.N.Y. 1986); Continental Casualty Co. v. Board of Education of Charles County, 302 Md. 516, 489 A.2d 536, 543 (1985).

See also Mashburn v. National Health-

care, Inc., 684 F. Supp. 679 (M.D. Ala. 1988); Spenser v. Comsery Corp., Fed. Sec. Rep. (CCH) ¶ 93,124 at p. 95,529 (D. Minn. 1986).

A California trial court caused a stir by holding that defense costs were not part of the limits of a D&O policy. Harbor Ins. Co. v. Frates, No. RCV 45500 (Super. Ct., San Bernardino City, March 16, 1989). However, the California Court of Appeals subsequently directed that the trial court vacate that ruling (Harbor Ins. Co. v. Superior Court, No. E006522 (Cal. Ct. App. 4th Dist. Div. 2, May 12, 1989), and the California Su-

under the policy to satisfy a judgment or to fund a settlement. Defense costs can be significant and there is a risk that the policy limits will be exhausted by defense costs before the end of the litigation. While this will not be a major concern in most cases (because the available limits tend to be large in relationship to average defense costs) it will force the insured to be "defense cost" conscious in those cases in which the insured's limits of liability are low. [47.1]

Many policies, such as the one offered by Aetna, provide that in the event that the Limits of Liability are exhausted, the insurer's duty under the policy is terminated. This provision, which is set forth below in its entirety, is designed to make it clear that the insurer has no further duties under the policy after it has expended the limits of the policy:

Exhaustion

In the event that the Limit of Liability is exhausted by the payment of Loss, any and all obligations of the Underwriter hereunder shall be deemed to be completely fulfilled and extinguished, and the Underwriter shall have no further obligations hereunder of any kind or nature whatsoever.

---

preme Court refused to review the Court of Appeals' ruling. Frates v. Harbor Ins. Co., No. S–010776 (Oct. 10, 1989).

The coverage dispute arose out of lawsuits instituted by the bankrupt Kaiser Steel Company and others against former officers and directors for alleged financial wrongdoing. The primary insurer agreed to pay the directors' and officers' defense costs, but took the position that such costs depleted the policy limits. The officer and director defendants hired a total of 17 law firms to conduct their defenses. Harbor Insurance, the primary D&O insurer, paid the costs of that defense up to its $5 million limits and then National Union, which had written an excess $5 million policy, began covering the cost. The trial court found the policy definition of "loss" to be ambiguous, and concluded that the phrase "costs . . . in the defensive ac-

tions" did not include attorneys fees. The California Court of Appeals reversed, finding that:

The trial court erroneously found the policy language ambiguous in respect to the inclusion of defense costs in the computation of the policy limits. The language being clear, there is no need to construe it or consider the expectations of the insured.

[47.1] Harbor Ins. Co. v. Frates, No. RCV 45500 (Super. Ct., San Bernardino City., March 16, 1989), *vacated sub. nom.,* Harbor Ins. Co. v. Superior Court, No. E006522 (Cal. Ct. App. 4th Dist. Div. 2, May 12, 1989). The primary $5 million policy limits had been exhausted in defense of various actions against former officers and directors of Kaiser Steel Company. A total of 17 law firms had been hired to defend those officers and directors.

If the Limit of Liability of this Policy is exhausted by payment of Loss prior to the Policy Termination Date, then this Policy shall be deemed to lapse immediately upon the date that the Limit of Liability is exhausted by payment of Loss. If this Policy is terminated pursuant to this provision, the premium shall be deemed fully earned.

While this language would seem to be superfluous since the insurer's defense obligation is only to reimburse defense costs which are chargeable against the limits of the policy, considering the tendency of the courts to interpret policies against insurers, such a provision may be necessary.[47.2]

It should be noted that this exhaustion provision does not contain the language commonly found in many professional liability policies which permits the insurer to fulfill its obligations by paying the limits of the policy to the court, thereby accelerating and extinguishing both the insurer's duty to defend and to indemnify.

The obligation of the insurer to defend the insured under a "duty to defend" type policy after the policy limits have been exhausted depends, in large measure, on the policy language. Since, historically, D&O policies have been written as "duty to pay", one must look to cases interpreting professional liability policies, which are typically "duty to defend" type.[48] Most professional liability policies written today specify the remaining duty to defend after the policy limits are exhausted.

[C]—Timing of Defense Reimbursements

D&O insurers have historically taken the position that no payment of defense costs is required (even after the retention is exceeded) until the claim is resolved, since only at that time can a fair allocation of covered amounts be determined.

This position has been rejected by several courts, which have held that an insurer is obligated to advance defense costs when incurred by the insured (rather than when paid) unless it can demonstrate that coverage is excludable. These decisions are premised on the theory that once such costs are incurred, they became "losses"

---

**47.2** *See* the discussion of the trial court's decision in Harbor Ins. Co. v. Frates, n.47 *above.*

**48** *See* Practicing Law Institute, Duty To Defend After Exhaustion of Limits, Professional Liability Insurance for Attorneys, Accountants, and Insurance Brokers 1986, 119–152.

covered by the policy which were required to be paid by the insured unless excluded.

