UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) ) |
| AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, | ) ) ) ) ) |
| Defendants. | ) ) ) ) |

C. A. No. 04-10685 WGY

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**EXHIBIT C**

**DIRECTORS' AND OFFICERS INDEMNIFICATION AND LIABILITY INSURANCE:
AN OVERVIEW OF LEGAL AND PRACTICAL ISSUES**

# Directors and Officers Indemnification and Liability Insurance: An Overview of Legal and Practical Issues

*By Joseph P. Monteleone and Nicholas J. Conca\**

## INTRODUCTION

In this Article, the authors explore the legal and practical issues attendant to liabilities of corporate directors and officers, both in the context of indemnification from the corporation and directors' and officers' (D&O) liability and corporate reimbursement insurance. The primary focus will be in the area of D&O insurance, but indemnification will be explored preliminary to and as a foundation for the D&O insurance discussion.

Until recently, the judicial guidance in these areas was quite sparse, and many of the questions that arose in connection with D&O indemnification and insurance coverage remained unanswered. As disputes continue to arise, however, the courts have been active in rendering decisions that affect the rights of directors and officers to indemnification and insurance coverage. The discussion that follows is not intended to be an exhaustive recitation of the law in this area, but rather an overview of the more salient issues.[1]

\*Joseph Monteleone is a Senior Vice President and Claims Counsel at Reliance National, a Reliance Group Holdings Company. Nicholas Conca is a Vice President and Claims Counsel at Reliance National.

The opinions expressed herein are personal to the authors and do not necessarily reflect the opinion of Reliance National or of any insurance company in the Reliance Insurance Group. Further, the authors, through these materials, do not purport to restate, explain, or interpret any policy of insurance issued by a member company in the Reliance Insurance Group.

While the information contained in these materials is believed to be accurate and authoritative, it is not intended to be a substitute for legal, insurance, or other professional advice. The reader should consult legal and/or insurance professionals for advice or assistance on specific issues of interest.

1. For a more in depth discussion of indemnification issues, the reader is referred to James J. Hanks, *Evaluating Recent State Legislation on Director and Officer Liability Limitation and Indemnification*, 43 BUS. LAW. 1207 (1988), and Karen L. Valihura & Robert J. Valihura, Jr., *A Delaware Perspective on Advancing Directors' and Officers' Litigation Expenses*, BANK & CORP. GOVERNANCE L. REP. (Mar. 1994). There are several more exhaustive works in the area of D&O insurance which also discuss in detail indemnification issues. *See* JOSEPH W. BISHOP, LAW OF CORPORATE OFFICERS AND DIRECTORS: INDEMNIFICATION AND INSURANCE (1994); WILLIAM

# INDEMNIFICATION OF CORPORATE DIRECTORS AND OFFICERS

Corporate indemnification is a major source of protecting directors and officers from personal liability. In years past, corporate employers were not permitted to protect their corporate officials in the form of indemnification because such payments were not viewed as benefitting the corporation or its shareholders. In the 1940s and 1950s, however, courts began to realize that a key ingredient to effective corporate management was the protection of corporate officials from personal liability. Accordingly, corporate officials vigorously began to pursue the protection of corporate indemnification and corporations responded by seeking the power to indemnify their directors and officers.

Not long thereafter, state legislatures began to enact statutory schemes permitting corporate indemnification. The overriding goal of these statutes was to protect directors and officers from personal liability resulting from business decisions. The statutes were intended to encourage capable individuals to serve as directors and officers secure in the knowledge that they would be insulated from personal liability if corporate actions, taken in good faith, were brought under attack by way of a legal proceeding. Stated another way, "[i]ndemnification under the statute[s] is provided to assure corporate officials that they will not be hampered by financial constraints in mounting a full defense against unjustified suits."[2]

The following section focuses on the salient provisions of the Delaware indemnification statute.[3] Because many, if not most, publicly traded corporations are incorporated in Delaware, the issues encountered regarding director and officer indemnification are often governed by the Delaware statute. In evaluating a given issue, however, the indemnification statute in the corporation's state of incorporation will govern.

## MANDATORY AND PERMISSIVE INDEMNIFICATION

The entitlement of corporate directors and officers to indemnification can be broadly categorized as "mandatory" or "permissive." Mandatory indemnification refers to the absolute statutory entitlement of a director or officer to indemnification of expenses in situations where he or she is "successful on the merits or otherwise" in defending a proceeding brought against him or her.[4] Permissive indemnification, on the other hand, refers to those situations where mandatory indemnification does not apply, such as when a proceeding involving a corporate official is resolved prior to

E. KNEPPER & DAN A. BAILEY, LIABILITY OF CORPORATE OFFICERS AND DIRECTORS (5th ed. 1993); JOHN OLSON & JOSIAH HATCH, DIRECTOR AND OFFICER LIABILITY: INDEMNIFICATION AND INSURANCE (1995).

2. McLean v. International Harvester Co., 902 F.2d 372 (5th Cir. 1990).
3. DEL. CODE ANN. tit. 8, § 145 (1995).
4. *Id.* § 145(c).

final judgmen
are afforded t
nification.[6]

### *Mandat*

The Delaw
provision state

> To the e
> ration ha
> any actio
> this secti
> shall be i
> tually an

The purpose
dicated direct
cation.[8] The
own good fait
the claim asse

Given that
and officers' r
applies to sett
with prejudice
or assumption
ing of that pr
mant's right t
under section

A key disti
that some stat
cessful on the

5. *Id.* § 145(a)-
6. *Id.*
7. *Id.* § 145(c).
8. *Id.*
9. Green v. W
was acquitted of
incurred in conne
321 A.2d 138 (D
other than convic
tinental Copper
the decision of a
was "successful"
10. Safeway S
Cir. 1995); Wiser
11. Galdi v. B
12. *E.g.*, N.C.

*TORS AND*

g directors and
mployers were
m of indemni-
fitting the cor-
owever, courts
e management
bility. Accord-
otection of cor-
king the power

tutory schemes
of these statutes
resulting from
ge capable in-
nowledge that
: actions, taken
al proceeding.
| is provided to
financial con-
"2

f the Delaware
cly traded cor-
ered regarding
the Delaware
fication statute

*ION*

demnification
:." Mandatory
t of a director
re he or she is
eding brought
er hand, refers
ot apply, such
olved prior to

DIRECTORS (5th
IABILITY: INDEM-

)).

final judgment (e.g., a settlement).[5] In such circumstances, corporations are afforded the power, but not necessarily the duty, to provide indemnification.[6]

### Mandatory Indemnification

The Delaware indemnification statute's mandatory indemnification provision states as follows:

> To the extent that a director, officer, employee or agent of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in subsections (a) and (b) of this section, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him in connection therewith.[7]

The purpose of the mandatory indemnification provision is to give vindicated directors and officers a judicially enforceable right to indemnification.[8] The person to be indemnified need not demonstrate his or her own good faith or that he or she was free from wrongdoing, but only that the claim asserted against him or her was without merit.[9]

Given that most D&O claims are settled, a question in many directors' and officers' minds is whether the mandatory indemnification provision applies to settlements. The answer appears to be that a settlement that is with prejudice and results in the dismissal of the case without any payment or assumption of liability may be considered a "success" within the meaning of that provision.[10] Settlements that are without prejudice to a claimant's right to assert further claims against an officer are not "successes" under section 145(c) of the Delaware statute.[11]

A key distinction among the various state indemnification statutes is that some states require the person to be indemnified to be "wholly successful on the merits" before mandatory indemnification is implicated.[12]

5. *Id.* § 145(a)-(b).

6. *Id.*

7. *Id.* § 145(c).

8. *Id.*

9. Green v. Westcap, 492 A.2d 260 (Del. Super. Ct. 1985) (concluding that an officer who was acquitted of criminal charges was entitled to mandatory indemnification of expenses incurred in connection with that proceeding); Merritt-Chapman & Scott Corp. v. Wolfson, 321 A.2d 138 (Del. Super. Ct. 1980) (holding, in a criminal proceeding, that "any result other than conviction must be considered success" for purposes of § 145(c)); Stewart v. Continental Copper & Steel Indus., Inc., 414 N.Y.S.2d 910 (N.Y. App. Div. 1979) (stating that the decision of a grand jury not to return an indictment meant that person to be indemnified was "successful" within the meaning of DEL. CODE ANN. tit. 8, § 145(c)).

10. Safeway Stores, Inc. v. National Union Fire Ins. Co., 64 F.3d 1282, 1290 n.24 (9th Cir. 1995); Wisener v. Air Express Int'l Corp., 583 F.2d 579 (2d Cir. 1978).

11. Galdi v. Berg, 359 F. Supp. 698 (D. Del. 1973).

12. *E.g.,* N.C. GEN. STAT. § 55-8-52 (1990).

