UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>AMERICAN INTERNATIONAL GROUP, ) INC. and NATIONAL UNION FIRE ) INSURANCE COMPANY OF ) PITTSBURGH, PENNSYLVANIA, )<br><br>Defendants. ) | C. A. No. 04-10685 WGY |

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**<u>EXHIBIT C (PART 2 OF 2)</u>**

**DIRECTORS' AND OFFICERS INDEMNIFICATION AND LIABILITY INSURANCE: AN OVERVIEW OF LEGAL AND PRACTICAL ISSUES**

In the D&O policy situation, however, the insurer has little choice but to resort to an audit in difficult situations. Absent a regular and ongoing relationship, D&O defense counsel are not always willing to cooperate fully with the insurer in providing detailed billing statements and rendering only reasonable and necessary services.

Unfortunately, many disputes over the reasonableness of defense costs are beginning to find their way into litigation after attempts at negotiated resolution have failed. At least one court has held that the insurer only has an obligation to reimburse "reasonable" fees, regardless of whether that term is expressly stated in the policy.[116]

## POLICY EXCLUSIONS

Because the grant of coverage under the typical D&O policy form is so broad, the exclusions in the policy in a sense define the coverage more than any other policy provisions. As there have been changes in the insurance marketplace and increasing judicial interpretation of the policy over the past several years, numerous exclusions have been added to the specimen policy forms of most insurers by way of endorsement. Typically, between the specimen and added endorsements, the policy will contain somewhere between ten and twenty separate exclusions. Subject to negotiation among the insured corporation, the insurer, and the broker, various combinations of these exclusions may be used for given risks. Thus, one should be hesitant in drawing conclusions by simply comparing specimen policy forms. Most insurers are flexible enough to consider adopting endorsement language of a competitor in order to "close a deal." In examining a policy form, one needs to examine the *entire* policy very carefully, as not all of the exclusions are always contained in the policy section discretely labeled as "Exclusions."

### Exclusions in Definition of "Loss"

For example, most insurers utilize the definition of the term "loss" to set forth an exclusion for "fines or penalties," as illustrated in the sample Reliance language below.

"Loss" shall mean any amount which the Directors and Officers are legally obligated to pay or for which the company may be required or permitted by law to pay as indemnity to the Directors and Officers, for a claim or claims made against the Directors and Officers for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and cost of investigation (including salaries of officers and employees of the Company) and defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or

116. Macmillan, Inc. v. Federal Ins. Co., 141 F.R.D. 241 (S.D.N.Y. 1992).

le choice but
and ongoing
to cooperate
nd rendering

defense costs
it negotiated
rrer only has
whether that

cy form is so
verage more
es in the in-
of the policy
idded to the
it. Typically,
will contain
ibject to ne-
the broker,
risks. Thus,
paring spec-
ler adopting
leal." In ex-
ry carefully,
blicy section

m "loss" to
the sample

Officers are
be required
nd Officers,
Officers for
nages, judg-
laries of of-
gal actions,
achment or

).

similar bonds, provided always, however, *such subject of loss shall not include fines or penalties imposed by law, or matters which are deemed uninsurable under the law pursuant to which this policy shall be construed.*[117]

### *Exclusions in Definition of "Wrongful Act"*

A defense to coverage under D&O policies relating to "insured capacity" may arise from the definition of "Wrongful Act," which may read along the lines of the following:

> "Wrongful Act" shall mean any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty by the Directors and Officers in the discharge of their duties, individually or collectively, or any matter claimed against them *solely by reason of their being Directors and Officers of the Company.*[118]

Inclusion of the emphasized language reflects a recognition that corporate directors and officers may act in multiple capacities as a result of other relationships with the corporation. For example, many directors and officers of publicly traded corporations own stock in the corporation they serve. Other relationships may also exist. It is not unusual for a lawyer from the corporation's outside law firm to sit on the board of directors, or a director or officer may act as a fiduciary for a company benefit plan.

These varying relationships with the corporation create a number of issues for directors and officers, including, but by no means limited to, potential coverage defenses under D&O policies. There appears to be a consensus among the courts that coverage will not be available for claims against directors and officers for wrongful acts which do not relate to their corporate duties. For example, in *Aetna Casualty & Surety Co. v. Lindner,*[119] the court granted the D&O insurer's motion for summary judgment and held that no coverage was available to directors and officers who were sued "only in their capacities as individuals and as controlling shareholders."[120]

In an analogous context, the Fifth Circuit, interpreting a comprehensive general liability policy, held that a priest who sexually abused a minor was not acting within the scope of his duties as an employee of the Archdio-

117. Reliance National, Directors and Officers Liability Policy Including Company Reimbursement, at 2 (emphasis added) [hereinafter D&O Liability Policy] (on file with *The Business Lawyer,* University of Maryland School of Law).

118. *Id.*

119. No. Civ. 90-1221 (D. Ariz. Dec. 12, 1994) (on file with *The Business Lawyer,* University of Maryland School of Law).

120. *Id.* at 3-4; *see also* Beck v. American Casualty Co., No. MO-88-CA-303, 1990 WL 598573 (W.D. Tex. Apr. 12, 1990); Olson v. Federal Ins. Co., 219 Cal. App. 3d 252 (Cal. Ct. App. 1990) (concluding no coverage for individual who was sued in his capacity as a shareholder, rather than as a director or officer).

cese.[121] The fact that the illicit acts occurred in the priest's private residence while not "on duty" was dispositive as to the issue of insured capacity.[122] Sometimes, however, the line between insured wrongful acts and uninsured wrongful acts becomes blurred. In such situations, courts have found coverage to exist. In *Ratcliffe v. International Surplus Lines Insurance Co.*,[123] the D&O insurer was required to provide coverage for a claim that did not distinguish between the insureds acting as officers or trustees of a private trust.[124]

### Specific Policy Exclusions

The D&O policy exclusions can be characterized broadly as falling into either of two categories: corporate governance exclusions and those excluding matters that should be covered under other insurance. These exclusions have their origin in principles of good corporate governance and, in particular, state statutory law regarding indemnification of directors and officers by the corporation and recently, laws exculpating directors and officers from liability in certain circumstances.

Two of the Reliance policy form exclusions in this category read as follows:

> The Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers:
>
> . . .
>
> B. *for the return by the Directors or Officers of any remuneration paid in fact to them if payment of such remuneration shall be held by the Courts to be in violation of law;*
>
> C. *for an accounting of profits made from the purchase or sale by the Directors or Officers of securities of the company within the meaning of section 16(b) of the Securities Exchange Act of 1934 and amendments thereto or similar provisions of any State statutory law or common law* . . . .[125]

These two exclusions are fairly straightforward in their language and application. As such, they are rarely the subject of dispute between insureds and the insurer.

Generally, much of the conduct excluded by "dishonesty" and "personal profit" exclusions is the very conduct for which the statutes of many states and/or federal law, rules, and regulations prohibit indemnification, if such conduct is established. Many of the recent statutory enactments which exculpate directors (and sometimes officers as well) from liability to

121. Tichenor v. Roman Catholic Church, 32 F.3d 953, 960 (5th Cir. 1994).

122. *Id.*

123. 550 N.E.2d 1052 (Ill. App. Ct. 1990).

