UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

MELINDA BROWN and TREFFLE
LAFLECHE,

              Plaintiffs,

    v.

AMERICAN INTERNATIONAL GROUP,
INC. and NATIONAL UNION FIRE
INSURANCE COMPANY OF
PITTSBURGH, PENNSYLVANIA,

              Defendants.

C. A. No. 04-10685 WGY

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**<u>EXHIBIT D</u>**

**PRACTICAL ASPECTS OF DIRECTORS' AND OFFICERS' LIABILITY
INSURANCE -- ALLOCATING AND ADVANCING
LEGAL FEES AND THE DUTY TO DEFEND**

Service: Get by LEXSEE®
Citation: 32 ucla l rev 690

*32 UCLA L. Rev. 690, **

Copyright © The Regents of the University of California, 1985.

UCLA Law Review

FEBRUARY, 1985

32 UCLA L. Rev. 690

**LENGTH:** 17527 words

COMMENT: PRACTICAL ASPECTS OF DIRECTORS' AND OFFICERS' LIABILITY INSURANCE -- ALLOCATING AND ADVANCING LEGAL FEES AND THE DUTY TO DEFEND.

JULIE J. BISCEGLIA *

* The author gratefully acknowledges the contributions of the survey participants who gave so generously of their time and expertise; Professor Stanley Siegel, UCLA School of Law; and especially Thomas K. Bourke, Esq.

**SUMMARY:**
  ... Faced with a growing pioneer spirit among plaintiffs and harrowed by insurance-industry prophets of doom, corporate directors and officers, in ever larger numbers, have turned to directors' and officers' (D & O) liability insurance to protect themselves from devastating settlement, judgment, and legal costs. ... Exclusion provisions vary, but most policies do not cover claims related to pollution, libel and slander, bodily injury and property damage, ERISA, or claims for which the directors have other insurance policies in force or for which their corporation indemnifies them. ... The duty to defend requires an insurer to defend an insured person "against all actions brought against him on the allegation of facts and circumstances covered by the policy." ... Directors must also consider the conflict of interest between themselves and the insurance company, and potentially any lawyer it hired to defend them. ... Many indemnification statutes allow advances, but they are entirely permissive: A corporation may advance the money but need not. ... Professor Bishop believes that most corporations do, in fact, advance their directors the sums they need to defend themselves. ... The board of directors (unless advances require stockholder approval) knows the director in difficulty and may sympathize with him. ... Including a duty to defend in D & O insurance would improve the policy both from the directors' point of view and the insurance company's. ...

**TEXT:**
 **[*690]**  INTRODUCTION

Faced with a growing pioneer spirit among plaintiffs [1] and harrowed by insurance-industry prophets of doom, [2] corporate directors and officers, in ever larger numbers, [3] have turned to directors' and officers' (D & O) liability insurance to protect themselves from devastating settlement, judgment, and legal costs. [4] Once uncommon, this type of insurance has now

become expected, even required, before businesspeople will accept high managerial positions or serve on boards of directors, particularly as outside directors. [5] D & O **[*691]** insurance is currently available to only for large corporations but also for medium-sized companies, [6] although the steep premiums and deductibles and the rigorous screening procedures still put it beyond the reach of many small enterprises. [7] As litigation and threats of litigation increase, uneasy lies the corporate head unprotected by a solid D & O policy.

Even with a D & O policy, however, directors and officers embroiled in a lawsuit may find unpleasant surprises when they seek their insurance company's assistance. Moreover, despite detailed criticism in the commentaries, [8] policy language remains obscure, and some exclusions leave directors exposed to common hazards of corporate office. [9]

Although the word "liability" appears in the title of some policies, directors and officers may find, to their distress, that their D & O policy is an *indemnity* policy. If so, their insurance company will reimburse them for their expenses and claims, assuming an adverse settlement or judgment, only after they themselves have paid. By contrast, if they have a *liability* policy, the insurance company will pay as soon as the judgment or settlement becomes final. [10] If they have settlement or judgment costs, directors with an indemnity policy may have to manage their cash deftly until the insurance company reimburses them.

Whatever kind of policy he has, the director will often have a severe problem with legal expenses. Corporate defense lawyers do not work on contingency, as counsel for stockholder-plaintiffs usually do, and a director may be hard pressed to finance his defense over years of complex litigation. It is then that he may fully comprehend another potentially troublesome feature of D & O insurance: There is no duty to defend. Unlike the physician or attorney accused of malpractice, the director must hire, and pay for, his own counsel until the end of the suit, when the insurance company will **[*692]** repay him for the money he has spent on legal fees. [11]

Because the policy does not contain a duty to defend, another problem peculiar to this type of insurance arises: Who, if anyone, pays the legal fees before a suit ends if the director himself cannot pay? Will his corporation advance him the funds, or will the insurance company make "interim payments"?

The policy's two-part structure, which insures the corporation separately from its directors, creates yet another difficulty. The policy reimburses directors and officers for their legal fees in defending any covered action, but it reimburses the corporation *only* for indemnifying directors, not for any legal expenses it incurs in its own defense. [12] If, as frequently happens, a corporation and its directors are sued together, and if one lawyer or team of lawyers represents both, how are expenses allocated? Obviously the insurance company will try to assign as much as possible to the corporation, whose expenses it does not pay, while the corporation will struggle to get the bills into the directors' column.

These two major problems, allocating fees and paying for a defense, pose difficulties for directors and corporate counsel as they try to mount a defense to a lawsuit. [13] The time and money required to solve them add considerably to the cost not only of the defense but also of the policy itself. [14] And since the solutions are ad hoc and informal, they apply only to the immediate situation; when the same problem resurfaces in another case, it must be solved anew. [15]

The 1,979 U.S. corporations that participated in the 1982 Wyatt Company Survey reported 86 D & O policy claims in 1981, bringing the total for the years 1973-1982 to 515. [16] Obviously the insurance is not often used; claims covered by this policy resemble plane crashes, infrequent but devastating. Corporate counsel are thus likely to have little familiarity with the terms of a policy so seldom invoked. With one exception, the subjects dealt with in this Comment are not mentioned in any currently available D & O policy. [17] The corporation

and its attorneys may thus be unaware of **[*693]** how they affect the conduct of a suit and unprepared to deal with them. In the interest of preparedness, then, this Comment briefly describes the circustances giving rise to the demand for D & O insurance and discusses the problems created by the absence of a duty to defend and by the allocation requirement. It sets forth a solution to the duty-to-defend problem and recommends ways to cope with allocation.

## I. RISKS CONFRONTING CORPORATE DIRECTORS AND OFFICERS

Although a corporation carries liability insurance to insure itself and its employees against common risks of doing business, this type of insurance covers such causes of action as personal injury, property damage, and product liability. [18] It does not insure directors and officers involved in derivative, antitrust, or securities suits, all of which have become increasingly common. [19]

Inferences about the environment that created and sustains D & O policies can be drawn from the 1982 Wyatt Company Survey. [20] The companies participating in the survey represented a broad cross section of American business in size and character; their corporate assets ranged from under $ 10 million to over $ 5 billion, [21] and the participants, classified into sixty-five categories, included oil companies, chemical companies, banks, health service companies, and food stores. [22]

According to the survey, stockholders are the single most important source of claims against directors and officers. [23] Employees or former employees and customers rank second and third; governmental bodies or agencies a distant fourth. [24] Misleading representation is the most common allegation; others include collusion or conspiracy to defraud, improper expenditures, antitrust violations, and denial of civil rights. [25]

**[*694]** In 1982, the participants who gave information about their D & O claims reported an average total cost of $ 1,340,000 per claim. [26] Of this total, they paid an average of $ 763,000 for the claim itself, and an average of $ 577,000 in legal fees. [27] Even claims eventually dropped cost the participants an average of $ 70,000 in legal expenses before being abandoned. [28] Overall, the average defense cost, including both litigation and settlement, was $ 365,000 per claim. [29] Such sums would set back all but the wealthiest directors. The largest corporations could probably absorb these costs without much strain, but smaller companies could not fail to feel losses of this size.

Because the Wyatt Survey figures are averages, they mask the real forces to which directors and officers respond. Anecdotal figures add another perspective. The Wyatt Survey reported one legal defense fee of $ 3.5 million [30] and one award in excess of $ 20 million. [31] The famed case *Eisen v. Carlisle & Jacquelin,* [32] a stockholders' suit that eventually foundered on the Federal Rules of Civil Procedure's notice requirement in Rule 23, "occupied the attention of numerous lawyers and the U.S. District Courts in New York, the Court of Appeals for the Second Circuit and the U.S. Supreme Court over a period of more than six years." [33] Although no award was ever made, [34] six years' worth of legal fees probably dampened any excessive rejoicing by the defendants when the suit ended. [35] **[*695]** Finally, the spectacular failure of Penn Central Railroad prompted eighteen suits against twenty-two of Penn Central's directors. [36]

It must be remembered that in stockholders' and securities suits, two common ills to which corporate life is heir, the defendants are *personally* liable if they lose. [37] The corporation may indemnify them, if it is still solvent, [38] still feels sympathetic toward them, and state law permits. [39] But if it cannot, will not, or may not, the individual director pays. Professor Bishop notes, "[T]he managers of a publicly held company can hardly avoid exposing themselves to litigation and to liability which is measured not in terms of the personal fortunes of the individual managers but according to the vastly larger scale of the corporation's operations."

[40] Prudent directors, alert to the lessons that others' misfortunes teach, will naturally seek to protect themselves against catastrophe.

