UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MELINDA BROWN and TREFFLE LAFLECHE, <br><br> Plaintiffs, <br><br> v. <br><br> AMERICAN INTERNATIONAL GROUP, INC. and NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PENNSYLVANIA, <br><br> Defendants. | C. A. No. 04-10685 WGY |

**PLAINTIFFS' POST-TRIAL MEMORANDUM OF LAW**

**Exhibit G:**

**National Union Fire Ins. Co. v. Guam Housing,**
**2003 WL 22497996 (Guam Terr).**

Not Reported in Guam    Page 1
2003 Guam 19
**(Cite as: 2003 WL 22497996 (Guam Terr.))**

Supreme Court of the Territory of Guam.

NATIONAL UNION FIRE INSURANCE CO. OF PITTSBURGH, PA, Plaintiff-Appellant,
v.
GUAM HOUSING AND URBAN RENEWAL AUTHORITY, Defendant-Appellee.

**Nos. CVA02-012, CV1849-01.**

Argued and Submitted on Feb. 13, 2003.
Filed Nov. 4, 2003.

Appeal from the Superior Court of Guam. Supreme Court Case Nos. CVA02-012, CV1849-01.

Michael D. Flynn, Jr., Esq., McKeown, Vernier, Price, Maher, A Joint Venture of McKeown Price, LLP, and Vernier & Maher, LLP, Hagåtña, GU, for plaintiff-appellant.

Daniel J. Berman, Esq., Berman, O'Connor, Mann & Shklov, Hagåtña, GU, for defendant-appellee.

Before F. PHILIP CARBULLIDO, Chief Justice; FRANCES M. TYDINGCO-GATEWOOD, Associate Justice; PETER C. SIGUENZA, JR., Justice Pro Tempore.

**AMENDED OPINION** [FN1]

> FN1. Subsequent to the issuance of the Opinion in this case filed on September 19, 2003, the court *sua sponte* discovered that a portion of footnote 6 was inadvertently omitted from the Opinion. Furthermore, the court detected three typographical or editing errors in the Opinion, which include the misprint of the attorneys' addresses on the cover page, a reference in a parenthetical explanation in paragraph 63 to "Section 553" of the California Insurance Code, which should instead read "Section 533," as well as the appearance of an extraneous word "that" in paragraph 77. This Amended Opinion is issued to correct those errors, and, aside from the addition of this footnote, does not otherwise alter the substance of the Opinion filed on September 19, 2003. This Amended Opinion shall supercede the Opinion filed on September 19, 2003.

CARBULLIDO, C.J.:

**\*1** [1] Guam Housing and Urban Renewal Authority ("GHURA") purchased a Public Officials and Employees Liability Insurance Policy ("Policy") from National Union Fire Insurance Co. of Pittsburgh, PA ("National Union"). Invoking the terms and benefits under the Policy, GHURA requested a defense in three lawsuits filed against it by former GHURA employees. National Union paid the defense costs subject to a reservation of the right to seek reimbursement. At the conclusion of the cases, National Union filed the present underlying action in the Superior Court of Guam seeking reimbursement of defense costs pursuant to the reservation of rights letter. National Union filed a motion for summary judgment arguing that there was no possibility that the acts alleged in the three complaints were covered under the Policy, that National Union therefore had no duty to defend GHURA, and that because there was no duty to defend, National Union is entitled to a reimbursement for the defense costs. The Superior Court denied National Union's motion for summary judgment and granted summary judgment in favor of GHURA. The trial court found that under the Policy, National Union had a duty to defend GHURA in the underlying suits and was therefore not entitled to a reimbursement of defense costs. We find that National Union had a duty to pay defense costs for claims which were covered under the Policy. We further find that several claims in the underlying lawsuits were not covered under the Policy, and that National Union is therefore entitled to a reimbursement for costs expended to defend those non-covered claims provided that National Union is able to produce evidence of allocation of costs expended on covered and non-covered claims. We further find that National Union may only recover defense costs if it filed its government claim within the limitations periods set forth in the Government Claims Act. Accordingly, we affirm in part, reverse in part, and remand for findings on the issues of allocation and the timeliness of National Union's government claim.

I.

[2] In September of 1995, GHURA purchased a Public Officials and Employees Liability Insurance Policy from National Union. The Policy was in effect from September 14, 1995 to September 14, 1998. GHURA is a named insured under the Policy.

[3] On December 5, 1997, Margarita D. Perez and Jesse C. Toves, former employees of GHURA (collectively referred to as "Employees"), sued GHURA in the District Court of Guam, (Case No. CV97-00080), alleging that they were wrongfully terminated from their positions at GHURA in violation of their rights as provided for by statute and guaranteed under the United States Constitution.

[4] On December 9, 1997, GHURA requested that National Union defend it in the District Court suit. In a letter dated

January 8, 1998, National Union accepted the tender of defense on behalf of GHURA subject to a reservation of rights. Specifically, in the letter, National Union maintained that there was no potential for coverage under the Policy and therefore denied GHURA's claim for indemnity. Nonetheless, National Union agreed to defend GHURA but specifically reserved "its right to withdraw from the defense ... upon a judicial determination of non-coverage" and to "seek reimbursement of defense costs incurred defending claims for which there is no potential for coverage." Excerpts of Record, vol. II, Ex. "F", pp. 220-225 (Guam Ins. Adjusters, Ins. Ltr.).

**\*2** [5] The Employees thereafter filed two other suits in the Superior Court of Guam, both claiming relief based on the alleged wrongful termination. These included a civil action filed on February 26, 1999 (Case No. CV0410-99) and a petition for alternative writ of mandate filed on February 10, 2000 (Case No. SP0051-00). [FN2]

> FN2. The Employees also filed a petition for writ of review of a Civil Service Commission decision filed on March 13, 2000 (Superior Court Case No. SP0081-00). It is unclear from the record whether National Union defended GHRUA in the petition for writ of review. In the present action, National Union did not claim reimbursement for defense costs related to that proceeding.

[6] National Union defended GHURA in all three actions. The suits were ultimately dismissed on procedural grounds, primarily as being time-barred. *See* Excerpts of Record, vol. II, pp. 487-506 (Orders Dismissing Suits). No case was decided on its merits.

[7] On June 14, 2000, National Union filed an amended complaint for declaratory relief in the Superior Court (Case No. CV0873-00), seeking a declaration of whether it was entitled to reimbursement of defense costs for defending GHURA in the three prior suits. [FN3]

> FN3. It appears form the record on appeal that a declaratory judgment has not yet been issued in that case.

[8] In the interim, on January 25, 2001, National Union filed a government claim for amounts paid for the defense. The claim was later supplemented on August 14, 2001. GHURA denied the claim on July 18, 2001.

[9] Thereafter, on November 7, 2001, National Union filed the instant action claiming reimbursement from GHURA for the defense costs pursuant to its reservation of rights.

National Union filed a motion for summary judgment, arguing that there was no possibility that the acts alleged in the complaints were covered under the Policy and, therefore, that GHURA was obligated to reimburse National Union for the defense costs. [FN4]

> FN4. GHURA also contemporaneously filed a motion to consolidate the instant case with the declaratory judgment action.

[10] In a Decision and Order filed on May 3, 2002, the lower court denied National Union's motion for summary judgment. [FN5] The court instead granted summary judgment in favor of GHURA, finding that, pursuant to the Policy, National Union had a duty to defend GHURA in the underlying suits, and that National Union was therefore not entitled to a reimbursement of defense costs. A judgment for GHURA was thereafter entered on the docket. This appeal followed.

> FN5. In the Decision and Order, the lower court also denied GHURA's motion to consolidate. That decision has not been challenged in this appeal.

## II.

[11] This court has jurisdiction over appeals of final judgments entered in the Superior Court pursuant to Title 7 GCA §§ 3107 and 3108(a) (1994).

## III.

[12] National Union appeals the lower court's denial of its motion for summary judgment and its grant of summary judgment in favor of GHURA. We review a grant or denial of summary judgment *de novo. See* Aguon v. Gutierrez, 2002 Guam 14, ¶ 5. Summary judgment is appropriate if there are no genuine issues of material fact and the movant is entitled to judgment in his or her favor as a matter of law. *See* Guam R. Civ. P. 56(c); GHURA v. Dongbu Ins. Co., 2002 Guam 3, ¶ 8.

