UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
MELINDA BROWN and TREFFLE     )
LaFLECHE,                     )
                              )
         Plaintiffs,          )
                              )
         v.                   )  CIVIL ACTION
                              )  NO. 04-10685-WGY
AMERICAN INTERNATIONAL GROUP, )
INC. and NATIONAL UNION FIRE  )
INSURANCE COMPANY OF          )
PITTSBURGH, PENNSYLVANIA,     )
                              )
         Defendants.          )
                              )
                              )
```

MEMORANDUM AND ORDER

YOUNG, C.J.                                    October 19, 2004


I.    **INTRODUCTION**

Plaintiffs Melinda Brown ("Brown") and Treffle LaFleche ("LaFleche") (together the "Plaintiffs") seek a declaration of their rights under a directors' and officers' liability policy issued by defendant National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"). The Court, having denied the Plaintiffs' motion for summary judgment and proceeded to a bench trial, renders the following findings of fact and conclusions of law. Fed. R. Civ. P. 52(a).

II.   **BACKGROUND**

## A.    Factual Background

The following facts, although drawn primarily from the Plaintiffs' Complaint and proposed findings, are essentially undisputed.  Massachusetts residents Brown and LaFleche are each former directors of Computrex, Inc. ("Computrex"), a Delaware corporation with its principal place of business in Kentucky. Pls.' Compl. [Doc. No. 1] ¶ 1; Pls.' Proposed Findings at 2.  The Defendant National Union, a Pennsylvania corporation with its principal place of business in New York, issued to Computrex a directors' and officers' liability policy extending coverage both to individual insureds and to Computrex.  See Trial Ex. 2 (Directors, Officers and Private Company Liability Insurance Policy No. 872-35-08) (the "Policy").[1]  As to the individual insureds:

> This policy shall pay the Loss of each and every Director, Officer or Employee of the Company arising from a Claim first made against such Insureds during the Policy Period or the Discovery Period (if applicable) and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act in their respective capacities as Directors, Officers or Employees of the Company except when and to the extent that the Company has indemnified such Insureds.  The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

---

[1] As the Plaintiffs note, the Policy's attached Coverage Description names National Union's parent company, American International Group, Inc., as insurer.  See Pls.' Compl. ¶ 2; Policy, Coverage Description.  Because the remainder of the Policy refers exclusively to National Union, however, the Court will do the same.

Policy, cl. 1.

### 1. Trustee's Complaint

On January 30, 2004, former directors and officers of Computrex were served with an adversary complaint filed by the company's trustee in bankruptcy (the "Trustee").  Pls.' Compl. ¶ 12; Trial Ex. 1 ("Trustee's Complaint").  The Trustee's Complaint explains that Computrex was formed in 1973 "for the purpose of auditing freight bills," a service that involved receiving freight bills from carriers, auditing them for correct charges, invoicing and receiving payments from clients, and transmitting the payments to carriers.  Trustee's Compl. ¶ 19.  The Trustee contends that by December 20, 2001, Computrex had been driven into involuntary bankruptcy by its former directors and officers, who had misdirected client funds, distributed improper bonuses and dividends, and orchestrated a fraudulent spin-off of the company's successful logistics division.  See id. ¶¶ 114, 121.

As to Brown and LaFleche more specifically, the Trustee's Complaint alleges the following actions and -- significantly for present purposes -- indicates the following dates:

> Continuation of the company's business during insolvency.  In an effort "to delay financial collapse," Computrex directors approved the implementation of a "Ponzi scheme": clients were invoiced in the usual manner, but the funds they remitted were applied to the freight bills of other clients, "whose money the defendants had already spent."  Id. ¶¶ 74-75.  As a result, by June 2000, Computrex faced a shortfall of more than $17 million. Id. ¶¶ 115-16.  By June 2001, "other new clients had

been solicited" and the shortfall had increased to more than $22 million. Id. ¶¶ 115-16.

Settlement with Ronald LaFleche. In late July 2000, several directors agreed to settle a lawsuit initiated by Ronald LaFleche, the company's former majority shareholder.[2] Id. ¶ 51. The settlement provided that Computrex, notwithstanding its insolvency, would repurchase Ronald LaFleche's shares and forgive his outstanding debt. Id. ¶¶ 56-57, 59-61. These terms were formally approved on September 6, 2000 and finalized on September 14, 2000. Id. ¶¶ 56, 59.