In *Little v. MGIC Indem. Corp.,*[49] the Third Circuit found ambiguities in the policy's attempt to give the insurer an "option" to reimburse "expenses" and, applying the standard maxim interpreting ambiguities against the insurer, interpreted the policy to require contemporaneous reimbursement of defense costs.[50] The insurer had argued that a policy provision providing that the insurer ". . . may at its option and upon request, advance on behalf of the Directors and Officers, or any of them, expenses which they have incurred in connection with claims made against them, prior to disposition of such claims . . ."[51] allowed the insurer to delay payment of defense costs until the conclusion of the litigation. In analyzing the application of this provision, the court first examined the policy language regarding the insurer's duty to pay in the absence of the above-quoted provision. The insuring clause was similar to such clauses in other D&O policies, whereby the insurer agrees to ". . . pay . . . all Loss . . . which the Directors and Officers or any of them *shall become legally obligated* to pay. [emphasis added]" The policy further defined "Loss" to mean

> Any amount which the Directors and Officers are *legally obligated* to pay . . . for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgements, settlements, costs (exclusive of salaries of officers or employees), and *defense of legal actions,* claims or proceedings and appeals therefrom and cost of attachment or similar bonds. . . .[52]

[49] 836 F.2d 789 (3d Cir. 1987), *aff'g* 649 F. Supp. 1460 (W.D. Pa. 1986), applying Pennsylvania law.

[50] 836 F.2d at 794–95. Because the court based its decision upon construction of policy ambiguities against the insured, it did not need to address the District Court's alternate holding that the insurer's interpretation was unconscionable.

*See also* Gon v. First State Ins. Co., 871 F.2d 863 (9th Cir. 1989), applying California law; FSLIC v. Burdette, 718 F. Supp. 649 (E.D. Tenn. 1989); FSLIC v. Oldenburg, No. 85–1418 W. slip op. (D. Utah 1989); Okada v. MGIC Indem. Corp., 823 F.2d 276 (9th Cir. 1987), *superseding* 795 F.2d 1450 (9th Cir. 1986), applying Hawaii law; American Casualty Co. v. Bank of Montana Sys., 675 F. Supp. 538 (D. Minn. 1987), applying Minnesota and Montana law; Pepsico, Inc. v. Continental Casualty Co., 640 F. Supp. 656 (S.D.N.Y. 1986).

[51] Little v. MGIC Indem. Corp., 836 F.2d 789, 793–794 (3d Cir. 1987).

[52] *Id.* at 792.

The Third Circuit concluded that although these two provisions did not explicitly speak to the timing of the insurer's duty to pay, "the only reasonable interpretation is that this duty arises at the time the insured becomes 'legally obligated to pay'."[53]

The court then examined the extent to which the "option" provision permitted it to delay reimbursement. The court agreed with the insured's argument that since the option pertained only to "expenses" it was reasonable to interpret "expenses" to be something other than "defense costs."[54] In the court's view, the ambiguity of the option was compounded by the fact that it was worded in the affirmative (as the option to advance expenses) rather than as a reservation or limitation on its broader duty to pay as the insured become "legally obligated to pay." The court noted that the insurer could have remedied this ambiguity by defining those aspects of "loss" to which it was reserving its "option" more broadly, as it had done in the consent clause by requiring consent for all "costs, charges and expenses."[55]

In the beginning of its analysis in *Little,* the Third Circuit noted that because of the insurer's obligation "to pay" under the insuring clause of the direct liability part the policy was a "liability" policy rather than an "indemnity" policy.[56] Similarly, in *American Casualty Co. v. Bank of Montana System,*[57] the United States District Court for the District of Montana interpreted the insuring clause of the corporate reimbursement part of a D&O policy, which contained a promise "to pay," to require advancement of directors' and officers'

---

[53] *Id.* at 793.

See also McCuen v. American Casualty Co., 946 F.2d 1401, 1406–7 (8th Cir. 1991), applying Iowa law. The D&O insurer had a duty to pay legal costs when the insured directors became legally obligated to pay them, that is, when the costs were incurred. A further policy provision purporting to give the insurer the option to advance defense costs or await outcome of the litigation at best created an ambiguity.

[54] Little v. MGIC Indem. Corp., 836 F.2d 789, 795 (3d Cir. 1987). The court noted that under the principle of inter-

preting ambiguities against the insurer it was insufficient that the insurer's interpretation was reasonable, which the court found the insurer's interpretation to be. "If [the insured's] interpretation is also reasonable, the policy is ambiguous and must be construed against the insurer."

[55] 836 F.2d at 795.

[56] Little v. MGIC Indem. Corp., 836 F.2d 789, 793 (3d Cir. 1987).

See also Okada v. MGIC Indem. Corp., 823 F.2d 276, 280 (9th Cir. 1987), applying Hawaii law.