Other states, such as Delaware, allow for mandatory indemnification "to the extent" the person to be indemnified has been successful on the merits.[13] Courts have interpreted this latter provision to mean that, so long as the person to be indemnified is partially successful on the merits, he or she may be partially indemnified for expenses incurred in connection with the claims or allegations that were successfully defended.[14] This is true even if the person to be indemnified was unsuccessful in defending other claims asserted against him or her.[15]

For example, a former director of a Delaware corporation was entitled to mandatory indemnification of attorneys' fees and costs incurred in successfully defending three counts in a civil complaint, even though he was unsuccessful in defending a fourth count.[16] Of course, such partial indemnification situations give rise to the same allocation dilemmas with regard to the application of D&O insurance.

### Permissive Indemnification

In situations where a director or officer is not partially or wholly successful on the merits or otherwise, and therefore would not be entitled to mandatory indemnification, indemnification is permissive and thus left to the discretion of the corporation. As a practical matter, given that most D&O claims are settled before trial, a person's right to indemnification likely will be governed by the "permissive" provisions of the relevant indemnification statute. Even in the "permissive" context, however, corporations generally will attempt to afford their directors and officers the broadest possible rights to indemnification.

The permissive indemnification provision of the Delaware statute provides:

A corporation may indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the corporation) . . . against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding

if he acted
be in or n

The language o
of indemnificati

### Who May

The Delawar
ployees, or age
request of the c
another corpora
prise.[18] By perm
open the door t
powered to act

In a recent de
that an accounti
indemnification
explained that t
corporation with
dependent contr
portant to review
garding this issue
may be entitled t

In addition to
in which he or sh
indemnified mus
to be entitled to
corporate officer
clothing and ma
scope of his emp
fication of the cos
sexual harassmen

In a different fa
may seek indemn
even if the under
director's persona

---

13. DEL. CODE ANN. tit. 8, § 145(c) (1995).

14. *E.g.,* Merritt-Chapman & Scott Corp. v. Wolfson, 321 A.2d 138 (Del. Super. Ct. 1974).

15. *See id.*

16. MCI Telecommunications Corp. v. Wanzer, Nos. 89C-MR-216 & 89C-SE26, 1990 WL 91100 (Del. Super. Ct. June 19, 1990); *see also* Merritt-Chapman & Scott Corp. v. Wolfson, 264 A.2d 358 (Del. Super. Ct. 1970) (finding that the directors were entitled to mandatory indemnification for litigation expenses and attorneys' fees for counts which did not result in convictions, but could not recover such amounts with respect to charges which resulted in guilty verdicts).

17. DEL. CODE AN
18. *Id.*
19. APSB Bancorp
20. *Id.*
21. Kauffman v. C
22. *Id.*
23. Heffernan v. Pa
Corp. v. Beekhuis, No.
"[a]n officer or dire
there is a close nexus b
F.3d 682 (3d Cir. 199

lemnification "to
uccessful on the
to mean that, so
ful on the merits,
red in connection
fended.[14] This is
sful in defending

tion was entitled
s incurred in suc-
n though he was
ch partial indem-
umas with regard

y or wholly suc-
1ot be entitled to
e and thus left to
given that most
indemnification
f the relevant in-
t, however, cor-
and officers the

vare statute pro-

or is a party or is
pending or com-
inal, administra-
the right of the
leys' fees), judg-
r and reasonably
it or proceeding

38 (Del. Super. Ct.

& 89C-SE26, 1990
n & Scott Corp. v.
ors were entitled to
or counts which did
ect to charges which

if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation . . . .[17]

The language of the statute gives rise to several issues regarding the scope of indemnification.

### Who May Be Indemnified?

The Delaware statute permits indemnification of directors, officers, employees, or agents of the corporation, or anyone who is serving at the request of the corporation as a director, officer, employee, or agent of another corporation, partnership, joint venture, trust, or other enterprise.[18] By permitting indemnification of "agents," the statute appears to open the door to a corporation indemnifying almost anyone who is empowered to act on the corporation's behalf.

In a recent decision by a California state court, however, it was held that an accounting firm was not entitled to indemnity under California's indemnification statute because the firm was not an "agent."[19] The court explained that the firm was not carrying out activities on behalf of the corporation within the common law meaning of agency, but was an independent contractor performing business for its own benefit.[20] It is important to review the individual indemnification statute in question regarding this issue because the statutes vary somewhat with respect to who may be entitled to indemnification.

In addition to the position of the person to be indemnified, the capacity in which he or she acts also must be considered. That is, the person to be indemnified must act within the scope of his or her employment in order to be entitled to indemnification. Indeed, a New York court has held a corporate officer's grabbing a piece of a subordinate female employee's clothing and making lewd remarks about her in public was outside the scope of his employment.[21] Accordingly, he was not entitled to indemnification of the costs of defending the female employee's federal lawsuit for sexual harassment.[22]

In a different factual setting, the Seventh Circuit has held that a director may seek indemnification of expenses incurred in an underlying litigation even if the underlying litigation involves transactions undertaken in the director's personal capacity.[23] Indemnification may be permissible under

17. DEL. CODE ANN. tit. 8, § 145(a) (1995).
18. *Id.*
19. APSB Bancorp v. Grant, 31 Cal. Rptr. 2d 736 (Cal. Ct. App. 1994).
20. *Id.*
21. Kauffman v. CBS, Inc., 514 N.Y.S.2d 620 (N.Y. Civ. Ct. 1987).
22. *Id.*
23. Heffernan v. Pacific Dunlop GNS Corp., 965 F.2d 369 (7th Cir. 1992); *see also* Witco Corp. v. Beekhuis, No. 92-301-RPM, 1993 WL 749596, at *3 (D. Del. Oct. 22, 1993) (stating "[a]n officer or director is protected by § 145(c), even where personal liability is alleged, if there is a close nexus between the litigation and the defendant's corporate status"), *aff'd,* 38 F.3d 682 (3d Cir. 1994); United States v. Lowe, 29 F.3d 1005 (5th Cir. 1994).

such circumstances so long as the underlying action was "connected to [the person's] status as a director."[24] Other courts have taken a middle of the road approach by suggesting that indemnity of a person acting in a dual capacity should be apportioned.[25]

Additionally, a person is only eligible for indemnity relating to liabilities and expenses incurred in connection with wrongful acts committed while the person is a director, officer, employee, or agent of the corporation. That is, the person must be made a party to the action, suit, or proceeding "by reason of the fact that he is or was a director, officer, employee or agent of the corporation."[26] Under certain statutes, conduct undertaken by a director or officer prior or subsequent to his or her tenure at a company may not be indemnifiable.[27] In determining whether the person acted in an indemnifiable capacity, the corporation must look beyond the pleadings of the action, suit, or proceeding and examine facts known independently by the corporation.[28]

The Third Circuit recently held, however, that under Delaware law,[29] an individual could be indemnified for losses arising from acts committed before the individual became an officer of the corporation.[30] In this regard, the Delaware statute provides that a corporation that absorbs another corporation through a consolidation or merger may indemnify the acquired company's directors, officers, employees, or agents to the same extent that the acquired company could have.[31]

### *Types of Legal Proceedings that Trigger the Statute*

A director or officer may be indemnified for expenses and other liabilities incurred in any "action, suit or proceeding, whether civil, criminal, administrative or investigative."[32] The statute's description of actions, suits, or proceedings that may trigger indemnification is broad enough to encompass almost any legal proceeding, including those brought by private litigants or governmental agencies.[33]

One caveat is that the director or officer must be made a party or threatened to be made a party to the action, suit, or proceeding.[34] Ex-

penses incurred i[...]
poenas, would no[...]

It is also import[...]
that the action, su[...]
Although indemni[...]
when they need t[...]
of the director or[...]
necessarily a "def[...]
who brings an act[...]
action, suit, or pr[...]
erage under a D&[...]
entitlement to ind[...]
plaintiff. This is a[...]
*against* such indiv[...]

### *Amounts w[...]*

A key compone[...]
nification, i.e., the[...]
ute permits indem[...]
judgments, fines, a[...]
incurred in conne[...]
esting to note tha[...]
respect to the amo[...]
that the indemnifi[...]
the amounts inden[...]

### *Actions by [...]*

In Delaware, as[...]
entitled to permiss[...]
proceeding brough[...]
between two types[...]
ration,[38] and (ii) ac[...]
carries relatively f[...]
that may be affor[...]
on the indemnifica[...]

To explain brie[...]
corporation," in th[...]
to the corporation.[...]

---

24. *Heffernan*, 965 F.2d at 375.

25. *See, e.g.*, Grove v. Daniel Valve Co., 874 S.W.2d 150 (Tex. Ct. App. 1994).

26. DEL. CODE ANN. tit. 8, § 145(a) (1995).

27. National Union Fire Ins. Co. v. Emhart Corp., 11 F.3d 1524 (10th Cir. 1993) (applying Virginia law).

28. *Grove*, 874 S.W.2d at 153.

29. DEL. CODE ANN. tit. 8, § 145(h) (1995).

30. Witco Corp. v. Beekhuis, 38 F.3d 682, 690 n.1 (3d Cir. 1994).

31. Bear in mind that *Witco* and *Emhart*, which appear to be completely inconsistent judicial decisions, were decided under different bodies of law and under different factual settings.