124. *Id.* at 1059-60; *see also* Macmillan, Inc. v. Federal Ins. Co., 764 F. Supp. 38 (S.D.N.Y. 1991).

125. D&O Liability Policy, *supra* note 117, at 3.

the corporation and/or its shareholders make exceptions for fraudulent conduct, willful violations of law, and unentitled personal profit.

The "dishonesty" exclusion is also a "corporate governance exclusion" and potentially has application to almost every claim under a D&O policy.

The Reliance form provides as follows:

> D. *by reason of any deliberately dishonest or fraudulent act or omission, or any criminal or malicious act or omission, or any willful violation of law; however, notwithstanding the foregoing, the Directors or Officers shall be protected under the terms of this policy as to any claims upon which suit may be brought against them by reason of any alleged dishonesty on the part of the Directors or Officers, unless a judgment or other final adjudication thereof adverse to the Directors or Officers shall establish that acts of deliberate dishonesty, as aforesaid, committed by the Directors and Officers were material to the cause of action so adjudicated.*[126]

The Reliance D&O policy is an example of the forms that provide that the "dishonesty exclusion" shall not apply unless and until there is an adjudication adverse to the insured director or officer. To put the potential applicability of the exclusion in perspective, only a small percentage (some surveys suggest far less than five percent) of litigated matters ever proceed to a final adjudication. Thus, while it is not suggested that there should be no concern with the effects of the exclusion, the concern should be much greater where you have a D&O policy in which the "dishonesty exclusion" does not require a final adjudication or applies when dishonesty is established merely *in fact*.

A number of decisions have upheld this final adjudication requirement and have added the gloss that an insurer may not seek to have an adjudication of the dishonesty issue in a collateral action with the insured. In other words, the dishonesty must be adjudicated in the context of the underlying claim or not at all.[127]

A number of insurers have reacted to this line of decisions by dropping the adjudication requirement and requiring only dishonesty "in fact." It is unclear exactly when dishonesty "in fact" exists but a 1977 decision from the U.S. District Court for the District of Delaware applied similar exclusionary language in a D&O policy to exclude coverage for amounts paid as part of a *settlement*.[128] Also, without the adjudication requirement, the insurer should be entitled to seek collaterally an adjudication of dis-

126. *Id.*

127. *See* First Nat'l Bank Holding Co. v. Fidelity Deposit Co., 885 F. Supp. 1533 (N.D. Fla. 1995) (concluding guilty plea was a final adjudication for purposes of dishonesty exclusion); *see also* Atlantic Permanent Fed. Sav. & Loan Ass'n. v. American Casualty Co., 839 F.2d 212 (4th Cir.), *cert. denied*, 486 U.S. 1056 (1988); National Union Fire Ins. Co. v. Continental Illinois Corp., 666 F. Supp. 1180 (N.D. Ill. 1987); PepsiCo, Inc. v. Continental Casualty Co., 640 F. Supp. 656 (S.D.N.Y. 1986).

128. *See* Stargatt v. Avenell, 434 F. Supp. 234 (D. Del. 1977).

honesty and an application of the exclusion in a subsequent or parallel action.[129]

Courts have not had a great deal of difficulty in identifying or defining "dishonesty." One question that directors and officers *may* ask, however, is whether certain breaches of fiduciary duty may implicate the dishonesty exclusion in their D&O policies. One case suggests the answer is "yes." In *Leucadia, Inc. v. Reliance Insurance Co.*,[130] the Second Circuit, in the context of interpreting the coverage afforded under a fidelity bond, held that there need not be a finding of fraud in order to have dishonesty: "New York law does not . . . consider the words fraud and dishonesty to be synonymous. Dishonesty is broader and may cover acts which fall short of constituting fraud."[131]

In any event, the label of the legal cause of action asserted against the insureds is irrelevant to the issue of whether the dishonesty exclusion is triggered. The central issue is whether the factual record supports a finding that acts of active and deliberate dishonesty occurred.[132]

One final point should be made on the dishonesty exclusion regarding coverage available under a fidelity bond. This type of contract is extended to cover specifically dishonest acts of employees, directors, and/or officers. Unlike the D&O liability policy, however, the bond is essentially first party coverage for the benefit of the corporate entity and requires proof that the loss was caused by the dishonesty of the individual.

In *Eglin National Bank v. Home Indemnity Co.*,[133] the court held that a D&O liability policy and a fidelity bond are mutually exclusive.[134] In essence, once the loss is proven for purposes of recovery under the bond, one has triggered the application of the dishonesty exclusion in the D&O policy as to the "dishonest" officer or director.[135] Many D&O policies provide that this exclusion, among others, applies severally and thus will not preclude coverage for the individual whose culpability may have been less than "dishonest."

Most D&O policies exclude claims based upon or attributed to directors or officers gaining *in fact* any personal profit or *advantage* to which they were not *legally entitled*.

The Reliance form provides as follows: "*A. based upon or attributable to their gaining in fact any personal profit or advantage to which they were not legally enti-*

---

129.   *See* American Casualty Co. v. United S. Bank, 950 F.2d 250 (5th Cir. 1992).

130.   864 F.2d 964 (2d Cir. 1988), *cert. denied*, 109 S. Ct. 3160 (1989).

131.   *Id.*

132.   *See* Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc., 534 So.2d 1187 (Fla. Dist. Ct. App. 1988) (finding that even though claim asserted against the insureds did not require a finding of dishonesty, the record supported such a finding, and hence, the dishonesty exclusion was applicable).

133.   583 F.2d 1281 (5th Cir. 1978).

134.   *Id.* at 1285.

135.   *Id.* at 1288.

*tled.*"[136] Typically, this exclusion does not require a final adjudication and the courts have upheld this application.[137]

In *Gardner v. Cumis Insurance Society, Inc.*,[138] the personal profit exclusion was held to exclude coverage for a claim involving an insured's receiving "kickbacks."[139] Interestingly, even though the insured was acquitted of criminal wrongdoing, the court still precluded coverage based upon a personal profit exclusion.[140]

The "advantage" language in the exclusion raises questions regarding golden parachutes or measures undertaken by management to entrench themselves in the face of a hostile takeover attempt. Are these unentitled personal "advantages" that should trigger the application of the exclusion? One case involving golden parachutes declined to allow the insurers to apply the personal profit exclusion, but it would appear that this was only because the "golden parachute" arrangement was determined to be valid.[141]

A second group of exclusions bars from coverage matters which should be covered under some other liability insurance policy held by the corporation for its own and its directors' and officers' benefit. Again, using the Reliance policy form to illustrate, these exclusions are as follows:

> E. which is insured by another valid policy or policies except in respect of any excess beyond the amount or amounts of payments under such other policy or policies;
>
> F. for which the Directors and Officers are entitled to indemnity and/or payment by reason of having given notice of any circumstance which might give rise to a claim under any policy or policies the term of which has expired prior to the inception date of this policy . . . .[142]

Exclusion E, while nominally set forth in the policy as an exclusion, is functionally a provision which provides that the D&O policy is excess over other insurance policies that may be applicable. The language of Exclusion E is intended to help to alleviate possible disputes among the D&O insurer, its insureds, and other insurers as to how the policies should be applied. It should be recognized, however, that, oftentimes, the "other" insurance policy will contain the identical "other insurance" provision, thus creating a situation of mutual repugnancy.[143] Exclusion F is intended simply to

---

136. D&O Liability Policy, *supra* note 117, at 3.

137. *See* Federal Ins. Co. v. Sheldon, 186 B.R. 364 (S.D.N.Y. 1995); National Union Fire Ins. Co. v. Continental Illinois Corp., 666 F. Supp. 1180 (N.D. Ill. 1987); Gardner v. Cumis Ins. Society, Inc., 582 So.2d 1094 (Ala. 1991).