## II. CORPORATE INDEMNIFICATION -- THE FIRST LINE OF DEFENSE

Directors in earlier times could rely on corporate indemnification to shield them from actions brought by unruly stockholders. In modern practice, however, indemnification itself has fueled the present interest in D & O insurance. Fifty years ago, no one would have questioned a corporation's right to indemnify its directors and officers involved in corporate litigation. [41] In 1939, however, a New York state court in *New York Dock Co. v. McCollom* [42] unexpectedly ruled that a corporation could not indemnify its directors for legal expenses, even though they had successfully resisted a stockholders' derivative suit. [43] The court held that a corporation could **[\*696]** spend its funds only on projects that directly benefited the corporation; the directors' legal fees did not, in the court's opinion, meet this criterion. [44]

Although roundly criticized, [45] the *McCollom* decision caused great dismay in New York's financial centers. [46] Within two years, New York enacted a statute specifically permitting corporations to indemnify their executives. [47] Other state legislatures also went to work drafting and passing statutes allowing indemnification. [48] Today "[a]ll fifty states, the District of Columbia, Puerto Rico, and the Virgin Islands have enacted some form of statute providing for indemnification of corporate officers and directors." [49] Corporations themselves also began to insert indemnification provisions into their bylaws, compounding confusion when these provisions conflicted with or diverged from state laws. [50]

Corporate indemnification statutes and bylaws did not, however, put the issue to rest. Public policy arguments, which this subject had always provoked, continued to probe the wisdom of allowing a corporation to deflect the penalties of wrongdoing from wrongdoers to itself. [51] The statutes were partly intended to resolve this debate, but they have not entirely succeeded. [52]

Corporate indemnification statutes are not uniform from state to state, some states showing more sympathy for executives than others. States following Delaware's lead, [53] for example, allow indemnification for expenses, fines, and judgment and settlement costs **[\*697]** in third-party suits if the defendant "acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the corporation." [54] In criminal actions, the defendant must have "had no reasonable cause to believe his conduct was unlawful." [55] The standards of conduct for third-party suits also apply in derivative suits, but the law permits no indemnification for a director "adjudged liable for negligence or misconduct in the performance of his duty," unless a court rules otherwise. [56] Delaware's statute specifically does not exclude other indemnification rights under corporate bylaws [57] and allows a corporation to buy insurance reimbursing a director even if the corporation itself could not indemnify him, as for example, in some derivative actions. [58] The Delaware statute and those modelled on it are thus "nonexclusive," that is, they permit a corporation to make its own indemnity provisions in its bylaws. They also permit insurance coverage beyond statutory indemnification provisions.

Such statutes place a heavy public-policy burden on the courts, because corporate indemnification provisions may collide with established legal principles: No one may profit from his own wrong-doing; no one may insure himself against intentional or criminal misconduct. [59] A bylaw or resolution permitting indemnification of a director who loses as a derivative suit would violate these principles, and a court applying a Delaware-type law most likely would not allow recovery. [60] In fact, judges have gone to great lengths to withhold indemnification from executives whom they suspected of having breached their duty to the corporation, [61] even to the extent of refusing to honor a corporate resolution [62] or a lower-court-approved **[\*698]** settlement, [63] or ignoring statutory language if necessary. [64]

In contrast to Delaware's liberality, other states have adopted more restrictive provisions.

New York's Business Corporation Law does not allow indemnification other than that authorized by statute. [65] It does not permit indemnification if a director breached his duty [66] or if a derivative suit is settled. [67] The standard is also more stringent than Delaware's: "[s]uch director or officer acted, in good faith, for a purpose which he reasonably believed to be in the best interests of the corporation" in third-party suits [68] and, if the action is a criminal one, "no reasonable cause to believe that his conduct was unlawful." [69] A New York corporation may not insure its directors and officers for any amount for which they could not receive indemnification under the statute, unless the state superintendent of insurance approves the insurance provisions, especially the deductible and coinsurance. [70]

The new California statute is less restrictive than New York's, and less restrictive than the old California statute as well. [71] It requires substantially the same standard of care as New York's law, [72] but it is more liberal about insurance. [73] California's statute *requires* indemnification if the executive succeeded in either third-party or derivative suits and *permits* indemnification if approved by disinterested directors, stockholders, or the trial court. [74] Moreover, California requires that the director succeed *on the merits* before requiring indemnification. [75] Under Delaware law, *any* success will do, even one, for example, that relies on the expiration of a statute of limitations. [76] Unlike New York, California permits indemnification **[*699]** for expenses incurred in settling some derivative suits. [77]

States have thus fashioned their own combination of such elements as whether and under what circumstances indemnification is mandatory or permissive, what the standard of care should be, who decides whether and how much to indemnify, what kinds of losses can and cannot be indemnified, and what, if any, insurance may be provided. These statutes, coupled with the corporation's bylaws, bear heavily on any director's assessment of his risks of liability and what he should do about them. Particularly in those states that allow, but do not require, indemnification, [78] and in those states that restrict its scope, [79] the prudent director will want something more reliable than corporate goodwill, which may prove fleeting in times of trouble. [80] Furthermore, no matter how well disposed the board may be toward the embattled director, the corporation may have its own financial troubles and thus be unable to help him. [81] He needs insurance.

## III. THE DIRECTORS' AND OFFICERS' INSURANCE POLICY [82]

### A. *Structure of the Policy*

The typical D & O liability policy [83] has two parts. The first part, the corporate reimbursement policy, repays to the corporation any money it may give its directors or officers as indemnification. [84] The corporation's payments to its directors are governed by statute, by corporate bylaw, and by public policy, as noted above. [85] Furthermore, the policy excludes certain claims under certain circumstances, **[*700]** thus forcing the corporation to absorb noncovered payments it makes. [86] And a D & O policy does not cover any claims or suits against the corporation itself, only indemnification payments to directors. [87]

The second part of the policy covers the directors and officers themselves. It undertakes to reimburse them, within the limits of the law and the policy provisions, for any loss they may incur through claims against them in their official corporate capacities. [88] If the corporation itself reimburses them, then, of course, the insurance company will not pay. [89] And if the director's situation or behavior falls under one of the exclusions, he receives nothing from the insurance company.

Exclusion provisions vary, but most policies do not cover claims related to pollution, libel and slander, bodily injury and property damage, ERISA, [90] or claims for which the directors have other insurance policies in force or for which their corporation indemnifies them. [91] These exclusions are unexceptional; obviously the insurance companies do not want to contribute to double payments or pay for losses that other kinds of insurance cover.

Criticism of D & O policy exclusions focuses on those that exclude **[*701]** claims for repayments under section 16(b) of the Securities Exchange Act of 1934, [92] claims for the return of illegal remuneration, claims brought about by the "active and deliberate dishonesty" of the insureds, and claims based on illegal personal profit and advantage. [93] These criticisms usually fall into two categories: Either the exclusions are so varguely worded that the existence and extent of coverage are unclear [94] or the exclusions do not reflect business realities. [95] Some examples follow:

The "active and deliberate dishonesty" exclusion has been criticized for vagueness. [96] How bad does conduct have to be to qualify as actively and deliberately dishonest? Is there some other kind of dishonesty from which this kind may be distinguished, [97] and, if so, is the other kind covered? [98] Where does active and deliberate dishonesty fit in the negligence-gross negligence-recklessness-intentional wrongdoing continuum? [99]

The policies exclude claims based on "gaining in fact an illegal personal profit or advantage," an exclusion to which few would take exception, [100] but the policies do not say how this "fact" will be determined. [101] **[*702]** The "dishonesty" exclusion, whatever it entails, requires a final adjudication, but no such condition attaches to the "personal profit or advantage" exclusion. [102]

Clauses that exclude claims "for the return of any remuneration paid to the insureds without previous approval of the stockholders" exemplify an exclusion reflecting an imperfect grasp of corporate operations. As noted in the commentaries, stockholders do not usually approve compensation. [103]

Exclusions in liability policies often generate legal contention, as insurance companies and their customers wrangle about definitions in order to deny or force coverage. A policy that couples ambiguities with no duty to defend exacerbates the insured person's troubles. He cannot predict his coverage with any certainty, and the insurance company does not have to declare itself until the suit is over. The ordinary malpractice policy, which routinely includes a duty to defend, may also generate squabbles about coverages, but it does so early enough that the parties can resolve the coverage dispute before the litigation begins.

B. *The Duty to Defend*

1. Absence Largely Unremarked

The duty to defend requires an insurer to defend an insured person "against all actions brought against him on the allegation of facts and circumstances covered by the policy." even if groundless, false or fraudulent. [104] The duty to defend is not, strictly speaking, excluded from the standard D & O policy. Like the barking of the dog in the Sherlock Holmes story, its absence is significant. [105]

Surprisingly, in view of the practical problem its absence occasions, the duty to defend is seldom mentioned in the otherwise exhaustive discussions of D & O insurance. [106] Most commentators, **[*703]** like the policies themselves, skip the subject. Those who do address **[*704]** the point often merely note in passing that the policies contain no duty to defend, without trying to account for this circumstance or assess its effect on the insured businessperson. [107] Some go so far as to congratulate the director on his good fortune in having shed this common provision of liability insurance:

The D & O policies do not provide for the insurance company to take over the defense of the action, as do many other liability policies. The insureds retain their own counsel (with the consent of the insurers) who is paid by the insurers (subject to the retention [*i.e.,* deductible] and other terms of the policy). This is a substantial advantage for the insureds . . . . [108]

The nature of this advantage is not explained; possibly the writer means that the director can pick his own counsel instead of getting stuck with a lawyer chosen by the insurance company. Unlike a physician or attorney sued for malpractice, a director involved in corporate litigation may have an experienced in-house counsel on call, but conflict of interest may bar in-house counsel from defending him. [109] To gain choice of counsel, the corporate director must give up the protection of a defense paid for as it occurs.

Furthermore, having given up this protection, the director does not gain complete control over his litigation. D & O insurance policies indirectly afford insurance companies the right to control litigation without the duty to defend through clauses that forbid the incurring of "costs, charges, and expenses" without the company's consent. [110]

[*705] 2. Methods of Incorporation into Policies

A duty to defend usually arises in one of two ways. It can be specifically incorporated into the insurance contract, and, in fact, the treatises insist that "[a] duty to defend is contractual and if there is no contract to defend there is no duty to defend." [111] Obviously, language in an insurance policy stating that the insurance company undertakes to defend the policyholder in specified actions would meet this requirement.

A duty to defend can also be imposed through the operation of "reasonable expectation." Some courts, following a general rule of resolving contractual uncertainties in the insured's favor, [112] have required insurers to defend actions that the insurers maintained were not included in coverage. [113] When courts impose these additional duties, they usually make much of the complicated language and fine print that often enshrine conditions and exclusions and of the fact that most insurance contracts are adhesion contracts. [114] Thus an insurance company may find itself required to defend an [*706] action when it had not explicitly contracted to do so, and even when it thought it had contracted *not* to do so. [115]

Although judges sometimes sympathize with ordinary consumers forced to decipher policyspeak, a similar argument on behalf of a corporation would probably not be successful. Directors and officers may be as naive as the ordinary consumer about insurance, but corporations often employ risk managers, who possess sophistication equal to the insurance company's about policy provisions. Thus, the corporation would probably not make much headway with a reasonable-expectations argument. [116] Furthermore, D & O insurance is negotiable, the particular policy created in bargaining sessions between the corporation's risk manager and the insurance company's representative. In the present competitive market, the corporation is in a position to bargain. [117] Thus, a D & O policy may well not be an adhesion contract.