[13] This case involves the interpretation of an insurance policy, which is also reviewed *de novo. See* Conestoga Servs. Corp. v. Executive Risk Indem., Inc., 312 F.3d 976, 981 (9th Cir.2002); Cort v. St. Paul Fire & Marine Ins. Co., 311 F.3d 979, 982 (9th Cir.2002) ("The interpretation of an insurance policy, as applied to undisputed facts, is a question of law."). Specifically, the question of whether certain undisputed acts of an insured fall within the coverage or exclusionary provisions of an insurance policy requires contract interpretation and is reviewed *de novo. See* Brown & Lacounte, LLP v. Westport Ins. Corp., 307 F.3d

660, 662 (7th Cir.2002) ("A court's interpretation of the terms and coverage of an insurance policy is a question of law and therefore appropriately resolved on summary judgment."); see also B.M. Co. v. Avery, 2001 Guam 27, ¶ 9 (finding that an interpretation of a contract is reviewed *de novo* ). "Because the interpretation of an insurance policy is a question of law, this [c]ourt must make its own determination of the meaning of the relevant contract language." See Conestoga Servs. Corp., 312 F.3d at 981; see also B.M. Co., 2001 Guam 27 at ¶ 9 ("When the trial court looks merely to the contract language in interpreting the contract, and not to extraneous facts, the court's interpretation is a legal conclusion and is thus reviewed *de novo.*")

**A. *Duty to Defend v. Duty to Pay Defense Costs.***

**\*3** [14] In rendering summary judgment for GHURA, the lower court made two findings. First, that National Union had a duty to defend GHURA in the underlying suits, and, second, that because there was a duty to defend, National Union was not entitled to reimbursement of defense costs. National Union challenges both findings on appeal.

[15] The lower court and the parties have concentrated primarily on whether National Union had a duty to defend GHURA. The lower court reasoned and the parties contend that if the insurer had a duty to defend the insured, then the insurer is not entitled to a reimbursement of defense costs. We agree that this is the rule to be applied when the policy contains a duty to defend. In such cases, the insurer is not entitled to a reimbursement of defense costs if the contractual duty to defend was triggered. See United Nat'l Ins. Co. v. SST Fitness Corp., 309 F.3d 914, 919 (6th Cir.2002) ("[C]ourts ... consistently have held that an insurer is entitled to reimbursement for defense costs when the insurer did not have the duty to defend any of the asserted claims and the insurer makes a valid reservation of rights to recoup defense costs...."). However, a court must first determine whether the insurer had a duty to defend under the policy. We find that the Policy here did not contain a duty to defend.

[16] "[T]he duty to defend has no roots in the common law." Allstate Ins. Co. v. RJT Enters., 692 So.2d 142, 144 (Fla.1997); Stamford Wallpaper Co. v. TIG Ins., 138 F.3d 75, 79 (2d Cir.1998) ("The nature of the insurer's duty to defend is purely contractual. There is no common law duty as to which the courts are free to devise rules.") (citation omitted); see also Horesh v. State Farm Fire & Cas. Co., 625 A.2d 541, 544 (N.J.Super .Ct.App.Div.1993) ( "The duty to defend is not a product of ... common law, but is solely a contractual undertaking made in the insurance policy."). Rather, the duty to defend is "purely a statutory or contractual duty." Allstate Ins. Co., 692 So.2d at 144. Thus, in determining whether the insurer has a duty to defend, the court must look to the contract, i.e., the insurance policy, or to any statute imposing such a duty. See Buss v. Superior Court, 939 P.2d 766, 774 (Cal.1997) ("The duty to defend is contractual.").

[17] Most commercial general liability ("CGL") [FN6] insurance policies contain a standard clause explicitly imposing a duty to defend. FMC Corp. v. Plaisted and Cos., 72 Cal.Rptr.2d 467, 508 (Ct.App.1998) ("Primary CGL policies typically provide that ... the insurer 'shall have the right and duty, subject to [specified policy] provisions ..., to defend any suit against the *insured* seeking damages on account of such *personal injury* or *property damage,* even if any or all of the allegations of the suit are groundless, false or fraudulent.' ") (citation omitted) (alteration and second omission in original). However, the Policy in the present case is not a CGL policy; rather, it is a Public Officials and Employees Liability Policy. The Policy provided in pertinent part:

> FN6. "Before 1986, 'commercial general liability insurance' was called 'comprehensive general liability insurance'." Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 n. 1 (Minn.2002); see Am. Star Ins. Co. v. Ins. Co. of the West, 284 Cal.Rptr. 45, 46, n. 1 (Ct.App.1991) ("The standard commercial insurance forms undergo revisions from time to time. The last major overhaul took effect 1986, when the name of the standard commercial policy was changed from 'comprehensive' general liability to 'commercial' general liability."). The pre-1986 comprehensive general liability policies are also referred to, by courts, as CGL policies. See, e .g., Foster-Gardner, Inc. v. Nat'l Union Fire Ins. Co., 959 P.2d 265, 267 (Cal.1998). Notwithstanding, both "standard comprehensive [and] ... commercial general liability insurance policies provide that the insurer has a duty to defend the insured in any action brought against the insured seeking damages for a covered claim." Aerojet-General Corp. v. Transport Indem. Co., 948 P.2d 909, 920 (Cal.1997).

2. Defense Costs, Charges & Expenses (Included in the Limits of Liability)
> **\*4** With respect to any such Wrongful Act for which insurance is afforded by this policy under Insuring Agreement 1, above, the Company shall, as part of and subject to the limits of liability, pay on behalf of the

Not Reported in Guam                                                                                              Page 4
2003 Guam 19
**(Cite as: 2003 WL 22497996 (Guam Terr.))**

> Insured Defense Costs, Charges and Expenses.
> *The Company shall at all times have the right but not the duty to assume the defense of any claim or suit against the Insured,* and in the event of the exercise of this right the Insured shall provide the Company with full cooperation.

Excerpts of Record, vol. I, p. 190 (Policy) (emphasis added). As referenced above, the Policy did not contain an express duty to defend. [FN7] *Cf. Univ. of Ill. v. Cont'l Cas. Co., 599 N.E.2d 1338, 1343-44 (Ill.App.Ct.1992)* (noting that the policy did not provide a duty to defend).

> FN7. The Policy here resembles a professional liability policy such as a directors and officers ("D & O") policy. "The defense obligations of D & O carriers typically differ in nature and in scope from the defense obligations of general liability carriers." *Helfand v. Nat'l Union Fire Ins. Co. of Pittsburgh, 13 Cal.Rptr.2d 295, 298 (Ct.App.1992)*. Unlike a CGL policy, D & O policies generally do not "obligate the carriers to provide the insured with a defense." *Id.i; see Nat'l Union Fire Ins. Co. of Pittsburgh v. Ambassador Group, Inc., 556 N.Y.S.2d 549, 553 (App.Div.1990)* ("[M]ost directors and officers liability policies do[ ] not impose an obligation to provide a defense, but only to reimburse expenses incurred in the defense."); *Gon v. First State Ins. Co., 871 F.2d 863, 868 (9th Cir.1989)* ("Directors and officers liability policies generally do not contain a duty to defend.").

[18] Under Guam law, the fact that the insurance policy does not contain a duty to defend is not necessarily determinative. Pursuant to Title 18 GCA § 30107 [FN8], "[a] policy which does not contain an express duty to defend should nevertheless be interpreted to include a duty to defend unless a contrary intention appears." *Save Mart Supermarkets v. Underwriters at Lloyd's London, 843 F.Supp. 597, 602 (N.D.Cal.1994)* (interpreting Cal. Civ.Code § 2778, which mirrors Title 18 GCA § 30107).

> FN8. Title 18 GCA § 30107 provides:
> In the interpretation of a contract of indemnity, the following rules are to be applied, *unless a contrary intention appears:*
> ....
> 4. *The person indemnifying is bound, on request of the person indemnified, to defend actions or proceedings brought against the latter in respect to the matters embraced by the indemnity,* but the person indemnified has the right to conduct such defenses, if he chooses to do so;
> .... Title 18 GCA § 30107 (1994) (emphasis added).

This section applies to the interpretation of insurance contracts because "[a]ll insurance policies are contracts of indemnity...." *Univ. of Ill., 599 N.E.2d at 1346*.