Award of improper bonuses. On December 1, 2000, Computrex directors awarded bonuses to Edward Lindquist ("Lindquist") and Milton Collins ("Collins"), then the company's chief executive officer and chief operating officer, respectively. Id. ¶ 65. The bonuses -- which were awarded and accepted despite "knowledge of the Debtor's true financial condition" -- "were based in large part on false or inflated revenues." Id. ¶ 66. In July and August 2001, Lindquist and Collins were awarded second, more sizable bonuses "for the orchestrated spin-off of [the company's logistics division]." Id. ¶ 104.

Distribution and receipt of unlawful shareholder dividends. From August 1997 to December 1999 -- a period of "severe financial difficulties" -- Computrex directors approved the payment of several cash dividends, which Brown and LaFleche received as individual and joint[3] shareholders. Id. ¶ 112. In addition, on March 10, 2001, the company distributed a stock dividend, issuing one share of stock in its spin-off companies for each share of Computrex stock. Id. ¶¶ 87, 112.

Consent to counsel's dual representation. By memorandum dated January 16, 2001, company counsel Ogden Newell & Welch disclosed that a "real conflict"

---

[2] Ronald LaFleche is also the co-founder of Computrex, Trustee's Compl. ¶ 19, and the father of defendant Treffle LaFleche.

[3] As Brown testified at trial, she and LaFleche are husband and wife.

could arise from its representation of both Computrex and its spin-off company.  Id. ¶ 80, Ex. 13 (Mem. of 1/16/01).  Counsel advised that the companies' "financially precarious position[s]" could "imperil[]" the intended loan from Computrex to its spin-off, rendering their interests adverse.  Mem. of 1/16/01 at 1.  Notwithstanding counsel's advice that one of the parties "secure [separate] transactions counsel," id. at 3, Computrex directors opted not to do so.  See Trustee's Compl. ¶ 81.

Spin-off of the logistics division.  Preparations for the spin-off of the logistics division began in early September 2000.  Id. ¶ 58.  In memoranda transmitted on December 14, 2000 and January 5, 2001, Computrex officers Lindquist and Collins urged Brown and LaFleche to consider the "benefits of executing the spin off," id. ¶ 76, Ex. 11 ("Project Merlin" Mem.), and to select spin-off from among the company's "alternative strategic directions," id. ¶ 79, Ex. 12 (Draft Discussion Mem.).  The company's directors, in spite of foreseeable "'fraudulent conveyance' claims," "Project Merlin" Mem., section II(C), apparently agreed.  On March 10, 2001, Computrex spun off its logistics and technology divisions, issuing one share of stock in Computrex International, Inc. ("International") and CX-IT, Inc. ("CX-IT") for each share of Computrex stock.  Trustee's Compl. ¶¶ 87-88.

Based on the above, the Trustee's counts against Brown and LaFleche allege breaches of fiduciary duty (Counts I and II), fraudulent conveyances (Count IV), violations of the Racketeer Influenced and Corrupt Organization Act, 18 U.S.C. § 1962 (Count V), negligence (Count VI), liability for the return of dividends (Count VIII), and fraud (Count IX).

## 2.    Request for Coverage

By letter dated February 6, 2004, Brown and LaFleche provided National Union with timely notice of the Trustee's Complaint.  See Pls.' Compl. ¶ 16; Trial Ex. 3 (Letter from Kelly

5

to National Union of 2/6/04) ("Kelly Letter"); Policy, cl. 7.

Brown and LaFleche sought coverage, including the assumption of

their defense, as provided under Clause 8 of the Policy.  Kelly

Letter at 1.  Clause 8, titled "DEFENSE COSTS, SETTLEMENTS, [AND]

JUDGMENTS," provides, in relevant part:

> The Insurer does not assume any duty to defend. The Insureds shall defend and contest any Claim made against them.
>
> Notwithstanding the foregoing, the Insureds shall have the right to tender the defense of the Claim to the Insurer, which right shall be exercised in writing by the Named Entity on behalf of all Insureds to the Insurer pursuant to the notice provisions of Clause 7 of this policy [requiring appropriate notice "as a condition precedent to the obligations of the Insurer"].  . . .
>
> When the insurer has not assumed the defense of a Claim pursuant to this Clause 8, the Insurer shall advance nevertheless, at the written request of the Insured, Defense Costs prior to the final disposition of a Claim.  Such advanced payments by the Insurer shall be repaid to the Insurer by the Insureds or the Company, severally according to their respective interests, in the event and to the extent that the Insureds or the Company shall not be entitled under the terms and conditions of this policy to payment of such Loss.