[57] 675 F. Supp. 538 (D. Minn. 1987), applying Minnesota and Montana law.

defense costs paid by the corporation under a corporate indemnity provision prior to the resolution of the litigation.[58]

In *Okada v. MGIC Indem. Corp.*,[59] the Ninth Circuit noted that: "If an action against the directors incorporates both covered and uncovered claims, the parties must apportion the costs so that MGIC need only pay for amounts generated in defense of covered claims."[60] Of course, as the Ninth Circuit also noted, if the insurer asserts application of the "dishonesty" exclusion,[61] which is applicable only upon an adjudication of "dishonesty," the insurer must advance defense costs for such claim subject to reimbursement from the insured if there is ever an adjudication of dishonesty.[62]

Notwithstanding these decisions, several courts, interpreting the same language as in *Little* and *Okada*, have recently reaffirmed the traditional position that an insurer has no duty to reimburse defense costs until after the outcome of the litigation.[63]

In *Zaborac v. American Casualty Co.*,[64] the court interpreted the same policy language involved in *Little v. MGIC Indem. Corp.* and *Okada v. MGIC Indem. Corp.* and held that payment was not required until the underlying litigation was concluded. The insurer had denied coverage for any of the claims in the underlying litigation and the corporation and the insured directors, who were defendants in the underlying litigation, were seeking a declaratory judgment, *inter alia,* (1) that the insurer was liable for the losses for which the directors became obligated to pay in the underlying litigation and (2) for defense costs as incurred in the underlying litigation.[65] The

---

[58] 675 F. Supp. at 540. The insuring clause in the corporate reimbursement part of many D&O policies obligates the insurer to "reimburse" rather than to "pay." Such a language difference might lead another court to a different conclusion about the timing of the insurer's obligation under the corporate reimbursement part of the policy.

[59] 823 F.2d 276 (9th Cir. 1987), applying Hawaii law.

[60] 823 F.2d at 282.

[61] For discussion of the dishonesty exclusion, *see below* § 12A.06[2].

[62] 823 F.2d at 282.

[63] *See* Luther v. Fidelity & Deposit Co. of Maryland, 679 F. Supp. 1092 (S.D.

Fla. 1986), applying Florida law; Zaborac v. American Casualty Co., 663 F. Supp. 330 (C.D. Ill. 1987), applying Illinois law; American Casualty Co. v. FDIC, 677 F. Supp. 600, 606 (N.D. Iowa 1987), applying Iowa law; Board of Education v. CNA Ins. Co., 647 F. Supp. 1495, 1507 (S.D.N.Y. 1986), applying New York law.

*See also* Continental Casualty v. Allen, Ca-5-86-252 (N.D. Tex. 1988), *modified on other grounds,* F. Supp. (N.D. Tex. 1989); National Union Fire Ins. Co. v. Goldman, 548 So. 2d 790 (Fla. 1989).

[64] 663 Supp. 330 (C.D. Ill. 1987).

[65] There was no indication in the opinion of the grounds for the insurer's dis-

district court distinguished the D&O policy from what it termed "a general liability policy," noting that:

> The directors' and officers' liability insurance policy in the present case requires only that the insurer indemnify its insured for losses incurred, with the definition of loss including defense costs. This makes it different from a general liability policy, in which the insurer must defend an insured in addition to indemnifying him against liability.[66]

Interpreting the same policy language that the court in *Little v. MGIC Indem. Corp.* found to require contemporaneous reimbursement, the court in *Zaborac* concluded:

> As these clauses of the policy indicate, the insurer's obligation is to pay the insured for covered "loss" which the insured incurs in connection with the claims made against it. Furthermore, the insurance company's obligations do not accrue until the loss suffered by the insured can be ultimately determined, which is at the time the underlying claims are adjudicated or settled. Because there has been no judgement or settlement in the *Gibson* case, any claimed "loss" by the Plaintiffs in this declaratory judgement action would be no more than specula tion and guess work. The existence and extent of any loss for which American Casualty must pay cannot be ascertained until the liability, if any, of the directors is determined in *Gibson* and the insurance company can determine whether the facts adjudicated in *Gibson* support the application of the exclusion provisions of the insur-ance policy.[67]

---

claimer of liability. Thus, there is no indication that, as in *Okada v. MGIC Indem. Corp.* and *Little v. MGIC Indem. Corp.*, the insurer was disclaiming under an exclusion that was applicable only upon adjudication of "dishonesty."

*Cf.* Bank of Commerce and Trust Co. v. National Union Fire Ins. Co., 651 F.Supp. 474, 476 (N.D. Okla. 1986), applying federal law. In this case, in denying the directors' motion for a dec-laration of contemporaneous advance-ment of legal expenses, the court noted that "there remain factual issues as to whether Sweet's [one of the insureds acting in a dual capacity] are to be reim-bursed for any losses arising from the claims against Sweet." Note that al-though this is not the point on which the holdings of the *Little/Okada* line of cases differ from *Zaborac/Bank of Com-merce* line of cases, it may be a basis upon which a distinction can be made.

[66] *Zaborac v. American Casualty Co.*, 663 F. Supp. 330, 332 (C.D. Ill. 1987), applying Illinois law.

[67] *Id.*

(Matthew Bender & Co., Inc.)