32. DEL. CODE ANN. tit. 8, § 145(a) (1995).

33. *See id.*

34. *Id.*

35. *Id.*

36. *Id.*

37. *See* Macmillan, I[...]

38. DEL. CODE ANN[...]

39. *Id.* § 145(a).

penses incurred in connection with other matters, such as non-party sub-poenas, would not trigger the statute.

It is also important to note that there is no requirement under the statute that the action, suit, or proceeding be brought *against* the director or officer. Although indemnification most often is requested by directors and officers when they need to defend themselves against a claim, the statute speaks of the director or officer being made a "party" to the proceeding; not necessarily a "defendant."[35] It follows, therefore, that a director or officer who brings an action, suit, or proceeding as plaintiff is a "party" to such action, suit, or proceeding and thus may be entitled to indemnity. Coverage under a D&O insurance policy, however, may not necessarily follow entitlement to indemnification where the corporate officer or director is a plaintiff. This is a result of the policy's requirement that a claim be made *against* such individual for a wrongful act.

### Amounts which may be Indemnified

A key component of any indemnification statute is the scope of indemnification, i.e., the type of loss which is indemnifiable. The Delaware statute permits indemnification against expenses (including attorneys' fees), judgments, fines, and amounts paid in settlement actually and reasonably incurred in connection with the action, suit, or proceeding.[36] It is interesting to note that the statute imposes a reasonableness standard with respect to the amounts which are indemnified. It is, therefore, conceivable that the indemnification of a director or officer may be objectionable if the amounts indemnified are unreasonably excessive.[37]

### Actions by or in the Right of the Corporation

In Delaware, as in most other states, the extent to which a person is entitled to permissive indemnification depends upon the type of action or proceeding brought against him or her. Specifically, a distinction is drawn between two types of actions: (i) actions by or in the right of the corporation,[38] and (ii) actions by any other parties.[39] The latter type of action carries relatively few limitations regarding the scope of indemnification that may be afforded. The statute, however, imposes certain limitations on the indemnification afforded in connection with the first type of action.

To explain briefly what is meant by "actions by or in the right of the corporation," in the event a director or officer breaches his or her duties to the corporation, the corporation may pursue a legal action to collect

35. *Id.*
36. *Id.*
37. *See* Macmillan, Inc. v. Federal Ins. Co., 741 F. Supp. 1079 (S.D.N.Y. 1990).
38. DEL. CODE ANN. tit. 8, § 145(b) (1995).
39. *Id.* § 145(a).

the losses it incurred as a result of such wrongful conduct.[40] The corporation may bring such an action on its own or a shareholder may assert the claim on behalf of (or "in the right of") the corporation—a so-called derivative action.[41] Whether the legal action is asserted directly by the corporation or derivatively by a shareholder, the corporation assumes the capacity of plaintiff asserting claims against its director or officer. Consequently, certain restrictions are placed on that director's or officer's right to indemnification from the corporation.

Some jurisdictions, including Delaware, preclude corporations from indemnifying their directors or officers for any settlement reached in a shareholders' derivative action or one brought directly by the corporation.[42] The theory is that the corporation would be indemnifying the director or officer for a settlement ultimately paid to the corporation itself as plaintiff. Certain state legislatures, including Delaware's, have determined that such circularity of payment is unacceptable.[43]

New York has a state indemnification statute that allows indemnification of settlements in direct or derivative actions and permits such indemnity so long as a court determines that the person in question is "fairly and reasonably entitled to indemnity for such portion of the settlement amount and expenses as the court deems proper."[44]

It is interesting to note that the Resolution Trust Corporation (RTC), the federal agency that ceased its existence at the end of 1995, has taken the position that under the Federal Institutions Reform, Recovery and Enforcement Act of 1989 (FIRREA), the directors and officers of financial institutions are not entitled to indemnification when the RTC sues them for wrongful conduct perpetrated against the institution.[45]

### The Due Diligence Process

The permissive indemnification provisions of the Delaware statute will be triggered only if the person to be indemnified acted in accordance with the statutory standard of conduct: the person must have acted in good faith and in a manner he or she reasonably believed to be in or not opposed to the best interests of the corporation.[46] That is, separate and apart from the action, suit, or proceeding brought against the director or officer, in which their conduct is at issue, the corporation must make its own determination of whether such conduct met the statutory standard.[47] Only

directors and officers ...
tion.[48]

A literal reading o...
cannot be afforded ...
process. With anythi...
jeopardized. Indeed, ...
held that the Delawa...
absent a determinatio...
utory standard of co...

The courts, howev...
porations may circum...
nonexclusivity provis...
*Co.*,[51] the U.S. Distri...
that the corporation...
requirements of the ...
merely "fall back" p...
ation's bylaws.[52]

### Advancemen...

The corporation ...
in defending the ac...
Under the statutor...
nature: the corpora...
position of the actio...
of the person's cond...
action, suit, or proc...
proach of *not* condi...
ular standard of co...
take any due dilige...
under the statute is ...
dertaking to repay...
mined that he or s...

Under the statut...
to make the permi...
law, charter, or cor...
expenses).[55] As a r...

40. *See id.*
41. *See id.*
42. *Id.*
43. *See id.*
44. N.Y. Bus. Corp. Law § 722(c) (McKinney 1986 & Supp. 1996).
45. Adams v. Resolution Trust Co., 831 F. Supp. 1471 (D. Minn.), *aff'd*, 10 F.3d 568 (8th Cir. 1993).
46. Del. Code Ann. tit. 8, § 145(a)-(b) (1995).
47. *Id.* § 145(d).

48. *Id.*
49. 833 F. Supp. 3...
50. *Id.* at 311-13.
51. 640 F. Supp. 6...
52. *Id.; see also* Mac...
(deciding statutory du...
53. Del. Code An...
54. *Id.*
55. *Id.* § 145(f).

directors and officers who satisfy this standard qualify for indemnification.[48]

A literal reading of the statute leads to the conclusion that indemnity cannot be afforded unless the corporation undertakes the due diligence process. With anything less, the person's right to indemnification could be jeopardized. Indeed, in *Waltuch v. Conticommodity Services, Inc.*,[49] the court held that the Delaware statute would not allow indemnification of a person absent a determination that that person acted in accordance with the statutory standard of conduct.[50]

The courts, however, have not been consistent regarding whether corporations may circumvent the due diligence process through the statute's nonexclusivity provision. For example, in *PepsiCo, Inc. v. Continental Casualty Co.*,[51] the U.S. District Court for the Southern District of New York held that the corporation's failure to adhere to the procedural due diligence requirements of the Delaware statute was irrelevant because they were merely "fall back" provisions, which had been supplanted by the corporation's bylaws.[52]

### *Advancement of Defense Expenses*

The corporation may pay the expenses incurred by a director or officer in defending the action in advance of the final disposition of the action. Under the statutory language, advancement of expenses is permissive in nature: the corporation "may" pay expenses in advance of the final disposition of the action, suit, or proceeding.[53] Also, given that the propriety of the person's conduct may not be ascertainable in the early stages of the action, suit, or proceeding, the Delaware statute has taken a realistic approach of *not* conditioning advancement on compliance with any particular standard of conduct. As such, the board of directors need not undertake any due diligence prior to advancing expenses. The sole requirement under the statute is that the person seeking advancement provide an undertaking to repay advanced amounts in the event it is ultimately determined that he or she is not entitled to indemnification.[54]

Under the statute's nonexclusivity provision, the corporation has power to make the permissive advancement provision mandatory through a bylaw, charter, or contractual provision (i.e., the corporation "shall" advance expenses).[55] As a matter of personal protection, individuals seeking direc-

---

48. *Id.*
49. 833 F. Supp. 302 (S.D.N.Y. 1993).
50. *Id.* at 311-13.
51. 640 F. Supp. 656, 661 (S.D.N.Y. 1986).
52. *Id.*; *see also* Macmillan, Inc. v. Federal Ins. Co., 741 F. Supp. 1079 (S.D.N.Y. 1990) (deciding statutory due diligence procedures govern absent a bylaw provision to the contrary).
53. DEL. CODE ANN. tit. 8, § 145(e) (1995).
54. *Id.*
55. *Id.* § 145(f).

torship or executive positions should verify whether the corporation they serve will advance expenses on a permissive (discretionary) or mandatory basis. Again, it is worth noting that a person must be a party or threatened to be made a party to an action, suit, or proceeding in order to be entitled to advancement of expenses.

## NONEXCLUSIVITY OF INDEMNIFICATION PROVISIONS

The Delaware statute provides that the rights to indemnification granted by statute "shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise."[56] It is unclear whether the nonexclusivity provision is subject to the policy considerations and various restrictions embodied in the statute, or whether the corporation has unqualified discretion to afford indemnification in any manner it sees fit. The courts have offered very little guidance in this area.