138. *Gardner*, 582 So.2d at 1094.

139. *Id.* at 1096.

140. *Id.* at 1095.

141. International Ins. Co. v. Johns, 874 F.2d 1447 (11th Cir. 1989).

142. D&O Liability Policy, *supra* note 117, at 3.

143. There is a well-developed body of case law dealing with "other insurance" disputes that is beyond the scope of this Article.

ensure that there can be no inappropriate "stacking" of serial D&O policies to apply to a single loss.

"*G. for any Personal Injury, bodily injury, sickness, disease or death of any person, or for damage to or destruction of any tangible property including loss of use thereof.*"[144] Exclusion G excludes from coverage matters that are generally covered under the corporation's comprehensive or commercial general liability policies.

"*H. arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste material or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.*"[145] Exclusion H is commonly referenced as a "pollution exclusion." To a certain extent and pursuant to a number of judicial decisions over the past several years, the corporation *may* have coverage for these matters under a comprehensive or commercial general liability policy or under a separately purchased pollution liability (or environmental impairment liability) policy.

The pollution exclusion is not often at issue in the context of a coverage dispute under a D&O policy. Perhaps this is because the exclusionary language in a D&O pollution exclusion has always been "absolute," i.e., it does not reference the temporal term "sudden and accidental," which has been the focus of much judicial scrutiny. As such, few disputes have been litigated in this area and the insurer has prevailed in the reported decisions to date.[146]

Finally, the matters excluded in Exclusion I should be covered by an appropriate fiduciary liability policy. "*I. based upon, or arising out of, or in any way involving, the Employee Retirement Income Security Act of 1974 or amendments thereto or any regulations promulgated thereunder, or similar provisions of any Federal, State or Local statutory law or common law.*"[147]

The following exclusions are not common to all policy forms currently in use, but are frequently added by way of endorsement. The Insured v. Insured exclusion is usually added by endorsement, if not already in the specimen form, with wording to the following effect:

> The Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers . . . by or on behalf of a Director and/or Officer, or by or on behalf of the "Company," except for stockholder(s) derivative actions brought by a shareholder(s) of the Company other than a Director and/or Officer.

144. D&O Liability Policy, *supra* note 117, at 3.
145. *Id.*
146. *See* High Voltage Eng'g Corp. v. Federal Ins. Co., 981 F.2d 596 (1st Cir. 1992); Employers Ins. v. Duplan Corp., 899 F. Supp 1112 (S.D.N.Y. 1995); Prudential-LMI Commercial Ins. Co. v. Meadowood Condominium Ass'n, No. 91-3848, 1992 WL 189490 (E.D. Pa. Aug. 3, 1992).
147. D&O Liability Policy, *supra* note 117, at 3.

Many brokers and others in the insurance industry commonly refer to this exclusion as an "Insured vs. Insured" or "1 vs. 1" (the 1 apparently being used in place of "I" for Insured) exclusion.

This language was intended to restrict the coverage afforded by a D&O policy solely to claims made by third parties, not by other directors, officers, or the corporation itself. This is a major difference from a fidelity bond or property policy. Obviously, where there are insureds on both sides of a third-party liability claim situation, the potential exists for collusion and failure to cooperate adequately with the insurer in undertaking a vigorous defense.

Of course, the insured organization is not without recourse in protecting itself from directors' and officers' wrongdoing. While it is beyond the scope of discussion here, the corporation's fidelity bond may well be available to respond in cases of directors' and officers' dishonesty. Further, the endorsement as drafted by Reliance does not exclude coverage for stockholder's derivative actions. Such actions brought in the name of the insured corporation would otherwise trigger the exclusion absent the above-quoted qualifying language.

Historically, this exclusion has been litigated most often in the context of claims brought by the Resolution Trust Corporation (RTC) and similar agencies against directors and officers of failed financial institutions. In this regard, if these government agencies take over an insolvent company and then sue the company's directors and officers, they are said to "stand in the shoes" of the company, thus falling within the scope of the exclusion.[148]

Apart from claims brought by these regulatory agencies, the Insured vs. Insured exclusion has been widely upheld as written.[149] A "Regulatory Exclusion" is generally endorsed upon the policy with the following or similar language:

> The Insurer shall not be liable to make any payment for Loss in connection with any claim made against the Directors or Officers . . . brought or maintained by or on behalf of the Resolution Trust Corporation, Office of Thrift Supervision, Federal Deposit Insurance Corporation, the Comptroller of the Currency, or similar federal or state agency (collectively referred herein as Agencies), regardless of whether such Agencies are acting in the capacity of a depository insurance organization, regulatory agency, receiver, conservator or liquidator of any institution, and further without regard to whether any claim is brought in the name of such Agencies, by or on behalf of such Agencies in the name of the Company, another entity or individual, or solely by or on behalf of the Company, another entity

---

148. See Appendix B of this Article for a listing of the decisions and results in this area.
149. *See* Reliance Ins. Co. v. Weis, 5 F.3d 532 (8th Cir. 1993), *cert. denied*, 114 S. Ct. 1066 (1994); Levy v. National Union Fire Ins. Co., 889 F.2d 433 (2d Cir. 1989); Bendis v. Federal Ins. Co., 1989 WL 161437 (D. Kan. Dec. 4, 1989), *aff'd*, 958 F.2d 960 (10th Cir. 1991).

or individual and based upon, attributable to, arising from or in any way related to a Claim, Action or Proceeding brought by or on behalf of such Agencies.