[*707] 3. Reasons for Omission

Assuming that the duty to defend was not omitted from D & O insurance policies by inadvertence, why might the first policy drafters have wanted to avoid it? The duty to defend is the source of unending controversy between insurance companies and their customers, [118] as well as between one insurance company and another. [119] A policy containing a duty to defend requires the insurance company to defend any action in which the facts or allegations suggest potential coverage. [120] Even if the policy covers only some of the allegations, the insurance company must defend the whole action. [121]

The duty may exist even when coverage is doubtful and does not finally arise. [122] The insurance company faces heavy penalties if it refuses to honor its obligation to defend the policyholder. [123] It might find itself required not only to pay the policyholder's defense costs and judgment [124] but also to exceed the policy limit in doing so. [125] Even if it denies a claim reasonably and in good faith, the insurance company operates at its peril in refusing to defend [126] because doubtful cases generally go to the policyholder. [127] No wonder, then, that

a right-thinking underwriter would want to avoid this obligation.

The duty to defend could also work to the director's disadvantage, **[\*708]** because the duty to defend brings with it a corresponding right to control the litigation. Thus, the insurer usually selects the attorney and decides whether to settle or fight a claim. The company will obviously choose counsel with whom it is familiar; in the expectation of further business, an attorney may charge the insurance company a lower-than-average hourly rate. Such camaraderie might dismay the director, who will not like to see corners cut in his defense, either in the choice of attorney or in the defense strategy. Thus, some commentators regard D & O policies as better without a duty to defend: The *right* rather than the duty to defend concerns them. [128]

Directors must also consider the conflict of interest between themselves and the insurance company, and potentially any lawyer it hired to defend them. Although the company has a duty to defend in good faith, [129] a director cannot but notice that his interests and the company's not only do not coincide but directly oppose each other. The director wants to be cleared or, failing that, to be covered. The insurance company wants to pay as little as possible in judgment or settlement. [130] The insurance company's interests would thus be served by a finding of dishonest behavior or other excluded misconduct. [131] A lawyer one chooses and hires oneself will not subconsciously hope that if a court finds liability, it will be worse than mere negligence. And he will also be more likely to consult only the director's interest in the matter of settlement, rather than trying to save the insurance company money or trouble.

### 4. Consequences of Absence

Although these objections to a duty to defend incorporated into D & O policies have some force, they fail to consider the total effect its absence has on the conduct of a suit and on public policy. From the directors' and the corporation's point of view, this absence **[\*709]** creates intractable problems, and usually at a time when they can ill afford to be distracted from other pressing matters.

As noted above, [132] the absence of a duty to defend means that a director must finance his defense himself. An extremely well-heeled director may face such a prospect undaunted, but as legal fees approach the seven-figure mark, many would find them difficult to manage. Thus, the ability to defend the action may be compromised; a director might be forced to settle a nonmeritorious claim simply because he cannot afford to litigate. Although public policy favors settlements, it does not favor blackmail, and this situation invites such abuse. Settlements work only if the two bargaining parties are roughly equivalent in power, and each can credibly threaten the other with a court fight if the settlement does not materialize. Stockholders' lawyers often work on contingency, and the government's lawyers work on salary; corporate defense lawyers do neither. Thus, a director's threat to go to court may be an easily called bluff. [133]

Faced with overwhelming legal fees, a corporate officer or director will look for help to someone with resources greater than his: the corporation or the insurance company. Frequently one or the other will come to his aid; the money he gets is called "advances" if it comes from the corporation, "interim payments" if it comes from the insurance company. Although this adaptation seems to solve the defense financing problem, it creates another set of difficulties.

Many indemnification statutes allow advances, [134] but they are entirely permissive: A corporation may advance the money but need not. Delaware's statute allows a corporation to advance funds provided that the director "undertak[es] . . . to repay." [135] An "undertaking" may be a simple promise to repay, [136] or it may involve a **[\*710]** more formal commitment, and even interest payments. [137] Some statutes demand only the director's or

officer's agreement to repay, [138] while others demand approval from a disinterested board of directors, independent counsel, or stockholders. [139]

Professor Bishop believes that most corporations do, in fact, advance their directors the sums they need to defend themselves. [140] And insurance companies, after some prodding by defendants' counsel, will often make interim payments. [141] These arrangements cannot adequately protect directors, however, because they are informal: No one *must* do anything, and thus these funds become a favor to the director, not his enforceable right. [142]

Seeking advances from the corporation has both advantages and disadvantages. The board of directors (unless advances require stockholder approval) knows the director in difficulty and may sympathize with him. In-house arrangements can proceed more quickly that would be possible with an insurance company, and the director is likely to get what he needs without much delay.

Problems arise, however, if the entire board, or almost all of it, is being sued, if the corporation is insolvent or nearly so, or if the director is not of favor with management. [143] If a substantial portion of the board is involved in the suit, it may not be possible to muster enough disinterested directors to authorize advances. Obviously, if the corporation itself has no money, it cannot advance anything for legal fees. The policies themselves do not say whether the **[*711]** corporate indemnification part of the policy permits the corporation to recover the money it advances to its directors. [144] And finally, a hostile or new board may refuse to approve a request for advances or require as an "undertaking to repay" such a stiff bond as to amount to the same thing. The board would be entirely within its statutory rights to do so. [145] A director can try to protect himself by making mandatory advances part of his employment contract. This precaution will avail him little, however, if the corporation is insolvent or if a hostile board chooses to dispute the terms.

The insurance company is thus the preferred candidate to make "interim payments." Although the insurance company will take a more objective view that the corporation toward the director personally, it is also much less likely to have any animosity toward him. Involvement and insolvency do not affect the company's payments, and, in fact, most companies will make interim payments. [146] But they have to be asked, and asked again, and sometimes threatened, before the they pay. [147] This situation thus penalizes the inexperienced defense counsel, as well as his client, who may believe the company's first refusal and not press further. It also creates inefficiency: Instead of being routine, payments now must be the subject of costly negotiations. [148]

Finally, the insurance company does not have to pay, and if it refuses, the director probably has no recourse. [149] This situation occurred in a recent case, *Ted Clandening v. MGIC Indemnity Corp.* [150] The plaintiff sued to force MGIC to pay his defense costs, in advance, for a lawsuit filed against him alleging fraudulent loan practices. [151] The insurance company maintained that the policy contained no duty to defend and that interim payments were optional, not required. [152] The insurance company prevailed. [153]

Informal arrangements work only if everyone feels cooperative; a director has no way to enforce them. Furthermore, this uncertainty, which obviously affects the director's ability to mount a defense **[*712]** and the kind of defense, if any, he eventually mounts, arises *solely* because the policy contains no duty to defend. If the policy included defense, this problem would evaporate. [154]

The informal arrangements also work more serious damage. With no contractual duty to defend, the insurance company makes interim payments at its discretion. In practice, this means that it will pay if it believes that the director is either blameless or covered. Thus, the insurance company assumes an adjudicatory role that may, if the company is in fact the sole source of expense funds, determine the outcome of a suit. Public policy, however, so favors a

vigorous defense that one court allowed directors who had lost a criminal antitrust action to be reimbursed for their legal expenses. [155] Another court allowed a taxpayer to deduct legal costs for an unsuccessful securities fraud case. [156] Allowing an insurance company to decide that some defendants are worthy of a defense while others are not would compromise this policy.

5. Proposal

A D & O policy should fairly balance both the director's and the insurance company's needs for security and control. The director needs his legal fees paid as they accrue, and he needs some control over the course of litigation, particularly over the decision to settle or fight. The insurance company wants to minimize costs and therefore does not want to give the director carte blanche to hire the most expensive legal talent he can find. It wants to retain the control it has over the litigation, again to minimize expenses. Both director and insurer are united in their desire to see the suit defeated. And both have an incentive to contest what they regard as frivolous or marginal actions, in order to discourage strike suits.

Thus, a policy that accounts for these concerns could contain an optional duty to defend, or the insurance company could prepare alternative policies, one with a duty to defend and one without. The corporation itself could then decide whether it wanted, in effect, to insure itself against litigation expenses during lawsuits or whether it preferred the insurance company to make these payments. Since policies are individually negotiated, transaction costs should not greatly increase.

**[\*713]** Including a duty to defend in the D & O policy would confer several benefits on directors and officers. The financing problems which otherwise beset them would be eliminated. [157] The informal, and thus unreliable, advances machinery would no longer be necessary. [158]

A formally recognized duty to defend would also solve the conflict if interest problem. California and some other states protect policyholders from conflict of interest more directly than by vague and hopeful exhortations to exhibit good faith. Courts have ruled that "in a conflict of interest situation, the insurer's desire to control exclusively the defense must yield to its obligation to defend the policyholder. Accordingly, the insurer's obligation to defend extends to paying the reasonable value of the legal services and costs performed by independent counsel selected by the insider." [159] Where conflict of interest exists, as, for example, when an insurance company defends an action under a reservation of rights, the director would have a choice: He could accept the insurance company's counsel or get his own. [160]

Although the insurance company would seem to assume an enormous burden when it takes on the duty to defend, [161] the duty can work to the company's advantage. The company can avail itself of case law that sometimes holds that the company is *not* required to defend. [162] Moreover, as the policies are currently written, an enthusiastic **[\*714]** court could read a duty to defend into the policy. The frequent use of "liability," the use of phrases such as "any amount which the Insured are legally obligated to pay" to describe what the insurance covers, along with the "reasonable expectation" doctrine and the requirement to construe policies in favor of the insured might allow a court called upon to interpret a D & O policy to find a duty to defend. To operate efficiently, insurers need certainty and predictability as much as insureds do. An explicit duty to defend meets these needs. [163]

By including a duty to defend, the insurance company is not doing its policyholders a favor, but looking after its own interests. The company can assume more direct control over any litigation than it presently can. Presently, a lawyer not chosen by the company conducts the litigation and, more significantly, the settlements. Nothing prompts him to try to save the company's money; he has every reason to settle up to the policy limits and no reason to

struggle for a lower figure. [164] The company must approve settlements, but it cannot unreasonably withhold its approval and doubtful cases are resolved in the insured's favor. [165]

The insurance company benefits also from greater efficiency. As the system works now, defendant's counsel must often make repeated requests before the company will make interim payments. [166] Importunities and threats do nothing but increase the legal fees, which the insurance company ultimately pays. The more the two contracting parties are able to settle in advance, the less piecemeal negotiating need take place.