[19] The Policy specifically stated that National Union had the "right *but not the duty to assume the defense of any claim or suit against the Insured.* " Excerpts of Record, vol. I, p. 190 (Policy) (emphasis added). This language expresses an intent that there be no duty to defend. *Cf. Save Mart Supermarkets, 843 F.Supp. at 603* (finding that the policy language which gave the insurer the *option* to join in the defense directly contradicted any possible *duty* to defend; therefore, the insurer did "not have a duty to defend under Cal. Civ.Code § 2778(4) because a contrary intention appears"); *Valassis Communications, Inc. v. Aetna Cas. & Sur. Co., 97 F.3d 870, 876 (6th Cir.1996)* (determining that the insurer did not have a duty to defend because the policy specifically declared that "nothing in this paragraph is intended, nor shall it be construed, to create any duty to defend ....") (citation omitted). [FN9]

> FN9. This interpretation is not affected by the clause in the Policy which provides that National Union was required to pay defense costs. *See Gon, 871 F.2d at 867-68* (rejecting the insured's argument that the requirement of payment of defense costs as incurred amounts to a duty to defend); *Valassis, 97 F.3d at 876* ("A commitment by the insurance company to reimburse the defense costs does not create a duty to defend on the part of the insurance company."). The clause which allows National Union the "right" to assume the defense on GHURA's behalf similarly does not create a duty to defend. A policy with a duty to defend "typically contains a clause that provides that the insurer chooses the attorney and controls the strategy of the litigation, a valuable right to protect the insurer's own interest." *Gon, 871 F.2d at 868.* While the Policy here presents an *opportunity* to control the defense, the Policy does not mandate that National Union be *required* to choose an attorney and control the litigation strategy in all cases.

[20] Thus, under the Policy, National Union did not have a duty to defend GHURA. Consequently, the lower court's conclusion that National Union was not entitled to a reimbursement *because it had a duty to defend* was erroneous in light of the Policy language. *See Gon v. First State Ins. Co., 871 F.2d 863, 867-68 (9th Cir .1989)* ("The district court ... conclude[d] that First State had a duty to defend. We disagree with that conclusion, and believe there

is no duty to defend under the terms of the First State policy ."). The issue remaining is whether National Union is entitled to a reimbursement of costs it expended in defending GHURA. In answering that question, we must look to the relevant provisions of the Policy.

**\*5** [21] Section 2 of the Insuring Agreement of the Policy provided that National Union would "pay on behalf of the insured Defense Costs" "with respect to any such Wrongful Act for which insurance is afforded by th[e] policy under Insuring Agreement 1." Excerpts of Record, vol. II, p. 471 (Policy). We interpret this in accordance with its plain meaning, that National Union was responsible for paying defense costs incurred in defending claims for covered, non-excluded, wrongful acts. See *Indep. Sch. Dist. No. 697, Eveleth v. St. Paul Fire & Marine Ins. Co.,* 515 N.W.2d 576, 579 (Minn.1994) ("Generally, an insurance contract must be construed as a whole, and unambiguous language must be given its plain and ordinary meaning.") (citation and quotation marks omitted).

[22] In determining whether National Union was required to pay defense costs, we review the allegations in the third-party complaint and compare it with the coverage afforded under the Policy. If the allegations in the underlying complaints stated a claim for which there was a possibility of coverage under the Policy, National Union was obligated to pay defense costs. See *Okada v. MGIC Indem. Corp.,* 823 F.2d 276, 282 (9th Cir.1986); *Gon,* 871 F.2d at 868. This inquiry is similar to the inquiry made in determining whether the duty to defend is triggered, and cases discussing the duty to defend are therefore instructive. [FN10] See *Lowy v. Travelers Prop. & Cas. Co.,* 2000 WL 526702, \*2, n. 1 (S.D.N.Y.2000) ("[T]here is no relevant difference between the allegations that trigger an insurer's duty to defend and the allegations that trigger an insurer's obligation to pay defense expenses."). In determining whether the duty to defend, or, as here, whether the obligation to pay defense costs, is triggered, the focus is on the facts in the complaint and those known to the insurer "regardless of the technical legal cause of action pleaded by the third party." *Cort,* 311 F.3d at 983. There is no duty to defend or obligation to pay defense costs "[i]f a third party complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage." *Id.* (citation omitted) (stating the test for determining whether the duty to defend is triggered); *Fuisz v. Selective Ins. Co. of Am.,* 61 F.3d 238, 242 (4th Cir.1995).

> FN10. The test for determining whether the duty to defend was triggered is especially appropriate for application in this case because under the Policy, National Union was given the option to control the defense of claims filed against GHURA.

[23] The insured carries the initial burden to show that the "claim *may* fall within the policy coverage." *Pension Trust Fund for Operating Eng'rs v. Fed. Ins. Co.,* 307 F.3d 944, 949 (9th Cir.2002) (citation omitted). The insurer carries the higher burden of showing that the claim cannot. *Id.* Furthermore, "[w]hen an exclusionary clause is relied upon to deny coverage, the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage." *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.,* 779 N.E.2d 167, 170 (N.Y.2002); *Fuisz,* 61 F.3d at 242 ("[T]he burden rests on the insurer to establish the clear applicability of a particular exclusion from coverage."). Like any other contract, the intent of the parties should be gleaned from the unambiguous language. See *Yasuda Fire & Marine Ins. Co. v. Heights Enters.,* 1998 Guam 5, ¶ 13. Generally, the words of the policy "should be given an ordinary meaning...." *Camacho v. Camacho,* 1997 Guam 5, ¶ 33. However, if the language of the policy is ambiguous, the ambiguity must be interpreted in light of the objective reasonable expectations of the insured. See *Yasuda Fire & Marine Ins. Co.,* 1998 Guam 5, at ¶ 13 ("[I]f found to be ambiguous, the terms of a promise are to be interpreted in the manner in which the promisor believed the promisee understood it at the time of its making."). If application of the doctrine of reasonable expectations fails to resolve the ambiguity, the ambiguity is to be construed in favor of the insured. See *id.*

**B. Whether National Union had a Duty to Pay Defense Costs.**

**\*6** [24] On appeal, National Union does not contest that the Employees' allegations of wrongful termination were "Wrongful Acts" as defined under the Policy. Rather, National Union cites various exclusions in the Policy, as well as statutory authority, as support for its contention that the wrongful acts alleged in the complaints were excluded from coverage. [FN11]

> FN11. Reliance on exclusions in determining whether there was a duty to pay defense costs is proper in this case because the Policy specifically limited coverage for defense costs to costs associated with claims for wrongful acts for which coverage was afforded under the Policy.

[25] In accordance with the Policy language, National Union was required to provide coverage for "Wrongful Acts." Under the Policy, a "Wrongful Act" was defined as follows:

Not Reported in Guam                                                                                                         Page 6
2003 Guam 19
**(Cite as: 2003 WL 22497996 (Guam Terr.))**

> Wrongful Act means any actual or alleged error or misstatement or misleading statement or act or omission or neglect or breach of duty, including misfeasance, malfeasance and nonfeasance.

Excerpts of Record, vol. I, p. 191 (Policy). National Union contends that the following types of risks were excluded from coverage under the Policy thereby frustrating GHURA's expectation of coverage for defense costs:

> b) claims alleging ... malicious acts;
> c) any claim seeking non-pecuniary relief;
> ...
> n) any awards ... of back salary or wages or other employee compensation;
> ...
> p) any Wrongful Act committed with knowledge that it was a Wrongful Act.

Excerpts of Record, vol. I, p. 191-192 (Policy).

[26] We must therefore determine whether the allegations of the complaints and facts known to National Union at the time of the complaints stated a claim for which there was a potential for coverage in light of the relevant Policy exclusions. *See* Andover Newton Theological Sch. v. Cont'l Cas. Co., 930 F.2d 89, 96 (1st Cir.1991) (finding that the claims alleged conduct which was covered under the policy and the only relevant question was the scope of the exclusion).

**1. District Court Case No. CV97-00080 [FN12] and Superior Court Case No. CV0410-99 [FN13]**

> FN12. This action was filed against GHURA and all then-members of GHURA's Board of Commissioners, individually, and in their capacities as Board members. *See* Excerpts of Record, vol. I, pp. 9-10.

> FN13. GHURA was the named defendant in this action.

**a) Allegations in the Complaint.**

[27] The first two complaints for which National Union seeks reimbursement of defense costs, (Dist. Ct. Case No. CV97-00080; Super. Ct. Case No. CV0410-99), contained virtually identical factual allegations. [FN14] These are summarized as follows: The Employees were hired at GHURA during Former Governor Joseph Ada's administration. The Employees had no particular political affiliation but did not support or campaign for Carl T.C. Gutierrez in the 1994 gubernatorial race. The Employees' respective positions did not entail duties which would render relevant the political affiliation of their occupants. GHURA could not demonstrate that an affiliation with a political party, and in particular, Carl T.C. Gutierrez, was necessary for the effective performance of their job duties.

> FN14. *See* Excerpts of Record, vol. I, Ex. A, pp. 10-22 (Complaint, Dist. Ct. Case No. CIV97-00080), pp. 105-112 (Complaint, Super.Ct. Case. No. CV0410-99).