>
> **The Insureds shall not admit or assume any liability, enter into any settlement agreement, stipulate to any judgment, or incur any Defense Costs without the prior written consent of the Insurer.  Only those settlements, stipulated judgments and Defense Costs which have been consented to by the Insurer shall be recoverable as Loss under the terms of this policy. The Insurer's consent shall not be unreasonably withheld, provided that the Insurer, when it has not assumed the defense of a Claim pursuant to this Clause 8, shall be entitled to effectively associate in the defense and the negotiation of any settlement of any**

6

> **Claim, and provided further that in all events the**
> **Insurer may withhold consent to any settlement,**
> **stipulated judgment or Defense Costs, or any portion**
> **thereof, to the extent such Loss is not covered under**
> **the terms of this policy.**

Policy, cl. 8.

National Union denied the Plaintiffs' request, invoking the

exclusion from coverage set forth in Endorsement 8.  Pls.' Compl.

¶¶ 17-18.  Endorsement 8, titled "PRIOR ACTS EXCLUSION,"

provides:

> In consideration of the premium charged, it is hereby
> understood and agreed that the Insurer shall not be
> liable to make any payment for Loss arising from any
> Claim(s) alleging Wrongful Act(s) which occurred prior
> to the inception date of the Policy Period or after the
> end of the Policy Period.  This policy only provides
> coverage for Loss arising from a Claim(s) for an
> alleged Wrongful Act(s) occurring on or after the
> inception date of the Policy Period and prior to the
> end of the Policy Period and otherwise covered by this
> policy.  Loss(es) arising out of the same or Related
> Wrongful Act(s) shall be deemed to arise from the first
> such same or Related Wrongful Act.

Policy, Endorse. 8.  Based on his review of the Trustee's

Complaint, National Union's Complex Claims Director, John F.

Varley, III ("Varley"), determined that the alleged wrongful acts

were alternatively prior acts -- that is, wrongful acts which

"occurred prior to the inception date of the Policy" -- or

"Related Wrongful Acts" -- that is, acts which were the "same"

as, "related" to, or "continuous" with prior acts, or which

"ar[o]se from a common nucleus of facts."  Trial Ex. 5 (Letter

from Varley to Kelly, Brittain, and Russell of 4/5/04) ("Varley

Letter") at 2 (quoting Policy, cl. 2, Endorse. 8).  "As such,"
Varley reasoned, "there can be no coverage for the Claim."[4]  Id.

## B.    Procedural Posture

The Plaintiffs initiated the present diversity action on
April 5, 2004.  See Pls.' Compl.  National Union, pursuant to an
assented-to extension, filed its answer on May 10, 2004. [Doc.
Nos. 4-5].  The Plaintiffs moved for summary judgment the
following day. [Doc. No. 6].

The Court, after hearing oral argument on June 21, 2004,
denied the motion, instructing the parties to prepare for trial
to commence the following week.  See Clerk's Note of 6/21/04.
The evidence presented at the subsequent bench trial included the
testimonies of Brown, LaFleche, and Varley.  Brown and LaFleche
essentially confirmed that each was a director during the periods
described by the Trustee's Complaint and was covered by the
Policy.  Varley, testifying for National Union, explained its
denial of benefits in greater detail.  Varley maintained that
neither of the conditions precedent to coverage had been met:
Although counsel for the Trustee had provided National Union with
a copy of the Trustee's Complaint, see Trial Ex. 6 (Letter from

---

[4] Varley also made passing reference to the exclusions
provided for claims "arising out of, based upon or attributable
to": "the gaining in fact of any [unlawful] profit or advantage"
or "the committing of any criminal, fraudulent or dishonest act."
See Varley Letter at 2-3 (quoting Policy, cl. 4).  Because
National Union has offered no further argument or evidence
regarding these exclusions, the Court declines to address them.

Ingram to Varley of 3/3/04), it had not "tender[ed] the defense."
See Policy, cl. 8. Nor did the Trustee's Complaint reveal a
"reasonable potential for coverage." Rather, the Trustee's
Complaint alleged a series of "Related Wrongful Acts," each of
which, in the Trustee's words, "raided the . . . coffers" of a
failing company, Trustee's Compl. ¶ 121. Because losses arising
from related wrongful acts are "deemed to arise from the first .