The court supported its interpretation by referring to the "no-action" clause of the policy.[68]

In response to court decisions interpreting D&O policies to provide contemporaneous payment of defense costs, many insurers have clarified the language of their policies to remove the ambiguities noted by the courts in *Little* and *Okada*. For example, the Nation Union (8/88) policy provides:

> Under Coverage A, except as hereinafter stated, the Insurer shall advance Defense Costs prior to the final disposition of the claim, unless such Defense Costs have been advanced by the Company. Such advance payments by the Insurer shall be repaid to the Insurer by the Insureds, severally according to their respective interests, in the event and to the extent that the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss. Notwithstanding the foregoing, if the Company is required or permitted to advance such Defense Costs in accordance with the fullest application of law, common or statutory, or contract, or the Charter or By-laws of the Company, then the Insurer assumes no duty to advance Defense Costs prior to the final disposition of the claim and the retention amount as stated in item 5 of the Declarations shall apply to such Loss. In such case, however, the Insurer may, in its absolute discretion, advance all or any part of such Defense Costs prior to the final disposition of the claim and in such event the advance payments by the Insurer shall be repaid to the Insurer by the Company or the Insureds, severally according to their respective interests, In the event and to the extent that the Company or the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

> Under Coverage B, the Insurer assumes no duty to reimburse Defense Costs prior to the final disposition of the claim. The Insurer may, in its absolute discretion, reimburse all or any part of such Defense Costs prior to the final disposition of the claim.

---

[68] 663 F. Supp. at 333. That clause provided:

Action Against Insurer Clause—No action shall be taken against the Insurer unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy nor until the amount of the Directors' or Officers' obligation to pay shall have been finally determined either by judgement against the Directors or Officers after actual trial, or by written agreement of the Directors of Officers, the claimant and the Insurer.

In such event, however, such advance payments by the Insurer shall be repaid to the Insurer by the Company or the Insureds, severally according to their respective interests, in the event and to the extent that the Company or the Insureds shall not be entitled under the terms and conditions of this policy to payment of such Loss.

The Insurer does not, however, under this policy, assume any duty to defend. The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgement or incur any Defense Costs without the prior written consent of the Insurer. Only those Settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably witheld, provided that the Insurer shall be entitled to effectively associate in the defense and the negotiation of any settlement of any claim in order to reach a decision as to reasonableness.

The different obligations under the direct liability part and the company reimbursement parts of the policy are reflected in the fact that the insuring clause of the direct liability part begins: "This policy shall pay . . . each and every Director or Officer . . ." whereas the insuring clause of the corporate reimbursement part begins "This policy shall reimburse the Company . . ."

A number of important consequences may flow from the holding that the insurer has no duty to reimburse defense costs as they are incurred. Arguably, the insurer has no duty to reimburse the insured for any settlements with one or more of multiple claimants until all claims have been resolved. Moreover, the insurer could argue that it has no duty to pay until all claims under the same policy limits have been satisfied. Although these two interpretations might not seem particularly realistic in light of the tendency to interpret ambiguities against insurers, there is a logical basis for the second argument since multiple claims under the same policy limits raise potential questions of allocation if the limits are not sufficient to cover all claims. An insurer would not wish to pay the policy limits on fewer than all the claims in such a circumstance because it would then be subject to potential coverage disputes by any insureds who are defendants in unsatisfied claims.

Even where there is an obligation to contemporaneously reimburse defense costs, the insurer is entitled to reimbursement of

defense costs it paid on excluded claims if the plaintiff ultimately prevails on them at trial.[69]

### [D]—Allocations of Defense Costs

The insurer's obligation under the "duty to pay" type D&O policies extends only to the costs incurred in the defense of covered claims. Thus, the insured must bear defense costs to the extent incurred (a) for excluded claims (b) for the defense of the corporation (in addition to its insured officers and directors) or (c) for the prosecution of counter-claims or third party claims not related to covered claims.[70] This is to be contrasted with the insurer's obligation under a "duty to defend" policy in which the insurer has a duty to provide a defense of the entire claim if any of the causes of action stated in the complaint are arguably covered by the policy. Where one law firm is handling both covered and non-covered claims or the defense of both the corporation and the officers and directors, the insurer will typically insist on an allocation of covered defense costs.

Cases are divided on whether the insurer or the insured bears the burden of justifying the proportion of such allocation.[71]

---

[69] *See* Okada v. MGIC Indem. Corp., 823 F.2d 276, 282 (9th Cir. 1987), applying Hawaii law; Pepsico, Inc. v. Continental Casualty Co., 640 F. Supp. 656, 659 (S.D.N.Y. 1986).

[70] *See* Okada v. MGIC Indem. Corp., 823 F.2d 276, 282 (9th Cir. 1987), applying Hawaii law; Pepsico, Inc. v. Continental Casualty Co., 640 F. Supp. 656, 660 (S.D.N.Y. 1986); Continental Casualty Co. v. Board of Education of Charles County, 302 Md. 516, 489 A.2d 536 (1986); Farmers & Merchants Bank v. Home Ins. Co., 514 So. 2d 825 (Ala. 1987).

*See generally:*

Caterpillar, Inc. v. Great American Ins. Co., 62 F.3d 955 (7th Cir. 1995), applying Illinois law. Liability of a D&O insurer for a settlement by the corporation was governed by the "larger settlement rule," requiring allocation only if the settlement was larger because of the activities of uninsured persons who were sued or persons who were not sued, but whose actions may have contributed to the suit.