For example, the court in *PepsiCo* found that the Delaware indemnification statute does not provide the exclusive means for indemnification, but is simply a "fall back" measure that can be completely supplanted by the corporation's bylaws.[57] The court held that the corporation's failure to comply with the statute's provisions did not prevent the corporation from indemnifying its directors in accordance with the corporation's certificate of incorporation.[58]

A contrary conclusion was reached by the same court in *Waltuch v. Conticommodity Services, Inc.*,[59] where the court held that the indemnification allowable under the nonexclusivity provision is subject to the limitations on indemnification that public policy imposes (as reflected in the statute).[60] The court, relying on the consensus among knowledgeable commentators who have written on the subject, ruled that indemnification could not be granted unless the director met the statutory standard of care.[61] In this regard, the court explained "there would be no point to the carefully crafted provisions of Section 145 spelling out the permissible scope of indemnification under Delaware law if subsection (f) allowed indemnification in additional circumstances without regard to these limits. The exception would swallow the rule."[62] The court thus held that indemnification needed to be effected in accordance with the procedural

requirements under the non

Another iss clause would for settlement plain languag stated that th indemnificati tion could be

The *Waltu* provision is su regard, if the indemnificati into the statu specifically p derivative act that such ind

## SECURIT INDEMN

The Secu declared that is against pu received sup of *Globus v. I* of whether t the policy u any indemn cover fraud

Recently, California h and director holder class Exchange A indemnifica qualified in

56. *Id.*
57. PepsiCo, Inc. v. Continental Casualty Co., 640 F. Supp. 656, 661 (S.D.N.Y. 1986).
58. *Id.* at 660-61.
59. 833 F. Supp. 302 (S.D.N.Y. 1993).
60. *Id.* at 307-09.
61. *Id.* at 308-09.
62. *Id.* at 309.

63. *Id.* at 30
64. *See* Heff
5 (N.D. Ill. Ja
65. *See* N.Y.
66. *See, e.g.*
67. 418 F.2
68. *Id.* at 1
indemnificati
69. Raychc

poration they
or mandatory
or threatened
to be entitled

*SIONS*

emnification
ther rights to
enses may be
disinterested
usivity provi-
tions embod-
ied discretion
s have offered

re indemnifi-
emnification,
upplanted by
tion's failure
corporation
oration's cer-

in *Waltuch v.*
lemnification
ie limitations
he statute).[60]
ommentators
could not be
are.[61] In this
the carefully
ble scope of
d indemnifi-
nits. The ex-
it indemnifi-
procedural

D.N.Y. 1986).

requirements in the statute, regardless of whether indemnity was provided under the nonexclusivity provision.[63]

Another issue that arises from time to time is whether the nonexclusivity clause would allow the corporation to indemnify its directors and officers for settlements in derivative actions, something not permitted under the plain language of the Delaware statute and other statutes. One court has stated that the statutory provisions do "not mark the exclusive ambit of indemnification rights," thus suggesting that such expanded indemnification could be granted.[64]

The *Waltuch* court, however, likely would hold that the nonexclusivity provision is subject to limitations explicitly set forth in the statute. In this regard, if the state legislatures intended to allow corporations to grant such indemnification, they would have incorporated the appropriate provisions into the statutes themselves. For example, the New York legislature has specifically provided for indemnification of settlements or judgments in derivative actions, but only if a court of competent jurisdiction determines that such indemnification is proper under the circumstances.[65]

## SECURITIES AND EXCHANGE COMMISSION'S POLICY ON INDEMNIFICATION

The Securities and Exchange Commission (SEC or Commission) has declared that indemnification for liabilities arising under the securities laws is against public policy and therefore unenforceable.[66] This policy has received support from several court decisions, including the oft-cited case of *Globus v. Law Research Service, Inc.*[67] In *Globus*, it was held that, regardless of whether the individual involved is an officer, director, or underwriter, the policy underlying the Securities Act of 1933 (1933 Act) renders void any indemnification agreement to the extent that, as applied, it would cover fraudulent misconduct.[68]

Recently, however, the U.S. District Court for the Northern District of California held that a corporation may voluntarily indemnify its officers and directors for *settlement* payments and defense costs arising from shareholder class action claims for violations of section 10(b) of the Securities Exchange Act of 1934 (1934 Act).[69] The court noted that allowing such indemnification would support two competing public policies: encouraging qualified individuals to serve as corporate officers and directors, and en-

63. *Id.* at 306-09.

64. *See* Heffernan v. Pacific Dunlop GNB Corp., No. 91-C-2494, 1993 U.S. Dist. LEXIS 5 (N.D. Ill. Jan. 5, 1993).

65. *See* N.Y. BUS. CORP. LAW § 722(c) (McKinney 1986).

66. *See, e.g.,* 17 C.F.R. § 229.512(h)(3) (1995).

67. 418 F.2d 1276 (2d Cir. 1969), *cert. denied*, 397 U.S. 913 (1970).

68. *Id.* at 1288; *see also* Eichenholtz v. Brennan, 52 F.3d 478 (3d Cir. 1995) (stating that indemnification "runs counter to the policies underlying the 1933 and 1934 Acts").

69. Raychem Corp. v. Federal Ins. Co., 853 F. Supp. 1170 (N.D. Cal. 1994).

couraging settlement of class action lawsuits.[70] Thus, the court held that the SEC's policy considerations did not prohibit such indemnification.[71]

## THE APPLICATION FOR THE POLICY

The application constitutes the "formal" introduction of the prospective insured corporation and its directors and officers to the insurer. It is essentially an information-gathering process by which the insurer evaluates the insured as an insurance risk. Typically, the application will request information concerning the corporation's business, including the corporation's (i) name, address, nature of business, and state of incorporation; (ii) assets, liabilities, and revenues; (iii) stock ownership information (i.e., the total shares outstanding, payment of dividends, and the number of shares held by directors and officers); (iv) subsidiary information (i.e., identity of all subsidiaries, dates of acquisition or creation, and percentage ownership); (v) plans for any extraordinary corporate transactions, such as a merger, divestiture, or acquisition; (vi) previous D&O insurance (i.e., limits of liability, deductibles, and premiums); (vii) previous claims experience; and (viii) present knowledge of any occurrence or circumstance that may give rise to claims against the insured directors and officers.

The insured generally is also required to attach the following documents to the application: (i) a complete list of all the corporation's directors and officers, including their names, positions, terms of office, and affiliation with any other organizations; (ii) the most recent annual report; (iii) the most recent filings with the SEC (i.e., Form 10-K, Form 10-Q, Form 8K, etc.); (iv) the latest available interim financial statements; (v) proxy statements for the last and next annual meetings; and (vi) the most recent prospectus.

The information contained in and submitted in connection with the application is critical to the insurer in underwriting and pricing the policy. Various statements, representations, and omissions made in connection with the process of applying for D&O insurance may be dispositive of whether there is coverage for a given claim.

## EFFECT OF MISREPRESENTATIONS IN THE APPLICATION

In the event a prospective insured misrepresents material information in the policy application, including the attachments, the insurer generally is permitted to take a number of different actions (depending upon the specific policy language and applicable state law): deny coverage with respect to a claim made under the policy, reform the policy, or rescind the policy.

If coverage is merely denied for a particular claim, the policy has a

70. *Id.* at 1177.
71. *Id.*

court held that
emnification.[71]

the prospective
nsurer. It is es-
nsurer evaluates
on will request
ing the corpor-
: incorporation;
iformation (i.e.,
the number of
ation (i.e., iden-
and percentage
actions, such as
insurance (i.e.,
us claims expe-
or circumstance
and officers.
wing documents
i's directors and
, and affiliation
report; (iii) the
0-Q, Form 8K,
(v) proxy state-
he most recent

ection with the
icing the policy.
e in connection
le dispositive of

*PLICATION*

rial information
nsurer generally
nding upon the
overage with re-
/, or rescind the

he policy has a

continuing existence and is available for potential coverage in the event of a future claim, particularly if the future claim has no interrelationship with the prior claim denied based upon the misrepresentation.

Reformation is also an option. This entails the "rewriting" of the policy to reflect accurately what the terms of the policy would have been had the insured provided "truthful" information in the policy application. Obviously, reformation is a more drastic remedy than the mere denial of coverage because it involves the alteration of the policy. It should be noted that, after reforming the policy, coverage still will be in existence, and thus will be available for subsequent claims made against the insured.

Rescission is the most drastic remedy in that it renders the policy void *ab initio* (from the date the insurance contract is executed). As such, the policy ceases to exist for future claims and, arguably, the insurer also should be able to recover amounts expended in claims arising before the rescission occurs.

In return for the granting of a rescission, the insurer usually will be required to return to the insured the premium paid for the policy plus an interest factor. These amounts, however, usually are insignificant when compared to the insurer's potential exposure if the policy limits remained effective. It should be noted that an insurer who has valid grounds to rescind a policy must act promptly or risk waiving that right to rescind.[72]

The courts generally have applied two different approaches in actions for rescission wherein misrepresentations on the application are at issue: the "agency" approach and the "material misrepresentation" approach.