While this exclusion has potential applicability outside the banking institution context, it is most commonly used with financial institutions where there are legitimate concerns of claim activity being instituted by federal or other governmental regulators. Without such an exclusion, D&O insurers were generally unwilling to write much insurance for savings and loans and other thrift institutions in certain markets. Recently, however, the easing of the savings and loan crisis atmosphere of the late 1980s and early 1990s and the generally improving health of other financial institutions have led D&O insurers to respond to competitive market conditions by not utilizing the exclusion as widely as in the past.[150]

Other types of exclusions include the rather common "pending or prior litigation" exclusion, which usually provides that

> *Arising from any litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees, or judgments against the Company and/or its Director(s) and/or Officer(s) occurring prior to or pending as of _____ of which the Company and/or its Director(s) and/or Officer(s) had received notice or otherwise had knowledge as of such date; or*
>
> *Arising from any subsequent litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees, or judgments against the Company and/or its Director(s) and/or officer(s) arising from or based on substantially the same matters as alleged in the pleadings of such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees, or judgments against the Company and/or its Director(s) and/or Officer(s); or*
>
> *Arising from any act(s) of the Company and/or its Director(s) and/or Officer(s) which gave rise to such prior or pending litigation, claims, demands, arbitration, legal or quasi-legal proceedings, decrees, or judgments against the Company and/or its Director(s) and/or Officer(s).*

This exclusion is intended to protect the insurer from providing coverage for the "building already afire" at the time the policy incepts. Typically, the date inserted in the blank space is the policy inception date, although most insurers would be willing to consider an earlier date under appropriate circumstances.

Also, it should be noted that the terminology "pending or prior litigation" is only a shorthand description. The exclusion encompasses more than just litigation. The "pending or prior litigation" endorsement should not be a problem to most insureds. Through the advice of broker and counsel, all appropriate litigation, claims, and demands should be reported

---

150. Appendix B to this Article sets forth an extensive listing of decisions interpreting the regulatory exclusion, the insured v. insured exclusion, or both, together with a brief indication of the result and reasoning.

to the incumbent D&O insurer with the result that the insurer would therefore be on notice to respond to any ensuing litigation, claims, or demands as described in the endorsement.

In comparing policy forms, it is critical to examine the introductory or preamble language preceding the substantive exclusion. Using the so-called "bodily injury/property damage" exclusion, consider the effect of dropping the introductory word "for" and substituting in its place the phrase "based upon, attributable to, arising from, related to (whether directly or indirectly) or in any way connected with." D&O underwriters usually refer to this latter type of phrase as "absolute" or "broad form" wording and the impact of this wording on coverage may be very significant.

Take as an example a shareholders' derivative action premised upon mismanagement of the board of directors which resulted in the acquisition of property which was a former toxic waste site. As a result, the corporation now has liabilities under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) and related laws in the tens of millions of dollars.

While a claim from adjoining property owners based upon toxic leakage from the site in their drinking water and causing them various physical illnesses would fall within the scope of the exclusion using the "for" wording, the above-described shareholders' derivative claim may not. The absolute preamble, however, likely would result in the effective exclusion of the shareholders' action *and* the physical illness claims.

The following caveats should be kept in mind when comparing exclusionary language in specimen policy forms:

- Exclusions are not only found in a policy section entitled "Exclusions."
- Read the preamble language to a particular exclusion very carefully in order to ascertain the breadth of the exclusion.
- Exclusions can be and frequently are added or deleted by endorsements. Absent occasional reinsurer driven restrictions, most insurers will consider restructuring exclusionary language. Sometimes an endorsement may implement numerous and substantial revisions to the specimen policy form.
- Some exclusions, such as "dishonesty with an adjudication requirement," have a bark that is far worse than their bite.
- Other exclusions, such as the "other insurance" and ERISA exclusions, highlight the fact that there may be other available insurance to cover a loss potentially excluded under the D&O policy.

## *ALLOCATION*

The concept of allocation is inherent in the makeup of a D&O policy. To state the concept simply, D&O policies afford coverage only to specific

classes of insureds, i.e., the directors and officers of the insured organization, and not the insured organization itself. Additionally, D&O policies cover only specified types of wrongful acts, and do not insure conduct which is excluded or beyond the scope of coverage. The end result is that D&O coverage will attach only if covered claims are asserted against covered parties (the directors and officers). On occasion, a claim may only be partially covered: hence the need for allocation.

Allocation comes into play when (i) covered and noncovered claims are asserted against covered parties; (ii) a claim is asserted against both covered and noncovered parties; or (iii) covered parties are alleged to have committed wrongful acts in both insured and noninsured capacities. Once it is determined whether one or more of these scenarios is present in a given claim, the parties should agree upon an appropriate allocation, i.e., what portion of the defense costs, settlement, or judgment amounts should be borne by the D&O insurer.

Unfortunately, although the courts have offered some broad criteria for determining allocations, no court has formulated a specific mechanism by which an appropriate allocation can be derived. As a result, most practitioners agree that the derivation of allocations is an inexact science and typically is the subject of negotiation between the interested parties.[151]

## TYPES OF ALLOCATION
### Covered and Noncovered Wrongful Acts (or Counts)

First, there is the issue of allocation as between covered and noncovered *counts* in a given litigation. For example, an allegation of libel (which is usually excluded from coverage under most D&O policies) asserted together with allegations of breach of fiduciary duty in a single complaint raises an allocation issue. This aspect of allocation is perhaps best addressed in *Continental Casualty Co. v. Board of Education (Charles County)*.[152]

In *Charles County*, decided in 1985, a Maryland court held that it was appropriate to apportion defense costs between counts in a complaint that were subject to coverage under the policy at issue and counts not covered under that policy.[153] The court concluded, however, that defense costs reasonably related to the defense of covered claims must be paid by the

---

151. Other than those cases specifically discussed below, the following decisions address the allocation issue: Continental Casualty Co. v. Canadian Universal Ins., 924 F.2d 370 (1st Cir. 1991); PLM, Inc. v. National Union Fire Ins. Co., 848 F.2d 1243 (9th Cir. 1988); Society Corp. v. American Casualty Co., No. 1:91 CV 0327, 1991 WL 346302 (N.D. Ohio July 24, 1992); Prime Computer, Inc. v. Chubb Corp., No. 89-2554-H, 1990 WL 117990 (D. Mass. Jan. 3, 1990); Perini Corp. v. National Union Fire Ins. Co., No. 86-3522-S, 1988 WL 192453 (D. Mass. June 2, 1988); Farmers & Merchants Bank v. Home Ins. Co., 514 So.2d 825 (Ala. 1987); Ratcliffe v. International Surplus Lines Ins. Co., 550 N.E.2d 1052 (Ill. App. Ct. 1990).

152. 489 A.2d 536 (Md. 1985).

153. *Id.* at 543-44.

insurer, even if they are partially related to the defense of an uncovered count.[154]

Perhaps the best illustration of this would be in claims for punitive damages. While most insurers, whether through policy language and/or applicable state law, need not provide coverage for an *award* of punitive damages, the mere *allegation* of a claim for punitive damages may not be the basis for an allocation under the reasoning of *Charles County*. As a practical matter, claims for punitive damages oftentimes do not materially affect defense tactics and strategy through most of the course of discovery and pleading. Whether an insurer, however, would be entitled to deny coverage for defense costs attendant to experts' testimony solely for the purpose of establishing the value of the company's assets as a measure for a punitive award is an interesting issue that has not been squarely addressed by *Charles County* or subsequent decisions.[155]

## *Covered and Noncovered Parties*

There is also an allocation issue as between covered and noncovered parties in an action. In order to understand this issue fully, it is important to note that the corporate entity that purchases a D&O policy for its directors and officers is a "non-covered party" for purposes of an allocation analysis. This results because the corporate entity, although an "insured," is insured *solely* to the extent it indemnifies its directors and officers in the litigation. It is not insured for the costs of its defense or for its own liability to the claimants.