Because a duty to defend is not mentioned in a D & O policy, the corporation can overlook its absence when the policy's terms **[*715]** are negotiated, especially if the corporation's negotiator is not an insurance specialist. Therefore, a policy that does not contain a duty to defend should say so explicitly. In its place, a corporation and its insurer should agree to substitute something else; for example, they might agree that, in lieu of a duty to defend, they will compile a short list of corporate defense attorneys or firms acceptable to both and work out a reasonable fee schedule. Agreement in advance helps to decrease the negotiations necessary at the beginning of a lawsuit and to minimize the chances of either the corporation or the insurance company getting an attorney who inspires less than absolute confidence. A policy not containing a duty to defend should likewise explicitly deal with advances or interim payments.

Explicit provisions governing these issues will serve the specific policies often cited as the rationale for corporate indemnification and D & O insurance: to encourage corporate officers and directors to resist unjustified actions and to attract and retain competent management for corporations. [167] At present, a director or officer should not fear being found liable, but rather being sued at all. The legal fees will drain his resources, even if he is eventually vindicated. Directors already hesitate to serve on boards for fear of such liability; [168] in addition, they might well be discouraged from serving if they know they must cover their legal fees if they are sued. Directors need reliable, efficient, and above all predictable insurance coverage because without it they run risks so great that knowledgeable people will be less and less willing to accept directorships.

## C. Allocation of Defense Costs

The allocation of defense expenses results from the two-part structure of a D & O policy. As noted above, [169] the insurance company will pay a director's legal expenses, if he turns out to be covered. It does not, however, pay any fees incurred defending the corporation; it pays only what the corporation spends to indemnify its directors and officers.

The allocation problem arises in one setting. If the corporation alone is sued, the insurance company is not responsible for any legal expenses. Likewise, if only the directors and officers are sued, the insurance company pays their legal fees exceeding deductibles and coinsurance amounts. But if both the corporation and the directors are sued together, the costs of defending them must be allocated **[*716]** between the insured directors and the uninsured corporation. The problem may be avoided if corporate counsel defends the corporation and the directors hire their own attorneys. It may be desirable both economically and strategically, however, to have one attorney or team of attorneys handle the whole defense.

The necessity to allocate expenses generates some significant transaction costs. Experienced defense counsel have developed a pattern designed to protect themselves from both conflict of interest and unnecessary distraction. After a suit is filed naming both the corporation and its directors, the corporation hires an attorney to defend everyone. An experienced attorney will agree to undertake the defense but will refuse to get involved in the allocation issue. That, he will say, is for the corporation and the insurance company to settle between them. So the corporation must hire *another* attorney, solely for the purpose of doing battle over allocation.

The simplest solution to this problem is to change the two-part structure, either covering the corporation's expenses or covering only the directors and officers, eliminating coverage for corporate indemnification. Of course, if the policy covers the corporation's expenses, it will cost more, the rise in premium cost perhaps not offset by the savings in transaction costs. A policy that covered only directors and officers would probably not expose them to any more risk than they presently run. Between statutory and commonlaw restrictions on a corporation's power to indemnify on the one hand, and insurance policy exclusions on the other, a director has nearly the same chance of being reimbursed by either the corporation or the insurance company.

Even if directors and officers do not lose any protection, however, the corporation would not save money through a new policy format. It would still need to retain counsel to defend itself; although the directors and officers would have their expenses paid by the insurance company, the corporation would have to pay its own expenses. It may be less costly to allocate, even if an extra lawyer is needed to settle this issue.

Given the variety of circumstances under which lawsuits can arise, there probably is no simple allocation formula that can combine predictability with flexibility. Once again, the key to reducing transaction costs lies in negotiating as much as possible in advance. While bargaining with the company, the corporation's representative should inquire closely into the insurance company's allocation practice.

If the corporation and its directors find themselves involved in the kind of suit in which the time and expenses attributable to the corporation's defense can be readily distinguished from the directors' defense, then, of course, separate accounts can be maintained. **[*717]** More commonly, however, the charges overlap, so that the defense of one is the defense of all. The insurance company may then allocate on a pro rata basis, dividing the costs by the number of defendants and excluding one share as the corporation's. The company may operate on a strict percentage basis, covering, say, ninety percent of the expenses. This would be a boon to the corporation in a suit with a few defendants, for example, the corporation and four directors. On occasion, when the corporation itself was in serious financial trouble, an insurance company has paid 100% of the expenses, operating apparently, under the blood-from-a-stone economic theory. [170]

After inquiring into the company's patterns, the corporate representative should try to make explicit arrangements in advance. For example, the parties could insert a clause stating that it is the insurance company's practice to allocate expenses on a pro rata basis and that the corporation accedes to this practice unless special circumstances intervene. Such a provision would permit some flexibility while allowing an automatic procedure to operate in the absence of unusual difficulties.

CONCLUSION

Although a workable allocation formula for defense expenses probably cannot be arranged entirely in advance, negotiations during the bargaining period can minimize the high transaction costs associated with this problem. By ascertaining the insurance company's practice and agreeing to some procedure for allocation, the corporation can reduce the likelihood that a dispute over allocation will arise at the same time as a lawsuit against the corporation and its directors.

Including a duty to defend in D & O insurance would improve the policy both from the directors' point of view and the insurance company's. By eliminating the financing difficulties that the typical policy form presently imposes on directors and officers, this addition would being D & O insurance in line with other forms of professional malpractice insurance, promote efficiency, and perhaps even lower costs. The problem of advances or interim payments, now

a source of uneasiness for all concerned, would disappear.

If a duty to defend is not included in the policy, its absence ought to be noted at the time the policy is negotiated and something else agreed upon in its place. When the corporation purchases its coverage, some mechanism should be created that will permit legal fees to be paid as they accrue. Only then will the policy fulfill its function: to assure the corporation access to capable directors and **[*718]** officers by protecting them from overwhelming legal expenses and from the consequences of their negligence, should that be proved.

**FOOTNOTES:**

⚓n1 *See, e.g.,* Bishop, *New Problems in Indemnifying and Insuring Directors: Protection Against Liability Under the Federal Securities Laws,* 1972 DUKE L.J. 1153, 1153 ("fertile legal imaginations have conceived novel and alarming theories of liability"); Greenberg & Dean, *Protecting the Corporate Executive: Director and Officer Liability Insurance Reevaluated,* 58 MARQ. L. REV. 555, 557-58 (1975) ("[C]ourts . . . construe with increasing strictness the role of management . . . . The future may well see the development of additional theories of liability aimed at directors and officers.").

⚓n2 *See* Bishop, *Sitting Ducks and Decoy Ducks: New Trends in the Indemnification of Corporate Directors and Officers,* 77 YALE L.J. 1078, 1078 (1968) [hereinafter cited as *Sitting Ducks*]:

The general tenor of the insurance companies' campaign is illustrated by its advertisements in the business press -- for example, an ad which features a composite photograph of a board of directors presided over by a stuffed duck and the explanatory text, "As a corporate director or officer, you may be a sitting duck for a shareholder or third party liability suit." *See also* Bishop, *New Cure for an Old Ailment: Insurance Against Directors' and Officers' Liability,* 22 BUS. LAW. 92, 93 (1966) [hereinafter cited as *New Cure*].

⚓n3 THE WYATT COMPANY, 1982 COMPREHENSIVE REPORT: DIRECTORS & OFFICERS LIABILITY/FIDUCIARY LIABILITY 45 (1982); *Sitting Ducks, supra* note 2, at 1078 n.1.

⚓n4 J. BISHOP, THE LAW OF CORPORATE OFFICERS AND DIRECTORS: INDEMNIFICATION AND INSURANCE P1.01 (1981); THE WYATT COMPANY, *supra* note 3, at 9-44; Johnston, *Corporate Indemnification and Liability Insurance for Directors and Officers,* 33 BUS. LAW. 1993 (1978); *see also infra* notes 26-35 and accompanying text. The 1982 Wyatt Survey reports that 86% of the 1,979 participating U.S. companies carry D & O insurance, an increase of 7% from 1980. THE WYATT COMPANY, *supra* note 3, at 1, 45.

⚓n5 M. SCHAEFTLER, THE LIABILITIES OF OFFICE: INDEMNIFICATION AND INSURANCE OF CORPORATE OFFICERS AND DIRECTORS 218 (1976); Conard, *A Behavioral Analysis of Directors' Liability for Negligence,* 1972 DUKE L.J. 895, 903; Greenberg & Dean, *supra* note 1, at 555, 561-62. For the changes in the liability exposure of an "outside" director, *i.e.,* one who has no other employment connection with the corporation, see Comment, *Corporate Indemnification: A View from the Director's Chair,* 27 LOY. L. REV. 89, 89-90 (1981).

⚓n6 Greenberg & Dean, *supra* note 1, at 571-72; Knepper, *Corporate Indemnification and Liability Insurance for Corporation Officers and Directors,* 25 SW. L.J. 240, 253 (1971).

⚓n7 M. SCHAEFTLER, *supra* note 5, at 109; THE WYATT COMPANY, *supra* note 3, at 45; Greenberg & Dean, *supra* note 1, at 569-71.