[28] Without notice of possible adverse action, notice of reclassification hearing, and an opportunity to respond to the charges, as guaranteed to the government's classified employees under 48 U.S.C. § 1422c, Title 4 GCA, Chapter 4, and GHURA's Personnel Rules and Regulations, the defendants, including GHURA, through a Board of Commissioner's Resolution dated February 22, 1995, converted the Employees' classified positions into unclassified positions, in violation of the above-mentioned statutes and rules. Furthermore, on Friday, March 3, 1995, the defendants, without cause, notice, and pre-termination hearing or an opportunity to respond, informed the Employees that as of that date, they were terminated.

*7 [29] The Employees further alleged that the dismissals from their positions were "due to their lack of political affiliation with the administration of Governor Carl T.C. Gutierrez." Excerpts of Record, vol. I, p. 18 (Complaint). They additionally alleged that their dismissals were "the result of their exercising their freedom of speech and freedom of association rights guaranteed them by the [F]irst Amendment of the U.S. Constitution," and that as a result, the defendants "have acted beyond their authority and in direct violation of the law." Excerpts of Record, vol. I, p. 19 (Complaint).

[30] Finally, the Employees alleged that as a result of the defendants' actions, they were grievously damaged in having lost a valuable property right in their employment with GHURA, and suffered emotional and mental anguish.

[31] In the District Court complaint (CV97-00080), the Employees asserted jurisdiction under 42 U.S.C. § 1983. [FN15] Similarly, in the Superior Court suit (CV0410-99), the Employees alleged the same claims as those enumerated in the District Court action, but the precise nature of their theory of recovery is unclear from the allegations and claims. *See* Excerpts of Record, vol. I, pp. 114-16 (Complaint). In both complaints, the Employees presented the following causes of action or "counts" [FN16]:

> FN15. That section provides: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, *shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress,* except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable." Title 42 U.S.C.A. § 1983 (2002) (emphasis added).

FN16. In both complaints, the Employees identified their separate claims as "counts."

(1) damages for violating their Due Process rights under the Fourteenth Amendment
(2) damages for violating their guarantee to equal protection of the law under the Fourteenth Amendment for terminating them without affording rights available to other classified government employees;
(3) damages for violating their rights to free speech, expression, and association by illegally terminating them on the "same day.. at the same time ... for the same reasons, allegedly for 'non-support of Governor Carl T.C. Gutierrez during his campaign for governor' and 'high visibility' support for the republican opponent of Governor Gutierrez....";
(4) penalty damages for violating Title 42, Chapter 2, § 46030(a), which mandates that an employee's last paycheck is due on the date of termination;
(5) breach of employment contract which were "willfully, unlawfully and maliciously done," because classified employees have property rights in their employment;
(6) injunctive relief to being restored to their positions for the acts which were "willfully, unlawfully, and maliciously done" and back pay commencing from the date of termination;
(7) punitive damages for the acts of wrongful termination and the infliction of emotional distress because "Defendants' termination of Plaintiffs were deliberate, cruel, malicious, spiteful, vulgar, nasty, vindictive, mean spirited and vicious...."
Excerpts of Record, vol. I, pp. 26-31 (Complaint).

**b) Comparison to the Policy.**

[32] Viewing the allegations of the complaints, it is clear that the Employees alleged claims for violation of their constitutional and statutory rights. As stated earlier, National Union does not contest that the above-mentioned complaints were prompted by GHURA's actions which are "Wrongful Acts" as defined in the Policy. We agree. *See Indep. Sch. Dist. No. 697, Eveleth,* 515 N.W.2d at 579 (finding that a claim against employees for age discrimination was covered under a policy covering "wrongful acts based on: an error or omission, negligence, breach of duty, misstatement or misleading statement"). The determinative question is whether the wrongful acts could not potentially fall within coverage under the Policy because they fell exclusively within an exclusion. *New Madrid County Reorganized Sch. Dist. No. 1, Enlarged v. Cont'l Cas. Co.,* 904 F.2d 1236, 1240 (8th Cir.1990) (finding that coverage applied to the employees' § 1983 action because the allegations amounted to wrongful acts and there was no exclusion prohibiting coverage). This requires an analysis of the complaint in light of the exclusions.

***8** [33] National Union contends that the claims in the complaints should be viewed in light of the basic allegation that GHURA acted in a purposeful and malicious way to deny the Employees' rights based on their political affiliation. Viewed this way, GHURA argues that the entire complaints would fall within one or more exclusions under the Policy. We think the proper course is to separately consider the individual claims within each complaint. *See Cort,* 311 F.3d at 983-87 (reviewing separately whether the insurer had a duty to defend a claim in the complaint alleging violating § 106A of the Visual Artists' Rights Act of 1991 ("VARA"), and another claim alleging violation of section 17200 of the California Bus. & Prof.Code). The claims are discussed below.

**1) Due Process, Equal Protection, and First Amendment Claims.**

[34] In their complaints, the Employees alleged that GHURA violated their due process, equal protection, and First Amendment rights. We find that these claims were not excluded from coverage under the Policy.

[35] With regard to these claims, National Union highlights Exclusion (p) in the Policy which bars coverage for "any Wrongful Act committed with knowledge that it was a Wrongful Act." Excerpts of Record, vol. I, p. 191-92 (Policy). National Union argues that Exclusion (p) is an intentional acts exclusion. We disagree. First, National Union has not cited any cases that have interpreted this exclusion to bar intentional acts. Moreover, in covering "Wrongful Acts" as defined in the Policy, it is clear that the Policy covered intentional acts. *See New Madrid,* 904 F.2d at 1239 ("The term 'wrongful acts' can fairly be read to encompass more affirmative, willful behavior than can the phrase 'negligent acts, errors, and omissions.' "). To read

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

Not Reported in Guam                                                                                                              Page 8
2003 Guam 19
**(Cite as: 2003 WL 22497996 (Guam Terr.))**

Exclusion (p) to bar intentional acts would be completely inconsistent with the insuring clause thus creating an ambiguity which is to be interpreted in light of the reasonable expectations of the insured. *See W. Cas. Co. v. Adams County,* 534 N.E.2d 1066, 1070 (Ill.App.Ct.1989). Exclusion (p) is not reasonably interpreted to exclude intentional acts. Rather, it is reasonably interpreted as barring coverage for acts of the insured which are accomplished with the awareness that such act is a wrongful act. If National Union intended the exclusion to cover intentional acts, it could have drafted the exclusion more precisely. *See, e.g., Chandler v. Ala. Mun. Ins. Co.,* 585 So.2d 1365, 1366 (quoting a policy covering wrongful acts which excluded "Claims or Suits for Damages which result from a Wrongful Act committed intentionally with knowledge of wrongdoing.").

[36] Thus, we interpret Exclusion (p) in accordance with its plain language, as only barring coverage for intentional acts which were done with appreciation of its wrongfulness. Furthermore, the obligation to pay defense costs is not defeated merely because the claimant alleges that the insured had knowledge that what he or she was doing was wrongful. *See Solo Cup Co. v. Fed. Ins. Co.,* 619 F.2d 1178, 1184-85 (7th Cir.1980). Rather, the court must look to the elements necessary to recover on the underlying cause of action. *See id.* If liability could have been found without a determination that GHURA had knowledge of the wrongfulness of its actions towards the Employees, National Union had an obligation under the Policy to pay defense costs. [FN17]

> FN17. We acknowledge that there are few, if any, causes of action which require a claimant to prove awareness of wrongfulness. This fact, however, is not our concern. We are merely required to interpret the contract as written, in light of the plain language and the reasonable expectations of the insured. If the Policy is drafted in a way that will never be of benefit to the insurer, the disadvantage created therein must fall on the shoulders of the drafter.

*9 [37] Having considered Exclusion (p) as interpreted above, we find that the claims for violations of the Employees' due process, equal protection, and First Amendment rights did not fall within the exclusion and were potentially covered under the Policy.