. . Related Wrongful Act," and the Plaintiffs' wrongful acts
dated at least as far back as the year 2000, National Union
determined that they were excluded from coverage. See Policy,
Endorse. 8.

At the trial's conclusion, the Court expressed skepticism
regarding the Plaintiffs' purported tender of their defense.
First, the tender made by Plaintiffs' counsel clearly was not "on
behalf of all Insureds," as required by Clause 8. See Kelly
Letter at 1 (referring exclusively to Brown and LaFleche and
requesting appointment of Gadsby Hannah LLP in part because Brown
and LaFleche -- unlike each of the other defendants named in the
Trustee's Complaint -- are "residents of Massachusetts"); cf.
Pls.' Post-Trial Mem. at 26-27 (resisting joinder of the absent
insureds in part because the Plaintiffs' "prayer [regarding the
duty to defend] is entirely specific to the parties named in the
current proceeding"). Second, although the Plaintiffs urged the
Court to "eschew technical notice requirements," Pls.' Proposed

Findings at 12 (quoting <u>Johnson Controls, Inc.</u> v. <u>Bowes</u>, 381 Mass. 278, 280 (1980)) (alterations omitted), the Policy indicated that its notice requirements were more than merely technical.  Clause 8 expressly disclosed that "[t]his right shall terminate" if not exercised "pursuant to the notice provisions of Clause 7," which clause expressly characterized proper notice "as a condition precedent to the obligations of the Insurer." Policy, cls. 7-8.  Third, and most importantly, it appeared that enforcing a duty to defend would secure little additional benefit for the Plaintiffs.  The Plaintiffs wished to control their defense through retention of personal counsel, <u>see</u> Kelly Letter at 1, and the Policy, somewhat unusually for a directors' and officers' policy, <u>see</u> Pls.' Post-Trial Mem., Ex. B (The D & O Book), indicated that defense costs were to be advanced "prior to the final disposition of a Claim," Policy, cl. 8.

For these reasons, the Court requested that the parties limit further briefing to the alleged duty to advance defense costs.  <u>See</u> Defs.' Post-Trial Mem. [Doc. No. 28] at 1-2.  In addition, the parties were to address whether joinder of absent directors and officers was "[n]eeded for [j]ust [a]djudication." <u>See</u> <u>id.</u>; Fed. R. Civ. P. 19.  The Court, having considered the parties' submissions, addresses these issues below.

**III. DISCUSSION**

**A.  Joinder of Necessary Parties**

Because the Trustee's Complaint names seven other
defendants, at least some of whom are also "Individual
Insured[s]," the Court first must consider whether these persons
are "necessary" to this action under Federal Rule of Civil
Procedure 19(a).  Rule 19(a) provides that if feasible, a
personal "shall be joined as a party in the action if":

> (1) in the person's absence complete relief cannot be
> accorded among those already parties, or (2) the person
> claims an interest relating to the subject of the
> action and is so situated that the disposition of the
> action in the person's absence may (i) as a practical
> matter impair or impede the person's ability to protect
> that interest or (ii) leave any of the persons already
> parties subject to a substantial risk of incurring
> double, multiple, or otherwise inconsistent obligations
> by reason of the claimed interest.

Fed. R. Civ. P. 19(a).  National Union asserts that the absent
insureds are necessary under both of the above definitions.  See
Defs.' Post-Trial Mem. 3-4.  The Court considers each in turn.

National Union contends under Rule 19(a)(1) that it "cannot
obtain complete relief without the added directors and/or
officer[s] being joined since the parties will not be bound by
any decision in the case which favors NU's position." Id. at 3.
Its argument, however, misapprehends the nature of the relief to
be granted.  The relief sought here is not a general declaration
of National Union's duties, but rather a specific determination
of its duties to the Plaintiffs.  Pls.' Post-Trial Mem. at 26-27;
see Allstate Ins. Co. v. Daniels, 87 F.R.D. 1, 3 (D. Okl. 1978)
("Allstate brings this action for a declaratory judgment of the

11

rights and liabilities of Allstate and Phelps under the particular insurance policy involved.  Both of the parties whose rights and liabilities are to be determined herein are presently parties in this action.").  Accordingly, the absence of the other individual insureds poses no bar to according complete relief among those already parties.  <u>See</u> <u>Hill</u> v. <u>Liberty Mut. Ins. Co.</u>, 453 F. Supp. 1342, 1344 (D. Va. 1978); <u>cf.</u> <u>Royal Ins. Co. of Am.</u> v. <u>Caleb V. Smith & Son, Inc.</u>, No. 3:90CV651(WWE), 1997 WL 835058, *3 & n.3 (D. Conn. June 16, 1997) (concluding, under Rule 19(b), which "look[s] at similar issues" as Rule 19(a), that an absent insured was not indispensable because "[a]lthough allowing this action to proceed without the presence of one of the Texas defendants does not completely resolve Royal's duty to defend and indemnify, it does serve a useful purpose and fully disposes of the issue with respect to three of the Texas defendants that are parties to this action").