Safeway Stores, Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 64 F.3d 1282 (9th Cir. 1995), applying California law. Under the "larger settlement rule," a corporation is entitled to reimbursement of all settlement costs under its D&O policy where the corporation's liability is purely derivative of the liability of the insured directors and officers.

[71] *Compare* Continental Casualty Co. v. Board of Education of Charles County, 302 Md. 516, 489 A.2d 536 (1986), in which the court held that the insured had the burden of allocating the defense costs *with* Pepsico, Inc. v. Continental Casualty Co., 640 F. Supp. 656 (S.D.N.Y. 1986), in which the court held that the insurer had the burden of proving the allocation of a settlement payment.

Allocation problems also arise when the insured's policy only covers a portion of the period during which the insured's wrongful actions are alleged to have taken place. In such cases, the insurer will only be responsible for a portion of the insured's loss payments and claims expenses.[72]

Prior policy forms have attempted to address the issue of allocation, however, their generality rendered them largely meaningless. For example, the 1976 form of policy used by Lloyds of London (identified as Lyando No. 1) and adopted by several U.S. insurers used the following language:

> In any claim against both the directors and/or officers and any other party or parties costs, charges and expenses for defense shall be limited to those incurred in the right of and for the principal benefit of directors and/or officers, as distinguished from any other such party or parties, and the insurer and the directors and/or officers shall endeavor to establish at the earliest opportunity a proper basis for the allocation of costs, charges, and expenses of counsel or others rendering services to or for the benefit of both the directors and/or officers and any such other party or parties.

Although some available policies still incorporate similar language, they do not utilize the "principal benefit" test invoked in this provision and merely require the parties to use their best efforts to reach a fair allocation of defense costs.

Issues concerning allocation are invariably negotiated by the parties and only rarely proceed to litigation. In reaching a fair apportionment, the parties will examine the complaint to determine what proportion of the claims are covered by the policy and they will, perhaps, weigh them in terms of their liability potential. The same allocation process may be used for both loss payments and claims expenses, however, other factors may also have to be considered when determining the allocation of claims expenses, such as whether there are unrelated counterclaims and third-party claims

---

[72] *Cf.* Insurance Co. of North Am. v. Forty-Eight Insulations, Inc., 633 F.2d 1212 (6th Cir. 1980) *aff'd on reh'g,* 657 F.2d 814, *cert. denied,* 454 U.S. 1009 (1982), applying federal law. In this case involving asbestos litigation, the court held that defense costs could be allocated, *pro rata,* between the insured corporation and the insurer(s) based on the relative period of time during the development of a plaintiff's asbestos-related disease that the corporation was self insured.

§ 12A.05[7]  Law of Liability Insurance  12A–94.4

in the case, whether defense counsel was approved by the insurer, and whether defense counsel's fee was billed at a rate approved by the insurer.

*(Text continued on page 12A–95)*

While both the insured and the insurer will perform their own analyses to determine the appropriate allocation, the issue is generally resolved as a matter of pure negotiation, with both sides factoring in the possibly large litigation costs.

While it is often possible to resolve many of these issues before the conclusion of the litigation began by the claimant and incorporate those resolutions into a defense agreement[73] , most insurers generally prefer to defer these questions to the conclusion of the matter when all facts are known, even though they may advance certain of the litigation costs as the case proceeds.

Theoretically, it is possible that the insurer might advance more defense costs than its total obligation under the policy. As a practical matter, this never happens and having separately agreed to do so, the insurer might be deemed to have waived his right to recover those outlays. In any event, such recoveries of insurer advances are unheard of.

### [E]—Appeals

Many policies explicitly provide that the covered "loss" includes the cost of appeal. Moreover, courts have held that, even in the absence of an express provision, the insurer is obligated to fund a reasonable appeal from a determination adverse to the insured.[74]

### [iii]—Fines, Penalties, Punitive, Exemplary, Treble and Uninsurable Damages

As part of the definition of "loss" policies typically exclude coverage for one or more of the following:

(1)  fines and penalties;

(2)  taxes or wages;

(3)  punitive and exemplary damage, including the two-thirds portion of any treble damages; and

(4)  any other damages uninsurable under the law by which the policy is interpreted.

---

[73] *See infra* § 12A.07[4].

[74] *See, e.g.,* Chrestman v. United States Fidelity & Guar. Co., 511 F.2d 129 (5th Cir. 1975), applying federal law; Guarantee Abstract & Title Co. v. Interstate Fire & Casualty Co., 228 Kan. 532, 618 P.2d 1195 (1980); Palmer v. Pacific Indem. Co., 74 Mich. App. 259, 254 N.W.2d 52 (1977).

The specific reference to treble damages is a recent development, and raises the question whether the two-thirds portion of treble damages are excluded under a policy that excludes exemplary damages without mentioning treble damages. While some courts have concluded that treble damages are punitive,[75] at least one court has characterized RICO treble damages as intending to liquidate·otherwise uncertain damages and therefore were not punitive.[76]

A majority of courts have held that, unless coverage for these forms of non-compensatory damages is explicitly excluded or is against public policy, the policy covers such damages.[77]

Courts are divided about whether enforcement of insurance coverage for punitive damages is against public policy, with

---

[75] *See* Summers v. F.D.I.C., 592 F. Supp. 1240 (W.D. Okla. 1984) (RICO treble damages are punitive); Tedesco v. Maryland Casualty Co., 127 Conn. 533, 18 A.2d 357 (1941) (Statutory double or treble damages constitute uninsurable punitive damages).