The "agency" approach is best illustrated in *Bird v. Penn Central Co.*,[73] a decision emanating from the reorganization of the Penn Central Corporation in the early 1970s. On rehearing, the court in *Bird* held that the corporate officer signing the application for D&O insurance acted as an *agent* for the corporate entity and all other officers and directors.[74] Thus, so long as the insurer can establish that the signing officer made material misrepresentations on the application, it is entitled to a rescission of the policy as to all officers and directors and the corporation itself.[75]

The *Bird* approach appears to have been supplanted in recent years by a "material misrepresentation" analysis grounded in contract law. This approach is best illustrated in the *Shapiro v. American Home Assurance Co.* (*Shapiro I*)[76] decision that was rendered by Judge Keeton, who wrote ex-

72. *See, e.g.*, Federal Ins. Co. v. Oak Indus., Inc., No. 85-985-G(M) (S.D. Cal. Feb. 5, 1986) (concluding insurer waived right to rescind after waiting two years after it was placed on notice of misrepresentations).

73. 334 F. Supp. 255 (E.D. Pa. 1971).

74. 341 F. Supp. 291 (E.D. Pa. 1972).

75. *Bird*, 334 F. Supp. at 255. *But see* Zaremba v. National Union Fire Ins. Co., 1979 Fire & Casualty Cas. (CCH) 1302 (N.D. Ohio Sept. 29, 1978) (determining an agency relationship only existed between the application signatory and the corporation, but not with other officers and directors).

76. 584 F. Supp. 1245 (D. Mass. 1984).

tensively on insurance law issues while sitting on the bench of the U.S. District Court for the District of Massachusetts. In essence, *Shapiro I* held that, so long as the application contained misrepresentations material to the insurer's decision to underwrite the risk, the insurer is entitled to a rescission which effectively precludes coverage for all insureds under the policy.[77] This approach has been followed in many other recent cases as well.[78]

Both the *Bird* and *Shapiro I* approaches work well until one encounters what is commonly referenced as a "severability" provision in the D&O policy. "Severability" provisions commonly provide that, for purposes of a prospective insured's response to questions contained in the policy application (particularly those pertaining to the insured's knowledge of circumstances that might give rise to later claims), one insured's knowledge will not be imputed to another insured. The practical application of this concept is that an insurer seeking to rescind an entire policy based upon misrepresentations in the application must prove that each and every insured director and officer had knowledge of the misrepresentation. The "severability" provision will prevent the insurer from imputing the knowledge of the director or officer who signed the application to any other insured.

Not all insurers employ such a provision in their policies for reasons that will become abundantly clear as recent decisions are analyzed.

In *Shapiro v. American Home Assurance Co.* (*Shapiro II*),[79] the court addressed the application of a "severability" provision in the context of a Securities Act liability policy which was substantively similar to those found in certain D&O policies. The severability provision at issue stated in pertinent part: "this Insurance shall be construed as a separate contract with each Insured, the reference in this Insurance to the Insured shall be construed as referring only to that particular Insured, and the liability of the insurer to such Insured shall be independent of its liability to any other Insured."[80]

---

77. *Id.*

78. *See* Home Ins. Co. v. Dunn, 963 F.2d 1023 (7th Cir. 1992) (deciding misrepresentation by one member of a law firm in a policy application rendered the policy void in its entirety); FDIC v. Duffy, 835 F. Supp. 307 (E.D. La. 1993), *aff'd*, 47 F.3d 146 (5th Cir. 1995) (finding misrepresentations in an application for professional liability insurance warranted rescission of the entire policy where there was no indication of a severability provision); National Union Fire Ins. Co. v. Sahlen, 807 F. Supp. 743 (S.D. Fla. 1992), *aff'd*, 999 F.2d 1532 (11th Cir. 1993) (concluding insurer was entitled to rescind policy because of material misrepresentations in attachments to policy application regardless of whether insureds were aware of misrepresentations); Jaunich v. National Union Fire Ins. Co., 647 F. Supp. 209 (N.D. Cal. 1986); *see also* INA Underwriters Ins. Co. v. D.H. Forde & Co., P.C., 630 F. Supp. 76 (W.D.N.Y. 1985) (regarding accountants professional liability policy).

One court has held that a material misrepresentation, even if innocently made, will void the policy. First Nat'l Bank Holding Co. v. Fidelity Deposit Co., 885 F. Supp. 1533 (N.D. Fla. 1995) (applying Florida law).

79. 616 F. Supp. 900 (D. Mass. 1984).

80. *Id.* at 902.

---

It should b
severability i
*application.* Th
certain *exclusi*

While it m
pertinent to
may not be
viewed as su
material misr
tection to the
had no know
the applicati

## POLICY A

### THE BA

There are
Officers Lia

The Dire
cover losses
tion is not p
nify. Many
sumption of
corporation
fact do so.
part of the
Company I
rate indem
solely to m
demnificati
clude an u
the compan
indemnify
propriately

The follo
National I

---

81. *See als*
liability polic
(deciding sev
as to "innoce
A number
policy. *See* A
212 (4th Cir.
Tenn. 1989)
Dist. LEXIS

It should be reiterated that, at this juncture, the authors are discussing severability in regard to the statements made in or in connection with the *application*. This is distinct from severability regarding the applicability of certain *exclusions* in the policy.

While it may be argued that there were public policy considerations pertinent to the Securities Act liability policies at issue in *Shapiro II* that may not be extant in a D&O context, that decision generally has been viewed as supporting the notion that a severability provision vitiates the material misrepresentation standard set forth in *Shapiro I* and affords protection to the so-called "innocent insured," i.e., the director or officer who had no knowledge of the misrepresentation being made in connection with the application.[81]

## POLICY ANALYSIS
### THE BASIC INSURING AGREEMENTS

There are two component parts to a D&O policy: (i) Directors and Officers Liability, and (ii) Company Reimbursement.

The Directors and Officers Liability section is generally intended to cover losses incurred by the directors and officers for which the corporation is not permitted or required to indemnify and does not in fact indemnify. Many insurers have added by endorsement to their policies a "presumption of indemnification" provision to address situations wherein the corporation is legally permitted or required to indemnify but does not in fact do so. This is done because the deductible/retention amount in this part of the policy is relatively minimal compared to that contained in the Company Reimbursement part. The insurer wants to assure that corporate indemnification decisions are not inappropriately made with a view solely to maximize insurance coverage. Oftentimes, this presumptive indemnification provision includes a "financial insolvency" exception to preclude an undue hardship upon the individual directors and officers when the company enters a bankrupt status and where, arguably, the failure to indemnify is for legitimate financial reasons and not with intent to inappropriately avoid the higher deductible/retention.

The following insuring agreement language is taken from the Reliance National Insurance Company (Reliance) form:

81. *See also* Mazur v. Gaudet, 826 F. Supp. 188 (E.D. La. 1992) (regarding fiduciary liability policy); Wedtech Corp. v. Federal Ins. Co., 740 F. Supp. 214 (S.D.N.Y. 1990) (deciding severability provision in a D&O policy precluded the insurer from rescinding policy as to "innocent" insureds).

A number of other cases have dealt with the rescission issue in the context of a D&O policy. *See* Atlantic Permanent Fed. Sav. & Loan Ass'n v. American Casualty Co., 839 F.2d 212 (4th Cir.), *cert. denied*, 486 U.S. 1056 (1988); FSLIC v. Burdette, 718 F. Supp. 649 (E.D. Tenn. 1989); National Union Fire Ins. Co. v. SeaFirst Corp., No. C85-396R, 1987 U.S. Dist. LEXIS 14394 (W.D. Wash. Dec. 23, 1987).

Except for Loss which the Insurer pays pursuant to Insuring Agreement B of this Policy, the Insurer will pay on behalf of the Directors and Officers Loss which the Directors and Officers shall become legally obligated to pay as a result of any Claim first made during the Policy Period or Discovery Period, if applicable, against the Directors and Officers, jointly or severally, for a Wrongful Act which takes place during or prior to the Policy Period . . . .

The second part of the D&O policy, known as Company Reimbursement, is intended to cover those claims against directors and officers for which the company legally indemnifies them. It should be noted that, typically, the corporation must properly grant indemnification to the directors and officers pursuant to the governing statute, charter, or bylaw provision in order to obtain reimbursement under the Company Reimbursement aspect of the policy.[82] The Reliance form states:

The Insurer will pay on behalf of the Company all Loss for which the Company has, to the extent permitted or required by law, and for which the Directors and Officers have become legally obligated to pay as a result of a Claim first made during the Policy Period or Discovery Period, if applicable, against the Directors and Officers, jointly or severally, for a Wrongful Act which takes place during or prior to the Policy Period . . . .