The first judicial decision to address allocation between covered and noncovered parties was *PepsiCo*. As is often the case, the parties disputing allocation in *PepsiCo* were the corporate insured and the D&O insurer, which was purportedly acting on behalf of individual directors and officers. The issue before the *PepsiCo* court was whether there needed to be an allocation of a settlement amount and defense expenses incurred in the underlying litigation as between the corporation on the one hand and the directors and officers, and thus the D&O insurer, on the other. The court held that the burden of proving that an allocation was appropriate under the circumstances should be on the *insurer*.[156] To assist the insurer in dis-

---

154. *Id.* at 545; *see also* Apollo Indus., Inc. v. Associated Int'l Ins., No. 153902 (Mich. Ct. App. Apr. 13, 1995) (applying reasonable relationship test) (on file with *The Business Lawyer*, University of Maryland School of Law).

155. Other cases that have addressed allocation between covered and noncovered counts include Gon v. First State Ins. Co., 871 F.2d 863 (9th Cir. 1989), and Harristown Dev. Corp. v. International Ins. Co., No. 87-1380, 1988 U.S. Dist. LEXIS 12791 (M.D. Pa. Nov. 15, 1988).

156. PepsiCo, Inc. v. Continental Casualty Co., 640 F. Supp. 656, 662 (S.D.N.Y. 1986).

charging its burden of proof, the court held that one should look to the *relative exposures* of the parties to the settlement.[157]

Unfortunately, the *PepsiCo* court provided no guidance as to how one can objectively assess relative exposure in a matter that is settled or otherwise not tried to a conclusion on its merits. Indeed, even in litigation that concludes with a verdict and judgment, it may still be difficult to assess relative fault or exposure where joint and several liability is found and no special interrogatories are presented to the jury as part of its instructions.[158]

During the years following *Charles County* and *PepsiCo*, the "reasonable relationship" and "relative exposure" analyses became fairly well accepted by the courts in the context of allocating defense costs and settlement amounts, respectively. Courts applied these standards regardless of whether the allocation issue at hand related to parties or claims (counts).[159]

One decision of some notoriety on the issue of allocation is *Nodaway Valley Bank v. Continental Casualty Co.*,[160] in which the court "watered down" the *PepsiCo* test for determining the allocation of a settlement.[161] At issue in *Nodaway* was allocation of both a settlement amount and defense costs between insured directors on one hand, and the corporate entity and non-director controlling shareholders on the other. A settlement agreement with the plaintiffs in the underlying litigation was drafted so that the payment obligation for the settlement rested solely with the insured directors. The court acknowledged that the settlement was structured with the D&O insurance policy in mind.[162]

The *Nodaway* court essentially held for a ninety-to-ten percent allocation in favor of the corporate entity and other noninsureds, i.e., the insurer would pay ninety percent of the total settlement and defense amounts.[163]

---

157. *Id.; see also* American Casualty Co. v. Sierra Chem. Co., No. C-89-1800 (N.D. Cal. 1990) (applying a relative exposure analysis) (on file with *The Business Lawyer*, University of Maryland School of Law).

158. Another New York decision that addressed allocation as between covered versus noncovered parties (except in the context of determining an allocation for defense costs) was Health-Chem v. National Union Fire Ins. Co., 559 N.Y.S.2d 435 (N.Y. Sup. Ct. 1990). In that case, the court was called upon to determine the appropriate allocation of defense costs, incurred in a securities class action, between a corporation, its directors and officers, and its investment banking firm. Adhering to the standard set forth in *PepsiCo*, the court held that upon *prima facie* proof of an expense incurred in the defense of a covered party, the burden of showing that all or a specific portion of that expense was incurred in the defense of a non-covered party falls on the D&O insurer. *Id.* at 438.

159. A good example of the wide ranging application of these standards is reflected in the court's discussion in Federal Realty Inv. Trust v. Pacific Ins. Co., 760 F. Supp. 533 (D. Md. 1991), in which the court had to consider both allocation between parties and among covered versus noncovered claims and, in so doing, applied both the "relative fault/exposure" test of *PepsiCo* (as to the allocation of the settlement) and the "reasonable relationship" standard of *Charles County* (as to the allocation of defense costs).

160. 715 F. Supp. 1458 (W.D. Mo. 1989).

161. *Id.* at 1461.

162. *Id.* at 1464.

163. *Id.*

Although the court did look at the relative exposures of the parties in determining the allocation of the settlement, the court refused to allocate to the corporation any part of the settlement that was based upon vicarious liability stemming from the acts of the insured directors and officers.[164] Certain language in the *Nodaway* opinion, issued by the U.S. District Court for the Western District of Missouri and affirmed by the Eighth Circuit, caused some concern among insurers:

> The insurer's respondeat superior argument, to the effect that it was liable for the conduct of insured directors and officers but not for the corporate liability created by their acts and should therefore obtain an allocation, comes dangerously close to saying the D&O insurance is *never* adequate insurance, making whole the insureds, when the uninsured corporate employer is joined in litigation with insured officers and directors. This would defeat the reasonable expectations of insureds who have purchased insurance that supposedly gives full coverage for director and officer liability. It seems clear that merely derivative corporate liability should not cause an apportionment between the primary wrongdoer and a vicarious wrongdoer, where both are joined in litigation. [This] conclusion would not expand the insurance policy to unfairly create corporate coverage; it simply gives full effect to the D&O coverage.[165]

Of course, "merely derivative corporate liability" was not at issue in *Nodaway* and that is why the court apparently apportioned some liability (ten percent) to the corporate and other noninsured defendants.[166]

While the court's opinion may have some persuasiveness as to allocation of *settlement* amounts in derivative litigation where the corporation is only a nominal defendant, most claims for coverage under the D&O policy do not fit this mold. Indeed, even in a shareholders' derivative action, it can be argued that some allocation of defense costs is appropriate because the corporate defendant has care, custody, and control of corporate records and must bear the expense of producing these documents in discovery and at trial.

The *Nodaway* analysis was firmly rejected by the U.S. District Court for the Eastern District of Pennsylvania court in *First Fidelity Bancorp v. National*

---

164. *Id.* at 1466.

165. *Id.*; *see also* Vicorp Restaurants, Inc. v. Federal Ins. Co., No. 92-C-751 (D. Colo. Aug. 10, 1994) (acknowledging that derivative corporate liability could not support an allocation) (on file with *The Business Lawyer*, University of Maryland School of Law). In an earlier decision, the *Vicorp* court stated that a corporation's liability exposure in a securities class action is not necessarily wholly derived from the acts of the directors and officers. Vicorp Restaurants, Inc. v. Federal Ins. Co., No. 92-C-751, 1993 U.S. Dist. LEXIS 20294 (D. Colo. June 30, 1994).