⚓n8 *See, e.g., Sitting Ducks, supra* note 2, at 1088-90; *New Cure, supra* note 2, at 103-06, Johnston, *supra* note 4, at 2018-20.

n9 *New Cure, supra* note 2, at 104.

n10 *See* 6B J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4261 (R. Buckley ed. 1979); 11 G. COUCH, COUCH ON INSURANCE § 44:4 (rev. ed. 1982). For arguments that the policies are really liability policies, see Note, *Liability Insurance for Corporate Executives,* 80 HARV. L. REV. 648, 651-53 (1967) [hereinafter cited as *Liability*]; Note, *Indemnification of the Corporate Insider: Directors' and Officers' Liability Insurance,* 54 MINN. L. REV. 667, 683-84 (1970) [hereinafter cited as *Indemnification*].

n11 One article refers to a duty to defend in credit union D & O policies. The authors do not mention any specific policies or quote any provisions. *See* Weinar & David, *The Credit Union Discovery Board and the Directors and Officers Policy: Elements of An Attorney's Conflict of Interest,* 15 FORUM 321 (1980).

n12 *See infra* notes 84-87, 169 and accompanying text.

n13 *See infra* notes 132-56 and accompanying text.

n14 *See infra* note 148 and accompanying text.

n15 Practitioners' survey conducted by author (results on file at *UCLA Law Review*) [hereinafter cited as Practitioners' Survey].

n16 THE WYATT COMPANY, *supra* note 3, at 9, 11. The 1982 survey is the eighth survey of D & O insurance since 1973. The Wyatt Company is "an international consulting firm specializing in pension plans, actuarial evaluations, risk management, employee benefits, and executive compensation."

n17 The MGIC policy mentions advances. The Chubb policy will soon offer an endorsement that, if purchased, requires the insurance company to provide advance payments.

n18 T. SHEEHAN, THE LIABILITIES OF DIRECTORS AND OFFICERS: WITH PRACTICAL SOLUTIONS TO THEIR DISCHARGE 23-24 (3d ed. 1979); Knepper, *supra* note 6, at 255.

n19 Greenberg & Dean, *supra* note 1, at 556-62.

n20 THE WYATT COMPANY, *supra* note 3, introduction.

n21 *Id.*

n22 *Id.* at 4-5.

n23 *Id.* at 17-18. The 1980 Survey likewise reported stockholders as the most frequent plaintiffs. *Id.* at 17.

n24 *Id.*

n25 *Id.* at 19-20. Professor Bishop, writing some fifteen years earlier, compiled a slightly different list of the kinds of litigation a corporate director could expect to face. He called the stockholders' derivative suit the "principal occupational hazard of the corporate manager." *New Cure, supra* note 2, at 95. He then identified as the second largest legal hazard third-party suits, such as antitrust, patent and copyright infringement, or securities regulation, brought against directors, and usually against the corporation as well, "as a result of their zealous endeavors to maximize its profits." *Id.* He finally identified another kind of litigation that besets corporate management, suits that they face because of their status. These suits

arise from the federal securities laws, which impose special standards of conduct on insiders trading in their companies' stock. *Id.* at 95-96.

For a detailed discussion of the kinds of litigation corporate officers and directors face, see J. BISHOP, *supra* note 4, PP3.01- .07; W. KNEPPER, LIABILITY OF CORPORATE OFFICERS AND DIRECTORS *passim* (3d ed. 1978); G. WASHINGTON & J. BISHOP, INDEMNIFYING THE CORPORATE EXECUTIVE 19-36 (1963).

⫪n26 THE WYATT COMPANY, *supra* note 3, at 10.

⫪n27 *Id.*

⫪n28 *Id.* at 13.

⫪n29 *Id.* at 14.

⫪n30 *Id.* at 9.

⫪n31 *Id.* at 10.

⫪n32 417 U.S. 156 (1974).

⫪n33 Knepper, *An Overview of D & O Liability for Insurance Company Directors and Officers,* 45 INS. COUNS. J. 63, 63 (1978).

⫪n34 *Id.* at 63-64.

⫪n35 Despite corporate reluctance to report legal expenses, a quirk for which the Wyatt surveyors gently rebuked their participants, THE WYATT COMPANY, *supra* note 3, at 13, sometimes the awful truth does come out. The court in St. Paul Fire & Marine Inc. Co. v. Weiner, 606 F.2d 864, 867 (9th Cir. 1979), reported in passing the legal fees connected with a securities fraud action; after settlement, with some loose ends still waiting to be tied up, the legal costs were already over $ 1.85 million for one pair or defendants and over $ 1 million for another, lone, defendant.

⫪n36 T. SHEEHAN, *supra* note 18, at 27, 32.

⫪n37 G. WASHINGTON & J. BISHOP, *supra* note 25, at 19-36.

⫪n38 Greenberg & Dean, *supra* note 1, at 557 (based on the 1974 Wyatt Survey, authors argue, "The more profitable companies are sued much less than those encountering financial problems."); *see also* Darlin, *Insurer's Failure to Insure Directors Could Ensure Them Some Worries,* Wall St. J., Sept. 22, 1983, at 35, col. 1. This article recounts the cautionary tale of directors of a large corporation, presently in serious financial trouble, who lack D & O insurance. The corporation promised to pay their legal expenses, but its difficulties now preclude any payments. The stockholders are suing the directors for fraud, hoping to recover from them the money the corporation no longer has. What makes this story especially intriguing is that the corporation is Baldwin-United, one of the largest U.S. sellers of D & O insurance.

⫪n39 *See infra* notes 47-81 and accompanying text.

⫪n40 *New Cure, supra* note 2, at 93; *see* Conard, *supra* note 5, at 913-15 (proposal to limit directors' and officers' negligence liability and to eliminate insurance and indemnification).

⫪n41 *New Cure, supra* note 2, at 96-97.

⌐n42 173 Misc. 106, 16 N.Y.S.2d 844 (1939).

⌐n43 Perhaps the ruling cannot be termed "unexpected." The case law up to that point was so confused that no ruling could truly surprise. *See New Cure, supra* note 2, at 97; Greenberg & Dean, *supra* note 1, at 562.

⌐n44 173 Misc. at 109, 16 N.Y.S.2d at 847.

⌐n45 *New Cure, supra* note 2, at 97; Greenberg & Dean, *supra* note 1, at 562-63.

⌐n46 *New Cure, supra* note 2, at 97; Pillai & Tractenberg, *Corporate Indemnification of Directors and Officers: Time for Reappraisal,* 15 U. MICH, J.L. REF. 101, 109 (1981).

⌐n47 1941 N.Y. Laws ch. 209, § 1; 1941 N.Y. Laws ch. 350, § 1.

⌐n48 The American Bar Association and the American Law Institute also drafted amendments to the Model Business Corporation Act (MBCA) to deal with indemnification; these amendments served as models for business codes in many states. In 1967, both the MBCA and Delaware's indemnification provisions were further amended to expressly authorize D & O insurance. *See Sitting Ducks, supra* note 2, at 1081-87; Greenberg & Dean, *supra* note 1, at 565-66; Knepper, *supra* note 6, at 240-41.

⌐n49 W. KNEPPER, *supra* note 25, at 590; *see id.* at 591-92 (list of statutes authorizing indemnification).

⌐n50 *New Cure, supra* note 2, at 98.

⌐n51 For discussions of public policy issues involved, see *New Cure, supra* note 2, at 107-12; *Liabilities Which Can Be Covered Under State Statutes and Corporate By-Laws,* 27 BUS. LAW. s-109, s-126-30 (1972) (speech of S. Arsht) [hereinafter cited as *Liabilities Covered*]; Pillai & Tractenberg, *supra* note 46, at 119-21. *See generally* Note, *Public Policy and Directors' Liability Insurance,* 67 COLUM. L. REV. 716 (1967).

⌐n52 *Liabilities Covered, supra* note 51, at s-109, s-120-24 (speech of J. Bishop); *Sitting Ducks, supra* note 2, at 1082.

⌐n53 DEL. CODE ANN. tit. 8, § 145 (1983). For an analysis of the potential pitfalls of the earlier 1943 Delaware Act, still alive in other states, and a brief survey of some state statutes, see Brook, *Directors' Indemnification and Liability Insurance,* 21 N.Y.L.F. 1, 5-12 (1975).

⌐n54 DEL. CODE ANN. tit. 8, § 145(a) (1983) (nonderivative actions); *id.* § 145(b) (derivative actions).

⌐n55 *Id.* § 145(a).

⌐n56 *Id.* § 145(b).

⌐n57 *Id.* § 145(f). The corporation could, for example, contract to indemnify an executive for any personal tort liability or for medical expenses.

⌐n58 *Id.* § 145(g).

⌐n59 *See, e.g.,* Globus v. Law Research Serv., 287 F. Supp. 188, 199 (S.D.N.Y. 1968) (issuer cannot indemnify underwriter for adverse judgment in stock offering suit), *aff'd in*

part, rev'd in part, 418 F.2d 1276, 1288 (2d Cir. 1969), cert. denied, 397 U.S. 913 (1970); Messersmith v. American Fidelity Co., 232 N.Y. 161, 165, 133 N.E. 432, 433 (1921) (Cardozo, J.) (allowing underage driver to use car not willful, uninsurable misconduct); see also CAL. INS. CODE § 533 (West 1972).

☨n60 New Cure, supra note 2, at 98-99, 101.

☨n61 See, e.g., Essential Enters. v. Dorsey Corp., 40 Del. Ch. 343, 350-53, 182 A.2d 647, 652-53 (1962) (construing corporate bylaw to prohibit indemnification when suit alleging official misconduct settled).

☨n62 Teren v. Howard, 322 F.2d 949, 955-59 (9th Cir. 1963) (defendant directors not entitled to indemnification for legal fees in derivative suit for excessive compensation).

☨n63 Fletcher v. A.J. Indus., 266 Cal. App. 2d 313, 72 Cal. Rptr. 146 (1968) (lower court's grant of defendant officers' attorneys fees in settled derivative suit held erroneous because settlement left questions concerning officers' conduct for arbitration).

☨n64 See SEC v. Continental Growth Fund, [1964-1966 Transfer Binder] FED. SEC. L. REP. (CCH) P91,437 (S.D.N.Y. 1964) (investment company director denied indemnification for negligence judgment even though federal statute prohibited indemnification only for "willful misfeasance, bad faith, gross negligence or reckless disregard of duties").

☨n65 N.Y. BUS. CORP. LAW § 721 (McKinney 1963).

☨n66 Id. § 722(a) (McKinney 1963 & Supp. 1984-1985).

☨n67 Id. § 722(b)(1)-(2) (McKinney 1963).

☨n68 Id. § 723(a) (McKinney 1963 & Supp. 1984-1985). The 1977 amendment to this section lowers the standard for a director serving "any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise" to "in or not opposed to the best interests of the corporation." Id. § 723(a) (McKinney Supp. 1984-1985).

☨n69 Id. § 723(a) (McKinney 1963 & Supp. 1984-1985).

☨n70 Id. § 727(a)(3) (McKinney Supp. 1984-1985).

☨n71 CAL. CORP. CODE § 317 (West Supp. 1984). For a comparison with the old California statute, CAL. CORP. CODE § 830, see Heyler, Indemnification of Corporate Agents, 23 UCLA L. Rev. 1255 (1976).

☨n72 CAL. CORP. CODE § 317(b)-(c) (West Supp. 1984).

☨n73 Id. § 317(i).

☨n74 Id. § 317(d)-(e).

☨n75 Id. § 317(d).