[38] All three constitutional claims were actionable under 42 U.S.C. § 1983. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983 (1990) ( "A § 1983 action may be brought for a violation of procedural due process...."); *Birnbaum v. Trussell,* 371 F.2d 672, 679 (2d Cir.1966); *Carey v. Piphus,* 435 U.S. 247, 254-67, 98 S.Ct. 1042, 1047-54, n. 11 (1978) (recognizing that in an action under section 1983 for a procedural due process violation, the plaintiff may recover damages, either nominal, actual, or punitive); *Annis v. County of Westchester, N.Y .,* 36 F.3d 251, 253-54 (2d Cir.1994) (recognizing that a violation of the Equal Protection Clause is actionable under § 1983); *Kreuzer v. Brown,* 128 F.3d 359, 362 (6th Cir.1997) (analyzing whether summary judgment for the defendant should be affirmed on plaintiff's claim brought under section 1983 for dismissal based on political affiliation). The three claims encompassed state-of-mind requirements beyond mere negligence to support recovery. *See Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1277 (3d Cir.1994) ("In *Daniels* the Supreme Court stated a plaintiff who wishes to sustain a § 1983 claim based upon a violation of procedural due process must, at a minimum, prove recklessness or 'gross negligence' and in some instance may be required to show a 'deliberate decision to deprive' the plaintiff of due process."); *Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 271-72, 99 S.Ct. 2282, 2292-93 (1979) (discussing the intent requirement in a claim of a violation of equal protection); *Kreuzer,* 128 F.3d at 363 (finding that to establish a First Amendment claim of patronage dismissal, the plaintiff must show that "her political affiliation was a 'substantial' or 'motivating' factor behind the adverse employment action."). Nonetheless, while proof of negligence is not enough to recover, we have not found any cases which hold that the claimant must prove that the defendant acted with knowledge that what he or she was doing was wrongful. Accordingly, the Employees' due process, equal protection, and First Amendment claims were covered under the Policy and were not barred by Exclusion (p). [FN18] *See Melugin v. Zurich Canada,* 57 Cal.Rptr.2d 781, 785 (Ct.App .1996) (finding that the insurer had a duty to defend the complaint alleging sexual discrimination because "there could be some acts occurring in the working world which would constitute sexual discrimination in employment, but which would only involve unintentional, negligent conduct, for which coverage might exist."). Because there was a potential for coverage, National Union was contractually obligated to pay defense costs for those claims.

> FN18. Note that "[a] termination in violation of fundamental public policy has been found to be 'ex delictu' and thus enforceable by a tort action, because the action redresses a discharge that clearly violated an express statutory objective or undermined a firmly established principle of public policy." *B & E Convalescent Ctr. v. State Comp. Ins. Fund,* 9 Cal.Rptr.2d 894, 907 (Ct.App.1992)

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

(citations and internal quotations and brackets omitted). However, "such claim can *only* be established by evidence of an employer's motive and intent to violate or frustrate the law(s) declaring or establishing fundamental public policy." Id. at 907-08; *see also* Cagle v. Burns and Roe, Inc., 726 P.2d 434, 436 (Wash.1986) (en banc) ("[W]rongful termination of employment in violation of public policy can be accurately characterized as intentional tort."). Even assuming claims under this theory required that the plaintiff prove that the acts were done with knowledge that they were wrongful, we find that National Union would nonetheless be obligated to pay defense costs. Because the due process, equal protection, and First Amendment claims are also actionable under § 1983, *see* Swedlund v. Foster, 657 N.W.2d 39, 46 (S.D.2003) ( "A claim for violation of civil rights under 42 U.S.C. § 1983 can be brought in either federal or state court."), and would be covered if brought pursuant to that section, there exists the *potential* for coverage under the Policy, thus obligating National Union to pay defense costs.

**2) Damages for Back Wages and Penalties**

**\*10** [39] In their Complaints, the Employees alleged that GHURA violated Title 42, Chapter 2 of the Fair Labor Standards Act, Government Code § 46030(a), which, according to the Employees, mandates that an employee's last paycheck is due on the date of termination. The Employees sought damages equal to three times the amount of their last paycheck, as well as all back pay due to the Employees from "March 3, 1995 through the date of settlement" to each Employee. Record on Appeal, Tab 1 (Complaint, Ex. A, p. 16).

[40] The Employees sought recovery under the wage provision currently codified at Title 22 GCA § 3201(a), which provides:

> The earned wages of all employees shall be due and payable within seven (7) days after the end of each pay period, except that: (a) the earned wages of all employees discharged [by] the employer either with or without cause shall be immediately due and payable upon discharge.

Title 22 GCA § 3201(a) (1994). The penalties for failure to comply with section 3201(a) are set forth in 22 GCA § 3219(a), which provides:

> (a) Except for government entities, any employer who fails to pay one (1) or more employees wages when due or who underpays an employee *shall pay punitive damages to the employee of three (3) times the wages due,*

*unless the employer can establish, as an affirmative defense in equity, by a preponderance of the evidence, that:*
> (1) In the case of non-payment, the employer did not have the ability to pay the wages due; and
> (2) The employer complied with all other provisions of this Chapter; and
> (3) There was no fraud committed against any employee by the employer in the computation of wages; and
> (4) The employer was in substantial compliance with all territorial and federal laws as to wage and hours matters relating to employees, and that any non-compliance was in good faith; and
> (5) In the case of non-payment, managers or officers of the employer were not given priority in the disbursement of wages or allowances; and
> (6) In the case of non-payment, the employer complied with the requirements of § 3213[of] this Code; and
> (7) The employer comes before the court with clean hands; and
> (8) In the case of an underpayment, the underpayment was a good faith error with no intent to defraud.

Title 22 GCA § 3219(a) (1994) (emphasis added).

[41] In determining whether National Union was obligated to pay defense costs for this claim for back wages and penalty damages, the question is whether the claim was potentially covered under the Policy. *See* Okada, 823 F.2d at 282. After reviewing the relevant exclusions in the Policy, we find that the claim for back pay was excluded from coverage under Exclusion (n), which barred coverage for awards of back wages or employee compensation. We note that Exclusion (n) excluded "*awards* " of wages and back pay, and not *claims* seeking wages and back pay. However, where the claim seeks an award of back pay as its sole relief, the claim itself would necessarily be excluded from coverage. Because awards of back pay were completely excluded, it cannot be concluded that there was a potential for coverage for a claim solely seeking an award of back pay. Therefore, National Union would have no obligation to pay defense costs for such claim.

**\*11** [42] Furthermore, we find that the claim for damages in the amount of triple the amount of wages owed was excluded under Exclusion (q) which provided:

This Policy does not apply:
> ...
> (q) to fines, penalties, or punitive, exemplary or multiplied damages; however, only where permitted by law, this policy shall cover, subject to all the terms, conditions and exclusions contained herein, up to $25,000 punitive, exemplary or multiplied damages, as part of or

not in addition to the limits of the Company's liability otherwise afforded by this policy.

Excerpts of Record, vol. I, p. 191-92 (Policy).

[43] Title 22 § 3219(a) clearly states that an employer who withholds the payment of wages, or underpays an employee, "shall pay *punitive damages* to the employee of three (3) times the wages due." Title 22 GCA § 3219(a) (emphasis added). The damages recoverable under the statute plainly serve as a penalty for the failure to pay wages as required under the Fair Labor Standards Act. Because the Policy specifically excluded "fines, penalties, or punitive, exemplary or multiplied damages," the Employees' claim for damages pursuant to section 3219(a) was excluded from coverage. We further note that the proviso in Exclusion (q) allowing coverage of up to $25,000 for punitive damages where "permitted by law" did not apply to the Employees' claim because under section 3219(a), recovery of punitive damages is only permitted against non-government entities. Because GHURA is a government entity [FN19], the statute did not permit the recovery of punitive damages against GHURA.

> FN19. We find that GHURA is a "government entity" as used in section 3219(a). This is evident upon review of the definitions portion of the Fair Labor Standards Act. There, an "employer" is defined to include various types of private business entities and "government entities or instrumentalities." 22 GCA § 3104. GHURA is logically included in the phrase "government entities" because if not, this would lead to the absurd conclusion that GHURA is not an "employer" under the Fair Labor Standards Act and is therefore exempt from the various provisions governing "employers" under Act. Because GHURA is a "government entity" under the definitions portion of the Act, it is consistent that they be considered a "government entity" under section 3219(a). *Cf.* Baker v. Runyon, 114 F.3d 668, 669-71 (7th Cir.1997) (holding that the Postal Service was a "government agency" and fell within the exemption for punitive damages under Title VII).

[44] Overall, we find that the claim for back wages and penalty damages under 22 GCA § 3219(a) was not potentially covered, thus, National Union was not contractually obligated to pay the costs of defending GHURA against this claim.

**3) Breach of Employment Contract.**

[45] The Employees also claimed that GHURA breached their employment contracts by denying their rights as classified employees. With regard to this claim, we recognize that any action between employees and employers "will to some extent ... emanate from the parties' contract." *See* New Madrid, 904 F.2d at 1241. However, it is evident that because the Employees essentially sought redress for a violation of their constitutional rights, this claim cannot fairly be characterized as one for breach of contract. *See id.* Rather, this claim is more properly viewed as a one to vindicate constitutional rights. *See id.* As discussed above, because the constitutional claims were potentially covered under the Policy, this claim was similarly potentially covered. Accordingly, National Union had an obligation to pay defense costs for this claim.