Under Rule 19(a)(2)(i), National Union argues that "[g]iven the limited funds available from the D&O policy," the interests of absent directors and officers may be impaired by disposition of the present action.  Defs.' Post-Trial Mem. at 6.  Although the Policy indeed defines an aggregate "Limit of Liability," Policy, Decls., the interests of absent directors and officers do not, "as a practical matter," appear impaired.  As National Union suggests, absent directors and officers may have an interest in

challenging the Plaintiffs' claims (and thus ensuring that the
Policy's limit is not "exhausted by one or two directors at the
expense of others"). See Defs.' Post-Trial Mem. at 6. This
interest, however, may be effectively asserted in a subsequent
action. The Policy expressly requires insureds to repay advanced
payments "severally according to their respective interests, in
the event and to the extent that the Insureds or the Company
shall not be entitled under the terms and conditions of this
policy to payment of such Loss." Policy, cl. 8. Alternatively,
absent directors and officers may have an interest in supporting
the Plaintiffs' claims (and thus securing the benefit of a
"favorable ruling"). See Pls.' Post-Trial Mem. at 27. But this
interest is "virtually identical" to that of the Plaintiffs.
Pujol v. Shearson Am. Express, Inc., 877 F.2d 132, 135 (1st Cir.
1989) (reasoning that a subsidiary failed to satisfy the "test"
of Rule 19(a)(2)(i) in part because its interests in the case
were "virtually identical" to those of the named defendant); see
Ace Am. Ins. Co. v. Paradise Divers, Inc., 216 F.R.D. 537, 540
(S.D. Fla. 2003) (concluding that a party was not necessary under
Rule 19(a) where he and the named defendant "share[d] the
ultimate objective of obtaining a declaration of coverage under
the insurance policy").

Turning finally to Rule 19(a)(2)(ii), National Union
suggests that the absent directors and officers subject it to a

"risk of incurring double, multiple, or otherwise inconsistent obligations." See Defs.' Post-Trial Mem. at 6. As a general matter, this Court does not disagree. Yet National Union assumed precisely this risk when it extended coverage to "each and every Director, Officer, or Employee of the Company." Policy, cl. 1. It surely was foreseeable that these individual insureds could commit multiple or inconsistent wrongful acts. See Okada v. MGIC Indem. Corp., 608 F. Supp. 383, 390 (D. Haw. 1985) (rejecting the insurer's arguments under Rule 19(a) in part because the absent "directors may have participated in different acts, requiring separate determination of coverage based on different factual allegations"), overruled on other grounds by 823 F.2d 276 (9th Cir. 1986). Thus, National Union's risk of inconsistent obligations is due not to the absence of the other directors and officers, but to the terms of its Policy.

For these reasons -- contrary to National Union's "position," Defs.' Post-Trial Mem. at 2 -- the absent directors and officers are not "'Rule 19(a) person[s]' who should be joined 'if feasible,' let alone [] Rule 19(b) 'indispensable part[ies].'" Pujol, 877 F.2d at 135. Accordingly, the Court proceeds to resolve the issues among the parties before it.

**B.    Duty to Advance Defense Costs**

14

As the Court explained at trial, to determine National
Union's duty, it must reconcile these apparently contradictory
paragraphs of Clause 8:

> When the insurer has not assumed the defense of a
> Claim pursuant to this Clause 8, the Insurer shall
> advance nevertheless, at the written request of the
> Insured, Defense Costs prior to the final disposition
> of a Claim.  Such advanced payments by the Insurer
> shall be repaid to the Insurer by the Insureds or the
> Company, severally according to their respective
> interests, in the event and to the extent that the
> Insureds or the Company shall not be entitled under the
> terms and conditions of this policy to payment of such
> Loss.
>
> **The Insureds shall not admit or assume any
> liability, enter into any settlement agreement,
> stipulate to any judgment, or incur any Defense Costs
> without the prior written consent of the Insurer.  Only
> those settlements, stipulated judgments and Defense
> Costs which have been consented to by the Insurer shall
> be recoverable as Loss under the terms of this policy.