*Cf.* Perl v. St. Paul Fire and Marine Ins. Co., 345 N.W.2d 209, 214 (Minn. 1984). The court held that forfeiture damages were not "exemplary or punitive damages" within the policy exclusion, although forfeiture has a penalty aspect to it. The court further held that forfeiture damages were uninsurable as against public policy. .

[76] State Farm Fire and Casualty Co. v. Caton's Estate, 540 F. Supp. 673 (N.D. Ind. 1982). The court rejected the argument that RICO damages are penal and therefore they were recoverable against the defendant estate.

Other court have found treble damages to be covered under the policy where no express exclusion was present.

*See* California Shoppers v. Royal Globe Ins. Co., 175 Cal. App. 3d 1, 221 Cal. Rptr. 171 (1985). The court

held that treble damages awarded under the state unfair trade practices statute were insurable.

Avis Rent A Car Sys., Inc. v. Liberty Mutual Ins. Co., 203 Conn. 667, 526 A.2d 522, 524 (1984). The court held that treble damages awarded due to grossly negligent operation of an automobile were insurable.

[77] *See, e.g.,* Ridgway v. Gulf Life Ins. Co., 578 F.2d 1026 (5th Cir. 1978), applying Texas law; Scott v. Instant Parking, Inc., 105 Ill. App.2d 133, 245 N.E.2d 124 (1969); Harrell. Travelers Indem. Co., 279 Or. 199, 567 P.2d 1013 (1977) (punitive damages for gross, reckless or wanton negligence); Lazenby v. Universal Underwriters Ins. Co., 214 Tenn. 639, 383 S.W.2d 1 (1964); Hensley v. Erie Ins. Co., 168 W.Va. 172, 283 S.E.2d 227 (1981).

*But see* Cavin's Inc. v. Atlantic Mut. Ins. Co., 27 N.C. App. 698, 220 S.E.2d 403 (1975) (interpreting policy insuring for "damages because of personal injury" not to include punitive damages); Brown v. Western Casualty & Sur. Co., 484 P.2d 1252 (Colo. Ct. App. 1971).

(Rel.31–2/89  Pub.354)

some courts holding that it is[78] and others holding that is is not.[79]

### [b]—Retention[80]

Every D&O policy has a retention (typically termed a "deductible" in older policies). The policy typically provides that the insurer shall only be liable on each claim for the amount of loss in excess of the retention. A typical retention provision reads:

> The Insurer shall only be liable for the amount of Loss arising from a claim which is in excess of retention amount stated in Item 5 of the Declarations, such retention amount to be borne by the Company and/or the Insureds and shall remain uninsured, with regards to all Loss under Coverage A or B for which the Company has indemnified or is permitted or required to indemnify the Insured(s). A single retention amount shall apply to Loss arising from all claims alleging the same Wrongful Act or related Wrongful Acts. [National Union (8/88) policy]

Thus, the policy language provides coverage for the difference between the limits of liability and the insured's deductible and not for the limits of liability in excess of the deductible amount. Although the policy language is generally clear, the courts have a tendency to interpret insurance policies according to "the reasonable expectation" of the insureds. Therefore, it is not incon-

---

[78] See Ford Motor Co. v. Home Ins. Co., 116 Cal. App. 3d 374, 172 Cal. Rptr. 59 (1981). The court held that coverage for punitive damages is not against public policy whether or not the punitive damages were based on intentional conduct.

See also Beaver v. Country Mutual Ins. Co., 95 Ill. App. 3d 1122, 420 N.E.2d 1058 (1981); Hartford Accident & Indem. Co. v. Village of Hempstead, 48 N.Y.2d 218, 397 N.E.2d 737, 422 N.Y.S.2d 47 (1979).

[79] See:

Scott v. Instant Packing, Inc., 105 Ill. App.2d 133, 245 N.E.2d 124 (1969). The court held that it was not agianst public policy to insure against wilful and wanton misconduct.

Harrell v. Travels Indem. Co., 279 Or. 199, 567 P.2d 1013 (1977). The court held that an insurance contract providing for coverage of punitive damages is not ipso facto invalid for reasons of public policy.

Hensley v. Erie Ins. Co., 168 W.Va. 172, 283 S.E.2d 227, 230 (1981). The court permitted recovery for punitive damages arising from gross, reckless or wanton negligence, as opposed to purposeful or intentional conduct.

See also Greenwood Cemetery, Inc. v. Travelers Indem. Co., 238 Ga. 313, 232 S.E.2d 910 (1977).

[80] For a discussion of retention issues specifically relating to defense costs see supra § 12A.05[7][a].

ceivable that in an appropriate case, especially one where the relationship between the retention and the policy limit is not adequately defined, a court might chose the latter interpretation.