## THE "CLAIMS MADE" ASPECT OF THE POLICY

Given the "claims made" structure of D&O policies, in order for a D&O policy to be implicated, a "claim" first must be made against an insured director or officer during the policy period. An important variation of the claims made requirement is the "notice of circumstances" provision typically contained in D&O policies. Most D&O policies allow insureds to report, during the policy period, circumstances that might give rise to future claims. In the event such claims ultimately are made, even if made after the expiration of the policy, they will be deemed to have been made at the time notice was provided. Accordingly, if an insured becomes aware of circumstances that may give rise to a claim and properly reports those circumstances to the D&O insurer during the policy period, the term of the policy can be effectively extended to respond to a claim involving those circumstances even if the claim is first made after the expiration of the policy.

Many policies do not specifically define the term "claim" or indicate what is meant by "claims first made." It is, however, well established that in the absence of an express policy definition a "claim" is the "assertion,

---

82. *See* MGIC Indem. Corp. v. Home State Sav. Ass'n, 797 F.2d 285 (6th Cir. 1986); Macmillan, Inc. v. Federal Ins. Co., 741 F. Supp. 1079 (S.D.N.Y. 1990); *cf.* Safeway Stores, Inc. v. National Union Fire Ins. Co., 64 F.3d 1282 (9th Cir. 1995).

ring Agree-
ie Directors
become le-
: during the
ie Directors
takes place

Reimburse-
officers for
noted that,
1 to the di-
r, or bylaw
any Reim-

: for which
y law, and
bligated to
Period or
d Officers,
during or

or a D&O
an insured
tion of the
vision typ-
isureds to
ve rise to
n if made
een made
nes aware
orts those
e term of
ving those
on of the

r indicate
ished that
assertion,

Cir. 1986);
way Stores,

demand or challenge of something as a right; the assertion of liability to the party making it do some service or pay a sum of money."[83]

While it is generally accepted that a lawsuit constitutes a "claim," what about threats of legal action, written demands for monetary relief, grand jury investigations, or regulatory agency inquiries? Mere threats of legal action generally do not constitute "claims."[84] Courts also will not recognize requests for explanations, expressions of dissatisfaction or disappointment, mere complaining, or the lodging of a grievance as a "claim."[85] It is clear, however, that a "claim" may be something other than a formal lawsuit, such as a letter demanding money or other relief as a result of specific wrongdoing.[86]

With respect to grand jury investigations, an Eighth Circuit decision has held that attorneys' fees and costs attendant to a grand jury investigation are covered under a D&O policy that does not specifically define the term "claim."[87] The courts are not, however, in agreement over whether certain government actions constitute "claims."[88]

Even in the context of a lawsuit, the resolution of *when* the claim is first made is not clear. Is it the date a complaint is filed, the date service is first made upon an insured, or the date an insured is first made aware of the claim regardless of legal service (e.g., the providing of a "courtesy copy" of the complaint by the plaintiff's counsel)? While all of this may appear

83. Mt. Hawley Ins. v. FSLIC, 695 F. Supp. 469, 479 (C.D. Cal. 1987).

84. Winkler v. National Union Fire Ins. Co., 930 F.2d 1364 (9th Cir. 1991); *In re* Ambassador Group, Inc. Litig., 830 F. Supp. 147 (E.D.N.Y. 1993).

85. *See* Bendis v. Federal Ins. Co., 958 F.2d 960 (10th Cir. 1991); Abifadel v. Cigna, 9 Cal. Rptr. 2d 910 (Cal. Ct. App. 1992).

86. *See, e.g.,* Pacific Ins. Co. v. Cordova Chem. Co., No. 87-23270-CK (Mich. Cir. Ct. Jan. 20, 1989) (discussing letter from EPA notifying the insured of potential liability under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) constituting a "claim" under a general liability policy).

87. Polychron v. Crum & Forster Ins. Cos., 916 F.2d 461 (8th Cir. 1990). A contrary result was reached in MGIC Indem. Corp. v. Home State Sav. Assocs., 797 F.2d 285 (6th Cir. 1986) (discussing a letter identifying officers as targets of a grand jury investigation and the determination that it did not constitute a "claim").

88. California Union Ins. Co. v. American Diversified Sav. Bank, 914 F.2d 1271 (9th Cir. 1990), *cert. denied*, 498 U.S. 1088 (1991) (discussing letters and a cease-and-desist order from the Federal Home Loan Bank Board and the Federal Savings and Loan Insurance Corp. and determining they were not "claims"); Harbor Ins. Co. v. Continental Illinois Corp., No. 85 C 7081, 1989 U.S. Dist. LEXIS 14300 (N.D. Ill. Nov. 27, 1989) (concluding that the SEC's issuance of an order of private investigation was a "claim"); Mt. Hawley Ins. Co. v. FSLIC, 695 F. Supp. 469 (C.D. Cal. 1987) (deeming letters from Federal Home Loan Bank Board to be "claims"); Bensalem Township v. Western World Ins. Co., 609 F. Supp. 1343 (E.D. Pa. 1985) (concluding letter from the Equal Employment Opportunity Commission (EEOC) was not a "claim"); Campbell Soup v. Liberty Mutual Ins. Co., 571 A.2d 969 (N.J. Super. Ct.), *cert. denied*, 584 A.2d 230 (N.J. 1990) (deciding an EEOC reasonable cause determination did not constitute a "claim"); Chalk v. Trans Power Mfg., 451 N.W.2d 770 (Wis. Ct. App. 1989) (concluding letters from the Internal Revenue Service were not "claims").

to be "splitting hairs," an unfortunately significant number of claims arise at or near policy expiration dates and a precise resolution of these issues is necessary to avoid disputes among different insurers and their insureds.

Further, in the case of service by mail, is it the mailing date or the receipt date that is controlling? In a 1992 decision by the U.S. District Court for the Northern District of California, *Informix v. Lloyd's of London*,[89] the court held that an amended complaint naming an additional insured D&O defendant *and* setting forth new allegations nonetheless "related back" to the original complaint which occurred in an earlier policy year and thus did not open the later policy to coverage for the amended complaint.[90]

In addition to the requirement that a claim first be made against the insured directors and officers during the policy period, D&O policies typically contain a requirement relative to the time within which such a claim must be reported to the insurer. These requirements generally fall into one of the following three categories. First, the most onerous requirement from the viewpoint of an insured is that the claim must be reported to the insurer during the policy period. Literally applied, this would mean that if an outside director were served with a summons in a civil action at 10:00 pm on the last day of a policy period that expired at midnight that same day, he or she would have two hours to report it to the insurer. Perhaps this is not altogether impractical in this age of fax and electronic mail communication, but it is still unlikely that the notice requirement could be satisfied even with the most sophisticated communications structure at the insured's and insurer's end.

Second, perhaps in recognition of the intolerable burden that "reporting during the policy period" placed on an insured, many D&O policies have a reporting time period specified in the policy language. Typical language may be as follows: "reported [as soon as practicable] but in no event later than sixty (60) days (after the Claim is first made) or (after the end of the policy period)."

The variations, as illustrated by the bracketed and parenthetical phrases above, may be quite significant. Consider the following situation. A claim is first made on day one of the policy period and not reported until fifty-nine days after the policy expires. While there is compliance with the sixty-day requirement, arguably the fourteen-month delay in reporting runs afoul of the "as soon as practicable" requirement. Of course, fourteen months is the most extreme illustration, but what if there is a two or three month delay in reporting?

Utilizing a requirement of sixty days *after the claim is made*, rather than sixty days after the policy period expires, eliminates the subjectivity problem. While this approach brings great certainty, however, it does shorten

the reportin
resistance fr

It should
time period
an addition:
lengths of ti
to be more 1
have rather
expire well l

Third, al
prefer simpl
practicable,
to both insu
days? Sixty
first noticec
plant super

There is
rence-basec
where it is a
for a claim
establish th
notice on t
prejudicial,
was forsake
different m

In most j
rule does n
which of th
A notable
claims asse
rect Action
cable in o
would have
insurer.[92]

*NOTICI*

Another
is the right
give rise t
stances—o
mon amor

89. No. C-91-1506-FMS, 1992 U.S. Dist. LEXIS 16836 (N.D. Cal. Oct. 15, 1992).
90. *Id.* at *5-*6.

91. LA. RI
92. *See* Wi
(La. 1995).

**of claims arise
of these issues
their insureds.
g date or the
e U.S. District
yd's of London,**[89]
**itional insured
neless "related
ier policy year
mended com-**

**de against the
policies typ-
h such a claim
erally fall into
s requirement
eported to the
ld mean that
ction at 10:00
ght that same
urer. Perhaps
ectronic mail
rement could
s structure at**

**at "reporting
policies have
ical language
o event later
e end of the**

**etical phrases
ion. A claim
d until fifty-
ith the sixty-
porting runs
se, fourteen
two or three**

**rather than
ctivity prob-
loes shorten**

15, 1992).

the reporting period for the insured. Primarily for this reason, it has met resistance from insureds and the brokerage community.

It should be noted that the sixty-day period is just one example of a time period used by D&O insurers. Insureds are free to try to bargain for an additional length of time, and some insurers routinely impose shorter lengths of time, e.g., thirty days. Although thirty days may at first appear to be more than sufficient time to report a claim, many large corporations have rather labyrinthine structures and the thirty-day time period may expire well before the claim works its way through the corporate structure.