166. *Nodaway*, 715 F. Supp. at 1461.

*Union.*[167] There, the court disputed the notion, first articulated in *Nodaway,* that derivative corporate liability could not serve as a basis for an allocation:

> [B]oth the directors and officers as well as the corporate entity faced liability in the underlying litigation. The mere fact that liability arises exclusively from the conduct of the insured . . . does not provide a basis for the insurer to be responsible for the liability of those who are uninsured. For instance, Section 11 of the Securities Act of 1933 provides separate standards of liability for issuers, such as First Fidelity, and individuals, such as directors and officers. As stated by First Fidelity's expert, an issuer is almost absolutely liable for any misstatements made in connection with the sale of securities, but the directors and officers are allowed a due diligence defense. . . . The occasion could arise where liability results from the conduct of the insured directors and officers, but they are found not liable. In this instance, First Fidelity would contend that the D&O insurer should pay the damages on behalf of the issuing corporation, who is not insured under the policy. Such a result would be contrary to the purpose of the parties' intent under the policy.[168]

The concept of the corporation having direct, instead of merely derivative, liability under the securities laws was established by the U.S. Supreme Court after the Eighth Circuit decided *Nodaway* and prior to the *First Fidelity* decision.[169]

### *The Larger Settlement Rule*

About two months after *Nodaway* was decided, the Seventh Circuit issued its opinion in *Harbor Insurance Co. v. Continental Bank Corp.,*[170] in which the court drew upon the *Nodaway* reasoning to develop what has come to be known as "the larger settlement rule": allocation is warranted only where the wrongful acts of uninsured parties or insured parties against whom no claim has been made increased the amount of the settlement in question.[171]

The larger settlement rule was also adopted by the Ninth Circuit in

---

167. No. 90-1866, 1994 U.S. Dist. LEXIS 3977 (E.D. Pa. Mar. 30, 1994). *But see* Raychem Corp. v. Federal Ins. Co., 853 F. Supp. 1170 (N.D. Cal. 1994); Ameriwood Indus. Int'l Co. v. American Casualty Co., No. 1:92-CV-658, 1994 U.S. Dist. LEXIS 10554 (W.D. Mich. July 26, 1994) (adopting the larger settlement rule).

168. *Bancorp,* 1994 U.S. Dist. LEXIS 3977 at *12–*13.

169. *See* Musick, Peeler & Garrett v. Employers Ins., 113 S. Ct. 2085 (1993); *see also* First Nat'l Bank v. American Casualty Co., No. 2:94-CV-306 (W.D. Mich. Sept. 11, 1995) (rejecting the notion that derivative corporate liability defeats allocation) (on file with *The Business Lawyer,* University of Maryland School of Law).

170. 922 F.2d 357 (7th Cir. 1990).

171. *Id.* at 367-68.

*Nordstrom, Inc. v. Chubb & Son, Inc.*[172] There, the court held that the D&O insurer was

> responsible for any amount of liability that is attributable in any way to the wrongful acts or omissions of the directors and officers, regardless of whether the corporation could be found *concurrently* liable on any given claim under an independent theory. Accordingly, we will allocate only if there is some amount of corporate liability that is both independent of and not duplicated by liability against the directors and officers.[173]

In *Caterpillar, Inc. v. Great American Insurance Co.*,[174] the Seventh Circuit reiterated its adoption of the larger settlement rule, as set forth in the *Harbor* decision.[175] The court made clear that it did not seek to "develop general canons of allocation for every conflict between D&O insurers and their insureds; rather [the court read] a particular insurance contract and decide[d] what method of allocation, if any, that contract envisions."[176] For two reasons, the court determined that the larger settlement rule better suited the facts of this case.[177] First, a relative exposure analysis was contrary to the policy language. The policy covered *all* loss which the directors and officers were legally obligated to pay on account of a claim for the wrongful act. Such language implied a complete indemnity for claims regardless of who else might be at fault for similar actions. "[T]he policy does not limit coverage because of the activities of others that might overlap the claims against the directors and officers."[178] This would render a relative exposure analysis contrary to the policy language.

Second, a relative exposure analysis "envision[ed] a somewhat elaborate inquiry into what happened in a settlement and who really paid for what relief."[179] In this regard, the court observed

> We also believe that a protracted pursuit of the motivations underlying a settlement, as suggested in *Safeway* . . . is not necessarily the best way to resolve coverage disputes: The question at issue is whether the insurance policy covered certain claims, not the metaphysical underpinnings of why a corporation or its directors and officers might have acted as they did.[180]

Having adopted the *Harbor* approach, the Seventh Circuit needed to determine whether Caterpillar's presence in the litigation made the settle-

172. 54 F.3d 1424 (9th Cir. 1995).
173. *Id.* at 1433 (emphasis added).
174. 62 F.3d 955 (7th Cir. 1995).
175. *Id.* at 960-61.
176. *Id.* at 961.
177. *Id.* at 959-61.
178. *Id.* at 962.
179. *Id.* at 961.
180. *Id.* at 962.

ment larger.[181] Although there was a wide array of possibilities regarding Caterpillar's liability, a trier of fact needed to determine whether any direct liability existed and whether it increased the settlement figure. Accordingly, further proceedings were necessary.[182]

Only two weeks after *Caterpillar* was decided, the Ninth Circuit again addressed the allocation issue in *Safeway Stores, Inc. v. National Union Fire Insurance Co.*[183] In that case, a coverage issue arose from the resolution of several underlying shareholder class actions brought in response to the leveraged buy-out of Safeway, Inc., by Kohlberg, Kravis Roberts & Co. (KKR) in the 1980s. The underlying class action litigation was ultimately resolved with the defendants' (which were comprised of Safeway, KKR, and Safeway's directors) agreement to alter the merger agreement such that an $11.5 million dollar dividend would be paid to Safeway's pre-existing public shareholders, rather than to KKR. The defendants originally structured the transaction such that KKR would receive the dividend shortly after the effective date of the merger. Additionally, the defendants agreed to pay the sum of $1.8 million dollars in plaintiff attorneys' fees.