☨n76 DEL. CODE ANN. tit. 8, § 145(c) (1983).

☨n77 CAL. CORP. CODE § 317(c) (West Supp. 1984).

☨n78 Even in states requiring indemnification if the director or officer succeeds on the merits, the director's right to indemnity if a suit settles is not clear. Since many, if not most,

suits settle, this uncertainty often obtains.

⚓n79 *E.g.,* <u>CAL. CORP. CODE § 317(c)</u> (West Supp. 1984); N.Y. BUS. CORP. LAW. §§ 722(b), 726(b) (McKinney 1963).

⚓n80 *See, e.g.,* <u>Tomash v. Midwest Technical Dev. Corp., 281 Minn. 21, 160 N.W.2d 273 (1968)</u> (court upheld corporation's refusal to indemnify director).

⚓n81 Greenberg & Dean, *supra* note 1, at 557; *see also* Darlin, *supra* note 38.

⚓n82 The following discussion of directors' and officers' liability insurance policies is not meant to be an exhaustive treatment, which can be found elsewhere. *See* sources cited *supra* notes 1-6. Thus, it includes only those elements of the policy that bear on the matter at hand.

⚓n83 The following policies are included in this discussion: Chubb form 14-02-228; Harbor Union (Swett & Crawford) form HU 8128-1; Home Ins. Co. (Home) form H26305F; Lloyd's "Lydando No. 1"; MGIC form DO/SLA-1; National Union (AIG) form 8749/8750; Stewart, Smith Smith Mid America, Inc. (Stewart, Smith) form SS4. Together these policies account for over 60% of the total premium volume in the U.S. (both primary and excess coverage). THE WYATT COMPANY, *supra* note 3, at 100. Individual departures from general provisions will be noted as they occur.

⚓n84 Lloyd's "Lydando No. 1," Home form H26305F, and Stewart, Smith form SS4 have one-part insuring clauses with two subsections.

⚓n85 *See supra* notes 49-77 and accompanying text.

⚓n86 *See infra* notes 91-93 and accompanying text.

⚓n87 For example, Stewart, Smith undertakes to pay "on behalf of the Company, all loss for which the Company may be required or permitted by law to indemnify such Directors and Officers." Stewart, Smith form SS4, cl. I(b).

⚓n88 Harbor Union will pay for "[l]oss . . . arising from any claim . . . made against the insureds . . . by reason of any wrongful act . . . in their respective capacities as directors and officers." Harbor Union form HU 8128-1, sec. B1. Lloyd's, Chubb, and Stewart, Smith do not mention corporate capacities in their insuring clauses, but each defines "wrongful act" to cover only acts done in this capacity.

Official capacity is not always easily determined. Some acts are ambiguous, and the distinction between personal and corporate capacity may be hard to discern, for example, in a fight between entrenched and aspiring management. *See* J. BISHOP, *supra* note 4, PP2.01-.05; R. LEWIS & D. PARKER, ADVISING AND DEFENDING CORPORATE OFFICERS AND DIRECTORS UNDER THE NEW GENERAL CORPORATION LAW 47-52 (1977) (California Continuing Education of the Bar, Mar.-Apr. 1977) (discussing private and corporate capacity as related to federal securities laws); G. WASHINGTON & J. BISHOP, *supra* note 25, at 6-18; *see also* <u>Continental Copper & Steel Indus. v. Johnson, 641 F.2d 59 (2d Cir. 1981)</u> (directors of one corporation serving on board of another held to be acting in official capacity for first corporation); <u>Sorensen v. Overland Corp., 142 F. Supp. 354 (D. Del. 1956)</u> (executive not allowed indemnification for successfully resisted derivative suit because employment contract that was subject of suit was made *before* executive became director or officer), *aff'd,* <u>242 F.2d 70 (3d Cir. 1957).</u>

⚓n89 For example, Home will not pay a claim "for which the Insureds shall be indemnified by the company . . . ." Home form H26305F, cl. 5(h). Chubb and Stewart, Smith exclude these

payments in the insuring clause itself.

✠n90 Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101-1461 (1975) & Supp. 1984).

✠n91 Harbor Union and Lloyd's do not exclude bodily injury or property damages in the main policy. Stewart, Smith does not exclude ERISA claims. Home excludes pollution and ERISA claims by endorsement. Various policies exclude claims related to nuclear accident and to bribery.

✠n92 See R. LEWIS & D. PARKER, supra note 88, at 63-64; Hinsey & De Lancey, Directors and Officers Liability Insurance -- An Approach to Its Evaluation and a Checklist, 23 BUS. LAW. 869, 877 (1968).

✠n93 See, e.g., Liability, supra note 10, at 656-57.

✠n94 See J. BISHOP, supra note 4, P8.03[2][a]; Johnston, supra note 4, at 2019-20; Liability, supra note 10, at 656-57, 663.

✠n95 See New Cure, supra note 2, at 105-06; Johnston, supra note 4, at 2018.

✠n96 See supra note 94; see also Scott, Fears and Phobias: Management Liability and Insurance in Thrift Institutions, 88 BANKING L.J. 124, 147 (1971).

✠n97 "Is 'active and deliberate' dishonesty worse than common, unadorned dishonesty, or than passive and unintentional dishonesty?" J. BISHOP, supra note 4, P8.03[2][a]; see Eglin Nat'l Bank v. Home Indem. Co., 583 F.2d 1281 (5th Cir. 1978), for a valiant attempt to distinguish the two; see also Insurance Against Liabilities of Directors and Officers -- A Forum, 22 REC. A.B. CITY N.Y. 342, 364-65 (1967) (comments of R. Curtis, V. Futter & A. Kramer).

✠n98 Had they been insured, would the defendants in FSLIC v. Geisen, 392 F.2d 900 (7th Cir. 1968), have been covered because they simply sat by and allowed the chairman of the board of a savings and loan to make a prohibited loan but did nothing in particular themselves?

✠n99 The Supreme Court, in Ernst & Ernst v. Hochfelder, 425 U.S. 185, 214 (1976), held that scienter is required for private liability under § 10(b) of the Securities Exchange Act of 1934; negligence was not sufficient. The Court did not decide whether recklessness could qualify as scienter under certain circumstances, but it would be the foolhardy director who relied on this postponement. If a director were found liable for a § 10(b) violation under a recklessness/scienter standard, is he covered, or is this "active and deliberate dishonesty"?

✠n100 Professor Bishop, however, feels that the policy language paints with too broad a brush:

[S]o large a majority of derivative suits are grounded on allegations of self-dealing that the latter construction [any allegation of self-dealing excluded, no matter what the outcome] would produce something like fire insurance from which the insurer had excluded blazes caused by cigarettes, oily rags or defective wiring.
New Cure, supra note 2, at 104.

✠n101 See Johnston, supra note 4, at 2018.

✠n102 See Hinsey & De Lancey, supra note 92, at 877.

┬n103 *See New Cure, supra* note 2, at 105; Johnston, *supra* note 4, at 2018. In *New Cure, supra* note 2, at 106 n.55, professor Bishop remarks:

I note with some amusement that all the policies exclude claims based on the director's "failure or omission . . . to effect and maintain insurance." From an insurance man's point of view, it would be pernicious to abate one whit the penalties of this abominable and unforgivable sin. But I know of no derivative suit in which such an omission has been a ground of liability, or even alleged.

┬n104 14 G. COUCH, *supra* note 10, § 51:35.

┬n105 The costs of defense are covered. Lloyd's "Lydando No. 1," cl. 2(E) includes under the definition of loss "costs, charges and expenses." Clause 6(D) defines "costs, charges and expenses" to include "legal, accounting and investigative expenses and the cost of appeal, attachment and similar bonds."

┬n106 Only one source explores the practical implication of the duty to defend, or lack thereof, in any detail, and the tone of the discussion is distinctly negative:

We should also note the existence of a question as to the relationship between the Exclusions Clause and the obligation of underwriters to pay for the costs of defense -- or, of perhaps more practical importance, the obligation to pay for these costs as they are incurred. In large part this latter is a question of timing. Specifically, must there be an adjudication of the underlying claim *before* the applicability of the appropriate exclusion can be decided? In turn we can ask whether as a practical matter the determination with regard to the applicability of the exclusion is left to the discretion of underwriters.

From the standpoint of the assured the D&O policy provisions are not particularly reassuring with respect to these questions. Such comfort as the assureds can get is be found tangentially . . . [in a provision]:

"No costs, charges and expenses shall be incurred without Underwriters' consent which consent shall not be unreasonably withheld. . . ."

The result of this is in effect two standards of reference -- the words of the policy and the practice of underwriters. The company official confronted with a specific claim and desiring to invoke insurance protection will not, as we have just noted, be able to construct from the policy provisions themselves a very impressive argument that underwriters must pay costs as incurred. On the other hand the individual may find that underwriters after reviewing the available information will in fact adopt a current payment procedure which is quite satisfactory.
*What Existing D & O Policies Cover,* 27 BUS. LAW. s-147, s-153-54 (1972) (speech of W. DeLancey).

What is the director to do if the insurer fails to "adopt a current payment procedure"? The director and his chosen counsel will not want to be distracted from the stockholders' or securities suit to argue the point with the insurance company.

At least one insurance company appears to conduct itself as though it has duty to defend. Professor Bishop writes:

Lloyd's, but not all American insurers, will usually pay an executive's counsel fees as they accrue, under Part II, where it is highly probable that, although he may not prove to be entitled to indemnification, his liability and expenses will be within the coverage -- that is, where he is accused only of ordinary negligence. . . . If such current payments are not made by the insurer, the individual's defense may be seriously hampered.

J. BISHOP, *supra* note 4, P8.06.

If Lloyd's does pay counsel fees as they accrue, it does so voluntarily through a sense of its market; the policy language does not so require. Clause 4(C) of Lloyd's "Lydando No. 1" merely requires the underwriters to determine if an exclusion applies:

[I]f the circumstances and Underwriters' own investigation of the relevant facts pertaining to a claim to which this Clause 4(C) might apply, afford reasonable grounds for a determination by Underwriters that an exclusion enumerated in this Clause 4(C) does apply, Underwriters shall not be liable to pay "loss" arising from such [a] claim . . . .