**4) Injunction and Back Pay.**

[46] In the complaints, the Employees presented a claim to be restored to their positions and for back wages. This claim is excluded from coverage under the coverage clause, as well as Exclusions (c) and (n) which preclude coverage for non-pecuniary relief, and awards of back salary or employee compensation, respectively.

***12** [47] The Policy specifically states that it covers sums that the insured becomes legally liable to pay as "damages." The Policy's limitation of coverage for damages would render a claim for injunctive relief beyond the scope of coverage. For instance, in *Cort v. St. Paul Fire & Marine Ins. Co,* the court found that a claim under Section 17200 of the Cal. Bus & Prof.Code did not trigger a duty to defend. The court recognized that Section 17200 only entitles a person to "injunctive and restitutionary relief, and not damages." Cort, 311 F.3d at 987. Thus, "[b]ecause the policy only cover[ed] payments for damages (and certain associated legal fees), the artists' § 17200 claim did not give rise to a duty to defend." *Id.* Similarly, in the instant case, because the Policy only covered sums for which GHURA became legally obligated to pay as damages, the Policy did not cover the Employees' claim for injunctive relief, and thus there was no duty to pay defense costs for such claim. *See also* Ladd Constr. Co. v. Ins. Co. of N. Am., 391 N.E.2d 568, 573 (Ill.App.Ct.1979) (holding that there was no duty to defend a suit for an injunction because the Policy only covered sums the insured shall become legally liable to pay as "*damages* "); Aetna Cas. & Sur. Co. v. Hanna, 224 F.2d 499 (5th Cir.1955) (same).

[48] Furthermore, non-pecuniary relief is specifically excluded from the Policy under Exclusion (c). Injunctive relief is non-pecuniary relief. *See* BLACK'S LAW DICTIONARY 1152 (7th ed.1999) (defining pecuniary as

"[o]f or relating to money; monetary"). Thus, GHURA would have no duty to pay defense costs for such claims.

[49] Additionally, to the extent that back pay is considered damages, the claim would also be excluded from coverage under Exclusion (n), which excludes coverage for awards of wages and employee compensation. As stated earlier in the Opinion, claims solely seeking damages in the form of back wages were excluded from coverage under the Policy. Because National Union only had a duty to pay the defense costs for covered, non-excluded claims, National Union would have no duty to pay the costs of defending this claim.

**5) Punitive damages**

[50] In the complaints, the Employees also sought punitive damages. This final claim should not be characterized as a claim *per se.* A request for punitive damages is not a separate cause of action and can only be awarded based on a finding of liability for an underlying claim. *Mayes v. UVI Holdings, Inc.,* 723 N.Y.S.2d 151, 157 (App.Div.2001) ("It is settled that there is no independent cause of action for punitive damages") (citation omitted). While Exclusion (b) of the Policy excluded coverage for claims alleging malicious acts, and a request for punitive damages necessarily would entail proof of conduct which amounts to oppression, malice, or fraud, *see* Title 20 GCA § 2120, a court would not be required to award punitive damages; and may limit an award to nominal or compensatory damages. Clearly if a court awarded non-punitive damages, then National Union may escape indemnification for the award, with reliance on Exclusion (b), if the underlying facts showed that malice or fraud were proven. However, the possibility that such a finding could be made does not affect whether there is a duty to pay defense costs. So long as the underlying claims for which punitive damages are premised are potentially covered in that they may result in an award of compensatory or nominal damages, and are thus actionable without the allegation of malice, there would be a duty to pay GHURA's defense expenses. *See Lerner v. Gen. Ins. Co. of Am.,* 245 S.E.2d 249, 252 (Va.1978) (finding that where underlying claim for punitive damages "was ancillary to the claim for compensatory damages," the insurer had a duty to defend the insured against the punitive damages claim even if public policy prohibited indemnity for a punitive damages award); *see also Thomas v. Appalachian Ins. Co.,* 335 So.2d 789 (La.Ct.App.1976) (holding that there was a duty to defend notwithstanding that punitive damages are requested because the claim also supported compensatory damages which would not be excluded from the policy). This rationale similarly extends to Exclusion (q) which bars coverage for punitive or exemplary damages.

**\*13** [51] Because the Employees could have recovered non-punitive, compensatory damages for several non-excluded claims in the complaints, National Union was contractually obligated to pay defense costs notwithstanding that punitive damages were also requested.

**2. Superior Court Case No. SP0051-00.**

[52] As stated earlier, National Union seeks reimbursement for costs in defending three suits. The first two suits are discussed above. The third suit, the Petition for Writ of Mandate, (Superior Court Case No. SP0051-00), differed only slightly from the first two actions. In the Petition, the Employees presented the following factual allegations: In November of 1994, GHURA, through a Board resolution, classified the Employees' positions. In February of 1995, GHURA declassified their positions through a Board resolution. In March of 1995, GHURA, without notice, due process, and without basis, unilaterally terminated the Employees from their positions. The notice of termination did not specify the Employees' due process entitlements, nor did it inform the Employees of their right to appeal. The Employees were never afforded a hearing on their terminations, despite numerous requests. Excerpts of Record, vol. I, p. 82 (Petition for Alternative Writ of Mandate).

[53] The Employees further alleged in the Petition that GHURA's actions were invalid because the failure to afford notice, due process, and a hearing violated GHURA's Rules and Regulations, Title 4 of the Guam Code Annotated, the Organic Act, and the U.S. Constitution. They also alleged that as a result of GHURA's actions, they sustained damages and continue to suffer irreparable damage.

[54] Finally, the Employees prayed for the following relief: (1) that they be reinstated to their positions with back pay and increments; and (2) interest and costs of the action, including attorney's fees pursuant to Title 7 GCA § 26603.

[55] In Petition for Writ of Mandate, the Employees sought injunctive relief and back pay. As provided earlier, because the Policy covered "damages," an action for injunctive relief would be beyond the scope of coverage. Thus, the Petition for Writ of Mandate would not fall within the coverage portions of the Policy. Moreover, as stated previously, non-pecuniary relief is specifically excluded under the Policy. Injunctive relief is non-pecuniary relief. *See* BLACK'S LAW DICTIONARY 1152 (7th ed.1999) (defining pecuniary as "[o]f or relating to money; monetary"). In light of this exclusion, National Union would have no duty to pay the costs of defending such an action.

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works

[56] Furthermore, the request for back pay was also excluded from coverage under Exclusion (n), which excluded coverage for awards of wages and employee compensation.

### 3. Conclusion Regarding the Duty to Pay Defense Costs under the Policy.

[57] Overall, we find that National Union was not contractually obligated to pay defense costs for either the mandamus proceeding, or the claims for injunctive relief, back pay, and penalty damages under 22 GCA § 3219(a) in the first two lawsuits. The remaining claims in the first two lawsuits were potentially covered because they fell within the coverage clause and did not fall within any exclusion in the Policy. Accordingly, National Union was contractually obligated to pay defense costs for those covered claims.

*14 [58] As discussed below, National Union argues that we should look outside the Policy language in determining whether it had an obligation to pay defense costs in the underlying actions.

### 4. Title 22 GCA § 18602 and Title 18 § 88102.

[59] National Union contends that GHURA's reasonable expectation of defense under the Policy was defeated by Title 22 GCA § 18602 and Title 18 GCA § 88102. Title 22 GCA § 18602 provides:

> An insurer is not liable for a loss caused by the wil[l]ful act of the insured; but he is not exonerated by the negligence of the insured or of the insured's agents or others.

Title 22 GCA § 18602 (1994).

[60] Title 18 GCA § 88102 provides:

> All contract [sic] which have for their object, directly or indirectly, to exempt anyone from responsibility for his or her own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against public policy of the law.

Title 18 GCA § 88102 (1992).

[61] In its Decision and Order denying GHURA's motion for summary judgment, the trial court found that section 18602 was inapplicable in deciding whether National Union had a duty to defend GHURA in the underlying suit. The court found that section 18602 governed indemnification for willful acts, and not the defense of claims. The court found that because the issue in this case related to defense costs, and not indemnification, the statute was inapplicable to this case.

[62] On appeal, National Union contests the lower court's determination on this issue and argues that Title 22 GCA § 18602 and Title 18 GCA § 88102, which proscribe indemnification for willful acts, are to be read into every contact of insurance thus negating GHURA's reasonable expectation of defense in the underlying lawsuits. We disagree.