> The Insurer's consent shall not be unreasonably
> withheld, provided that the Insurer, when it has not
> assumed the defense of a Claim pursuant to this Clause
> 8, shall be entitled to effectively associate in the
> defense and the negotiation of any settlement of any
> Claim, and provided further that in all events the
> Insurer may withhold consent to any settlement,
> stipulated judgment or Defense Costs, or any portion
> thereof, to the extent such Loss is not covered under
> the terms of this policy.**

Policy, cl. 8.  The Plaintiffs maintain that the first of these
paragraphs "is unambiguous and unequivocal" in imposing a duty to
advance defense costs.  Pls.' Post-Trial Mem. at 17.  In
response, National Union emphasizes that "the first paragraph
does not stand alone."  Defs.' Post-Trial Mem. at 10.  Rather,
under the second paragraph, National Union may decline to advance

15

defense costs where -- as here -- the "Loss is not covered under the terms of this policy." Id. at 10.  The Court examines these arguments below, pausing first to survey directors' and officers' insurance more generally.

### 1.  Directors' and Officers' Insurance

Historically, directors' and officers' liability policies have not imposed a "duty to defend."  Pls.' Post-Trial Mem., Ex. C. (Joseph P. Monteleone & Nicholas J. Conca, Directors & Officers Indemnification and Liability Insurance, 51 Bus. Law. 573 (1996)) at 593.  As commentators have explained, "the policies were intended to cover the very 'brain trust' of the corporation and these individuals did not wish to have such delicate matters as their personal defense left to the control of an insurance company."  Id.  Rather than a "duty to defend," then, directors' and officers' policies typically impose a "duty to pay" -- that is, to advance or reimburse defense costs.  Pls.' Post-Trial Mem., Ex. A (Dan L. Goldwasser & Alan A. Harley, Directors' and Officers' Liability Insurance) § 12A.05[7][A]. This feature of directors' and officers' policies has had two consequences of note.  First, it has encouraged insurers to specify the timing of payments, with most insurers providing for payment only after resolution of the claim.  See id. § 12A.05[C]; Monteleone & Conca, supra, at 593 ("While under the 'duty to defend' language it is relatively clear that the duty . . . [is]

16

to pay for the defense expenses as they are rendered and billed,
the issue in D&O policies is whether that obligation exists or
whether the obligation to pay arises only after the claim matter
is concluded."). Second, it has required insurers to "reimpose"
control over costs, often through consent provisions, which limit
covered losses to defense costs incurred with the insurer's
consent. Goldwasser & Harley, <u>supra</u>, § 12A.05[7][a][ii].

## 2. The Policy

As is typical of directors' and officers' insurance,
National Union's Policy expressly disclaims a duty to defend.
<u>See</u> Policy, cl. 1. Somewhat unusually, though, the Policy also
provides that National Union "shall advance nevertheless . . .
Defense Costs prior to the final disposition of a Claim." <u>Id.</u>,
cl. 8; <u>see</u> The D & O Book, <u>supra</u> ("Some policies, however, do
contain an affirmative promise by an insurer to provide
contemporaneous reimbursement or payment on behalf of an insured.
Such a promise is highly desirable . . . ."). At trial, the
Plaintiffs argued that the foregoing language imposed an
"absolute duty." <u>See</u> Pls.' Post-Trial Mem. at 17. The Court was
not persuaded.

Were the Court to adopt the Plaintiffs' interpretation, it
would effectively "read out" the accompanying consent provision.
The Plaintiffs contend that this result is nevertheless
appropriate because "this Court should construe the Policy

17

against the Defendants." Pls.' Post-Trial Mem. at 20; <u>see</u>

<u>Brotherhood of R.R. Trainmen</u> v. <u>Wilkins</u>, 78 S.W.2d 6, 8 (Ky. App.

1935). As the Plaintiffs suggest, Kentucky's[5] general principles

of contract construction provide that ambiguous terms "will be

construed strictly against the insurer and liberally in favor of

the insured." <u>Wilkins</u>, 78 S.W.2d at 8. The Kentucky Court of

Appeals has cautioned, however, that these principles "do not

authorize courts to disregard plain, unambiguous, and easily

understood terms or provisions of a contract exempting the

insurer from liability under certain conditions." <u>Id.</u>

Nor is the Court convinced that the concerns motivating the

consent provision are "unwarranted" here. Pls.' Post-Trial Mem.