Although many recently issued policies are written with only one retention, the retention is often divided into three parts, two of which apply to the direct liability part of the policy and one that applies to the corporate reimbursement part. The retention on the direct reimbursement part is phrased in terms of a retention for each insured person and an aggregate retention. For example, a policy might have a $5,000 per insured person retention and a $25,000 aggregate retention. Thus, even if more than five directors are sued, the retention borne by them is limited to the first $25,000 (including defense costs). Questions of apportionment may arise where some directors are represented by separate counsel, and typically the retention is allocated on a pro rata basis. Some policies specifically provide that the aggregate maximum deductible is to be apportioned pro rata among the various insured officers and directors involved in the claim.

The corporate reimbursement retention is typically much larger than that applicable to the individual insureds. Accordingly, many policies attempt to shift the application of the policy to the corporate reimbursement part so that the insurer will benefit from this higher retention.[81]

Set forth below is a typical provision explaining the operation of the policy retention:

In the event a Claim is covered in part under both Insuring Clauses I.A. and I.B. [corporate reimbursement] the Retentions set forth in Item D. of the Declarations shall be applied separately to that part of the Loss resulting from such Claim covered by each Insuring Clause and the sum of the Retentions so applied shall constitute the Retention applicable to such Claim provided, however, the total Retention as finally determined shall in no event exceed the Retention applicable to Insuring Clause I.B.

The Retention applicable to Insuring Clause I.B. shall apply to Loss resulting from any Claim if indemnification by the Company is required by law or is legally permissible to the

----

[81] For a discussion of the applicable policy language *see supra* § 12A.02[2][a].

fullest extent permitted by law, regardless of whether or not actual indemnification is made, unless the Company is unable to make such actual indemnification solely by reason of its financial insolvency. [London form]

The above quoted language makes it clear that the deductible amount will normally be that specified under the corporate reimbursement part (i.e., the maximum deductible) unless corporate reimbursement is prohibited. Some policies merely prescribe that if the claim is covered in part by the corporate reimbursement part, the maximum deductible shall apply.

Despite the implicit application of the retention to defense costs, since those are defined as an element of the term "loss" against which the retention applies, policies often contain explicit provisions (often required by regulation) specifying that defense costs are applied against the retention.

### [c]—Policy Limits and Exhaustion[82]

The insurer's duty to reimburse its insureds is limited by the "Limit of the Liability;" and virtually every D&O insurance policy contains a provision explaining the operations of the policy limits. Typical of such provisions is the following, from the National Union (8/88) policy:

Limit of Liability (For All Loss - Including Defense Costs)

The limit of liability stated in Item 4 of the Declarations is the limit of the Insurer's liability for all Loss, under Coverage A and Coverage B combined, arising out of all claims first made against the Insureds and reported to the Insurer during the Policy Period and the Discovery Period (if applicable); however the limit of liabilty for the Discovery Period shall be part of, and not in addition to, the limit of liability for the Policy Period. Further, any claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) ["awareness" provisions] is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate limit of liability stated in Item 4 of the Declarations.

Defense Costs are not payable by the Insurer in addition to the limit of liability. Defense costs are part of Loss and as such are subject to the limit of liability for Loss.

---

[82] For a discussion of policy limit and exhaustion issues specifically relating to defense costs, *see supra* § 12A.05[7][a][ii][B].

As can be seen by this provision, a single limit of liability applies to the initial policy period and to any "discovery" period (or "extended coverage" period as it is called in some policies). In addition, that single limit of liability also applies to any related claim asserted after the policy period or discovery period that is covered by the policy by virtue of disclosure of a potential claim under the "awareness" provision.[83]

The limit of liability for unrelated claims applies only to claims made during the policy period (typically a year). A renewal of the policy brings into force a new, and additional, limit of liability, so that unrelated claims made during different policy periods are subject only to the respective limits of the policy period in which each claim was made. Those limits are, to that extent, aggregated (unless the claims are related, as discussed below, in which case the policy typically provides that the limit of liability of the earliest applicable policy period applies to all such related claims).

In the absence of "related claim" language in a policy, claims made in different policy periods will not be aggregated and the respective policy limit for the period in which the claim was asserted will apply to that claim.[84]

Many policies, such as the one offered by Aetna, provide that in the event that the Limits of Liability are exhausted, the insurer's duty under the policy is terminated. This provision, which is set forth below in its entirety is designed to make it clear that the insurer has no further duties under the policy after it has expended the limits of the policy.

<u>Exhaustion</u>

In the event that the Limit of Liability is exhausted by the payment of Loss, any and all obligations of the Underwriter hereunder shall be deemed to be completely fulfilled and extinguished, and the Underwriter shall have no further obligations hereunder of any kind or nature whatsoever.

If the Limit of Liability of this Policy is exhausted by payment of Loss prior to the Policy Termination Date, then this

---

[83] For a discussion of "awareness" provisions *see supra* § 12A.05[3].

[84] *See* National Union Fire Ins. Co. v. Continental Illinois Corp, 673 F.Supp. 300 (N.D. Ill. 1987); National Union Fire Ins. Co. v. Ambassador Group, Inc., 691 F. Supp. 618 (E.D.N.Y. 1988).

(Rel.31–2/89  Pub.354)

Policy shall be deemed to lapse immediately upon the date that the Limit of Liability is exhausted by payment of Loss. If this Policy is terminated pursuant to this provision, the premium shall be deemed fully earned.