Third, although some brokers and other commentators and advisors prefer simply to have a requirement that the claim be reported as soon as practicable, the subjectivity inherent in this standard can be problematic to both insurer and insured alike. What is "as soon as practicable?" Six days? Sixty days? Six months? Does it depend upon whether the claim is first noticed to someone in the general counsel's office, as opposed to a plant supervisor at a remote corporate outpost?

There is a standard usually applied to reporting issues under occurrence-based policies called the "notice-prejudice rule." In essence, in states where it is applied, the rule provides that an insurer may not deny coverage for a claim based upon late notice or reporting to the insurer unless it can establish that it was prejudiced by such late notice. In many cases, even notice on the eve of or during trial proceedings will not be considered prejudicial, unless the insurer can establish that a settlement opportunity was forsaken or that it would have conducted the defense in a materially different manner.

In most jurisdictions that have considered the issue, the notice-prejudice rule does not apply to claims-made policies such as D&O, regardless of which of the three reporting requirements previously described may apply. A notable exception in this area is Louisiana, but only with regard to claims asserted directly by third-party claimants under the Louisiana Direct Action Statute.[91] In such cases, a notice-prejudice standard is applicable in order to protect the interests of the third-party claimant who would have no control over how and when the insured gives notice to its insurer.[92]

## NOTICE OF CIRCUMSTANCES—"POTENTIAL CLAIMS"

Another important aspect of the D&O policy that must be understood is the right of the insured to give notice of facts or circumstances that could give rise to a claim. The right to give notice of such facts or circumstances—or "potential claims"—is not unique to D&O, but rather is common among professional liability policies written on a claims-made basis,

91. LA. REV. STAT. ANN. § 22:655 (West 1995).
92. *See* Williams v. Lemaire, 655 So.2d 765 (La. Ct. App.), *appeal denied,* 660 So.2d 481 (La. 1995).

such as, lawyers', accountants' and design professionals' liability policies. Such notice may be given within the policy period or, under some policy forms, in a "discovery period."

If one views the termination date of a claims made policy as similar in effect to the expiration of a statute of limitations for a legal cause of action, then effective notice of a potential claim essentially "tolls" the expiration of the policy with regard to an actual claim that may later arise from the facts or circumstances of the potential claim for which notice has been given.

Abuse of a "potential claim" notice provision can alter a claims made policy to a *de facto* "occurrence policy."[93] In order to avoid such abuse, most policies provide that there must be notice with requisite specificity as to the potential wrongful acts that may be alleged and against whom they may be alleged. If an insured desires to place the insurer on notice of a claim *or* a potential claim, it should be sure to do so in compliance with the appropriate provision in the policy.

A recent Massachusetts appellate decision held notice "buried" in material submitted with a renewal application for a policy was not sufficient notice of a claim.[94] Similarly, a "laundry list" noting that twenty-six employees were terminated within the last year would not be sufficient notice of a potential claim without some objective indication that one or more of the employees has questioned the company's termination procedures as applied and/or threatened legal action.[95] Several circuit court opinions have adopted a strict construction approach to interpreting the sufficiency of notice under D&O policies' notice of occurrence provisions.[96]

---

93. This policy covers all claims stemming from occurrences within the policy period regardless of when notice is given or a claim made.

94. W.R. Grace v. Maryland Casualty Co., 600 N.E.2d 176 (Mass. 1992); *see also* California Union Ins. Co. v. American Diversified Sav. Bank, 948 F.2d 556 (9th Cir. 1991) (deciding that a cease-and-desist order that did not describe circumstances which might give rise to director liability was not adequate notice). *But see* Branning v. CNA Ins. Co., 721 F. Supp. 1180 (W.D. Wash. 1989) (concluding that a cease-and-desist order attached to a renewal application was adequate notice).

95. *See also* FDIC v. Caplan, 838 F. Supp. 1125 (W.D. La. 1993) (concluding that a letter from the Federal Deposit Insurance Corp. was not sufficient notice as it neither identified wrongful acts, the directors and officers involved in the purported wrongful conduct, nor the relevant time period).

96. *See* LaForge v. American Casualty Co., 37 F.3d 580 (10th Cir. 1994) (determining that materials submitted in connection with an application for coverage did not provide adequate notice of an occurrence); Resolution Trust Co. v. Ayo, 31 F.3d 285 (5th Cir. 1994) (applying an objective standard, the court held that the submission of regulatory reports did not constitute sufficient notice of an occurrence); FDIC v. Mijalis, 15 F.3d 1314 (5th Cir. 1994) (finding that the notice to the insurer of a cease-and-desist order and the insured's deteriorating financial condition did not trigger coverage under the notice of potential claim provision).

*liability policies.*
*der some policy*

*licy as similar in*
*l cause of action,*
*" the expiration*
*r arise from the*
*notice has been*

*r a claims made*
*oid such abuse,*
*uisite specificity*
*d against whom*
*isurer on notice*
*) in compliance*

*'buried" in ma-*
*as not sufficient*
*: twenty-six em-*
*sufficient notice*
*at one or more*
*tion procedures*
*t court opinions*
*g the sufficiency*
*sions.[96]*

*i the policy period*

*1992); see also Cali-*
*56 (9th Cir. 1991)*
*:s which might give*
*IA Ins. Co., 721 F.*
*rder attached to a*

*:luding that a letter*
*t neither identified*
*ul conduct, nor the*

*1994) (determining*
*ge did not provide*
*285 (5th Cir. 1994)*
*ulatory reports did*
*.3d 1314 (5th Cir.*
*and the insured's*
*: of potential claim*

## DISCOVERY PERIOD

Almost every D&O policy affords the insured the right to purchase a "discovery period" or "optional extension period" in the event the insurer cancels the policy under certain circumstances. Under *some* policies, both actual claims and notice of circumstances may be reported during a purchased optional extension period, provided that the wrongful activity that is the subject of the claim or notice of circumstance took place during or prior to the expiring policy period. The longer the optional extension period, the less likely it is for an insured to have a claim falling within a "coverage gap" created by a replacement policy, excluding claims arising from circumstances that should have been known to result in a claim. Other D&O policy forms employ language intended to restrict the optional extension period solely to the reporting of *actual* claims. Once again, the unfortunate situation of courts interpreting identical policy language in contrary fashion arises.[97]

## DEFENSE EXPENSES

Another important feature of the D&O policy is its requirement that the insurer pay defense costs, but it does not impose upon the insurer the duty to defend its insureds.[98] Typically, the policy language permits the insureds to select defense counsel, subject to the consent of the insurer.

D&O policies historically have not been written on a "duty to defend" basis due to the fact that the policies were intended to cover the very "brain trust" of the corporation and these individuals did not wish to have such delicate matters as their personal defense left to the control of an insurance company. While this results in the insurer losing some amount of control over the costs and conduct of the defense effort, it is generally relieved from any potential exposure as a result of hiring counsel who may subsequently be negligent in the defense of the insureds.

Although the language of the prevalent policies varies greatly, there has arisen over the past few years a controversy as to when the obligation of the insurer to pay defense costs attaches. While under the "duty to defend" language it is relatively clear that the duty carries with it a concomitant obligation to pay for the defense expenses as they are rendered and billed, the issue in D&O policies is whether that obligation exists or whether the obligation to pay arises only *after* the claim matter is concluded.

97. *See* American Casualty Co. v. FDIC, 958 F.2d 324 (10th Cir. 1992) (finding notice of an occurrence or *potential* claim can only trigger coverage if it is given during the *policy period*); *see also* FDIC v. American Casualty Co., 528 N.W.2d 605 (Iowa 1995). *But see* McCuen v. American Casualty Co., 946 F.2d 1401 (8th Cir. 1991); Slaughter v. American Casualty Co., 842 F. Supp. 376 (E.D. Ark. 1993), *rev'd*, 37 F.3d 385 (8th Cir. 1994) (concluding notice of a potential claim may be given in either the policy period or optional extension period).

98. *See* Helfand v. National Union Fire Ins. Co., 13 Cal. Rptr. 2d 295 (Cal. Ct. App. 1992).

**594** The Business Lawyer; Vol. 51, May 1996

While many decisions on the issue throughout various state and federal jurisdictions exist, the decisions unfortunately are evenly split between those holding for contemporaneous payment of defense expenses and those permitting the insurer to defer making any payments until the conclusion of the claim.