Having concluded that coverage was not available for the dividend payment, the Ninth Circuit undertook an allocation analysis regarding the coverage available for the payment of the $1.8 million dollars in plaintiffs' attorneys' fees, and the defense costs incurred by the defendants, which the court noted to be about $230,000.[184] In this regard, the Ninth Circuit applied the larger settlement rule as it did four months earlier in *Nordstrom*.[185] As in *Nordstrom*, the *Safeway* court found that the particular language of the policy and the underlying litigation issues warranted application of the larger settlement rule.[186]

While it would not have been totally illogical under the rational of the *Nordstrom* to determine that no allocation was appropriate to Safeway, the court also found that no allocation should be made with respect to KKR.[187] KKR's role here was essentially one of an alleged aider and abettor of securities fraud through its actions as an offeror for the company's (Safeway's) securities and ultimately as the acquiring shareholder. Ironically, it appears from the decision that Safeway and KKR conceded that the costs of KKR's defense (approximately one third of the total de-

181. *Id.*
182. An interesting footnote to the *Caterpillar* case stated that, although the case generally is perceived as being negative from a D&O insurers' standpoint, Caterpillar, not the D&O insurer, petitioned the Seventh Circuit for a rehearing on the appeal. Perhaps this suggests that the "larger settlement rule" is not quite the magical elixir that every D&O policyholder seeks.
183. 64 F.3d 1282 (9th Cir. 1995).
184. *Id.* at 1286-87.
185. *Id.* at 1287.
186. *Id.* at 1288.
187. *Id.* at 1289.

fense costs for KKR, Safeway, and the directors) should not be covered under the Safeway D&O policy.[188]

Nonetheless, the court held that there should be no allocation as to KKR's liability for the settlement costs, stating that

> [W]hatever liability KKR might have would be *concurrently* with the liability of Safeway's officers and directors: KKR could not be liable for aiding and abetting their breach of fiduciary duty unless the Safeway officers and directors had indeed breached that duty. . . . There was no showing that KKR's potential concurrent liability increased the amount of the settlement.[189]

The Ninth Circuit thus relied upon the "concurrent liability" concept, first articulated in *Nordstrom*, to find that the fees incurred on behalf of KKR were entirely covered under Safeway's D&O policy.[190] Another troubling aspect of *Safeway* was its holding with respect to the "best efforts" allocation provision in the D&O insurance policy which stated: "With respect to the settlement of any claim made against the Company and the Insureds, the Company and the Insureds and the Insurer agree to use their best efforts to determine a fair and proper allocation of the settlement amount as between the Company and the Insureds."[191]

Similar language is present, either in the policy form or added by endorsement, in most D&O insurance contracts today. Many insurers would contend that such language mandates some allocation in a claim situation such as was presented by the underlying Safeway class actions. The *Safeway* court, however, held that this language requires only an allocation *analysis*, but not necessarily an allocation.[192] As such, the court appears to be reading a phrase into the provision that does not exist and was most likely not within the contemplation of the drafter. The language says "best efforts to determine a fair and proper allocation,"[193] not "best efforts to determine a fair and proper allocation, *if any*."

Unlike *Nordstrom* and *Safeway*, an earlier Ninth Circuit decision related to allocation is very much "pro-insurer." In *Olympic Club v. Those Interested Underwriters at Lloyd's London*,[194] the Ninth Circuit held that 100% of the liability in a discrimination suit should be allocated to the corporation because there was no evidence that the directors and officers were responsible for the discriminatory policies of the corporation.[195]

---

188. *Id.*
189. *Id.* at 1288 (emphasis added).
190. *Id.* at 1288-89.
191. *Id.* at 1289.
192. *Id.*
193. *Id.*
194. 991 F.2d 497 (9th Cir. 1993).
195. *Id.* at 500-01.

### *Insured Capacity and Uninsured Capacity*

There is the allocation issue that rests upon *capacity*, i.e., an insurer may not be liable for the entire costs of defense or settlement amount attributable to an insured individual if that individual is being sued in both an insured and uninsured capacity. In *Gon v. First State Insurance Co.*,[196] the Ninth Circuit addressed this issue which may become more prevalent as litigation involving U.S. subsidiaries of foreign parents in which an individual is sued both as a director of the parent and a director of the subsidiary increases. The latter issue becomes particularly acute when separate D&O policies are held by the subsidiary and parent with different insurers.

The opinion in *Gon* dealt with both the issues of uncovered claims and uncovered "individual capacities." This latter issue is dissimilar to the "director v. corporation" issue present in the *PepsiCo* case. Capacity may be an allocation issue where a single individual is the subject of a claim in both an insured and uninsured capacity. An illustration of this would be where an outside director who happens to be a lawyer is sued both for his misrepresentations to shareholders in the context of a Rule 10b-5[197] claim and also specifically for legal advice regarding the content of certain press releases at issue in the claim. The latter capacity would not be insured under the typical D&O policy.

While *Gon* recognized the appropriateness of an allocation, it held that an allocation could not be had early in the underlying litigation and at the expense of the insureds.[198] Where the bases for allocation are somewhat fact sensitive and cannot be determined with reasonable certainty until a later stage in the litigation, the insurer must pay all of the defense costs in the interim.

The court did distinguish the situation wherein an uncovered libel claim was included with other matters covered under the D&O policy.[199] In such a case where the coverage issue is subject to determination based upon the allegations listed above, the court stated, by way of dicta, that early allocation would be appropriate.[200]

### *Burden of Proof*

There appears to be a split of authority among the courts regarding which party bears the burden of proof with respect to allocation. Historically, courts placed the burden with the insurer because of traditional notions that once an insured demonstrated the existence of coverage, the

196. 871 F.2d 863 (9th Cir. 1989).
197. 17 C.F.R. § 240.10b-5 (1995).
198. *Gon*, 871 F.2d at 868.
199. *Id.*
200. *Id.*

burden shifted to the insurer to show that the matter was excluded or that coverage somehow was limited.

The emerging trend appears to be that the burden should rest with the insureds. The reasoning for this rule is that the insureds, who control the defense and settlement of the underlying litigation, are in the best position to prove what part of the defense and settlement costs are attributable to insured versus uninsured interests.[201]

One court adopted a hybrid rule, placing the burden of proof on the insureds with respect to the allocation of defense costs and on the insurer regarding allocation of a settlement.[202]

### Other Miscellaneous Issues

An issue that recently has been the subject of two important decisions is whether D&O insurers acted in bad faith in negotiating allocations with their insureds. In *Safeway*,[203] the U.S. District Court for the Northern District of California held that a D&O insurer's failure to articulate the basis for its position on allocation of defense costs and a settlement did not constitute bad faith where the D&O insurer made "efforts" to resolve the allocation issue.[204] Another recent case that addressed the bad faith issue was *Slottow v. American Casualty Co.*,[205] where the Ninth Circuit rejected an insured's argument that its D&O insurer acted in bad faith in negotiating allocation.[206]

In *Slottow*, the parties in the underlying litigation agreed to a $4.75 million dollar settlement, wherein ninety-six percent of liability was allocated to the lone insured officer and only four percent allocated to the corporation, a bank, and one of its subsidiaries. The bank sought reimbursement of the settlement amount from the D&O insurer. When the request for reimbursement was refused, the bank commenced an action to recover the $4.75 million dollars and also claimed punitive damages for bad faith on the part of the insurer. The district court in California ruled that the settlement was negotiated in good faith, and thus ordered the insurer to pay ninety-three percent of the settlement (having reduced by

---

201. The cases placing the burden of proof with the insurer include *PepsiCo, Health-Chem* and *Harbor*. Cases holding to the contrary, with the burden on the insured, are Atlantic Permanent Fed. Sav. & Loan v. American Casualty Co., 839 F.2d 212 (4th Cir. 1988); Kaufman & Broad, Inc., v. Continental Casualty Co., CV 88-1329 (C.D. Cal. Sept. 27, 1989) (on file with *The Business Lawyer*, University of Maryland School of Law); John Hancock Healthplan of Penn., Inc. v. Lexington Ins. Co., No. 88-2308, 1989 U.S. Dist. LEXIS 11019 (E.D. Pa. Sept. 11, 1989).