Another commentator, who has performed a thorough analysis of Lloyd's policy, implies that Lloyd's underwriters proceed more circumspectly:

[When claims of self-dealing or of active misconduct are involved,] [t]ypically, all rights will be reserved and many Underwriters follow the practice of holding in abeyance requests for payments of defense costs until resolution of the matter, thereby placing the assured[s] in a precarious if not untenable position. . . . In all likelihood, decisions to recognize coverage will be tentative, for purposes of funding defense costs, and Underwriters will reserve the right to invoke the exclusion(s) depending on future developments.
Hinsey, *The New Lloyd's Policy Form for Directors and Officers Liability Insurance -- An Analysis,* 33 BUS. LAW. 1961, 1970 (1978). The same writer believes that the wording of clause 4(C) requires the underwriters to reach a decision about exclusions "at an early stage," although the clause itself contains no reference to timing. *Id.* Finally, this policy is a revision of an earlier Lloyd's policy, and this clause is not contained in the older form, nor do the American policies modelled on Lloyd's old form contain such a provision. The new form is not widely used among American corporations. *Id.* at 1961; *see* J. BISHOP, *supra* note 4, P8.04.

n107 *See, e.g.,* W. KNEPPER, *supra* note 25, at 642.

n108 Johnston, *supra* note 4, at 2023.

n109 A lawyer employed or retained by a corporation or similar entity owes his allegiance to the entity and not to a stockholder, director, officier, employee, representative, or other person connected with the entity . . . . Occasionally a lawyer for an entity is requested by a stockholder, director, officer, employee, representative, or other person connected with the entity to represent him in an individual capacity; in such case the lawyer may serve the individual only if the lawyer is convinced that differing interests are not present.
MODEL CODE OF PROFESSIONAL RESPONSIBILITY EC 5-18 (1981).

n110 Thus, for example, Home's policy: "No costs, settlements, charges or expenses shall be incurred without the Insurers' consent, which consent shall not be unreasonably withheld; however, in the event of such consent being given, they will pay . . . 95% of all such costs, settlements, charges and expenses." Home form H26305F, cl. 8. Although this right is seldom exercised, it is sometimes used if the company believes that the director's choice of counsel, however experienced in other fields, might not have the expertise necessary to prevail in, for example, and antitrust action.

Some writers have noticed and commented upon this feature:

Such a [consent] clause may be unobjectionable in the ordinary liability policy, where the insured's prime objective is normally to dispose of the claim against him with a minimum of publicity and inconvenience. But in the case of stockholders' suits, where publicity of often hard to avoid, directors and officers, anxious to vindicate their conduct and preserve their good business reputations, might very well rather fight than settle. An insurance company in

the same circumstances would often prefer settlement for a modest sum to costly litigation whose outcome is uncertain.
*New Cure, supra* note 2, at 106.

The insider gives up independent control of any lawsuit, since he may neither incur expenses nor settle unilaterally without the consent of the insurer.

An insider may have various reasons for controlling or settling a suit, whereas the underwriter is concerned only with the financial aspect. Thus, relinquishing the decision to settle might be detrimental to the insider. He may be forced to settle at times when he desires to vindicate his name. Likewise, in cases where the insider may desire to settle to avoid adverse publicity, he relinquishes this right if independent counsel feel that the claim should be contested.
*Indemnification, supra* note 10, at 685 & n.103.

⚓n111 14 G. COUCH, *supra* note 10, § 51:35, at 444.

⚓n112 11 G. COUCH, *supra* note 10, § 44:6.

⚓n113 *See, e.g.,* Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 419 P.2d 168, 54 Cal. Rptr. 104 (1966) (policy covering bodily injury in main clause and excluding intentional bodily injury in exclusion clause gives rise to reasonable expectations of coverage and defense); Ritchie v. Anchor Casualty Co., 135 Cal. App. 3d 245, 266 P.2d 1000 (1955) (doubts about coverage and duty to defend resolved in insured's favor); American Policyholders' Ins. Co. v. Smith, 120 N.H. 202, 412 A.2d 749 (1980) (policy covering excavation in main clause and excluding coverage in fine print gives rise to reasonable expectations of coverage and defense); 14 G. COUCH, *supra* note 10, § 51:35, at 445.

⚓n114 Insurance Co. of N. Am. v. Sam Harris Constr. Co., 22 Cal. 3d 409, 583 P.2d 1335, 149 Cal. Rptr. 292 (1978); Century Bank v. St. Paul Fire & Marine Ins. Co., 4 Cal. 3d 319, 482 P.2d 193, 93 Cal. Rptr. 569 (1971); Gray v. Zurich Ins. Co., 65 Cal. 2d 263, 269-74, 419 P.2d 168, 171-75, 54 Cal. Rptr. 104, 107-11 (1966); Miller v. Elite Ins. Co., 100 Cal. App. 3d 739, 161 Cal. Rptr. 322 (1980).

⚓n115 In California, a duty to defend can arise in a third way. Section 2778 of the Civil Code provides a way of creating a duty to defend where none previously existed.

The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to matters embraced by the indemnity . . .; [i]f after request, the person indemnifying neglects to defend the person indemnified, a recovery against the latter suffered by him in good faith, is conclusive in his favor against the former . . . .
CAL. CIV. CODE § 2778 (West 1974). The statute assumes that a duty to defend accompanies a liability policy, while an indemnity policy usually has none. Under § 2778, a policyholder can add a duty to an indemnity policy simply by asking the insurance company to defend an action.

As the courts have construed this statute, it applies automatically to indemnity policies *unless a contrary intention appears in the contract.* Thus, the court ruled in Gribaldo, Jacobs, Jones & Assocs. v. Agrippina Versicherunges A.G., 3 Cal. 3d 434, 476 P.2d 406, 91 Cal. Rptr. 6 (1971), that the defendant insurance company did *not* have a duty to defend because the policy expressed a contrary intention. *Id.* at 448, 476 P.2d at 414, 91 Cal. Rptr. at 14. Actually, the contract, as quoted in the opinion, was silent on this point, although it did mention defense costs. *Id.* at 440-41, 452-53, 476 P.2d at 409, 417, 91 Cal. Rptr. at 9, 19. The majority, in effect, construed silence in the insurance company's favor, while the dissent recommended construing silence in the customer's favor. *Id.* at 453-54, 476 P.2d at 418, 91

Cal. Rptr. at 18 (Mosk, J., dissenting).

✠n116 It is unclear whether one person's knowledge can bind another in these matters. In Bird v. Penn Central Co., 334 F. Supp. 255 (E.D. Pa. 1971), *Motions denied on reh'g,* 341 F. Supp. 291 (E.D. Pa. 1972), the court held that the false answer to a question on a Lloyd's proposal form, for which Lloyd's had sought to rescind a $ 10 million policy, bound not only the corporation but also the individual directors and officers. On the other hand, many policies provide that "the wrongful act of any director or officer will not be imputed to any other director or officer." Lloyd's "Lydando No. 1," cl. 4(D); MGIC form DO/SLA-1, cl. 3(b); National Union form 8749/8750, cl. 4(i). Chubb has a similar provision for "facts" or "knowledge," which could provide a basis for a "reasonable expectations" argument. Chubb form 14-02-228, cl. 3.3. From these provisions, one could argue for independent assessment of each director's knowledge.

✠n117 *What Existing D & O Policies Cover, supra* note 106, at s-156 (speech of V. Stahl); THE WYATT COMPANY, *supra* note 3, at 74, 76, 80.

✠n118 In Appleman's treatise, the case names cited to support the proposition that an insured is entitled to recover costs and attorney's fees from the insurer if the insured has to conduct his own defense run to seven pages of single-spaced small print. 7C J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4691, at 240-48 (W. Berdal ed. 1979). The same proposition in Couch's treatise elicited more than four pages of closely printed case names plus two more pages of fine-print annotated cases. 14 G. COUCH, *supra* note 10, § 51:60, at 531-38.

✠n119 7C J. APPLEMAN, *supra* note 118, § 4682, at 28-33.

✠n120 7C J. APPLEMAN, *supra* note 118, §§ 4682, 4683.01, at 16-21, 61; 14 G. COUCH, *supra* note 10, §§ 51:42, 51:44, at 453, 458-63; *see also* Jefferson-Pilot Fire & Casualty Co. v. Boothe, Prichard & Dudley, 638 F.2d 670, 674 (4th Cir. 1980) (malpractice insurer liable for refusing to defend law firm in antitrust action).

✠n121 7C J. APPLEMAN, *supra* note 118, § 4684.01, at 102-06; 14 G. COUCH, *supra* note 10, § 51:47, at 482-87.

✠n122 7C J. APPLEMAN, *supra* note 118, § 4684, at 83; 14 G. COUCH, *supra* note 10, § 51:42, at 456; *see* State Farm Mut. Auto. Ins. Co. v. Flynt, 17 Cal. App. 3d 538, 548, 95 Cal. Rptr. 296, 302-03 (1971) (insurer refused to defend driver of stolen car in suit by accident victim).

✠n123 7C J. APPLEMAN, *supra* note 118, § 4682, at 41-42; 14 G. COUCH, *supra* note 10 §§ 51:57-:77.

✠n124 7C J. APPLEMAN, *supra* note 118, § 4689, at 207-10.

✠n125 *Id.* at 212.

✠n126 *Id.* §§ 4683, 4686, at 54-55, 165-66.

✠n127 7C J. APPLEMAN, *supra* note 118, § 4683, at 58-59; 14 G. COUCH, *supra* note 10, § 51:42, at 456; *see, e.g.,* Continental Casualty Co. v. Phoenix Constr. Co., 46 Cal. 2d 423, 437-38, 296 P.2d 801, 809-10 (1956); Blackfield v. Underwriters at Lloyd's, London, 245 Cal. App. 2d 271, 53 Cal. Rptr. 838 (1966) (insurer required to defend home builder against buyer's suit for construction defects).

✠n128 Under an ordinary liability policy the insurer is completely responsible for the defense

of an action and usually has sole authority to decide whether to settle or litigate. . . . Under the Lloyd's [D & O] policy, . . . the insured controls his own defense . . . . Such a provision would seem more appropriate in a professional liability policy . . ., since a businessman is probably more sensitive to publicity and its impact upon his reputation and therefore would prefer to have more control over the settling of claims.
*Liability, supra* note 10, at 658-59.

⚓n129 14 G. COUCH, *supra* note 10, § 51:78 at 565-66.

⚓n130 The insurance company must pay expenses no matter what the outcome. *See* Flintkote Co. v. Lloyd's Underwriters, N.Y.L.J. July 27, 1976, at 6-7 (N.Y. Sup. Ct. order and judgment filed Sept. 16, 1976) (insurance company required to indemnify corporation for legal expenses of executives fined for criminal antitrust violations), *aff'd*, 391 N.Y.S.2d 1005 (1977).