[63] Title 22 GCA § 18602 mirrors California Insurance Code § 533. See Fajardo v. Liberty House Guam, 2000 Guam 4, ¶ 15 ("Guam's insurance statutes were adopted from California.... California's Section 533 is the same as 22 GCA § 18602.") Similarly, 18 GCA § 88102 finds a California counterpart in California Civil Code § 1668. See Gray v. Zurich Ins. Co., 419 P.2d 168, n. 17 (Cal.1966). California courts have found that both their Insurance Code § 533 and Civil Code § 1668 "forbid only contracts which *indemnify* for 'loss' or 'responsibility' resulting from willful wrongdoing," and not contracts for *defense* of claims for willful acts. Id. at 177 (emphasis added); Evans v. Pac. Indem. Co., 122 Cal.Rptr. 680, 682 (Ct.App.1975) ("Section 533 of the Insurance Code reflects the very sound and long standing public policy (also contained in Civ.Code, § 1668) which disapproves of contracts which directly or indirectly exempt anyone from personal responsibility for his own willful injury to another.").

[64] The public policy underlying the analogous California statutes is to prevent the encouragement of willful torts by virtue of the availability of insurance coverage. Mez Indus. Inc. v. Pac. Nat'l Ins. Co., 90 Cal.Rptr.2d 721, 737 (Ct.App.1999) (citation omitted); see Evans, 122 Cal.Rptr. at 682 ("Section 1668 of the Civil Code and section 533 of the Insurance Code establish a public policy to prevent insurance coverage from encouragement of willful torts.") (citation omitted). That policy is not furthered by precluding the defense of claims alleging willful torts; *to wit*, "a contract to defend an [in]sured upon mere accusation of a willful tort does not encourage such willful conduct." See Gray, 419 P.2d at 177.

*15 [65] We find no reason to depart form the reasoning of the California courts. Thus, applying this interpretation to our local counterparts, an insurer may be precluded from indemnifying an insured for claims for willful acts under sections 88102 and 18602; however, these statutes do not necessarily preclude the insurer from *defending* the insured against such claims. Accordingly, the trial court was correct in finding that Title 22 GCA § 18602 "precludes only *indemnification* of willful conduct and not the *defense* of an action in which such conduct is alleged." Mez Indus. Inc., 90 Cal.Rptr.2d at 737 (citation omitted).

[66] Thus, the existence of sections 18602 and 88102 does not answer the question of whether National Union had a duty to pay defense costs for claims alleging willful acts. *See id.* ("[W]here a denial of indemnification is based on the application of [those statutes] ..., it does not necessarily follow that no duty to defend exists."). The test for whether there is a duty to pay defense costs rests on the reasonable expectation of the payment of those costs. *See id.* Specifically, "if the reasonable expectation of an insured are that a defense be provided for a claim, then the insurer cannot escape the obligation merely because public policy precludes it from indemnifying that claim." *Id.* (citation omitted); *see also St. Paul Fire & Ins. Co. v. Weiner,* 606 F.2d 864, 868, 870 (9th Cir.1979) (rejecting the lower court's reliance on section 533 of the Insurance Code and section 1668 of the Civil Code in finding that the insurer had no duty to defend against fraud claims, and holding that the insurer had a duty to defend because the insured had a reasonable expectation of defense for those claims in light of an ambiguity contained in the policy language).

[67] Even assuming indemnification for the Employees' claims would be precluded by virtue of sections 18602 and 88102, we find that National Union would nonetheless have had a duty to pay defense costs for those claims. *See Downey Venture v. LMI Ins. Co.,* 78 Cal.Rptr.2d 142, 161 (Ct.App.1998). The Policy provided that defense costs would be paid for wrongful acts covered under the Policy. Thus, GHURA had a reasonable expectation that National Union would pay defense costs for the claims which we have determined were potentially covered under the Policy.

[68] The next question is whether National Union is entitled to a reimbursement of defense costs for non-covered claims.

**5. Reimbursement.**

[69] On appeal, National Union argues that an insurer is entitled to reimbursement if there was no potential for coverage and it defends pursuant to a reservation of rights. GHURA, on the other hand, argues that an insurer should not be able to seek reimbursement if it defends an insured as a volunteer under a unilateral reservation of rights. The parties have articulated two lines of authority governing the right to reimbursement. We agree with National Union. *Buss,* 939 P.2d at 776-77.

**\*16** [70] Under an insurance contract, the insured only bargains for the payment of defense costs for claims which, viewing the facts of the complaint, are potentially covered under the policy. *Id.* Because the insured does not bargain for a defense for claims which are not potentially covered, there is no duty under the policy to pay those defense costs, and the insured cannot expect the payment of a defense in such circumstance. *Id.* Logically, then, the insured must reimburse the insurer for costs expended defending claims which are not potentially covered. *Id.* To hold otherwise would provide a windfall to the insured. *Id.*

[71] This principle was recently applied by the Sixth Circuit in *United National Insurance Co. v. SST Fitness Corp.,* 309 F.3d 914 (6th Cir.2002). *See also Matagorda County v. Tex. Assoc. of Counties County Gov't Risk Mgmt. Pool,* 975 S.W.2d 782, 785 (Tex.Ct .App.1998) (agreeing with other courts that an insurer has a right to reimbursement under quasi-contract, unjust enrichment, and quantum meruit theories if the insurer gives the insured specific notice that he may later be charged for these costs). In *United National,* the majority recognized that "courts ... consistently have held that an insurer is entitled to reimbursement for defense costs when the insurer did not have the duty to defend any of the asserted claims ..." and the insurer makes a valid reservation of its right to recoup defense costs. *United Nat'l Ins. Co.,* 309 F.3d at 919. The principle underlying its holding was this: "Having accepted [the insurer's] offer of a defense with a reservation of the right to seek reimbursement, [the insured] ought in fairness make the [insurer] whole, [where] ... it has been judicially determined that no duty to defend ever existed." *Id.* at 917 (citation omitted).

[72] We agree with the rationale articulated by the court in *United National,* and find that the use of a unilateral reservation of rights letter is appropriate to apprise the insured of the fact that it cannot accept the windfall of defense costs for which it was not entitled to under the Policy. *Buss,* 939 P.2d at 784, n. 27 ("Here, Transamerica reserved all its rights, contractual and otherwise. We also note that the Court of Appeal was evidently of the view that the insurer can reserve its right of reimbursement for defense costs by itself, without the insured's agreement. Such a view is in accord with the 'modern trend.' ").

**6. Reservation of Rights Letter.**

[73] If an insurer has no duty to defend or obligation to pay defense costs, it is entitled to a reimbursement of defense costs only if the insurer sufficiently reserves its right to seek reimbursement. *See United Nat'l,* 309 F.3d at 919; *Buss,* 939 P.2d at 784, n. 27 [FN20]. The reservation of its right to recoup defense costs must be (1) made in a timely and explicit manner, and (2) must provide "specific and adequate notice of the possibility of reimbursement." *See United Nat'l,* 309 F.3d at 920.

    FN20. In *Buss,* the court provided:

We note that the Court of Appeal assumed that, in order to obtain reimbursement for defense costs, the insurer must reserve its right thereto. To the extent that this right is implied in law as quasi-contractual, it *must* indeed be reserved. (Cf. 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 92, p. 123 [stating that, "[i]n an action in quasi-contract ..., a *demand* is ordinarily a necessary prerequisite" (italics in original) ].) Through reservation, the insurer gives the insured notice of how it will, or at least may, proceed and thereby provides it an opportunity to take any steps that it may deem reasonable or necessary in response--including whether to accept defense at the insurer's hands and under the insurer's control ... or, instead, to defend itself as it chooses. To the extent that this right is implied in fact in the policy as contractual, it *should* be reserved. Through reservation, the insurer avoids waiver. Buss, 939 P.2d at 784, n. 27 (alterations in original).

**\*17** [74] GHURA challenges the validity of National Union's January 8, 1998 reservation of rights letter ("Letter"). GHURA argues that because the Letter references the District Court action only, the Letter can only support a reimbursement of costs expended in the District Court action and not the costs incurred defending the later two Superior Court suits. We disagree.

[75] There is no doubt here that National Union met the above two criteria with regard to the District Court suit. First, in its Letter, National Union timely and explicitly reserved its right to recoup defense costs because it sent its Letter merely 31 days after GHURA tendered its defense to National Union. *See id.* (determining that the reservation was timely and explicit because the reservation of rights letter was submitted prior to the payment of defense costs). Furthermore, the Letter provided adequate and specific notice of the possibility of reimbursement because the Letter concluded with the following pronouncement: "By this letter National Union reserves its right to seek reimbursement of defense costs incurred defending claims for which there is no potential for coverage." Excerpts of Record, vol. I, p. 205 (Reservation of Rights Letter); *see* United Nat'l, 309 F.3d at 920-21 (noting that the reservation of rights letter contained a statement that the insurer "reserves the right to recoup ... any ... defense costs" and finding that the insurer specifically and adequately gave notice of the possibility of reimbursement). Thus, the remaining question is whether the reservation was adequate to cover both the later-filed Superior Court civil action and the mandamus proceeding. We find that it was.