at 22. Although the Plaintiffs must eventually repay the

advances if their losses are not covered, <u>id.</u> (citing Policy, cl.

8), the value of such repayments is necessarily diminished by the

---

[5] Although it does not explicitly contest the issue, National Union cites a decision of the Massachusetts Appeals Court in its post-trial memorandum, perhaps suggesting that Massachusetts law ought apply. <u>See</u> Defs.' Post-Trial Mem. at 11 (citing <u>Sterlite Corp.</u> v. <u>Cont'l Cas. Co.</u>, 17 Mass. App. Ct. 316, 318 (1983)). Massachusetts has adopted a "functional" choice-of-law approach "explicitly guided by the Restatement (Second) of Conflict of Laws (1971)." <u>Clarendon Nat. Ins. Co.</u> v. <u>Arbella Mut. Ins. Co.</u>, 60 Mass. App. Ct. 492, 496 (2004) (citing, <u>inter alia</u>, <u>Bushkin Assocs., Inc.</u> v. <u>Raytheon Co.</u>, 393 Mass. 622, 631 (1985)). Section 193 of the Restatement, which governs "various kinds of casualty insurance, such as . . . liability insurance," Restatement, <u>supra</u>, § 193 cmt. a, generally directs courts to the "state which the parties understood was to be the principal location of the insured risk." <u>Id.</u> § 193. Accordingly, the Court applies the law of Kentucky, the state in which Computrex had its principal place of business.

passage of time.  <u>See</u> Monteleone & Conca, <u>supra</u>, at 596 ("Claim

matters, particularly in the professional liability area,

oftentimes are not concluded by settlement, dismissal, or a final

adjudication until years after their inception.").  In addition,

if National Union were obligated to advance all costs, subject

only to an ultimate right of repayment, then it could not

"address the reasonableness of the costs incrementally," Pls.'

Mem. at 8.  It would thus be denied a primary benefit of

advancing rather than reimbursing defense costs.  <u>See</u> Monteleone

& Conca, <u>supra</u>, at 596 ("It has been common experience that

parties become more intransigent as more money is at issue.").

For these reasons, the Court declines to adopt the

interpretation urged by the Plaintiffs.  The Court instead

applies the construction suggested by National Union: that it

assumes a duty to advance defense costs only if the claim

suggests a "reasonable potential for coverage."  <u>See</u> Policy, cl.

8 (permitting National Union to "withhold consent to . . .

Defense Costs, or any portion thereof, to the extent such Loss is

not covered under the terms of this policy").  This reading,

offered by Varley at trial, better accommodates the cited

paragraphs of Clause 8, appropriately "giving effect" to both the

duty and the consent provisions.  <u>See</u> <u>City of Louisa</u> v. <u>Newland</u>,

705 S.W.2d 916, 919 (Ky. 1986).

19

This does not end the Court's inquiry, however.  To the contrary, the Court must now determine whether the Trustee's Complaint suggests "a reasonable potential for coverage."  As noted above, Kentucky law requires that insurance policies "be liberally construed and any doubts resolved in favor of the insured."  State Farm Mut. Auto. Ins. Co. v. Shelton 413 S.W.2d 344, 347 (Ky. App. 1967).  In addition, "exceptions and exclusions should be strictly construed so as to make insurance effective."  State Auto. Mut. Ins. Co. v. Trautwein, 414 S.W.2d 587, 589 (Ky. App. 1967).

Here, the exclusion on which National Union relies is broad, but not boundless.  National Union must demonstrate that each of the wrongful acts alleged during the policy period is related to a prior wrongful act -- that is, that the acts are "the same, related or continuous" or "arise from a common nucleus of facts." Policy, cl. 2(p).  Although these terms might otherwise be "liberally construed," they have been more strictly interpreted when used to define exclusions from coverage.  See Kentucky School Bds. Ins. Trust v. Bd. of Educ., No. 2002-CA-001748-MR, 2003 WL 22520018, *8 (Ky. App. Nov. 7, 2003) (agreeing with the insured's position that "'when a policy's general coverage or insuring clause uses terms like 'arising out of' and 'based upon,'' we must liberally construe those terms," but "when exclusionary provisions are at issue we must narrowly construe

20

those terms to accomplish the same controlling purpose of

rendering insurance effective" (citation omitted)); see also St.