While this language would seem to be superfluous since the insurer's defense obligation is only to reimburse defense costs which are chargeable against the limits of the policy, considering the tendency of the courts to interpret policies against insurers, such a provision may be necessary.

It should be noted that this exhaustion provision does not contain the language commonly found in many professional liability policies which permits the insurer to fulfill its obligations by paying the limits of the policy to the court, thereby accelerating and extinguishing both the insurer's duty to defend and to indemnify.

### [d]—"Related Claims"

D&O policies typically contain the concept of "related (or, as used in some policies, interrelated) acts". This concept aggregates all claims arising out of related acts for the purpose of applying a single retention and limit of liability, usually those of the earliest policy providing coverage. The effects of this provision are twofold: (a) all such related claims will be governed by a single policy (and, therefore, limited by a single policy's limit of liability); and (b) the insured will only be subject to a single retention.

One policy introduces the concept of related claims in the following manner:

If during the Policy Period or during the Discovery Period (if applicable) written notice of a claim has been given to the Insurer pursuant to Clause 8(a) above, then any claim which is subsequently made against the Insureds and reported to the Insurer alleging, arising out of , based upon or attributable to the facts alleged in the claim of which such notice has been given, or alleging any Wrongful Act which is the same as or related to any Wrongful Act alleged in the claim of which notice has been given, shall be considered made at the time such notice was given.

That policy also contains the following exclusion:

Alleging, arising out of, based upon or attributable to the facts alleged,to the same or related Wrongful Acts alleged or

> contained, in any claim which has been reported, or in any circumstances of which notice has been given, under any policy of which this policy is a renewal or replacement or which it may succeed in time.

Together these provisions shift any related claim to the earliest applicable policy period.

In the paragraph discussing application of the limit of liability, that policy provides:

> Further, any claim which is made subsequent to the Policy Period or Discovery Period (if applicable) which pursuant to Clause 8(b) or 8(c) is considered made during the Policy Period or Discovery Period shall also be subject to the one aggregate limit of liability stated in item 4 of the Declarations.

This provision deprives the insured of the opportunity to take advantage of the aggregate limits of different policy periods and is restricted to one limit of liability.

The same policy also has a clause in the paragraph pertaining to application of the retention which provides that "[a] single retention amount shall apply to loss arising from all claims alleging the same Wrongful Act or related Wrongful Acts." Together with the first provision quoted, this has the effect of making the single retention of the earliest policy applicable. Accordingly, only one retention is imposed on the insured.

This provision raises the question of what are "interrelated" wrongful acts. For example, is a wrongful termination of one employee on racial grounds interrelated to a failure to hire a job applicant on racial grounds? Similarly, is a misstatement concerning the corporation's bank loans in a SEC filing related to a misstatement of the corporation's earnings in another SEC report?

One policy seeks to eliminate some of these potential ambiguities by including the following definition of "Related Wrongful Acts":

> "Related Wrongful Acts" shall mean Wrongful Acts that arise out of, are based on, relate to, or are in consequence of the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events

Although this definition is obviously intended to be all inclusive, its sweeping terms leave a lot of lattitude for court interpretation, which more often than not will work to the disadvantage of the insurer.[85]

This issue arose in *Okada v. MGIC Indem. Corp.*,[86] in which bank officers were charged with a series of negligent acts which led to the bank's collapse. The defendant's D&O policy had a low "per loss" limit of liability, with a higher policy limit for multiple losses. The issue before the court was whether this series of actions gave rise to separate losses (for each defaulted loan, for example) or one loss (the bank's collapse). The court concluded that even though the end result was the collapse of the bank and even though there was only a single lawsuit, the bank suffered multiple losses, entitling the insured to the full coverage of the policy.[87]

### [e]—Co-Insurance

Most D&O insurance policies contain a 5% co-insurance provision which limits the insurer's exposure to an amount equal to 95% of the difference between the policy limits and the insured's deductible. The use of a co-insurance provision seems appropriate in policies, such as D&O insurance, wherein the insured is given control over the defense of claims, as it tends to remind the insured that his or her interests are the same as those of the insurer with respect to the defense of the claim.

---

[85] To some extent, insurers are placed in a no-win situation. Because they draft and issue their policies, all ambiguities are interpreted against them. By using broad language they place themselves at the court's mercy. On the other hand, if they use long and prolix policies addressing each possibility, they risk violating statutory requirements mandating a "readable" insurance form.

[86] 608 F. Supp. 383 (D. Haw. 1985).

[87] *See also* North River Ins. Co. v. Huff, 628 F. Supp 1129 (D. Kan. 1985), applying Kansas law. The court rejected the insurer's argument

that four bad loans to separate borrowers arose out of interrelated acts merely because they were part of the bank's loan swap program; as separate "occurrences" the insurer was liable for the aggregate of four times the "per occurrence" limit.

*But see* Aetna Casualty and Sur. Co. v. Medical Protection Co., 575 F. Supp. 901 (N.D. Ill. 1983), applying federal law. The court held that a series of negligent actions by an attending physician leading to a single injury to his patient was a single "occurrence" leaving the insurer liable only for a single "per occurrence" limit.

(Rel.32–8/89 Pub.354)