Even more confusing is the fact that some courts in the early decisions addressing this issue interpreted virtually identical policy language in an inconsistent fashion.[99] In one jurisdiction, the U.S. District Court for the Southern District of New York, there are arguably inconsistent opinions coming from the same court and even the same judge. In *PepsiCo*, Judge Breiant found a contemporaneous duty to pay under the CNA D&O policy at issue,[100] but he distinguished this in a later reported decision involving a CNA "Board of Education Liability Including School District Reimbursement" policy containing very similar language.[101] Another jurist in the same district found a contemporaneous duty to pay under an Employers Re "Publishers Libel and Allied Torts" policy with a provision similar to that in the CNA policy at issue in *PepsiCo*.[102]

99. A number of other decisions hold for a contemporaneous duty to pay. *See* McCuen v. American Casualty Co., 946 F.2d 1401 (8th Cir. 1991); Gon v. First State Ins. Co., 871 F.2d 863 (9th Cir. 1989); Okada v. MGIC Indem. Corp., 823 F.2d 276 (9th Cir. 1987); FDIC v. Booth, 824 F. Supp. 76 (M.D. La. 1993); Wedtech Corp. v. Federal Ins. Co., 740 F. Supp. 214 (S.D.N.Y. 1990); FSLIC v. Burdette, 718 F. Supp. 649 (E.D. Tenn. 1989); Mt. Hawley Ins. Co. v. FSLIC, 695 F. Supp. 469 (C.D. Cal. 1987); American Casualty Co. v. Bank System, 675 F. Supp. 538 (D. Minn. 1987); Little v. MGIC Indem. Corp., 649 F. Supp. 1460 (W.D. Pa. 1986), *aff'd on other grounds*, 836 F.2d 789 (3d Cir. 1987); Western Line Consol. Sch. Dist. v. Continental Casualty Co., 632 F. Supp. 295 (N.D. Miss. 1986); Quinlan v. Liberty Bank & Trust Co., 545 So.2d 1140 (La. Ct. App. 1991).

A number of other decisions follow the line of reasoning in Zaborac v. American Casualty Co., 663 F. Supp. 330 (C.D. Ill. 1987), in holding that the D&O insurer has no obligation to pay defense expenses at the time they are incurred. *See* Resolution Trust Corp. v. Miramon, No. 92-2672, 1993 U.S. Dist. LEXIS 8361 (E.D. La. May 27, 1993); Corabi v. CNA Ins. Cos., No. C-2-87-674, 1988 U.S. Dist. LEXIS 18424 (S.D. Ohio June 21, 1988); Continental Cas. Co. v. Allen, No. CA-5-86-252 (N.D. Tex. Feb. 16, 1988) (on file with *The Business Lawyer*, University of Maryland School of Law); Harristown Dev. Corp. v. International Ins. Co., No. 87-1380, 1988 U.S. Dist. LEXIS 12791 (M.D. Pa. Nov. 15, 1988); American Casualty Co. v. FDIC, 677 F. Supp. 600 (N.D. Iowa 1987); Continental Cas. Co. v. McAllen Sch. Dist., No. B-86-007, 1987 U.S. Dist. LEXIS 14150 (S.D. Tex. May 19, 1987); Luther v. Fidelity & Deposit Co., 679 F. Supp. 1092 (S.D. Fla. 1986); Bank of Commerce & Trust Co. v. National Union Fire Ins. Co., 651 F. Supp. 474 (N.D. Okla. 1986); Enzmeiler v. Fidelity & Deposit Co., No. 85-99, 1986 WL 20444 (E.D. Ky. May 13, 1986); Farmers & Merchants Bank v. Home Ins. Co., 514 So.2d 825 (Ala. 1987); Continental Casualty Co. v. Board of Ed., 489 A.2d 536 (Md. 1985); Amrep Corp. v. American Home Assurance Co., 440 N.Y.S.2d 244 (N.Y. App. Div. 1991); National Union Fire Ins. Co. v. Ambassador Group, Inc., 556 N.Y.S.2d 549 (N.Y. App. Div. 1990); Faulkner v. American Cas. Co., 584 A.2d 734 (Md. Ct. Spec. App.), *cert. denied*, 590 A.2d 158 (Md. 1991); National Union Fire Ins. Co. v. Goldman, 548 So.2d 790 (Fla. Dist. Ct. App. 1989).

100. 640 F. Supp. 656 (S.D.N.Y. 1986).

101. Board of Ed. v. CNA Ins. Co., 647 F. Supp. 1495 (S.D.N.Y. 1986), *aff'd*, 839 F.2d 14 (2d Cir. 1988).

102. McGinnis v. Employers Reinsurance Corp., 648 F. Supp. 1263 (S.D.N.Y. 1986).

Adding to the confusion, there arguably are inconsistent rulings in this area as between the U.S. District Court for the Southern District and U.S. District Court for the Eastern District of New York. In *In re Ambassador Group Litigation*,[103] the Eastern District court held that the D&O policy at issue provided neither a duty to defend nor the obligation of the insurer to contemporaneously pay defense costs.[104] Unlike *PepsiCo*, the policy at issue in *Ambassador* contained an endorsement that provided for "loss" payments to be paid before defense expenses were paid. As such, the court was concerned that the intent of this endorsement would be frustrated by the contemporaneous payment of defense costs, leaving little or nothing in the policy proceeds for loss payments.[105] Subsequently, the Southern District, in *In re Kenai Corp.*,[106] a decision on a D&O policy, elected to follow the Eastern District decision in *Ambassador* rather than the *PepsiCo* decision.[107]

Perhaps nothing illustrates the point that controversy *still* exists more than two of the more recent decisions in this area. The same National Union Policy language was at issue in both *Kenai* and a U.S. District Court for the Southern District of Florida case, *National Union Fire Insurance Co. v. Brown*,[108] decided within four months of each other. Florida said pay now[109] and New York said pay later.[110]

If any recent trend may be ascertained, it is that decisions in this area are now occurring somewhat less frequently than in recent years. This phenomenon seems to have occurred essentially for two reasons. First, many insurers revised their policy language in response to some of the early decisions holding that the insurer had an obligation contemporaneously to pay defense expenses. The National Union Fire Insurance Company of Pittsburgh, PA, in its Directors and Officers Insurance part and Company Reimbursement Policy Form, while specifically providing for advancement of defense costs under the Directors and Officers Insurance part of the policy (Coverage A) subject to certain limitations, does not so provide under the Company Reimbursement Insurance part (Coverage B). Unfortunately for the insureds, the overwhelming majority of D&O claims would be subject to coverage only under Coverage B given the liberal standards of indemnification now established in most jurisdictions. Indeed, and perhaps sensitive to decisions such as *Okada v. MGIC Indemnity Corp.*[111] and its progeny addressing ambiguities in policy lan-

---

103. 738 F. Supp. 57 (E.D.N.Y. 1990).
104. *Id.* at 61–62.
105. *Id.* at 64.
106. 136 B.R. 59 (S.D.N.Y. 1992) (holding no duty to pay contemporaneously unless specifically provided for in policy).
107. *Id.* at 63.
108. 787 F. Supp. 1424 (S.D. Fla.), *aff'd mem.*, 963 F.2d 385 (11th Cir. 1992).
109. *Id.* at 1429–30.
110. *Kenai*, 136 B.R. at 63–64.
111. 823 F.2d 276 (9th Cir. 1987).

guage, the National Union policy takes pains to make it explicit that it has no obligation to make payment for defense costs under Coverage B until the claim is concluded.[112] "The Insurer may, *in its absolute discretion,* reimburse all or any part of such Defense Costs prior to the final disposition of the claim."[113]

Second, many insurers, regardless of what their rights may be under the policy and pursuant to controlling judicial authority, began to implement a claims handling approach which included responding by paying defense costs as they are incurred. Regardless of whether there may be a legal obligation to pay defense costs as they come due, or to "advance" defense costs in this manner, it may make practical sense for an insurer to pay defense costs in this manner. What is meant by "advancing" expenses is not the creation of a retainer or fund by the insurer to be drawn down as legal expenses are incurred, but rather the payment of all reasonable legal defense expenses as they are billed by the appropriate vendors.

Advancement of defense expenses may be mutually beneficial to the insurer and insured for various reasons:

   (i). Money has a time value. Claim matters, particularly in the professional liability area, oftentimes are not concluded by settlement, dismissal, or a final adjudication until years after their inception. Where defense expenses reach the hundreds of thousands of dollars, and perhaps millions of dollars, it creates a tremendous financial strain upon an insured to have to pay these expenses and then await a future reimbursement from the insurer.

   (ii). Although when the insurer advances defense costs it loses the benefit of the "float," it and its insured will be able to address any disagreements they may have on the reasonableness and propriety of certain defense expenditures early in the life of the claim, and preferably at frequent intervals, so that these disputes remain small in scope on an individual basis. It has been common experience that parties become more intransigent as more money is at issue. In addition, the parties have the ability to agree to avoid problems in future bills, an ability that is lost if the process is deferred to the conclusion of the claim.

Aside from possible disagreements over the reasonableness of certain expenditures, issues of coverage and allocation of expense between the

112. See Clause 9 of the National Union Fire Insurance policy form, wherein it is stated: "Under Coverage B, *the Insurer assumes no duty to reimburse Defense Costs prior to the final disposition of the claim.*"

113. In a form introduced in April 1995 as an alternative to and/or replacement of this 1988 form, National Union now provides for contemporaneous payment of defense expenses under all aspects of the policy.