202. Harristown Dev. Corp. v. International Ins. Co., No. 87-1380, 1988 WL 123149 (N.D. Pa. 1988).

203. 805 F. Supp. 1484 (N.D. Cal. 1992).

204. *Id.* at 1491-92.

205. 1 F.3d 912 (9th Cir. 1993).

206. *Id.* at 918-19.

three percent the allocable portion of the settlement attributable to the officer).[207] The district court also awarded the insureds $5 million dollars in punitive damages.[208]

The Ninth Circuit reversed the district court's decision on allocation and remanded the case for further consideration (whereupon it should be noted that the district court allocated only fifty-five percent of the settlement amount to the officer).[209] In essence, the court held that there was no justification for giving presumptive effect to the allocation in the settlement agreement, which was derived by parties with common interests: obtaining as much insurance coverage as possible.[210] Indeed, the court recognized that the insured parties had attempted to craft "a win-win solution for themselves, with the insurance company footing the bill."[211]

The Ninth Circuit also found that there was no basis for awarding punitive damages to the insureds because there was no evidence that the insurer had acted in bad faith.[212] Finding that the dispute over coverage simply involved a contract dispute, and nothing more, the court stated

> Disagreement over insurance coverage—so long as the issues disputed are bona fide—is an ordinary cost of doing business. Nothing in California law suggests a refusal to provide coverage as requested by an insured, when the refusal is supported by a reasonable, good faith argument, can form the basis for punitive damages.[213]

### Predetermined Allocation and Entity Coverage

One must appreciate that, historically, the D&O policy wording itself gave little guidance in the resolution of allocation issues. Some insurers, however, have begun to address the issue via policy language. Some insurers have included provisions in their newer forms and endorsements that call for the parties to utilize their "best efforts" to derive fair and reasonable allocations when a claim presents both covered and uncovered matters. Other provisions, which have been incorporated into recent policies, provide for alternative dispute resolution in the event the parties cannot agree on the allocation issue.

Most recently, insurers have attempted to address substantively the allocation issue by, among other things, developing "predetermined" allo-

---

207. *Id.* at 915.

208. *Id.* at 912.

209. *Id.* at 919-20.

210. *See id.* at 916.

211. *Id.*

212. *Id.* at 918-19.

213. *Id.* For a further discussion on bad faith as respects allocation issues, see Carnation Co. v. Continental Casualty Co., CV 88-4018 (C.D. Cal. 1990) (concluding that in the absence of proof of wrongdoing, a D&O insurer's dispute over allocation did not constitute bad faith) (on file with *The Business Lawyer,* University of Maryland School of Law).

cation provisions, which set forth specific allocation percentages to be borne by the insureds and the insurer. For example, the Reliance "pre-determined" allocation endorsement provides as follows:

> It is agreed:
>
> *I. Allocation Generally*
> Except as otherwise provided in this Endorsement, the Directors and/or Officers, the Company and Insurer shall apply their best efforts to agree upon an equitable and appropriate allocation of any Allocable Amount between covered Loss and uncovered amounts.
>
> Unless otherwise agreed, any agreed allocation of costs, charges and expenses with respect to a claim or the pre-determined allocation of Securities Loss shall not apply to or create any presumption with respect to the allocation of any other amounts. If a claim is either covered in full or completely uncovered, such claim shall not be subject to allocation.
>
> *II. Allocation of Securities Claims*
> The Company, the Directors and/or Officers and the Insurer agree to allocate to covered Loss the following portions of any Allocable Amount incurred with respect to a Securities Claim:
>
> > A. _____% of all Securities Claim Expenses;
> > B. _____% of all Securities Loss other than Securities Claim Expenses.
>
> The agreed allocation shall be final and binding on the Directors and/or Officers, the Company and the Insurer.
>
> It is further agreed that for purposes of this Endorsement only, the following definitions shall apply:
>
> "Allocable Amount" shall mean the sum of covered Loss and uncovered amounts for which Directors and/or Officers are (i) solely liable because a claim includes both covered and uncovered matters, and/or (ii) jointly liable with the Company because a claim is made against both Directors and/or Officers and the Company. Allocable Amount does not include that portion of any costs, charges, expenses, judgments or settlements which is excluded from coverage by reason of this Policy's definition of Loss.
>
> "Securities Claim" shall mean any claim which, in whole or in part, is based upon or arises from the purchase or sale of, or offer to purchase or sell, any securities issued by the Company.
>
> "Securities Claim Expenses" shall mean that part of Securities Loss consisting of reasonable and necessary costs, charges, fees (including attorneys' fees and experts' fees) and expenses incurred in the defense of a Securities Claim and the premium for appeal, attachment or similar bonds, but shall not include the wages, salaries or expenses of any Director, Officer or employee of the Company.

"Securities Loss" shall mean any Allocable Amount which the Directors and/or Officers, either severally or jointly with the Company, become obligated to pay as a result of a Securities Claim.

Reliance, like certain other D&O insurers, has made this predetermined allocation endorsement available to its insureds who seek to resolve all allocation issues before claims arise. Recently, Reliance and certain other insurers have attempted to achieve a similar result through so-called "entity coverage," which is now available with, and subject to, co-insurance percentages.

### Cooperation and Compromise

As clear judicial guidelines as to how an allocation should take place still do not exist, it behooves the D&O insurer, its insureds, and the corporate entity to work together in attempting to reach some reasonable compromise on these thorny issues. As in the discussion of payment of defense costs, it is important not to lose sight of the fact that the insurer and insureds should strive for a unified and cooperative defensive effort, subsuming any coverage differences to the primary objective of a successful defense of the insured to the claims brought against them.

## CONCLUSION

The authors hope that this Article has given the reader an appreciation of the various major issues that arise from claims for coverage under a D&O policy. The lack of uniformity in policy forms among the various insurers and the various and oftentimes conflicting judicial decisions interpreting those forms have rendered this an area where one dare not tread without the assistance of qualified legal and other professional advisors.

While many insurers continue to employ policy forms that were first drafted in the early 1980s, those forms are so heavily endorsed that the actual contract issued is very often a substantially different document from the unendorsed specimen form.

D&O insurance continues to be a key component of the protection that every director and officer should have. The rather broad scope of coverage provided under the policy, together with the ability and willingness of insurers, brokers, and insureds to react to the ebb and flow of legal developments affecting director and officer liability, should ensure the viability of the product in the future.

As the ancient Chinese may have put it, the D&O community continues to be cursed with the burden of living in interesting times. Continued vigilance and adaptability to change on the part of all concerned with the insurance process—brokers, underwriters, claims professionals, risk man-

agers, legal counsel, and financial advisors—should ensure that all successfully survive the times.