⚓n131 Johnson, *The Defense of an Insurance Claim,* AM. BUS. TRIAL LAW. REP., Mar. 1984, at 1, 5.

⚓n132 *See supra* text accompanying note 11.

⚓n133 In an effort to balance the power between opposing sides, and to avoid strike suits, states have required certain classes of stockholders to post bonds for expenses if they wish to bring suit against a corporation or its directors. *See, e.g.,* N.J. STAT. ANN. § 14A:3-6(3) (West 1969 & Supp. 1983-1984); N.Y. BUS. CORP. LAW § 627 (McKinney Supp. 1984-1985); PA. STAT. ANN. tit. 15, § 433 (Purdon 1967); WIS. STAT. ANN. § 180.405(4) (West 1957). If, however, the plaintiffs can plead a federal question, they need not post bond for that complaint. *E.g.,* Fielding v. Allen, 181 F.2d 163 (2d Cir. 1950); *see* Greenberg & Dean, *supra* note 1, at 559-60.

⚓n134 *E.g.,* CAL. CORP. CODE § 317(f) (West 182); CONN. GEN. STAT. ANN. § 33-320a(f) (West 1960 & Supp. 1983); DEL. CODE ANN. tit. 8, § 145(e) (1975); MASS. ANN. LAWS ch. 156B, § 67 (Michie/Law. Co-op. 1979 & Supp. 1984); MICH. STAT. ANN. § 21.200(564) (Callaghan 1983); MINN. STAT. ANN. § 300.802 subd. 5 (West 1969 & Supp. 1983); N.J. STAT. ANN. § 14A:3-5(6) (West 1976 & Supp. 1983-1984); N.Y. BUS. CORP. LAW § 724(c) (McKinney 1982); TENN. CODE ANN. § 48-1-409(c) (1984); VA. CODE § 13.1-3.1(e) (1978 & Supp. 1983).

⚓n135 DEL CODE ANN. tit. 8, § 145(e) (1975).

⚓n136 *See* Comment, *Law for Sale: A Study of the Delaware Corporation Law of 1967,* 117 U. PA. L. REV. 861, 883 (1969).

⚓n137 Professional Ins. Co. v. Barry, 60 Misc. 2d 424, 303 N.Y.S.2d 556 (N.Y. Sup. Ct.), *aff'd mem.,* 32 A.D.2d 898, 302 N.Y.S.2d 722 (1969).

⚓n138 *E.g.,* CONN. GEN. STAT. ANN. § 33-320a(f) (West 1960 & Supp. 1984).

⚓n139 *E.g.,* MD. CORPS. & ASS'NS CODE ANN. § 2-418(e)-(f) (1975 & Supp. 1984).

⚓n140 A corporation's bylaws may contain a provision *requiring* advances; advances could, nevertheless, be vulnerable to attack by stockholders for misuse or waste of corporate funds and, in some states, for a violation of an exclusive indemnification statute. J. BISHOP, *supra* note 4, §§ 6.03[8]-[9], 8.06; *cf.* Lasher v. Burks, 567 F.2d 1208, 1212 (2d Cir.), *rev'd on other grounds,* 441 U.S. 471 (1978) ("disinterested" directors will probably not have an objective view of interested directors).

n141 MGIC's policy is unique among those listed *supra* note 83, in stating in the policy:

The Insurer may at its option and upon request, advance on behalf of the Directors or Officers . . . expenses which they have incurred in connection with claims made against them, prior to disposition of such claims, provided always that in the event that it is finally established the Insurer has no liability hereunder, such Directors and Officers agree to repay to the Insurer, upon demand, all monies advanced by virtue of this provision.
MGIC form DO/SLA-1, cl. 5(c). This is the only policy surveyed that explicitly mentions advances in the policy itself. The Chubb policy has an endorsement, not yet on the market as of this writing, which also provides for periodic advances of defense costs.

n142 *See, e.g.,* Gross v. Texas Plastics, Inc., 344 F. Supp. 564 (D.N.J. 1972) (court under Texas indemnification statute cannot order corporation to make advances), *aff'd,* 523 F.2d 1050 (3d Cir. 1975).

n143 J. BISHOP, *supra* note 4, § 8.06.

n144 *Id.*

n145 *See supra* note 142.

n146 *See* Practitioners' Survey, *supra* note 15.

n147 *Id.*

n148 *Id.*

n149 Gribaldo, Jacobs, Jones & Assocs. v. Agrippina Versicherunges A.G., 3 cal. 3d 434, 476 P.2d 406, 91 Cal. Prtr. 6 (1970); *see also supra* note 115.

n150 No. CV 83-2432 (C.D. Cal. May 24, 1983).

n151 The plaintiff faced not only a suit by the corporation's stockholders but also one by the corporation, a savings and loan association of which he was a vice-president. One can safely surmise that there was little possibility of his corporation's advancing money for his defense costs.

n152 *See supra* note 141.

n153 The court eventually dismissed all of the plaintiff's claims. No. CV 83-2432 (C.D. Cal. June 27, 1983).

n154 Another potential problem arises from the insurance companies' practice of enlisting a separate attorney to represent their interests, in addition to defendant's counsel. Both attorneys must usually, though not invariably, work together, sometimes fairly closely. Are disclosures that are made to the insurance company's attorney protected by attorney-client privilege? Quite possibly, they are not.

n155 Flintkote Co. v. Lloyd's Underwriters, N.Y.L.J. July 27, 1976, at 6 (N.Y. Sup. Ct. order and judgment filed Sept. 16, 1976), *aff'd,* 391 N.Y.S.2d 1005 (1977).

n156 Commissioner v. Tellier, 383 U.S. 687 (1966); *see also Liability, supra* note 10, at 660-61, 663.

n157 *See supra* notes 11, 132-33 and accompanying text.

⚓n158 *See supra* notes 134-54 and accompanying text.

⚓n159 Previews, Inc. v. Cal. Union Ins. Co., 640 F.2d 1026, 1028 (9th Cir. 1981) (insurer liable for reasonable cost of outside counsel hired to defend class action when dispute arose over amount of deductible).

⚓n160 California: Outboard Marine Corp. v. Liberty Mut. Ins. Co., 536 F.2d 730 (7th Cir. 1976) (applying California law) (insured entitled to hire own counsel at insurer's expense if conflict of interest exists); Nike, Inc. v. Atlantic Mut. Ins. Co., 578 F. Supp. 948 (N.D. Cal. 1983) (reservation of rights indicates conflict of interest; insured entitled to independent counsel); Executive Aviation, Inc. v. National Ins. Underwriters, 16 Cal. App. 3d 799, 94 Cal. Rptr. 347 (1971) (conflict of interest arose concerning plane crash suit; insured may select own counsel at insurer's expense); *Cf.* Tomerlin v. Canadian Indem. Co., 61 Cal. 2d 638, 647-48, 394 P.2d 571, 576-77, 39 Cal. Rptr. 731, 736-37 (1964) (conflict of interest exists when insurer has no "economic interest in the outcome of the suit" and no incentive to defend vigorously). Other jurisdictions: United States Fidelity & Guar. Co. v. Louis A. Roser Co., 585 F.2d 932 (8th Cir. 1978) (insurer disclaimed coverage under exclusion; conflict of interest does not relieve insurer of obligation to bear cost of defense); All-Star Ins. Corp v. Steel Bar, Inc., 324 F. Supp. 160, 165 (N.D. Ind. 1971) (if conflict of interest exists, "[t]he insurer must either provide an independent attorney to represent the insured, or pay for the cost of [his] defense"); Prashker v. United States Guarantee Co., 1 N.Y.2d 584, 136 N.E.2d 871, 154 N.Y.S.2d 910 (1956) (conflict of interest in airplane crash case resolved by allowing insureds to select attorney and requiring insurers to pay reasonable value of services); *see also* Johnson, *supra* note 131, at 4-6.

⚓n161 *See supra* text accompanying notes 118-27.

⚓n162 *See, e.g.,* Lassen Canyon Nursery, inc. v. Royal Ins. Co. of Am., 720 F.2d 1016 (9th Cir. 1983) (insurer not required to defend when reasonable investigation revealed no claim covered under the policy); State Farm Mut. Auto. Ins. Co. v. Flynt, 17 Cal. App. 3d 538, 95 Cal. Rptr. 296 (1971) (insurance company not required to defend driver, who crashed in stolen car); *see also* 7C. J. APPELMAN, *supra* note 118 § 4682, at 25-27.

⚓n163 Assuming that including a duty to defend in the policy does not affect costs, the insurance company would routinely lose only the advantage it gains in inflationary times. It must pay defense costs eventually, but given the time value of money the company would prefer to pay later rather than sooner. The company also increases its exposure by the amount it cannot recover from a noncovered director to whom it advanced funds. Premium costs might increase as a result of these expenses, but any increase should be offset by the savings from greater efficiency. It is conceivable that a duty to defend could influence policy costs, for example, by acting as an incentive to sue. This Comment, however, assumes that costs will remain constant, and the only change that will occur is the point at which the insurance company must pay the defendants' legal fees.

⚓n164 A recent *Wall Street Journal* story reports a proposed $ 4 million settlement of a shareholder class action suit, $ 400,000 for each of 10 directors. The corporation intends to file a claim with its insurance company, which "hasn't consented to the terms." Wall St. J., Jan. 19, 1984, at 22, col. 4.

⚓n165 *See supra* note 127 and accompanying text.

⚓n166 *See* Practitioners' Survey, *supra* note 15.

⚓n167 *See, e.g.,* Mooney v. Willys-Overland Motors, Inc., 204 F.2d 888, 898 (3d Cir. 1953) (indemnification statutes "encourage capable [people] to serve as corporate directors" by guaranteeing payment for litigation expenses).

⊤n168 *See, e.g.,* Matter, *Indemnification and Liability Insurance for Corporate Boards of Directors and Trustees -- A Legal Guide for the Director,* 83 COM. L.J. 550 (1978).

⊤n169 *See supra* notes 87-88 and accompanying text.

⊤n170 *See* Practitioners' Survey, *supra* note 15.

Service: **Get by LEXSEE®**
Citation: **32 ucla l rev 690**
View: Full
Date/Time: Monday, July 19, 2004 - 3:16 PM EDT

About LexisNexis | Terms and Conditions

Copyright © 2004 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.