[76] A reservation of rights letter is used for two recognized purposes. First, and primarily, a reservation of rights letter is generally used to protect the insurer from foreclosing its right to contest indemnification of damage awards. If an insurer defends the insured without reserving its rights to contest indemnification, then the insurer will be found to have waived its defenses under the policy, and will thus be bound to pay any sums for which the insured eventually is held to be liable. Am. States Ins. Co. v. Nat'l Cycle, Inc., 631 N.E.2d 1292, 1297 (Ill.Ct.App.1994). Thus, a reservation of rights letter has been referred to as a "nonwaiver agreement." *Id.* The second purpose of a reservation of rights letter is to prevent the insurer from having been found to have waived its right to reimbursement of defense costs. In cases where the insured contests its duty to pay defense costs, an insurer cannot be reimbursed unless it reserved its right to seek reimbursement. *See* United Nat'l, 309 F.3d at 919; Buss, 939 P.2d at 784, n. 27. Thus, a reservation of rights letter is also used to protect the insurer from waiving its rights to later contest payment of defense costs or to seek reimbursement of such costs. *See* St. Paul Mercury Ins. Co. v. Ralee Eng'g Co., 804 F.2d 520, 522 (9th Cir.1986) (determining that the insurer could not seek reimbursement when its reservation of rights letter did not reflect the understanding that the insured would reimburse the insurer for costs already expended if the insurer decided not to defend at a later date).

**\*18** [77] Waiver is found when the insurance company proceeds with knowledge of facts bearing on its policy defense and does not insist on non-coverage. Am. States Ins. Co., 631 N.E.2d at 1297. Waiver is premised on the theory that if the insurance company proceeds in such manner, it is deemed to have recognized the "continued validity of the policy" under the facts, and thus to have intended to waive the policy defense. *Id.; see also* Snedker v. Derby Oil Co., 192 P.2d 135, 138 (Kan.1948) ("An insurance company is ordinarily precluded from asserting nonliability under its policy where with notice or knowledge of the facts and without disclaimer it undertakes or continues defense of an action against the insured.") (citation omitted).

[78] We find that National Union's Letter was broad enough to extend to all suits involving the claims raised in the District Court action. In the Letter, National Union recounted all claims which were made in the District Court suit and very clearly expressed why each claim was not potentially covered under the Policy. At the conclusion of the Letter, National Union asserted that it reserved its rights to recoup defense costs for all "claims" which were not covered. The claims which were deemed "non-covered" in the District Court suit were the exact same claims in the later two suits. It would be disingenuous for GHURA to

claim that it was not notified of National Union's position regarding non-coverage and reimbursement when accepting the defense provided for them in the later two suits after having received the Letter which detailed the Employees' factual allegations and claims *and* National Union's reasons for denying coverage and seeking reimbursement; *especially when those same factual allegations and claims of wrongdoing formed the grounds for all three suits.* Moreover, there is nothing in the record which shows that National Union acted in such a way which would indicate that it abandoned its original opinion that the claims were not covered and that National Union intended to seek recovery of defense costs. Thus, the Letter was sufficient to notify GHURA of National Union's position that it did not intend to waive its right to a reimbursement of defense costs in all three suits.

### 7. Allocation.

[79] As stated above, several claims in the first two complaints were excluded and several claims were potentially covered under the Policy. Therefore, because the complaints alleged both noncovered and potentially covered claims, and because National Union exercised its right to defend GHURA in the underlying actions, National Union was required to pay defense costs for the entire suits. *See Gon,* 871 F.2d at 869 ("We affirm the district court's order that [the insurer] ... must pay all legal expenses as incurred, subject to apportionment and reimbursement for defense of uncovered claims or persons after settlement or judgment in the underlying ... action."). However, if an insurer paid defense costs for a suit containing both covered and non-covered claims, it is nonetheless entitled to a reimbursement for costs expended in defending non-covered claims if it reserved its rights and is able to identify those costs which were attributable *solely* to non-covered claims. *Downey Venture,* 78 Cal.Rptr.2d at 159. The insurer has the burden to prove allocation between covered and non-covered claims. *See id.* (stating that reimbursement is allowed if the insurer can produce undeniable evidence supporting allocation between the claims).

*19 [80] Thus, if it could prove allocation, National Union would be entitled to a reimbursement of defense costs for claims which it had no obligation to pay defense costs. Allocation is a factual question and is more appropriately determined by the trial court in the first instance.

### 8. Government Claim.

[81] Finally, GHURA argues that because the costs incurred in the District Court suit were incurred 18 months prior to the filing of the government claim, then pursuant to the Government Claims Act ("Claims Act"), National Union is time-barred from collecting on amounts it expended in that suit. Essentially, GHURA argues that National Union is precluded under the Claims Act from recovering the costs incurred in defending the District Court action.

[82] The Claims Act's applies to GHURA. *Perez v. GHURA,* 2000 Guam 33, ¶ 11 ("[T]he Claims Act is applicable to GHURA and the waiver of sovereign immunity is within the limits prescribed by the act."); *see also* Title 5 GCA § 6102 ("No government agency, whether denominated as a line department, an agency, or a public corporation, is excluded from the scope of this Chapter. The fact that an agency or instrumentality has or has not the right to sue or to be sued in its own name does not exclude such agency or instrumentality from the scope of this Chapter."). Thus, all claims against GHURA are subject to the limitations periods in the Claims Act. *Perez,* 2000 Guam at ¶ 11.

[83] Section 6106 of the Claims Act provides:
> Limitations on Actions and Filing.
> (a) All claims under this Act must be filed within 18 months from the date the claim arose, but any claims timely filed under the predecessor of this Act shall be considered to have been timely filed under this Chapter.
> (b) Every action filed under this Chapter shall be barred unless commenced within 18 months from the time the notice that the claim was rejected was served as provided in Article 2 of this Chapter, or within 24 months after the claim was filed in cases where the government does not reject the claim.

Title 5 GCA § 6106 (2001).

[84] As referenced above, there are two relevant dates under the Claims Act in determining whether a claimant is precluded from recovering money against the government: (1) the date the claim arose; and (2) the date the government claim was denied. *See Pac. Rock Corp. v. Dep't of Educ.* 2001 Guam 21, ¶ 51. To recover against the government in a court action, the claimant must first show that he filed his "government claim" within 18 months "from the date the claim arose." *Id.* (citing Title 5 GCA § 6106). Furthermore, the claimant must show that he or she filed the court action within 18 months of the time the government claim was rejected. *Id.* The issue raised by GHURA relates to the first requirement. GHURA argues that National Union failed to file its claim for defense costs incurred in the District Court action within 18 months of the date the claim arose. The issue, therefore, relates to the date National Union's claim for defense costs in the District Court action "arose." The point in which a claim against the government arose is a question of fact. *See Pac. Rock Corp.,* 2001 Guam 21, at ¶

43. Thus, like the issue of allocation, we find that the lower court is more appropriately equipped to make that determination in the first instance.

### IV.

**\*20** [85] In accordance with the foregoing, we find that National Union was not required to pay GHURA's defense costs for the claims for back pay, penalty damages under 22 GCA § 3219(a), and injunctive relief in the civil actions, nor was National Union responsible for paying defense costs for the mandamus proceeding. Thus, because National Union reserved its right to seek a reimbursement of defense costs, it is entitled to recover those costs in this action if it can provide evidence of the costs expended solely in defending the mandamus proceeding or the non-covered claims in the civil suits. Accordingly, we hereby **REVERSE** the lower court's decision granting summary judgment in favor of GHURA to the extent the judgment denies recovery for defense costs expended on non-covered claims. The case is **REMANDED** for a determination on the issue of allocation. Finally, we observe that National Union would be precluded from recovering against GHURA if its claim for reimbursement was not filed within the limitations period set forth in the Government Claims Act. Accordingly, on remand, the lower court is directed to determine whether National Union filed its government claim in a timely manner. The lower court's judgment is **AFFIRMED** in all other respects.

2003 WL 22497996 (Guam Terr.), 2003 Guam 19

END OF DOCUMENT

Copr. © West 2004 No Claim to Orig. U.S. Govt. Works