Paul Fire & Marine Ins. Co. v. Chong, 787 F. Supp. 183, 187-88

(D. Kan. 1992) ("Because the court finds that the term 'related'

and the phrase 'series of related wrongful acts' are ambiguous,

the court will construe the policy in the way most favorable to

the insured.  The court therefore finds that the term 'related'

as used in the policy at issue should be defined solely in terms

of causation."  (citation omitted)); Arizona Prop. & Cas. Ins.

Guar. Fund v. Helme, 735 P.2d 451, 456 (Ariz. 1987) ("We do not

believe that the word 'related' as used in the policy can be

equated with the phrase 'logical connection.'  Logic, like

beauty, is in the eye of the beholder and greatly depends upon

the subjective mental process of the reviewer."); cf. Bay Cities

Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co., 855 P.2d

1263, 1275 (Cal. 1993) (declining to limit "related" to causally

related acts, but noting that "[a]t some point, a relationship

between two claims, though perhaps 'logical,' might be so

attenuated or unusual that an objectively reasonable insured

could not have expected they would be treated as a single claim

under the policy").

The Court concludes that National Union has failed to meet

its "burden of proving the applicability of the exclusion."

Kentucky Sch. Bd. Ins. Trust, 2003 WL 22520018, at *9 (quoting

Bd. of Public Educ. of Sch. Dist. of Pittsburgh v. Nat'l Union
Fire Ins. Co. of Pittsburgh, 709 A.2d 910, 913 (Pa. Super. Ct.
1998)).  Two allegations -- which the Court notes as examples
only -- suggest that the wrongful acts alleged during the policy
period are not uniformly "related" to prior acts.  First, the
Trustee alleges that the Plaintiffs acquiesced in the joint
representation of Computrex and its spin-offs, notwithstanding
counsel's clearly disclosed conflict of interest.  See Trustee's
Compl. ¶¶ 80-81.  Yet corporate counsel did not disclose this
conflict until January 16, 2001, approximately two weeks after
the effective date of the Policy.  Moreover, counsel's memorandum
suggested that the conflict had not yet materialized: "[It is]
reasonably foreseeable that in the future the interests of Newco
and Computrex may become adverse, or at least somewhat
incompatible."  Mem. of 1/16/01, at 1.  Thus, the Trustee's
Complaint suggests that the alleged negligent act -- Plaintiffs'
failing to "seek separate counsel" or to "request that its
counsel cease representation of what would become the new
corporation," Trustee's Compl. ¶ 81 -- occurred after disclosure
of the conflict and during the Policy period.

Second, the Trustee alleges wrongful acts related to the
"orchestrated spin-off" of International and CX-IT.  See, e.g.,
id. ¶¶ 58,76, 79, 87-88, 104.  At trial, National Union suggested
that each of these acts was broadly "related" to the "Project

22

Merlin" memorandum transmitted to the Plaintiffs on December 14, 2000.  See id. ¶ 76; "Project Merlin" Mem.  Because "exceptions and exclusions should be strictly construed," Shelton, 413 S.W.2d 344, 347, however, this Court must examine the allegations with greater care.  Closer inspection of the "Project Merlin" memorandum reveals that the spin-off was, at that time, merely "[r]ecommended."  "Project Merlin" Mem., Part II.  Indeed, in the follow-up memorandum dated January 5, 2001, Lindquist and Collins urged the directors "to set a time to discuss in detail the strategic alternatives [including spin-off] presented in this document."  Draft Discussion Mem. at 8.  It appears, then, that the Plaintiffs -- whose actions must be examined independently of Lindquist's and Collins's, cf. Policy, cl. 4 -- took no action regarding spin-off until after receipt of the follow-up memorandum.  Because this occurred during the Policy period, the Court concludes that these alleged wrongful acts fall outside the scope of the prior acts exclusion.

Accordingly, the Court concludes that at least some of the wrongful acts alleged by the Trustee present a "reasonable potential for coverage."  Under National Union's interpretation of the Policy, it therefore has a duty to advance defense costs, subject to its ultimate right of repayment.

**IV.  CONCLUSION**

For the foregoing reasons, the Court DECLARES that National Union has a duty to advance defense costs to the Plaintiffs prior to the final disposition of the Trustee's Complaint.  Consistent with commercial practice, the parties are to allocate defense costs to potentially covered claims by negotiation.  See § 12A.05[7][D].

SO ORDERED.

                                   /s/ William G. Young
                              _____
                              WILLIAM G. YOUNG
                              CHIEF JUDGE